KEKER, VAN NEST & PETERS LLP
R. JAMES SLAUGHTER - # 192813
rslaughter@keker.com
BROOK DOOLEY - # 230423
bdooley@keker.com
JULIA ALLEN - # 286097
jallen@keker.com
CODY GRAY - # 310525
cgray@keker.com
GAVIN THOLE - # 325713
gthole@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant/Counterclaimant
INFOR (US), LLC (F/K/A INFOR (US), INC.)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BRAD PETERS, DAVID GRAY, AND PAUL STAELIN<br><br>Plaintiffs,<br><br>v.<br><br>INFOR (US), LLC (F/K/A INFOR (US), INC.),<br><br>Defendant. | Case No. 3:19-cv-08102-JCS<br><br>**INFOR (US), LLC'S NOTICE OF MOTION AND *DAUBERT* MOTION TO STRIKE THE EXPERT REPORTS OF WILLIAM PARTIN, PAUL C. PINTO, AND PORTIONS OF THE EXPERT REPORT OF DAVID TABER, AND TO EXCLUDE OPINIONS AND TESTIMONY AT TRIAL, PURSUANT TO FED. R. EVID. 702** |
| INFOR (US), LLC (F/K/A INFOR (US), INC.)<br><br>Counterclaimant,<br><br>v.<br><br>BRAD PETERS, DAVID GRAY, AND PAUL STAELIN,<br><br>Counter-Defendants. | Date:         December 17, 2021<br>Time:         2:00 pm<br>Conference by Zoom<br>Judge:        Hon. Joseph C. Spero<br><br>Date Filed:   December 11, 2019<br><br>Trial Date:   April 4, 2022 |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................2

I.      INTRODUCTION AND BACKGROUND .................................................................2

II.     LEGAL STANDARD.................................................................................................4

III.    ARGUMENT ..............................................................................................................4

     A.    Mr. Partin's opinions and calculations regarding Bookings and the
        Plaintiffs' earnout bonuses should be excluded in their entirety. ...........................4

        1.    Mr. Partin's methodology is contrary to the clear language of the
            Offer Letters.............................................................................................6

            a.    Contrary to the Offer Letters, Mr. Partin failed to limit
                Bookings to the "portion of subscription fees payable under
                a contract that are attributable to the Birst Offerings."....................6

            b.    Contrary to the Offer Letters, Mr. Partin attributes Bookings
                credit to Birst Offerings that were given away for free. .................8

        2.    Mr. Partin's methodology relies on a series of unsupported
            assumptions................................................................................................9

            a.    Contrary to the undisputed facts, Mr. Partin assumes that
                B4CS was included in every sale of a CloudSuite and that
                every CloudSuite customer was provisioned with B4CS. .............10

            b.    Contrary to the facts, Mr. Partin adopts Mr. Taber's opinion
                that the list price of B4CS is equivalent to Birst's more
                robust Birst Enterprise product. ....................................................12

        3.    Mr. Partin errs in his calculation of the "aggregate discount"
            applied to determine Bookings attributable to Birst Offerings.................13

        4.    Mr. Partin's conclusions demonstrate the unreliability of his
            methods.....................................................................................................14

     B.    Mr. Pinto's opinions should be excluded in their entirety. ....................................16

        1.    Mr. Pinto's recitation of background facts is inadmissible........................17

        2.    Mr. Pinto's source code analysis lacks any methodology. ........................17

        3.    Mr. Pinto's opinion that the "Birst component of Birst for
            CloudSuite" is a "product or service" is unsupported by fact or
            analysis, and he abandoned this opinion at his deposition........................18

     C.    Summary Opinions 1.a, 1.c, and 1.f of the Taber Report, and Mr. Taber's
        related opinions and testimony, should be excluded. .............................................19

1.     Mr. Taber is not qualified to give the opinion at § 1.a, nor does he have any factual basis for offering it.............................................................20

2.     Mr. Taber's opinion on list price is contrary to the underlying facts. .......21

3.     Mr. Taber's opinion at § 1.f is an inadmissible legal conclusion. .............24

IV.      CONCLUSION.................................................................................................25

1751710

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aerojet Rocketdyne, Inc. v. Glob. Aerospace, Inc.*,
  2021 WL 1839695 (E.D. Cal. May 7, 2021) ..........................................................................19

*Al Otro Lado v. Mayorkas*,
  2021 WL 3929673 (S.D. Cal. Sept. 2, 2021) ....................................................................11, 21

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
  2012 WL 2571332 (N.D. Cal. June 30, 2012) .................................................................... 6, 8

*Bank of N.Y. Mellon Tr. Co., N.A. v. Solstice ABS CBO II, Ltd.*,
  910 F. Supp. 2d 629 (S.D.N.Y. 2012) ..................................................................... 6, 8, 9, 25

*Bldg. Indus. Ass'n of Wash. v. Wash. St. Bldg. Code Council*,
  683 F.3d 1144 (9th Cir. 2012) ............................................................................................... 9

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) ...................................................................................................... 9

*Cholakyan v. Mercedes-Benz, USA, LLC*,
  281 F.R.D. 534 (C.D. Cal. 2012) .........................................................................................21

*Chung v. Washington Interscholastic Activities Ass'n*,
  No. 3:19-cv-05730, Dkt. No. 88 (W.D. Wash. May 18, 2021) .............................................. 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ............................................................................................................1, 4

*General Electric Co. v. Joiner*,
  522 U.S. 136 (1997) ...........................................................................................................4, 15

*Goldstine v. FedEx Freight Inc.*,
  2020 WL 5500369 (W.D. Wash. Sept. 11, 2020) .................................................................. 6

*Guidroz-Brault v. Mo. Pac. R. Co.*,
  254 F.3d 825 (9th Cir. 2001) ............................................................................................9, 11

*Heller v. Shaw Indus., Inc.*,
  167 F.3d 146 (3d Cir.1999) ..................................................................................................15

*In re Incretin-Based Therapies Prod. Liab. Litig.*,
  524 F. Supp. 3d 1007 (S.D. Cal. 2021) ................................................................................13

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................................................... 4

*Lang v. Kohl's Food Stores, Inc.*,
   217 F.3d 919 (7th Cir. 2000) ................................................................20

*Lust v. Merrell Dow Pharms., Inc.*,
   89 F.3d 594 (9th Cir. 1996) ..................................................................4

*Newkirk v. ConAgra Foods, Inc.*,
   727 F. Supp. 2d 1006 (E.D. Wash. 2010) ......................................17, 20

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3rd Cir. 2000) ...............................................................15

*Oliver v. Sweetwater Un. High Sch. Dist.*,
   768 F.3d 843 (9th Cir. 2014) ............................................................9, 11

*Otto v. LeMahieu*,
   2021 WL 1615311 (N.D. Cal. Apr. 26, 2021) .......................................11

*Pac. Fuel Co., LLC v. Shell Oil Co.*,
   2008 WL 11336467 (C.D. Cal. Jan. 24, 2008) ......................................4

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir.1994)....................................................................14

*In re Silicone Gel Breast Implants Prod. Liab. Litig.*,
   318 F. Supp. 2d 879 (C.D. Cal. 2004) .................................................14

*Stein v. Pac. Bell*,
   2007 WL 831750 (N.D. Cal. Mar. 19, 2007).....................................20, 23

*Stop Staring! Designs v. Tatyana, LLC*,
   2012 WL 12883613 (C.D. Cal. Sept. 13, 2012) ................................20, 23

*Tyger Const. Co. Inc. v. Pensacola Const. Co.*,
   29 F.3d 137 (4th Cir. 1994) ...................................................................9

*United States v. Hankey*,
   203 F.3d 1160 (9th Cir. 2000) ...............................................................4

*United States v. W.R. Grace*,
   504 F.3d 745 (9th Cir. 2007) ...............................................................17

*In re Viagra and Cialis Products Liability Litig.*,
   424 F. Supp. 3d 781 (N.D. Cal. 2020) ..............................................4, 18

*Villalpando v. Exel Direct Inc.*,
   161 F. Supp. 3d 873 (N.D. Cal. 2016) ..................................................25

**Rules**

Fed. R. Evid. 403 ........................................................................................4

Fed. R. Evid. 702 ................................................................................................................... *passim*

INFOR (US), LLC'S NOTICE OF MOTION AND DAUBERT MOTION
Case No. 3:19-cv-08102-JCS

1751710

1

## **NOTICE OF MOTION**

2       **PLEASE TAKE NOTICE THAT** on Friday, December 17, 2021 at 2:00 p.m., or as

3   soon thereafter as the matter may be heard, in the United States District Court for the Northern

4   District of California, San Francisco Division, Courtroom F, located at 450 Golden Gate Avenue,

5   San Francisco, California 94102 before the Honorable Joseph C. Spero, Defendant Infor (US),

6   LLC ("Infor") will and hereby does move this Court for an order to exclude Plaintiffs' expert

7   reports, opinions, and testimony. Specifically, Infor moves to strike and exclude the opinions and

8   calculations regarding Bookings and Plaintiffs' earnout bonuses contained in the Opening,

9   Rebuttal, and Supplemental Reports of William Partin, the reports, opinions, and testimony of

10  Mr. Paul C. Pinto in their entirety, and certain identified portions of the expert report, opinions,

11  and testimony of Mr. David Taber. Infor's motion is brought pursuant to Fed. R. Evid. 702 and

12  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

13       This motion is based on this Notice of Motion and Motion, the following Memorandum of

14  Points and Authorities, the Declarations of Brook Dooley and Nicholas R. Green filed herewith,

15  the Declaration of Gretchen D'Amico filed in support of Infor's contemporaneously submitted

16  Motion for Partial Summary Judgment, all other pleadings and papers on file or to be filed in the

17  above-entitled action, the arguments of counsel, and any other matters that may properly come

18  before the Court for its consideration.

19

20

21

22

23

24

25

26

27

28

1751710

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.      INTRODUCTION AND BACKGROUND**

3        The Court is familiar with the background of this case, provided in more detail in

4   Defendants' concurrently filed motion for summary judgment. Briefly, Plaintiffs were the co-

5   founders and senior leaders of Birst, a company that made and sold business intelligence

6   software. In 2017, Infor acquired Birst for $75 million (the "Acquisition"). Following the

7   Acquisition, Plaintiffs were hired by Infor to work in its new Birst business unit. This lawsuit

8   arises out of Plaintiffs' meritless claims that they are entitled to astronomical "earnout" bonuses

9   under the terms of their Offer Letters from Infor.

10       Plaintiffs were eligible for earnout bonuses, but only if "Bookings" of "Birst Offerings"

11  exceeded $18 million in Fiscal Year 2018 ("FY18") and $21 million in Fiscal Year 2019

12  ("FY19"). *See* Ex. 1, Ex. 2, Ex. 3.[1] The Offer Letters define a "Booking" as "ACV [annual

13  contract value] from subscriptions to the Birst Offerings that are Contracted in the applicable

14  fiscal year[.]" *See id.* Bookings are "Contracted" when "the written contract or order forms have

15  been duly executed by all parties *and* subscription revenue recognition in accordance with GAAP

16  and Infor's revenue recognition policies has commenced." *Id.* (emphasis added). "The amount of

17  any Booking shall include only that portion of the subscription fees payable under a contract that

18  are attributable to the Birst Offerings." *Id*. A "Birst Offering" is defined as a product or service

19  "offered, licensed, provided, sold, distributed or otherwise exploited by Birst at the time of the

20  Acquisition and any and all products or services already designed and developed by or for Birst at

21  the time of the Acquisition." *Id.*

22       Prior to the Acquisition, Birst offered two core products: the robust, full-featured Birst

23  Enterprise ("BE") and the more limited Birst Professional ("BP"). After the acquisition, Infor and

24  Birst created a new product—Birst for CloudSuite ("B4CS")—that combined limited Birst

25  analytics with Infor content. B4CS was only available as part of Infor's CloudSuite products—it

26  ───────────────

27  [1] Throughout this brief, **(1)** Exs. 1-13 refers to exhibits attached to the Declarations of Brook
Dooley and Exs. 14-30 are attached to the Declaration of Nicholas R. Green **(2)** "Infor" refers to
defendant Infor (US), LLC," **(3)** "Rule" refers to a Federal Rule of Evidence; and **(4)** emphases

28  were added to quotations, while internal alterations, punctuation, footnotes, and citations were
omitted from them.

was never sold individually. B4CS had a limited set of features and capabilities, less robust even than those offered in BP. Infor's goal with B4CS was to give its customers a sample of Birst capabilities and then to sell them more capable—and more expensive—BE software.

Plaintiffs now claim that Infor substantially undervalued Bookings attributable to Birst Offerings sold in FY18 and FY19. The core of the parties' dispute is whether B4CS is a "Birst Offering" entitled to Booking credit at all, and, if so, what list price to impute to B4CS (since it was never actually sold separately from Infor's CloudSuites) and how to tabulate B4CS Bookings. Plaintiffs' experts attempt to address these issues from various angles.

Two of Plaintiffs' experts—William Partin and Paul C. Pinto—are wholly unreliable. Mr. Partin is Plaintiffs' damages expert. His methodology is unreliable and based on assumptions that are unsupported, contrary to undisputed facts, and, in some cases, contrary to the plain language of the Offer Letters. Indeed, Mr. Partin admits that his faulty assumptions lead to wildly implausible results. To take one example, his methodology and assumptions generate an assumed "list price" for B4CS of ███████—more than Infor paid for Birst in the Acquisition. Mr. Partin's opinions and calculations regarding Bookings and Plaintiffs' earnout bonuses should be excluded in their entirety.

Mr. Pinto is a source code expert who Plaintiffs present presumably to support their argument that B4CS is a "Birst Offering," even though it was designed and developed after the Acquisition. Mr. Pinto's analysis, however, is essentially devoid of citations to any actual source code, and he fails to tie his purported methodology to his sweeping conclusions. Mr. Pinto's opinions should be excluded in their entirety.

Plaintiffs' third expert, David Taber, is purportedly an industry expert. He offers a hodgepodge of opinions. While none of Mr. Taber's opinions could aid the trier of fact, Infor moves now to exclude three particularly egregious examples: (1) Mr. Taber's opinion regarding Birst's source code (he is not qualified), (2) his opinion that software given away for free is a sale under the terms of the Offer Letters (improper legal opinion and contrary to the plain meaning of the Offer Letters), and (3) his opinion about the appropriate list price for B4CS (devoid of underlying factual or methodological support).

## II.     LEGAL STANDARD

The proponent of expert testimony "has the burden of proving admissibility." *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). "[I]n cases involving non-scientific testimony a trial court is not limited to the [traditional] *Daubert* factors but has broad discretion in determining reliability." *Pac. Fuel Co., LLC v. Shell Oil Co.*, 2008 WL 11336467, at *2 (C.D. Cal. Jan. 24, 2008) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150–51 (1999)). Courts are free to consider, among other factors: (1) whether the expert's opinion is actually based on some kind of specialized knowledge; (2) whether the expert opinion would "assist the trier of fact in understanding the evidence"; (3) whether the expert has appropriate qualifications "on that subject matter"; (4) whether the expert's testimony is relevant and reliable; (5) whether the expert's methodology "fits" the expert's conclusions; and (6) whether the probative value of the expert's testimony is outweighed by the risk of unfair prejudice under Rule 403. *See United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (collecting cases). In determining reliability, courts may also assess whether "there is simply too great an analytical gap between the data and the opinion proffered." *In re Viagra and Cialis Products Liability Litig.*, 424 F. Supp. 3d 781, 790 (N.D. Cal. 2020) (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)). In other words, "both unsound methods and unjustified extrapolations from existing data can require the exclusion of an expert's testimony." *Id.*

## III.     ARGUMENT

### A.     Mr. Partin's opinions and calculations regarding Bookings and the Plaintiffs' earnout bonuses should be excluded in their entirety.

Plaintiffs retained William Partin to opine on "bonuses and related damages" arising out of Infor's alleged breach of the terms of Plaintiffs' Offer Letters. *See* Ex. 14 at 1. Mr. Partin has offered two calculations of Bookings from subscriptions to Birst Offerings in FY18 and FY19 and two corresponding calculations of Plaintiffs' earnout bonuses. His first calculation, contained in his September 9, 2021 Opening Report estimates total Bookings of $46.7 million in FY18 and $139.8 million in FY19, yielding earnout bonuses of $43.3 million for Mr. Peters, $12.7 million for Mr. Staelin, and $14.5 million for Mr. Gray. *Id.* at 16–17. On October 18, 2021—ten days

1    after he served a Rebuttal Report—Plaintiffs served a Supplemental Report from Mr. Partin that

2    lowered his Bookings estimates to $20 million in FY18 and $77.1 million in FY19, yielding

3    correspondingly lower estimates of Plaintiff's earnout bonuses.[2]

4         Mr. Partin's opinions and calculations are fatally flawed in the following respects: *First*,

5    his assumptions and methodology are contrary to the clear, unambiguous language of the Offer

6    Letters. Mr. Partin assumes that Plaintiffs are entitled to Bookings credit when Infor gave Birst

7    Offerings away for free, contrary to the Offer Letters' definition of Booking as "*subscription fees*

8    applicable to Birst Offerings *payable under a contract"* for which "subscription revenue

9    recognition in accordance with GAAP and Infor's revenue recognition policies has commenced."

10   Mr. Partin also fails to ensure that the "[t]he amount of any Booking . . . include only that portion

11   of the subscription fees payable under a contract that are attributable to the Birst Offerings" as

12   required by the contract. Indeed, in many instances, Mr. Partin gives B4CS Booking credit that

13   exceeds the total selling price of a transaction of which B4CS was only a small part.

14        *Second,* Mr. Partin makes factual assumptions that are controverted by the undisputed

15   record evidence, fatally undermining the reliability of his conclusions. Mr. Partin wrongly

16   assumes that every CloudSuite customer was eventually provisioned with B4CS, leading him to

17   give B4CS Booking credit for sales of CloudSuites that did not include B4CS at the time of the

18   sale and for which the customer never actually received the B4CS software. Likewise, he adopts

19   wholesale Mr. Taber's unsupported assumption (parroted from Plaintiffs' depositions) that the

20   operative list price for calculating Bookings associated with B4CS sales should be the list price of

21   Birst's full-fledged BE product.

22        *Third,* Mr. Partin committed a key calculation error related to the aggregate discount to be

23   applied to sales of B4CS that eviscerates the reliability or usefulness of his analysis.

24        *Finally*, and most obviously, Mr. Partin's unreliable methodology produces absurd results

25   that even Mr. Partin admits require adjustment.

26

27

28   _____
     [2] Mr. Partin's Opening Report also briefly addresses Mr. Peters' claim to a retention bonus and
     statutory penalties and interest associated with Plaintiffs' breach of contract claim. *Id.* at 17–18.

Put another way, Mr. Partin starts from more than a few faulty premises, employs unreliable methodology, and then winds his way to an entirely unreasonable result. To wit, Mr. Partin's original September 9, 2021 Report concludes that Plaintiffs are entitled to more than $70 million in earnout bonuses, a sum nearly equivalent to the ▮▮▮▮▮ that Infor paid for Birst *in its entirety*. *See* Ex. 14 (Partin Rep.) at 16–17; Ex. 15. The Court should exercise its discretion to exclude Mr. Partin's testimony, which can only mislead the jury.[3]

### 1. Mr. Partin's methodology is contrary to the clear language of the Offer Letters.

Mr. Partin adopts a methodology that is contrary to the express terms of Plaintiffs' Offer Letters. Expert opinions that are "contrary to law . . . will not assist the trier of fact[,]" and may be excluded on that basis. *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2012 WL 2571332, at *7 (N.D. Cal. June 30, 2012). Likewise, expert opinions that employ a method for calculating damages "contrary to the terms" of an "agreement" are inadmissible. *See Bank of N.Y. Mellon Tr. Co., N.A. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 648 (S.D.N.Y. 2012) ("*B.N.Y. Mellon*") (excluding damages calculation based on expert's "faulty assumption" that contradicted contractual terms). Mr. Partin adopts two inputs that are precluded by the plain text of the Offer Letters. Thus, his calculation of Bookings and Plaintiffs' earnout bonuses must be excluded.

### a. Contrary to the Offer Letters, Mr. Partin failed to limit Bookings to the "portion of subscription fees payable under a contract that are attributable to the Birst Offerings."

Mr. Partin's methodology bakes in a fundamental error that renders his conclusions unreliable: he fails to limit Booking credit to the portion of each sale that is attributable to the Birst Offerings as required by the operative agreements. Plaintiffs' Offer Letters are clear: **Booking** means "ACV [annual contract value] from subscriptions to the Birst Offerings that are Contracted in the applicable fiscal year." Ex. 1 at 3. The next sentence of the Booking definition

---

[3] This is not the first time Mr. Partin has adopted unsupported assumptions or otherwise provided unreliable opinions. Recently, in *Chung v. Washington Interscholastic Activities Association*, No. 3:19-cv-05730, Dkt. No. 88 (W.D. Wash. May 18, 2021), the court excluded Mr. Partin's report, noting that his "questionable assumption[s]" lacked "a factual basis in the record." Another court recently excluded portions of Mr. Partin's report in an employment case in part because "his methodology . . . fails to demonstrate Daubert levels of reliability." *Goldstine v. FedEx Freight Inc.*, 2020 WL 5500369, at *2 (W.D. Wash. Sept. 11, 2020).

provides that "**[t]he amount of any Booking shall include only that portion of the subscription fees payable under a contract that are attributable to the Birst Offerings**." *Id.* In other words, Plaintiffs' Booking credit is limited to a *"portion of"* the total "fees payable under [the] contract" and can thus never *exceed* the total "fees payable under [the] contract." *Id*.

With respect to B4CS Bookings, the "contract" at issue is the contract for the Infor CloudSuite that allegedly included B4CS.[4] B4CS was never sold by itself and was only sold as a component in Infor CloudSuites. *See* Ex. 7 at No. 14; Ex. 16 (Partin) at 183:25-184:8. The order forms pursuant to which customers purchased CloudSuites did not even list B4CS separately. *See* Ex. 25 (Taber) at 210:10–15. Thus, as they relate to B4CS Bookings, the Offer Letters require that "[t]he amount of any [B4CS] Booking shall include only that portion of the subscription fees payable under [the CloudSuite] Contract that are attributable to [B4CS]." Ex. 1 at 3.

Yet Mr. Partin flatly admitted that he failed to adhere to this straightforward requirement in calculating Bookings credit for FY18 and FY19. He admitted that he "did [not] limit the Bookings for Birst for CloudSuite to . . . some portion of the subscription fees payable under the CloudSuite contract." Ex. 16 (Partin) at 193:19–194:6. Instead, he used a methodology that awarded Bookings credit for B4CS far in in excess of the total subscription fees payable for the CloudSuite of which B4CS was allegedly a component. For example, in July 2018, ██████ ███████████ signed a two-and-a-half-year subscription for an Infor CloudSuite for a total subscription fee of $████ (equal to an ACV of $████). Ex. 27 (Partin Sup. Rep. Data) at 1. Mr. Partin, however, gives Plaintiffs B4CS Bookings credit on this sale of $102,398—nearly ████ the subscription fee payable under the contract. *Id*. at 2. Likewise, Mr. Partin in his October 18, 2021 Supplemental Report awards $86,745 in B4CS Bookings credit on a FY19 sale of a CloudSuite to ████████████████, for which it paid a total subscription fee of $████. *Id*. at 3–4. The results are just as stark if you compare the B4CS Bookings credit awarded by Mr. Partin to the ACV of the subscription to the CloudSuite allegedly containing B4CS. For example,

---

[4] As explained in Infor's contemporaneously filed motion for summary judgment, B4CS is not a "Birst Offering" as defined in Plaintiffs' Offer Letters. Assuming only for purposes of this motion that B4CS were properly deemed a Birst Offering, Mr. Partin's analysis remains fatally flawed for the reasons explained in this section.

Mr. Partin's Supplemental Report includes B4CS Bookings credit of $528,575 for a CloudSuite

subscription with a total actual ACV of just ███████ . *See id.* at 5.

This fundamental defect in Mr. Partin's methodology can only mislead and confuse the

jury. *See Apple*, 2012 WL 2571332, at *7. Expert testimony is limited to that which will "help the

trier of fact to understand the evidence or to determine a fact in issue[.]" Rule 702(a). A damages

calculation in a breach of contract case that conflicts with the express terms of the contract has the

opposite effect and cannot be admitted. *See B.N.Y. Mellon*, 910 F. Supp. 2d at 648.

> **b.      Contrary to the Offer Letters, Mr. Partin attributes Bookings**
> **credit to Birst Offerings that were given away for free.**

Mr. Partin's method for calculating Bookings further conflicts with the express terms of

the Offer Letters because he attributes Bookings credit in circumstances where Infor gave Birst

Offerings away for nothing. The contracts plainly do not allow this.

Bookings are equal to "**ACV** from subscriptions to the Birst Offerings that are

**Contracted** in the applicable fiscal year" *See* Ex. 1 at 3 . **ACV** is defined as "the total amount of

subscription *fees* applicable to Birst Offerings *payable* under a contract, divided by the term of

the subscription in years." *Id.* at 2–3 . Subscriptions are **Contracted** when "the written contract or

order forms have been duly executed by all parties *and* subscription *revenue recognition* in

accordance with GAAP and Infor's revenue recognition policies has commenced." *Id*. The

meaning of these terms is unambiguous: Booking credit is limited to "subscription fees payable

under a contract" that generate "revenue" that Infor has "recogni[zed]." *Id.* at 3.

Obviously, when a product is given away for free, there are no subscriptions fees payable

under a contract, and Infor cannot recognize any revenue. Nonetheless, Mr. Partin was told to

treat transactions where Birst products were given away for free as sales. *See* Ex. 14 (Partin Rep.)

at 13. Mr. Partin does not attempt to explain how a give-away could result in "subscription fees

. . . payable under a contract," much less revenue recognition under GAAP.  Nor could he: it is a

logical impossibility. Indeed, Mr. Partin does not provide a single sentence explaining why he

made this assumption, points to no fact that supports it, and admits that he did nothing to assess

1751710

whether it was reasonable. *See* Ex. 16 (Partin) at 224:11-19. [5]

Mr. Partin's assumption is thus doubly inadmissible: it is both "unsupported by the facts"—indeed, factually contradicted, *see Oliver v. Sweetwater Un. High Sch. Dist.,* 768 F.3d 843, 861 (9th Cir. 2014), and "contrary to the terms of the agreements." *B.N.Y. Mellon*, 910 F. Supp. 2d at 648. This is no trifling mistake either. Mr. Partin attributes ██████████ in Booking credit (roughly $██████ by Mr. Partin's own calculations) to a transaction where the actual selling price of the Birst Offering was *zero*. *See* Ex. 14 (Partin Rep.) at 15; Ex. 27 (Partin Sup. Rep. Data) at 7. Even after applying a (wholly arbitrary) 90% discount, Mr. Partin still arrives at $██████ in Bookings for a transaction that undisputedly resulted in *no revenue* for Infor. In total, Mr. Partin attributes $██████ in FY18 Bookings and $██████ in FY19 Bookings to transactions for which the selling prices was *undisputedly zero* and Infor recognized *zero* revenue. *See* Ex. 29 (Kidder Reb. Rep.) at ¶ 54, Table 8.

### 2. Mr. Partin's methodology relies on a series of unsupported assumptions.

Expert testimony is unreliable and inadmissible if it is based on "unsupported assertions" or unfounded "assumptions or conclusions." *Bldg. Indus. Ass'n of Wash. v. Wash. St. Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012). Put another way, expert testimony should be excluded if it is "not sufficiently founded on facts." *Guidroz-Brault v. Mo. Pac. R. Co.*, 254 F.3d 825, 831–32 (9th Cir. 2001). Likewise, "[a] district court has discretion . . . to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony[,]" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996), and "[e]xpert opinion evidence based on assumptions not supported by the record should be excluded." *Tyger*

---

[5] Mr. Partin's lone explanation for his assumption is that he relied on Plaintiffs' industry expert David Taber, who opined that "Giveaways of Birst *Stand-Alone* Products to *Existing* Infor Customers Should be Understood as Part of a Bundle Included in the *Prior* Sale of Infor Products." Ex. 26 (Taber Reb. Rep.) at 11. However, Mr. Partin admitted that he did *not* limit Booking credit in his calculations to giveaways of Birst's stand-alone products; nor did he limit Booking credit to giveaways to "existing" Infor Customers. Ex. 16 (Partin) at 246:1-248:14. Mr. Partin also admitted that he did not apply any of the four methodologies specified by Mr. Taber for quantifying the value of such giveaways. *Compare* Ex. 26 (Taber Reb. Rep.) at 12 n.62, *with* Ex. 25 (Taber) at 236:10–238:8. Thus, even if the Court credits Mr. Taber's opinion that certain giveaways to certain customers could be treated as sales, Mr. Partin admits he did not calculate Bookings associated with just those transactions.

*Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 143 (4th Cir. 1994). Mr. Partin's assumptions are unreasonable and not supported by the record, and his opinions should be excluded on that basis.

a. **Contrary to the undisputed facts, Mr. Partin assumes that B4CS was included in every sale of a CloudSuite and that every CloudSuite customer was provisioned with B4CS.**

As noted above, Plaintiffs are only entitled to Booking credit for the "ACV from subscriptions to the Birst Offerings that are **Contracted** in the applicable fiscal year" (i.e., FY18 or FY19). Ex. 1 at 3. Subscriptions, in turn, are **Contracted** only when the written contract is executed by both parties and "revenue recognition in accordance with GAAP and Infor's revenue recognition policies has commenced." *Id.* Mr. Partin admits that GAAP generally requires provisioning before revenue recognition on a software sale can occur. *See* Ex. 16 (Partin) at 164:2-11. ███████████████████████████████████████████

███████████████████████████████████████████

In his September 9, 2021 Opening Report, Mr. Partin calculates B4CS Bookings of $32,361,804 in FY18 and $114,566,618 in FY19. *See* Ex. 14 (Partin Rep.) at 16. In doing this calculation, Mr. Partin assumes that B4CS was sold as a component of CloudSuites even where B4CS was demonstrably *not* included as a component of the relevant CloudSuite at the *time of the sale*. *See* Ex. 16 (Partin) at 108:11-24. Moreover, Mr. Partin also assumed that "all (or substantially all) CloudSuite customers were ultimately provisioned with B4CS." Ex. 18 (Partin Reb. Rep.) at 11; *see also* Ex. 16 (Partin) at 151:23-152:2.

Mr. Partin, however, did nothing to confirm whether his assumption regarding provisioning of B4CS was reliable. Neither his Opening Report nor his Rebuttal Report discusses any effort made to check the accuracy of this assumption. In fact, for the vast majority of CloudSuite sales for which Mr. Partin gives B4CS Booking credit in his September 9, 2021 calculation, the customer was not provisioned in FY18 or FY19. Of the $32,361,804 in B4CS Booking credit that Mr. Partin attributes to CloudSuite sales in FY18, *none* is associated with a transaction in which the customer received B4CS by the end of FY19. D'Amico Decl. in Sup. Of Infor's Mot. for Partial Summary Judgment (D'Amico Decl.) ¶ 8. Of the $114,566,618 in B4CS

Booking credit that Mr. Partin attributes to CloudSuite sales in FY19, barely 1% is associated with a transaction in which the customer was provisioned with B4CS by the end of the fiscal year. *Id.*[6] Thus, Mr. Partin's assumption underlying the calculation in his Opening Report is flatly contradicted by the facts.

Acknowledging that this glaring error completely undercuts Mr. Partin's original calculation, Plaintiffs served a "Supplemental" Report on October 18, 2021. In his Supplemental Report, Mr. Partin replaces his blanket assumption that "all (or substantially all) CloudSuite customers were ultimately provisioned with B4CS" with the assumption that "the presence of a B4CS Child SKU in the IDB [database] is a reasonable indicator that a customer actually received B4CS." Ex. 28 (Partin Supp. Rep.) at 2. Based on this new assumption—that, as long as the B4CS SKU showed up as associated with a customer in the IDB database, the customer was provisioned with B4CS—Mr. Partin estimated B4CS Bookings of $23,640,284 in FY18 and $72,876,294 in FY19. *See id.* at 4. As with his original calculation, however, the assumption underlying Mr. Partin's October 18, 2021 Supplemental Report is belied by the record. Gretchen D'Amico, Infor's 30(b)(6) designee, testified unambiguously that the IDB database does not track provisioning. *See* Ex. 12 (D'Amico) 56:16–17. In fact, of the 241 CloudSuite sales for which Mr. Partin assigns B4CS Booking in his Supplemental Report, the customer was provisioned with B4CS in FY18 or FY19 in just *eight* cases. D'Amico Decl. ¶ 16

Expert testimony that is "unsupported by the facts" is inherently unreliable and should be excluded, *Oliver*, 768 F.3d at 861; *see also Otto v. LeMahieu*, 2021 WL 1615311, at *4 (N.D. Cal. Apr. 26, 2021) (striking expert report in part because opinion was "untethered to and unsupported by any facts in the record"), as should expert testimony that is "speculative, unsupported by sufficient facts or contrary to the facts of the case," *Al Otro Lado v. Mayorkas*, 2021 WL 3929673, at *2 (S.D. Cal. Sept. 2, 2021). Mr. Partin's factually inaccurate assumptions result in materially overstated B4CS Bookings, rendering Mr. Partin's opinions inadmissible. *See Guidroz-Brault*, 254 F.3d at 831–32. The Court should exclude his calculations of Bookings and

---

[6] Indeed, 97% of Mr. Partin's FY18 B4CS Bookings and 95% of his FY19 B4CS Bookings are attributable to sales of CloudSuites where B4CS was *never* provisioned to the customer. *See* Ex. 29 (Kidder Reb. Rep.) ¶ 4.

INFOR (US), LLC'S NOTICE OF MOTION AND DAUBERT MOTION
Case No. 3:19-cv-08102-JCS

1751710

1   Plaintiffs' earnout bonuses in their entirety.

2            **b.     Contrary to the facts, Mr. Partin adopts Mr. Taber's opinion
                       that the list price of B4CS is equivalent to Birst's more robust
3                      Birst Enterprise product.**

4            The earnout provisions in Plaintiffs' Offer Letters provide that Booking credit is

5   equivalent to "only that portion of the subscription fees payable under a contract that are

6   attributable to the Birst Offerings." Ex. 1 at 3. Where "Birst Offerings are sold bundled or in

7   combination with other products or services offered by Infor, the subscription revenue for

8   purposes hereof shall be deemed to be *the list price of the Birst Offerings as if the Birst Offerings*

9   *had been sold individually*." *See id.* As applied to B4CS, this provision poses an analytical

10  challenge because it is undisputed that B4CS was never offered as a stand-alone product and—

11  *ipso facto*—never had a "list price" as if "sold individually." *See, e.g.*, Ex. 14 (Partin Rep.) at 10.

12  Thus, to calculate Bookings attributable to B4CS, Mr. Partin was required to assume a reasonable

13  list price for B4CS as if it had been "sold individually." This he did not do.

14           Instead, Mr. Partin was told to use Mr. Taber's assumed list price of B4CS as if sold

15  individually: a $100,000 annual BE platform fee, plus another $50,000 in platform fees for a

16  feature called Networked BI, plus an annual user fee of $200 per CloudSuite user, equivalent to

17  the Read-Only Lite User license fee available to customers who bought BE. Ex. 16 (Partin) at

18  202:16–203:1. Mr. Partin admits that he did not even consider any other possible list price for

19  B4CS, *id.* at 206:16–22, and that he did no independent analysis to determine whether the list

20  price he was asked to assume is reasonable, *id.* at 205:19–25. For all the reasons identified below,

21  Mr. Taber's assumed list price for B4CS is unreasonable and not supported by the facts. To the

22  extent the Court finds that Mr. Taber's opinion is not admissible in this regard, Mr. Partin's

23  analysis must be excluded along with it.

24           While Mr. Partin did nothing to determine whether it was reasonable to adopt Mr. Taber's

25  opinion that the list price of B4CS (a stripped-down version of Birst) is the same as BE (the

26  company's highest end product), the results of his calculations are a telling indicator of how

27  unreasonable his assumption is. Indeed, Mr. Partin was forced to acknowledge (with a fair bit of

28  understatement), that his assumption about the list price of B4CS generated a "possibly

overstated" $███ Booking value for a **single copy of B4CS**, *see* Ex. 14 (Partin Rep.) at 15, where the actual recorded list price for the entire sale to the customer was just $███, *see* Ex. 27 (Partin Sup. Rep. Data) at 7. That result alone should cast doubt on the reliability of Mr. Partin's assumptions and methodology.

What's more, to adjust for this wildly incorrect result, Mr. Partin conjured a correction factor out of thin air: he discounted the $███ assumed Booking value produced by his methodology by ██% supposedly "consistent with Infor's discount approach with its largest transaction[.]" *See* Ex. 14 (Partin Rep.) at 15. Mr. Partin never explains why this is an appropriate technique to apply just to this one outlier, or how a method requiring *ad hoc* correction could be considered reliable. This is a classic example of an expert opinion that is "arbitrary and therefore not properly grounded." *In re Incretin-Based Therapies Prod. Liab. Litig.*, 524 F. Supp. 3d 1007, 1038 (S.D. Cal. 2021). Remarkably, even after he applies his *ad hoc* ██% discount, Mr. Partin still attributes more than $███ in Booking credit to this single sale of B4CS, which is ██ times the price for which the entire CloudSuite was sold. Ex. 27 (Partin Reb. Rep. Data) at 6.

### 3.    Mr. Partin errs in his calculation of the "aggregate discount" applied to determine Bookings attributable to Birst Offerings

Mr. Partin also makes a fundamental methodological error: he gets the math wrong. As discussed above, the Offer Letters provide that, when Birst Offerings are sold bundled with other products, "the subscription revenue for purposes hereof shall be deemed to be the list price of the Birst Offerings as if the Birst Offerings had been sold individually." Ex. 1 at 3. The Offer Letters go on to provide that for such bundled sales "where a discount was applied . . ., the aggregate discount on such sale shall be applied pro rata to each product in such sale, including the applicable Birst Offerings, in accordance with each such product's list price." *Id.* Thus, for so-called bundled sales (including sales of B4CS), the Offer Letters require Mr. Partin to calculate the "aggregate discount" on the sale and apply that "aggregate discount" to "the list price of the Birst Offerings as if the Birst Offerings had been sold individually" (or, in the case of B4CS, the imputed list price). The idea here is simple enough: (1) add up the list prices of the individual products sold in the bundle, (2) divide that total by the amount for which all the products were

1    sold, and then (3) multiple the resulting percentage by the list price of each individual product.

2         Mr. Partin makes a fundamental error, however, in the first step of this process as applied

3    to sales of B4CS; he fails to include his imputed list price for B4CS when he adds up the list

4    prices of the products sold. Mr. Partin's error is illustrated by the example calculation he included

5    with his October 18, 2021 Supplemental Report. *See* Ex. 30 (Partin Sup. Rep. Schedule 11). To

6    calculate Birst Bookings associated with the sale of Birst Professional and B4CS to ██████████

7    ████████████ in FY2019, Mr. Partin added up the "List ACV" for the products sold ($█████)

8    and divided that by the total "Selling ACV" for the products sold ($█████) to get an aggregate

9    discount of ██%. Mr. Partin then multiplied this ██% by his imputed list price of $158,000 for

10   B4CS, which yields $87,814 of B4CS Bookings for this sale.

11        The problem is that Mr. Partin did not include his imputed $158,000 list price when he

12   added up the "List ACV" of the products sold to calculate his "aggregate discount." This error

13   yields results that are non-sensical and contrary to the explicit language of the contract. As

14   illustrated by Mr. Partin's own example, his methodology yields Booking credit for B4CS of

15   $87,814, when the ACV of the entire sale was only $█████. It defies logic to allocate more than

16   100% of the total ACV of a bundle of products to just one of the products in that bundle. It is also

17   directly contrary to the language of the Offer Letters, discussed in detail above, that limits "[t]he

18   amount of any Booking . . . [to] only that portion of the subscription fees payable under a contract

19   that are attributable to the Birst Offerings." Ex. 1 at 3. It should go without saying that $87,814 is

20   not a "portion" of $█████.

21        "[A]ny step that renders [the expert's] analysis unreliable . . . renders the expert's

22   testimony inadmissible. This is true whether the step completely changes a reliable methodology

23   or merely misapplies that methodology." *In re Silicone Gel Breast Implants Prod. Liab. Litig.*,

24   318 F. Supp. 2d 879, 890 (C.D. Cal. 2004) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d

25   717, 745 (3d Cir.1994)) (alternation in original). Mr. Partin's methodological misstep undermines

26   the reliability of his conclusions, to such a degree that the Court should exclude his calculations.

27        **4.    Mr. Partin's conclusions demonstrate the unreliability of his methods.**

28   Although the Court's role is not to weigh the persuasiveness of an expert's opinion,

"conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, "[a] court 'must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3rd Cir. 2000) (quoting *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 153 (3d Cir.1999)). Here, the utter implausibility of Mr. Partin's conclusions reveal how fundamentally unsound his methodology and assumptions are.

At the level of individual transactions, Mr. Partin's conclusions are nonsensical. His methodology produces imputed list prices for B4CS that are greater than the list price for the CloudSuite within which B4CS was purportedly sold, Ex. 27 (Partin Sup. Rep. Data) at 8, and greater than the list prices for subscriptions to Birst Enterprise and Birst Professional sold along with B4CS, *id.* at 10–11. Mr. Partin's calculations also include Bookings for B4CS greater than the ACV of the CloudSuite subscription with which B4CS was purportedly sold, *id.* at 10, and greater than the ACV of the entire sales transaction of which B4CS was just one piece, *id* at 12.

Mr. Partin's Bookings totals likewise defy reason. Prior to the Acquisition, Mr. Peters swore to Birst shareholders that the "reasonable maximum amount" of his earnout would be $▇ million based on estimated FY18 Bookings of $▇▇▇▇▇ and FY19 Bookings of $▇▇▇▇▇. *See* Ex. 20 at Exhibit A, p. 6. Through Mr. Partin, Mr. Peters now seeks more than $40 million in earnout bonuses just for himself based on alleged FY18 Bookings of $46.7 million and FY19 Bookings of $139.8 million. The $186.5 million in total Bookings Mr. Partin attributes to Birst Offerings in FY18 and FY19 in his September 9, 2021 calculation is nearly ▇▇▇▇▇ greater than Birst's Bookings for the two years prior to the acquisition combined. Ex. 29 (Kidder Reb. Rep.) ¶¶ 8, 15, Table 2. Indeed, Mr. Partin's estimate of $186.5 million in total Bookings dwarfs the $▇▇▇▇ that Infor paid for Birst in the first place.

As if the foregoing examples were not enough, Mr. Partin's estimates of Bookings completely contradict Plaintiffs' own understanding of their business.  In a September 2019 email, Mr. Peters wrote, "***the vast majority of our bookings and revenue come from standalone Birst*** . . . . Cloud suites [sic] is a small part of our business[.]" Ex. 13. Mr. Partin, on the other hand, attributes nearly four times as much Bookings to B4CS sales than he does to standalone

1   Birst sales. *See* Ex. 14 (Partin Rep.) at 16.

2     Mr. Partin's results speak for themselves. His opinion is fundamentally unreliable, the

3   product of numerous baseless assumptions that contradict both the facts and the plain language of

4   Plaintiffs' Offer Letters. The Court should exclude in its entirety his opinions and calculations

5   regarding Bookings and the Plaintiffs' earnout bonuses.

6     **B.**    **Mr. Pinto's opinions should be excluded in their entirety.**

7     Plaintiffs' purported source code expert Paul Pinto claims to have analyzed snapshots of

8   Birst source code to reach certain conclusions. █████████████████████████

9   ██████████████████████████████████████

10  ██████████████████████████████████████

11  ██████████████████████████████████████

12  ██████████████████████████████████████

13  ██████████████████████████████████████

14  ██ ██ ***Second***, Mr. Pinto claims that his analysis demonstrates that there is something called a

15  "Birst *component* of Birst for CloudSuite" which he claims is a "product or service offered,

16  licensed, provided, sold, distributed or otherwise exploited by Birst" at the time Infor acquired the

17  company—in other words, a "Birst Offering" as that term is defined in the Offer Letters. *See* Ex.

18  21 (Pinto Rep.) ¶ 11 (emphasis added). Relatedly, Mr. Pinto argues that whether "*B4CS* is a new

19  product is not a relevant inquiry to this analysis. . . . The relevant inquiry is whether the Birst

20  *component* of B4CS existed at the time of the acquisition[.]" Ex. 22 (Pinto Reb. Rep.) ¶ 18.

21    Mr. Pinto's opinions suffer from similar deficiencies to Mr. Partin's report and opinions.

22  ***First***, Mr. Pinto's core opinion regarding the integration of Birst's software into Infor's

23  CloudSuites is unsupported by any facts or reliable methodology. Instead of explaining his

24  methods or the facts supporting his conclusions in detail, Mr. Pinto devotes most of his opening

25  report to an improper recitation of irrelevant factual matters that the Court should strike. What

26  little substantive analysis remains is inadmissible under Rule 702. ***Second***, Mr. Pinto's opinion

27  that the so-called "Birst *component* of Birst for CloudSuite" is a "product or service offered,

28  licensed, provided, sold, distributed or otherwise exploited by Birst" at the time Infor acquired

1    Birst is similarly unsupported and must be excluded.

2    **1.    Mr. Pinto's recitation of background facts is inadmissible**

3    As an initial matter, Mr. Pinto devotes nearly seven pages (out of a total of seventeen) in

4    his opening report to largely irrelevant factual background that has little—if any—bearing on his

5    opinions. *See* Ex. 21 (Pinto Rep.) at 6–13. Indeed, Mr. Pinto does not even attempt to explain how

6    this background information informed—or even relates to—his opinions. The Court thus should

7    strike these irrelevant musings—and preclude Mr. Pinto from testifying to them at trial—because

8    they are not the proper subject of expert testimony. *See* Rule 702.

9    **2.    Mr. Pinto's source code analysis lacks any methodology.**

10   "The court should review the expert's opinion testimony for 'overall sufficiency of the

11   underlying facts and data, and the reliability of the methods, as well as the fit of the methods to

12   the facts of the case[.]'" *Newkirk v. ConAgra Foods, Inc.*, 727 F. Supp. 2d 1006, 1014 (E.D.

13   Wash. 2010) (quoting *United States v. W.R. Grace*, 504 F.3d 745, 765 (9th Cir. 2007)). Where an

14   expert offers no citation to underlying facts supporting a given opinion, the opinion is

15   inadmissible. *See id.* at 1016. (excluding expert testimony where expert did "not cite to any

16   support for many of his statements.").

17   Mr. Pinto's opening report fails to provide citations to any underlying facts or data—much

18   less any analysis—that support his conclusions, and the Court should exclude his opinions on that

19   basis alone. Indeed, the core paragraph of Mr. Pinto's opening report, describing his source code

20   review and his opinions, does not include even one single citation:



25   Amazingly, Mr. Pinto repeats this same paragraph *verbatim* in his

26   rebuttal report, and the only citation offered is to his opening report—which itself, of course, fails

27   to identify any underlying data. *See* Ex. 22 (Pinto Reb. Rep.) ¶ 44.

28   Notably absent is any explanation of what source code files he reviewed, the changes that

17

he observed, ███████████████████████████ or what metric he used in determining

whether "the Birst platform" was a "materially different product as compared to when it existed at

the time of the acquisition." Ex. 21 (Pinto Rep.) at 13–17. Mr. Pinto's opening report includes

literally zero analysis or explanation of the methodology used to reach his conclusions—let alone

citation to an evidentiary basis in the source code that he purportedly reviewed. At deposition,

when asked about the source code files he reviewed in reaching his conclusions, Mr. Pinto could

not identify the files he reviewed, which renders his analysis impossible to verify. *See e.g.* Ex. 23

(Pinto) at 113:17-116:3; 236:3-239:16.

    While Mr. Pinto's rebuttal report does contain a few stray citations to the number of lines

of code in each of the three source code "snap shots," Mr. Pinto fails to provide any analysis. He

notes that he identified various numbers of total lines of code, *see* Ex. 22 (Pinto Reb. Rep.) ¶¶ 13,

38, but he does not explain the significance of these numbers, how they impacted his analysis, or

why they support his opinions. █████████████████████████████

████████████████████████████████████████████████ is thus exactly

the kind of "unjustified extrapolation[] from existing data" that Rule 702 precludes. *In re Viagra

and Cialis Products Liability Litig.*, 424 F. Supp. 3d at 790.

    Finally, Mr. Pinto's source code analysis is unreliable because he failed to consider the

significant software development efforts required to integrate Birst into Infor's CloudSuites to

create B4CS. *See, e.g.*, Ex.23 (Pinto) at 136:10–137:25. This error results from his assumption

that the only "relevant inquiry" is whether the Birst *component* of B4CS existed at the time of the

acquisition, and not whether B4CS itself existed at the time of the acquisition. His faulty

assumption leads him to ignore the significant development efforts required to create B4CS. *See*

Ex. 22 (Pinto Reb. Rep.) ¶ 18.

### 3.    Mr. Pinto's opinion that the "Birst component of Birst for CloudSuite" is a "product or service" is unsupported by fact or analysis, and he abandoned this opinion at his deposition.

    Mr. Pinto concludes that the "Birst component of Birst for CloudSuite is a 'product or

service offered, licensed, provided, sold, distributed or otherwise exploited by Birst" at the time

Infor acquired Birst. *See* Ex. 21 (Pinto Rep.) ¶ 11. He focuses on this so-called "component"

because, as he makes explicit in his rebuttal report, he thinks "[t]he relevant inquiry is whether the Birst *component* of B4CS existed at the time of the acquisition[.]" Ex. 22 (Pinto Reb. Rep.) ¶ 18.[7]

Mr. Pinto fails to provide a single citation in support of his claim that the "Birst component of Birst for CloudSuite" is a "product or service." He testified at deposition that he based this conclusion at least in part on a conversation with David Taber, Plaintiffs' third expert. *See* Ex. 23 (Pinto) at 79:12–20.[8] When pressed, however, Mr. Pinto refused to say whether "the Birst component" of B4CS is in fact a "product or service," walking away from the core conclusion in his opening report. *See id.* 80:14–85:25. Indeed, Mr. Pinto's deposition testimony can fairly be read as a repudiation of his central opinion. Mr. Pinto admitted that "the scope of [his] analysis was not focused on determining what is a product or what isn't a product." *Id.* at 84:13–18. Accordingly, the Court should strike *at least* paragraphs 11 and 36 of Mr. Pinto's opening report and exclude testimony or opinions to the effect that the Birst "component" of B4CS was a product or service available at the time of Infor's acquisition of Birst.

In sum, Mr. Pinto's opinions are baseless conclusions drawn out of thin air and should be excluded in their entirety.

### C. Summary Opinions 1.a, 1.c, and 1.f of the Taber Report, and Mr. Taber's related opinions and testimony, should be excluded.

Plaintiffs' third expert, David Taber, was retained to provide opinions in three areas: (1) what constitutes a "sale" of an "embedded Birst Offering"; (2) the appropriate list price to use for sales of "Embedded Birst Offerings"; and (3) issues related to the functional integration of Birst and Infor. *See* Ex. 24 (Taber Rep.) § 2.a.1.

Mr. Taber's opening report contains seven summary opinions, three of which should be

---

[7] Mr. Pinto cannot, of course, testify about what he believes to be "relevant inquiry" in this case. Not only is he not qualified to interpret the Offer Letters, *see* Ex. 23 (Pinto) 41:17-24, but the determination of relevance is indisputably for the Court. Indeed, courts routinely exclude expert testimony that seeks to provide an improper opinion on an ultimate legal issue. *See, e.g., Aerojet Rocketdyne, Inc. v. Glob. Aerospace, Inc.*, 2021 WL 1839695, at *3 (E.D. Cal. May 7, 2021).

[8] Mr. Taber's reports do not address whether the so-called "Birst component" of B4CS is a product or service.

excluded at this stage.  **First**, Mr. Taber's opinion at § 1.a, ████████████████

███████████████████████████████████████████████ should be excluded

because Mr. Taber has no qualifications to offer such an opinion and did not examine any of

Birst's source code. **Second**, Mr. Taber's opinion at § 1.c, that the list price of the "Birst

component" of B4CS is equivalent to the BE platform fee plus the fee for Networked BI plus the

fees associated with Read-Only Lite ("ROLITE") user licenses, should be excluded because it is

contrary to the underlying facts and unsupported by any methodology. **Third**, Mr. Taber's

opinion in § 1.f that Infor's giveaways of Birst products are actually "sales" should be excluded

as an inadmissible legal opinion and as contrary to the plain language of the Offer Letters.

> 1.    **Mr. Taber is not qualified to give the opinion at § 1.a, nor does he have any factual basis for offering it.**

Mr. Taber admits that he is not "holding himself out as a source code expert for the

purposes of this litigation," Ex. 25 (Taber) at 79:7–11, and that he never looked at Birst source

code himself, *id.* at 79:4-6. Yet he opines at § 1.a that ███████████████████████

██████████████████████████████████████ There is no analysis or

citation in Mr. Taber's opening report to support that opinion, and the Court should strike it on

that basis alone. *See Newkirk*, 727 F. Supp. 2d at 1014.

Instead, Mr. Taber testified during his deposition that he relied on Mr. Pinto and

conversations with Plaintiffs. *See* Ex. 25 (Taber) at 78:24-79:3. An expert, however, cannot

merely parrot the conclusions of another expert or the self-serving statements of the litigants who

pay his salary. As one federal appellate court has observed, "[r]elaying the plaintiffs' likely

testimony is not an example of expertise." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924

(7th Cir. 2000). Ninth Circuit courts routinely exclude expert testimony that relies on little

beyond the Plaintiffs' own testimony. *See, e.g.*, *Stop Staring! Designs v. Tatyana, LLC*, 2012 WL

12883613, at *3 (C.D. Cal. Sept. 13, 2012) ("As it stands, Plaintiff seeks to have an expert simply

parrot its theory of the case based solely on his abstract expertise with no supporting methodology

or foundation."); *Stein v. Pac. Bell*, 2007 WL 831750, at *11 (N.D. Cal. Mar. 19, 2007).

Likewise, courts in this Circuit do not hesitate to exclude expert testimony that is merely a

conduit for the views of a different expert, with no additional analysis or independent review. *See, e.g.*, *Cholakyan v. Mercedes-Benz, USA, LLC,* 281 F.R.D. 534, 544 (C.D. Cal. 2012) (excluding testimony, observing that "[a]n expert's sole or primary reliance on the opinions of other experts raises serious reliability questions.") The Court should do the same here.

### 2.    Mr. Taber's opinion on list price is contrary to the underlying facts.

Mr. Taber opines that the list price of the supposed "Birst component" of B4CS, as if sold individually, should be equal to the $100,000 annual platform fee for BE, plus another $50,000 for a feature called Networked BI, plus a $200 per-CloudSuite-user fee, equivalent to the ROLITE user license fee available to BE customers.

Mr. Taber's opinion should be excluded because it contradicts the plain, unvarnished fact that B4CS and BE were dramatically different products that offered customers dramatically different features. *See Al Otro Lado*, 2021 WL 3929673, at *2 (excluding opinion "contrary to the facts of the case."). Indeed, there is not a single contemporaneous document that contemplates that B4CS—much less the "Birst component" of B4CS—should be priced at the same level as BE. Instead, *all* the evidence is to the contrary.

***First***, Plaintiffs themselves repeatedly distinguish between BE and B4CS. In a 2017 email, Plaintiff Brad Peters cautioned Plaintiff Paul Staelin that "[w]e need to make it very clear that ***[B4CS] is not full Birst*** and [that] significant functionality will not be there in the free version." Ex. 19. In his recent deposition, Mr. Staelin admitted that ***B4CS and BE are "different solutions,"*** Ex. 5 (Stealin) at 221:8–222:1, and vehemently denied that B4CS is a version or later release of BE "in any way, shape, or form." *Id.* at 193:3–16. Likewise, Plaintiff David Gray testified that the disparity in capabilities between B4CS and BE created the opportunity to "upsell" customers from B4CS (which came free with certain Infor CloudSuites) to Birst Enterprise. Gray testified that in FY18–19, salespeople told customers that B4CS

> "comes with prebuilt [Infor] content, reports, et cetera, dashboards for your users to consume, but it is restricted to your . . . [Infor] CloudSuite Data. It can't be used outside of that . . . . If you . . .want to use Birst more broadly, then there's an opportunity to purchase [BE]. Within [BE], there's different user profiles with different amounts of capability, license rights to do things, and then you can access those different data sources."

1751710

Ex. 6 (Gray) at 85:2–85:20.

**Second**, all of the contemporaneous Birst product roadmaps, marketing presentations, and other documents distinguish between BE and B4CS. For example, the slide below is taken from a September 2017 Birst Platform Options presentation for FY18, created in part by Mr. Staelin, and it describes the disparate features associated with BE, BP and B4CS:



Ex. 8 at 5. The same presentation makes the critical distinction between B4CS and BE: "If customer wants to analyze data from additional sources, edit or create new analytical reports, build custom dashboards, etc. they need to buy Birst Enterprise or Birst Professional." *Id.* at 11.

Birst's "Pricing and Packaging Options" presentation used at the FY19 sales kick-off event further illustrates the disparate use cases, data sources and price points for B4CS and Birst Enterprise:

Ex. 9 at 6.

The presentation also succinctly describes the differences between B4CS and Birst Enterprise: "Birst for CloudSuite gives users access to a pre-delivered data model, KPIs, reports and dashboards on top of the core CloudSuite data . . . . Upgrading to Birst Professional Plus or Birst Enterprise is required to access Visualizer, to bring in additional data sources, or to modify/extend the existing data model." *Id*. at 17.

*Third*, as reflected in the contemporaneous Birst documents cited above, it is undisputed that BE offered customers key features and capabilities that B4CS did not:

- **Access to Data**. BE customers could access and analyze data from any source, including third party applications. Ex.5 (Staelin) 212:21–213:20. B4CS customers, on the other hand, were limited to analyzing data from Infor's CloudSuite. Ex. 6 (Gray) 111:3–19.

- **Ability to Customize.** BE customers could create content (*e.g.*, charts, graphs, and KPIs) customized to their business. Ex. 4 (Peters) 49:6–50:8. B4CS customers were confined to using pre-built content that comes with the CloudSuite. *See* Ex. 4 (Peters) at 244:8–18; 249:6–250:8; Ex. 9 at 17.

Against this body of evidence, Mr. Taber cannot explain why it is methodologically sound or factually supportable to assume that the list price of B4CS "as if sold individually" should be the same as the vastly different BE product. Indeed, he barely tries to support this opinion, devoting just three paragraphs of his twenty-page opening report to his opinion about B4CS's list price. *See* Ex. 24 (Taber Rep.) § 5.l. These paragraphs include only four factual citations, two of which are to Plaintiffs' own depositions. *See id.* Plaintiffs thus "seek[] to have an expert simply parrot [their] theory of the case based solely on his abstract expertise with no supporting methodology or foundation." *Stop Staring! Designs*, 2012 WL 12883613, at *3 (C.D. Cal. Sept. 13, 2012). This does not pass muster under Rule 702. *Id; Stein*, 2007 WL 831750, at *11.

Finally, the only basis that Mr. Taber arguably offers for his opinion cannot stand scrutiny. Mr. Taber—again taking his cues from Plaintiffs' depositions—claims that his assumed list price is appropriate because the "the Birst features accessible to a B4CS *user* were essentially identical to those of a [Birst Enterprise ROLITE] *user*." Ex. 24 (Taber Rep.) at 17. For starters, Mr. Taber's statement is simply wrong: It is undisputed that an individual B4CS user could not

access business intelligence regarding data outside of the CloudSuite, while an individual with a BE ROLITE user license could review charts, graphs and dashboards pulled from any source. Ex. 6 (Gray) 111:3–112:12. More importantly, though, Mr. Taber's statement is irrelevant from the perspective of the *customer*. Even if an individual BE ROLITE *user* could not create or edit reports using Visualizer (just like a B4CS *user*), other users at the same customer could access the advanced features of BE. Ex. 5 (Staelin) 212:21–213:20. Thus, an employee at a company using BE who only had a ROLITE user license could not create custom dashboards herself, but she could use the custom dashboards created by her work colleagues with greater access rights. The same is not true at a company using B4CS. In that case, no employee could get the right to create custom content, and every employee was limited to the pre-built content that came with the CloudSuite.

Mr. Staelin made this very point in a FAQ document regarding "Licensing for CloudSuites and Birst Content Products." According to Mr. Staelin, "anyone that will access the custom content created with the Enterprise platform will need at least a Read-Only viewer license. . . . Users without that **expanded** license will be entitled to access only the OOTB (out of the box) content included in the Birst for CloudSuites base offering and NOT the custom content created by the Enterprise platform." Ex. 11 at 11. Mr. Staelin's contemporaneous admission that B4CS users do not have access to the same "custom content created by the Enterprise platform" as BE ROLITE users fatally undermines Mr. Taber's only rationale for his opinion.

For these reasons, Mr. Taber's opinion regarding the list price of B4CS—or the "Birst component" of B4CS—must be excluded, as must Mr. Partin's opinion regarding Bookings that relies on Mr. Taber's opinion.

### 3.   Mr. Taber's opinion at § 1.f is an inadmissible legal conclusion.

Mr. Taber opines that "giveaways of Birst stand-alone products to existing Infor customers should be understood as part of a bundle included in the prior sale of Infor products." Ex. 26 (Taber Reb. Rep.) at 11; *see also* Ex. 24 (Taber Rep.) at 1, 16. This opinion, which has no basis in any underlying factual matter, is just a legal conclusion dressed up as expert testimony. It is thus inadmissible because it purports to opine on a strictly legal question (what transactions are

1751710

1   eligible for Bookings credit) that is for the Court to determine. "[E]xpert opinion that is only a

2   legal conclusion without underlying factual support constitutes 'unsupported speculation' and

3   does not meet the requirements of Daubert." *Villalpando v. Exel Direct Inc.*, 161 F. Supp. 3d 873,

4   895 (N.D. Cal. 2016).[9]

5        Mr. Taber's opinion is also inadmissible because it is contrary to the express terms of the

6   contract. *See B.N.Y. Mellon*, 910 F. Supp. 2d at 648. As explained above with respect to Mr.

7   Partin's analysis, Mr. Taber's opinion directly contradicts the terms of the Offer Letters upon

8   which Plaintiffs base their entire case, which plainly require "subscriptions to the Birst

9   Offerings," "fees. . . payable under a contract" and "revenue recognition in accordance with

10   GAAP and Infor's revenue recognition policies." Ex. 1 at 3. By definition, a giveaway "at no

11   charge" does not result in any fees, much less revenue. Mr. Taber's opinion should be excluded

12   for this reason alone. *See B.N.Y. Mellon*, 910 F. Supp. 2d at 648.

13        Finally, Mr. Taber offers nothing to support his speculation about what constitutes a sale.

14   The section of Mr. Taber's opening report that addresses his conclusion in § 1.f contains only

15   three paragraphs and has only two factual citations—both to the same page of a single deposition.

16   *See* Ex. 24 (Taber Rep.) § 5.k. There is nothing in Mr. Taber's report that points to any

17   underlying factual matter that could validate his conclusion. There is no meaningful methodology

18   disclosed at all. Experts are permitted to provide reasoned opinions based on actual facts and data,

19   *see* Rule 702; they are precluded from presenting rank speculation as reliable testimony.

20        For these reasons, the Court should exclude Mr. Taber's inadmissible opinion in § 1.f.

21   **IV.    CONCLUSION**

22        For the foregoing reasons, Infor respectfully requests that the Court exclude Mr. Partin's

23   opinions and calculations regarding Bookings and Plaintiffs' earnout bonuses in their entirety and

24   those of Mr. Pinto in their entirety, as unreliable and inadmissible under Rule 702. Infor further

25   requests that the Court strike the opinions reflected in §§ 1.a, 1.c, and 1.f of Mr. Taber's opening

26   report, and preclude Mr. Taber from testifying or offering an opinion on those topics.

27

28   [9] Mr. Taber also has no expertise to render this opinion. He is not a lawyer and has no legal
     training, *see* Ex.25 (Taber) at 37:4–7, nor is he an accountant or an economist.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  October 29, 2021

KEKER, VAN NEST & PETERS LLP

By:   */s/ R. James Slaughter*

R. JAMES SLAUGHTER
BROOK DOOLEY
JULIA ALLEN
CODY GRAY
GAVIN THOLE
NICHOLAS R. GREEN

Attorneys for Defendant/Counterclaimant
INFOR (US), LLC (F/K/A INFOR (US),
INC.)

26

1751710