1

KEKER, VAN NEST & PETERS LLP
R. JAMES SLAUGHTER - # 192813

2

rslaughter@keker.com
BROOK DOOLEY - # 230423

3

bdooley@keker.com
STEVEN A. HIRSCH - #171825

4

shirsch@keker.com
CODY GRAY - # 310525

5

cgray@keker.com
GAVIN THOLE - # 325713

6

gthole@keker.com
633 Battery Street

7

San Francisco, CA 94111-1809
Telephone:     415 391 5400

8

Facsimile:     415 397 7188

9

Attorneys for Defendant/Counterclaimant
INFOR (US), LLC (F/K/A INFOR (US), INC.)

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

SAN FRANCISCO DIVISION

13

14

BRAD PETERS, DAVID GRAY, AND
PAUL STAELIN,

15

Plaintiffs,

16

v.

17

INFOR (US), LLC (F/K/A INFOR (US),
INC.),

18

Defendant.

19

20

INFOR (US), LLC (F/K/A INFOR (US),
INC.),

21

Counterclaimant,

22

v.

23

BRAD PETERS, DAVID GRAY, AND
PAUL STAELIN,

24

25

Counter-Defendants.

Case No. 3:19-cv-08102-JCS

**INFOR (US), LLC.'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

Date:          December 17, 2021
Time:          2:00 pm
Conference by Zoom
Judge:         Hon. Joseph C. Spero

Date Filed:  December 11, 2019

Trial Date:  April 4, 2022

26

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

27

28

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................................2

II.   STATEMENT OF THE ISSUES TO BE DECIDED.........................................5

III.   STATEMENT OF UNDISPUTED FACTS .........................................................5

A.   "Enterprise Resource Planning" software and "Software as a Service"................5

B.   Pre-acquisition, Infor offered CloudSuite ERP software and Birst offered Birst Enterprise and Birst Professional BI software. .................................................5

C.   After several money-losing years, Birst was acquired by Infor—enriching the plaintiffs at the expense of Birst's shareholders. .................................................7

D.   Peters negotiated an earnout bonus based on growth of "the business acquired." ...............................................................................................................8

E.   Post-acquisition, Infor and Birst began to work on integrating a stripped-down form of Birst analytics into Infor's CloudSuite offering................................9

F.   On the eve of termination, Peters and Staelin planted a made-for-litigation email exchange on Infor's servers to bolster their claims in this lawsuit. .............10

G.   Infor terminated the plaintiffs and declined to pay earnout bonuses. ...................12

IV.   ARGUMENT .......................................................................................................12

A.   This motion avoids factual disputes and meets Rule 56 standards by relying almost exclusively on evidence from the plaintiffs themselves...........................12

B.   The Court should grant summary judgment for Infor on all of plaintiffs' claims for unpaid earnout bonuses (COAs 1–6). ..................................................13

1.   The Court should grant summary judgment for Infor on plaintiffs' breach-of-contract claim (COA 1). ..........................................................13

a.   Plaintiffs' claim to have exceeded the earnout thresholds depends on sales of Cloudsuites that include B4CS, but neither B4CS nor the alleged "single code base" is a Birst Offering.......................................................................................14

(i)   Plaintiffs' "B4CS-is-BE theory" fails because B4CS did not exist pre-acquisition and is a pale shadow of BE. ..............................................................................15

(ii)   Plaintiffs' fallback "single code base theory" fails because the purported code base is neither a "product" nor a "service" capable of qualifying as a Birst Offering. ..................................................................18

(iii)   Plaintiffs' arguments would result in absurdly high Bookings inconsistent with the parties' expectations. .......20

i

(iv)    At minimum, the Court should issue a Rule 56(g) order. ...................................................................21

b.    Plaintiffs' claim to have exceeded the earnout thresholds fails for a second reason: B4CS was not provisioned to enough customers ...................................................................21

2.    The Court should grant summary judgment for Infor on plaintiffs' claim that Infor's declining to pay earnout bonuses breached the implied covenant of good faith and fair dealing (COA 2). ....................22

3.    The Court should grant summary judgment for Infor on plaintiffs' promissory-estoppel claim for unpaid earnout bonuses (COA 3). ............23

4.    The Court should grant summary judgment for Infor on the statutory unpaid wages claims covering the earnout bonuses (COAs 4, 5, and 6). ...................................................................25

C.    The Court should grant summary judgment for Infor on its conversion and unjust-enrichment counterclaims. ...................................................................25

V.    CONCLUSION...................................................................25

INFOR (US), LLC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 3:19-cv-08102-JCS

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Acosta v. City Nat'l Corp.*,
 922 F.3d 880 (9th Cir. 2019) ................................................................13

*Hanson v. Safeco Ins. Co. of Am.*,
 2014 WL 3752114 (W.D. Wash. July 30, 2014) ...................................13

*Hotchkiss v. CSK Auto Inc.*,
 918 F. Supp. 2d 1108 (E.D. Wash. 2013) ..............................................25

*Kliff v. Hewlett Packard Co., Inc.*,
 318 Fed. App'x 472 (9th Cir. 2008) .......................................................23

*Porkert v. Chevron Corp.*,
 461 F. App'x 245 (4th Cir. 2012) ...........................................................23

*Revitch v. DIRECTV, LLC*,
 977 F.3d 713 (9th Cir. 2020) ..................................................................20

*Stephens v. Union Pac. R.R. Co.*,
 935 F.3d 852 (9th Cir. 2019) ..................................................................13

*Tria Beauty, Inc. v. Radiancy, Inc.*,
 2012 WL 12919483 (N.D. Cal. June 12, 2012) .....................................21

*Walker v. KFC Corp.*,
 728 F.2d 1215 (9th Cir. 1984) ................................................................24

**State Cases**

*Cty. of Marin v. Assessment Appeals Bd.*,
 64 Cal. App. 3d 319 (1976) ....................................................................20

*Flintco Pac., Inc. v. TEC Mgmt. Consultants, Inc.*,
 1 Cal. App. 5th 727 (2016) .....................................................................23

*Lee v. Hanley*,
 61 Cal. 4th 1225 (2015) ..........................................................................25

*Platt Pac., Inc. v. Andelson*,
 6 Cal. 4th 307 (1993) ..............................................................................14

*Prof'l Tax Appeal v. Kennedy-Wilson Holdings, Inc.*,
 29 Cal. App. 5th 230 (2018) ...................................................................25

*Schachter v. Citigroup, Inc.*,
 47 Cal. 4th 610 (2009) ............................................................................25

iii

*Stephens & Stephens XII, LLC v. Fireman's Fund Ins. Co.*,
　　231 Cal. App. 4th 1131 (2014) ............................................................................14

*US Ecology, Inc. v. Cal.*,
　　129 Cal. App. 4th 887 (2005) ..............................................................................24

*Waller v. Truck Ins. Exch., Inc.*,
　　11 Cal. 4th 1 (1995) .............................................................................................22

*Youngman v. Nevada Irr. Dist.*,
　　70 Cal. 2d 240 (1969) ..........................................................................................24

**Federal Statutes**

Federal Rule of Civil Procedure 56 ................................................................1, 12, 13, 21

**State Statutes**

Cal. Civ. Proc. Code § 1638 .............................................................................................20

Cal. Civ. Proc. Code § 1856(b) ........................................................................................24

California Labor Code §§ 201 and 203 .............................................................................12

Revised Code of Washington Chapters 49.48 et seq. and 49.52 et seq. ....................12, 25

INFOR (US), LLC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 3:19-cv-08102-JCS

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on Friday, December 17 at 2:00 p.m., defendant Infor (US), LLC ("Infor"), will and hereby does move the Court for an order granting partial summary judgment under Federal Rule of Civil Procedure 56.

Specifically, Infor seeks **(1)** an order under Federal Rule of Civil Procedure 56(a) granting summary judgment in Infor's favor on the First through Sixth causes of action alleged in plaintiffs' Second Amended Complaint (Doc. 59) ("SAC") because there is no genuine dispute as to any material fact and those claims fail as a matter of law, **or (2)** if the Court does not grant some or all of that relief, an order under Federal Rule of Civil Procedure 56(g) stating that the following material facts are not genuinely in dispute and will be treated as established in the case: (i) Birst for CloudSuite, as well as the "single code base," "Birst platform," and "Birst component of Birst for CloudSuite" identified by Plaintiffs' experts, are not "Birst Offerings" within the meaning of the earnout-bonus provisions of the 2017 Offer Letters between Infor and the plaintiffs (Exs. 1-3), and (ii) transactions where "Birst Offerings" were provided at no charge are not "Bookings" within the meaning of the Offer Letters. **Additionally,** Infor seeks **(3)** an order granting summary judgment in Infor's favor on the First and Second Counterclaims alleged in Infor's Answer to the Second Amended Complaint and First Amended Counterclaims Against Plaintiffs because there is no genuine dispute as to any material fact and thus Infor must prevail on its counterclaims as a matter of law (Doc. 60).

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities that follows, the accompanying Declarations of R. James Slaughter, Gavin M. Thole, and Gretchen D'Amico in Support of Infor (US), LLC's Motion for Summary Judgment, the complete files and records in this action, the arguments of counsel, and any other matters that the Court may consider.

**MEMORANDUM OF POINTS AND AUTHORITIES**[1]

## I.   INTRODUCTION

This case concerns "earnout" bonuses that three software-company executives claim their former employer owes them, even though the conditions precedent for receiving those bonuses never occurred. Based on numerous admissions of the executives themselves, that former employer—defendant and movant Infor—now asks the Court to grant summary judgment in Infor's favor on all of the executives' earnout-bonus claims.

In 2017, Infor, a provider of "CloudSuite"-brand Enterprise Resource Planning ("ERP") software, acquired Birst, a provider of Business Intelligence ("BI") software, for $75 million. Plaintiffs Brad Peters, Paul Staelin, and David Gray were Birst's CEO, Chief Customer Officer, and global-sales chief. They stayed on post-acquisition to guide Infor's new Birst business unit.

Before the acquisition closed, each plaintiff signed an employment contract with Infor—an "Offer Letter"—whose terms Peters had negotiated in detail. The Offer Letters provided that the plaintiffs could receive "Earnout Bonuses" tied to "the growth of the business acquired." The bonuses were to be calculated as a percentage of the amount by which "Bookings" exceeded $18 million in FY18 and $21 million in FY19 (hereafter referred to as "the earnout thresholds"). And, in keeping with their focus on "the business acquired," the Offer Letters limited "Bookings" to qualifying "Birst Offerings" of products or services that Birst had sold, or that had been designed and developed, at the time of the acquisition. There were only two such products: the powerful and costly Birst Enterprise ("BE") and the less powerful but much cheaper Birst Professional ("BP"). Birst's total bookings before the acquisition never exceeded $17 million in any year.

After two lackluster years in which Infor's newly-acquired Birst business unit failed to meet the $18 million and $21 million earnout thresholds, Infor terminated the plaintiffs, who had already begun to plot how to lay claim to the bonuses despite missing the earnout thresholds. On

---

[1] Throughout this brief, **(1)** Exs. 1-23 refer to exhibits attached to the Declaration of R. James Slaughter and Exs. 24-41 refer to exhibits attached to the Declaration of Gavin M. Thole; **(2)** "SAC" refers to the Second Amended Complaint (Doc. 59); **(3)** "COA" and "COAs" refer respectively to one or more Causes of Action pleaded in the SAC; **(4)** "Rule" refers to a Federal Rule of Civil Procedure; and **(5)** emphases were added to quotations, while internal alterations, punctuation, footnotes, and citations were omitted from them.

their way out the door, Peters and Staelin planted emails that they hoped would be "discovered" in this lawsuit to corroborate a vastly inflated Bookings figure of $317 million. They now seek earnout bonuses totaling over $70 million based on claimed Bookings of more than $185 million.

In fact, however, Plaintiffs are owed nothing. Plaintiffs' *first* problem is that the combined Bookings of Birst's pre-acquisition products (BE and BP) do not exceed the earnout thresholds. Plaintiffs therefore try to rely on sales of Infor CloudSuites that include Birst for CloudSuite ("B4CS")—a product that did not exist at the time of the acquisition. But plaintiffs' attempt to bootstrap B4CS into Bookings fails because B4CS is not a Birst Offering within the meaning of the Offer Letters and therefore no Bookings can be attributed to it.

To begin, Plaintiffs concede that B4CS is the combination of some Birst analytics and Infor content and took "30 man-years" *after* the acquisition to develop. As such, B4CS never was part of "the business acquired" and cannot qualify as a "Birst Offering." Plaintiffs not only concede that B4CS did not exist before the acquisition; they make its nonexistence the core of their second cause of action, which alleges that Infor dragged its feet in creating B4CS post-acquisition. So, by operation of their own pleadings, plaintiffs' reliance on B4CS is dead in the water.

Plaintiffs claim that B4CS is just "BE plus Infor content," suggesting that B4CS is a Birst Offering. In reality, B4CS and BE were fundamentally different products, with different features and capabilities that offered different solutions to customers. Indeed, plaintiffs went to great lengths to emphasize internally at Birst and to customers that B4CS was not the "full Birst" and lacked key features of BE, such as the ability to customize charts and graphs and the ability to analyze data from any source. In fact, when B4CS customers wanted to access those advanced features or to analyze non-CloudSuite data, salespeople urged them to "upgrade" to BE—a practice that would make no sense if B4CS and BE were the same product. At their depositions, plaintiffs admitted again and again that the stripped-down but free-of-charge B4CS is *not* the same product as the full-featured and expensive BE—not even close. And *all* of Infor's marketing materials depict B4CS and BE as products of vastly divergent power and sophistication.

After their B4CS-is-BE theory collapsed, plaintiffs began to assert that each sale of an

Infor CloudSuite that included B4CS in FY18-19 should be treated as a "Booking" because B4CS included a "Birst component," or shared a "single code base" with BE, that existed before the acquisition. Thus, the theory goes, B4CS is just BE with many of its best features turned off (by switches contained within the "single code base" itself). But this theory fails, too, because the "single code base" / "Birst Component" is not a "product or service" and therefore cannot qualify as a "Birst Offering." No salesperson, before or after the acquisition, ever tried to market the "single code base" or "Birst Component" as an identifiable product or service. No document, before or after the acquisition, identified the "single code base" or "Birst Component" as a product or service. No salesperson ever tried to dissuade a CloudSuite+B4CS customer from upgrading to BE by telling them that no upgrade was necessary because they already had access to this "single code base." And it is pure litigation doubletalk to argue that a "single code base" is offering customers the same "product or service" when the code **(a)** *blocks* B4CS customers from accessing BE's advanced features and **(b)** *offers* BE customers access to those same features.

The "single code base" / "Birst component" theory also clashes with the Offer Letters, whose terms make clear that a software sale cannot qualify as a "Booking" unless that software could be "sold separately" for a readily ascertainable "list price." The "Birst Component of B4CS" had no list price and never was sold separately. It did not have its own stock-keeping unit ("SKU") number, and it does not appear in any Birst product roadmap or pricing presentation. In truth, the "single code base" is a made-for-litigation grab-bag of code, features, and licenses that plaintiffs' experts manufactured *post hoc* to argue Birst offered something pre-acquisition that could be assigned BE's high price for every subscription to CloudSuite+B4CS in FY18-19. As the *SNL* Church Lady used to say: *How convenient*.

Plaintiffs have a ***second*** problem. Even if one pretended that B4CS (or the "single code base"/"Birst Component") was otherwise a Birst Offering, it was not delivered to enough customers to allow plaintiffs to meet the earnout thresholds. Plaintiffs' expert admitted that CloudSuite sales do not count toward Bookings unless and until B4CS is delivered ("provisioned") to the customer. But B4CS ***was not*** provisioned to many CloudSuite purchasers in FY18-19. If CloudSuite sales where B4CS was not provisioned in FY18-19 are removed from

plaintiffs' calculations, plaintiffs fail to meet the earnout thresholds.

For these reasons and others set forth below, the Court should grant summary judgment in Infor's favor on each of plaintiffs' causes of action that is based on failure to pay earnout bonuses (COAs 1-6), and on Infor's counterclaims for the return of over $800,000 in FY19 earnout bonuses that Infor mistakenly paid to the plaintiffs as the result of a math error.

## II.   STATEMENT OF THE ISSUES TO BE DECIDED

1.     Did Infor breach the Offer Letters by failing to pay plaintiffs FY18 and FY19 earnout bonuses, where the conditions precedent for paying those bonuses did not occur?

2.     Did Infor breach the Offer Letters' implied covenant of good faith and fair dealing by frustrating the plaintiffs' ability to benefit from their purported "right" to earnout bonuses, where the conditions precedent for paying those bonuses did not occur?

3.     Is Infor liable for earnout bonuses under a promissory-estoppel theory even though each plaintiff had a written Offer Letter with Infor that was supported by valid consideration?

4.     Are plaintiffs liable to Infor for conversion and unjust enrichment because they have retained over $800,000 in FY19 earnout bonuses that Infor paid to them by mistake?

## III.   STATEMENT OF UNDISPUTED FACTS

### A.   "Enterprise Resource Planning" software and "Software as a Service"

Enterprise Resource Planning ("ERP") software ties together an organization's business processes and links workflows across departments and physical locations. Organizations use ERP software to manage day-to-day business activities such as accounting, human resources, factory planning and execution, distribution, customer-relationship management, ecommerce, financial planning, and performance reporting. Ex. 24 at 7-8.

In its modern form, the ERP software industry furnishes its products to customers in the form of "Software as a Service" ("SaaS"), meaning that the software resides in "the cloud" on remotely located servers, and customers must pay for access to it. *Id.* at 6.

### B.   Pre-acquisition, Infor offered CloudSuite ERP software and Birst offered Birst Enterprise and Birst Professional BI software.

Infor offers ERP software products and services on a SaaS basis. Infor's "CloudSuite" ERP software is tailored to be used by specific industry "verticals" such as healthcare, industrial

manufacturing, automotive, aerospace and defense, and retail stores. Ex. 24 at 9; Ex. 4 (Peters) at 258:20-22; Ex. 5 (Staelin) at 131:11-23. CloudSuites' core function is to manage a business' day-to-day activities; business intelligence (described below) is just one feature of a CloudSuite.

Founded in 2004 by plaintiffs Peters and Staelin, Birst sold "business intelligence" ("BI") software that enabled businesses to take data from applications, transform that data to make it more useful, and generate dashboards, charts, and analytical reports. Ex. 5 (Staelin) at 29:16-19; Ex. 4 (Peters) at 33:14-21, 36:7-17, 53:8-12.

Pre-acquisition, Birst offered two primary products: **Birst Enterprise ("BE")** and **Birst Professional ("BP")**. Ex.4 (Peters) at 40:20-41:2; Ex. 5 (Staelin) at 189:15-24, 238:14-239:20; Ex 7 at 5. BE is the more sophisticated and powerful product by far: It can tackle large, complicated enterprise problems, such as taking all the data from an ERP application and turning that data into dashboards and reports that help businesses interpret that data. Ex 4 (Peters) at 41:3-18; Ex. 5 (Staelin) at 164:3-165:3. Each BE sale included user licenses at two different levels of capability: two "Analyst User" licenses (the profile for an administrator who sets up systems, customizes dashboards and charts for the organization, and has access to all of Birst); and 18 "Business User" licenses (the profile for a businessperson who uses the platform to create reports). In addition, a customer could acquire some number of "read-only lite user" or "ROLITE" licenses (the profile of a user who can only view analytics and reports created by Analyst Users). While the "ROLITE" user cannot edit or customize content, she can access the customized reports, charts and dashboards created by her Analyst and Business Users colleagues. Ex. 6 (Gray) at 121:4-123:12; Ex. 8 at 11-12; Ex. 9; Ex. 10 at 11-12.

BE embodies two features that the plaintiffs view as particularly "novel" and "visionary": Network BI and Automated Data Refinement ("ADR"). Ex. 5 (Staelin) at 140:13-141:18, 146:3-16. Network BI allows customers to combine the metadata associated with one data set with the metadata associated with another data set without combining the two underlying data sets. Ex. 5 (Staelin) at 140:13-141:18; Ex. 4 (Peters) at 41:19-42:25. ADR is BE's primary data-modelling engine. Ex. 5 (Staelin) at 159:2-16. It allows customers to more quickly and readily model complex data and make it ready for analysis with metadata on it. Ex. 5 (Staelin) at 146:2-16,

150:11-18.

BE also includes Visualizer, which is the rendering engine for content that appears on a dashboard and also allows customers to create or modify that content. Ex. 4 (Peters) at 49:6-50:8. Visualizer performs two main functions: rendering charts and graphs that can shrink/expand with the size of a webpage; and allowing customers to change, edit, modify, and interact with those reports—e.g., by adding/removing columns. Ex. 5 (Staelin) at 121:22-124:2. BE and BP also offer Pronto, an add-on that allows users to take content from documents like spreadsheets and bring it into Birst to generate a report. Ex. 5 (Staelin) at 137:11-138:14, 144:1-145:2.

Due to its extensive capabilities, BE is expensive. Customers pay a $100,000 "platform fee," plus a $50,000 fee for the Network BI add-on, plus fees based on the desired quantity and user profiles of seat licenses. Ex. 5 (Staelin) at 163:12-164:2,279:17-281:3; Ex. 8 at 8.

Birst's other primary offering, BP, does much less and costs much less: Its platform fee is just $9,500, less than 10% of BE's. Ex. 4 (Peters) at 47:3-18, 342:5-16; Ex. 5 (Staelin) at 163:12-165:3. BP is an entry-level product for smaller companies whose users who cannot perform sophisticated data modelling. Ex. 4 (Peters) at 41:3-18, 48:8-19, 341:11-20; Ex. 6 (Gray) at 74:13-75:5, 120:9-24. It allows customers to provide dashboards based on "tinker[ing]" with spreadsheets. Ex. 5 (Staelin) at 164:3-165:3. BP offers the putatively "visionary" Network BI feature as well as Visualizer, but does not include ADR, as BP employs a different data-modelling approach. Ex. 4 (Peters) at 41:18-42:25; Ex. 5 (Staelin) at 159:22-160:19.

## C.   After several money-losing years, Birst was acquired by Infor—enriching the plaintiffs at the expense of Birst's shareholders.

In FY14, FY15, and FY16, Birst lost $36.7 million, $41 million, and $28.1 million, respectively. Ex. 4 (Peters) at 53:19-25; 57:10-58:25. Its bookings never exceeded $17 million. Ex. 26. By the fall of 2016, Birst had formally begun seeking acquirors. Ex. 4 (Peters) at 67:8-68:1,76:3-77:15; Ex. 5 (Staelin) at 38:6-39:11. Birst's investment banker, Morgan Stanley, reached out to multiple buyers, but failed to spark interest among obvious prospects like

Salesforce and SAP. Ex. 4 (Peters) at 81:4-84:22. No potential buyer offered more than Infor, which signed a merger agreement with Birst on April 25, 2017. Ex. 4 (Peters) at 85:1-19; Ex. 5 (Staelin) at 58:20-23; Ex. 23. Infor ultimately acquired Birst for around $75 million, but a "carve-out" to compensate Birst executives reduced the deal's value to Birst shareholders to around $63 million—a loss of 60% of their investments. Exs. 27, 28 at 8; Ex. 4 (Peters) at 138:17-142:5.

Unlike Birst's shareholders, plaintiffs did very well for themselves, negotiating payouts and bonuses worth millions. Peters took $2.6 million of the $11 million carve-out pool for himself, plus the right to a potential $11.6 million retention bonus if he stayed at Infor for two years (which he did). Ex. 4 (Peters) at 155:5-157:23, 199:1-6, 212:1-16; Ex. 26 at 1-2; Ex. 28 at 4. Staelin received around $5.7 million from the merger, while plaintiff David Gray made about $600,000. Ex. 4 (Peters) at 198:3-13; Ex. 28 at 7; Ex. 5 (Staelin) at 75:5-77:12; Ex. 6 (Gray) at 36:7-17.

### D. Peters negotiated an earnout bonus based on growth of "the business acquired."

One specifically negotiated aspect of the plaintiffs' employment contracts with Infor was the so-called "earnout bonus" that lies at the heart of this case. Peters negotiated the earnout in detail with Infor and signed the agreement on May 30, as did Staelin; Gray signed his Offer Letter on June 20, 2017. Exs 1-3; Ex. 4 (Peters) at 166:3-15, 169:1-171:20, 178:7-22; Ex. 5 (Staelin) at 58:20-23, 68:12-69:11.

The Offer Letters' earnout-bonus provision stated that "[y]ou will be eligible to receive an earnout bonus *based on the growth of the business acquired in the Acquisition* during each of FY18 and FY19[.]" Ex. 1. As explained above, the two primary offerings of "the business acquired in the Acquisition" were BE and BP.

This was the basic earnout-bonus promise in Peters' Offer Letter:

> The FY18 Earnout Bonus shall be an amount equal to 35% of the amount by which FY18 **Bookings** exceeds $18 million. The FY19 Bonus shall be an amount equal to 28% of the amount by which FY19 **Bookings** exceeds $21 million.[2]

---

[2] Ex. 1 at 3. Staelin's and Gray's Offer Letters featured the same provision, but with different bonus percentages—11% and 8% for Staelin for FY18 and FY19, respectively; 4% for Gray. Ex. 2 at 3; Ex. 3 at 2. Their Offer Letters' earnout-bonus provisions otherwise matched Peters'.

In keeping with the language tying earnout bonuses to "the growth of the business acquired in the Acquisition," the Offer Letters' "Booking" definition made no mention of products or services that might be created post-acquisition:

> ***"Booking"*** means ACV from subscriptions to the **Birst Offerings** that are **Contracted** in the applicable fiscal year. The amount of any booking shall include only that portion of the subscription fees payable under a contract that are attributable to the **Birst Offerings**. If Birst Offerings are sold bundled or in combination with other products or services offered by Infor, the subscription revenue for purposes hereof shall be deemed to be the list price of the Birst Offerings as if the Birst Offerings had been sold individually . . . .

Again in keeping with the "growth of the business acquired" language, the Offer Letter defined "Birst Offerings," in turn, as "products or services" that Birst either had been offering or had already designed and developed "at the time of the Acquisition," specifically *excluding* products and services like B4CS that were created after the acquisition:

> ***"Birst Offerings"*** shall mean any and all **products or services** offered, licensed, provided, sold, distributed or otherwise exploited by Birst **at the time of the Acquisition** and any and all products or services already designed and developed by or for Birst **at the time of the Acquisition**, including all versions and releases of the foregoing, together with any related user documentation.

The Offer Letters also limit "Bookings" to fees-generating sales for which Infor can recognize revenue. "Annual Contract Value" or "ACV" is defined as "the total amount of subscription fees applicable to Birst Offerings *payable* under a contract, divided by the term of the subscription in years…." And "Bookings" only includes fees "from subscriptions to the Birst Offerings that are **Contracted** in the applicable fiscal year." *Id*. "Contracted," in turn, requires in part that "subscription revenue recognition in accordance with GAAP and Infor's revenue recognition policies has commenced." *Id*.

In June of 2017, Infor agreed to allocate 10% of post-acquisition CloudSuite revenue to Birst for purposes of calculating Birst business-unit revenue. Ex. 4 (Peters) at 260:6-261:18, 264:3-8; Ex. 11 at 2; Ex. 13.

**E.    Post-acquisition, Infor and Birst began to work on integrating a stripped-down form of Birst analytics into Infor's CloudSuite offering.**

Even before the acquisition closed, Birst and Infor discussed how CloudSuite would incorporate limited aspects of Birst analytics in a new, free-of-charge CloudSuite component that

9

came to be known as "Birst for CloudSuite" ("B4CS"). Ex. 4 (Peters) at 236:11-237:5; Ex. 14. From plaintiffs' perspective, at least, the business purpose for this integration was clear: "to drive new and upsell revenue by enticing new and existing customers to purchase [BP] and [BE] and the value added solutions [that Infor's] teams [would] be developing using *those platforms* over time." Ex. 14. According to Gray, "what both the broader Infor and Birst would want is that if the client has a positive experience in consumption of the [B4CS] component of CloudSuite, then potentially . . . that gives us an opportunity to talk about additional sales outside of [B4CS]"—i.e., sales of Birst's superior freestanding products, BE and BP. Ex. 6 (Gray) at 126:4-127:23.

The plaintiffs knew that BE and BP would continue to be Birst's moneymakers and that B4CS, by contrast, was not going to produce significant revenues for the Birst business unit or ever become the focus of its marketing efforts. In October 2017, Peters cautioned Staelin that "[w]e need to make it very clear that [B4CS] is not full Birst and [that] significant functionality will not be there in the free version." Exs. 12 and 4 at 242:14-243:19. According to Peters, "[t]he goal was to make sure that there was differentiation between [B4CS] and [BE]." Ex. 4 (Peters) at 242:14-243:19. All of Birst's marketing documents presented B4CS as having vastly fewer features and capabilities compared to BE. *See, e.g.*, Exs. 8, 14, 15 & 29. Nearly two years later, when Infor began to discuss marketing Birst analytics as part of CloudSuite and not as standalone products, Peters objected that "[t]he vast majority of our bookings and revenue come from stand-alone Birst [i.e., BE and BP], either core or cross-sell. CloudSuites is a small part of our business and one [that is] already embedded in the suite, and hence there's no voluntary purchase decision to be made that can be influenced by marketing." Exs. 16 and 4 (Peters) at 269:2-20.

**F.      On the eve of termination, Peters and Staelin planted a made-for-litigation email exchange on Infor's servers to bolster their claims in this lawsuit.**

Post-acquisition, the Birst business unit didn't prove to be a raging success. An email that Gray sent to Staelin in May of 2019 reviewed the unit's performance in FY18 and FY19, noting that "[t]he data points make bleak reading," but adding that the 10% internal budgeting allocation would "contribute to a decent performance this year." Ex. 17. Bleak reading indeed: In FY18, only 2 of 24 sales reps had made their quota; in FY19, only 2 of 31. *Id*. Bookings lagged behind quota by $3.6 million in FY18 and by $6.7 million in FY19. *Id*.

By October 2019, Peters and Staelin knew they were going to be fired and fabricated an evidentiary foundation for their earnout claims here. Ex. 30 at 4; Ex. 31 at 4; Ex. 4 (Peters) at 296:7-298:20, 301-302; Ex. 5 (Staelin) at 320:5-22. On the evening of October 3, Staelin privately texted Peters to say that ████████████████████████████████████████ ████████████████████████████████████████████ Ex. 31 at 3; *see also* Ex. 4 (Peters) at 299:5-300:1, 305:5-25, 308:8-309:22; Ex. 5 (Staelin) at 322:18-325:12, 327:21-328:21; Ex 32. Staelin also came up with an alternative estimate of $2.9 ***billion*** in Bookings, but he and Peters did not go with that number because $317 million "seemed like it was going to be an easier number for us to start the conversation with." Ex. 4 (Peters) at 300:14-24. The next morning, as planned, Staelin emailed Peters the $317 million bookings estimate. Ex. 32; Ex. 4 (Peters) at 310:12-313:25.

Peters and Staelin knew both of those figures were inflated fictions. In the first place, the far lower $18 million and $21 million earnout thresholds in the Offer Letters already exceeded any bookings numbers that Birst had achieved in prior years. Peters accordingly understood from the outset that the earnout bonuses could turn out to be zero. Ex. 4 (Peters) at 168:1-23, 272. Moreover, as part of the acquisition, Peters had been required by law to disclose to existing Birst shareholders his acquisition-related compensation, or "parachute." Peters estimated that his ***maximum*** reasonable earnout for FY18 and FY19 would total $4.5 million, based on estimated Bookings of $22 million for FY18 and $31 million for FY19. Ex. 28 at 6; Ex. 4 (Peters) at 218:3-219:24. Peters attested that he was making a good-faith disclosure of "the highest possible value reasonably determinable under the parachute provisions based on the information available" as of the date of the disclosure. Ex. 28 at 2; Ex. 4 (Peters) at 207:2-209:18. Abandoning his $4.5 million estimate, Peters now claims he is personally entitled to $43 million.

Plaintiffs' disbelief in their own earnout-bonus calculations continued post-acquisition. In May 2019, Staelin generated Bookings calculations that showed ***zero*** Bookings for the first three quarters of FY19. Exs. 18-19; Ex. 5 (Staelin) at 308-313:7, 302-304. And private texts between Peters and Staelin establish that the day before they were terminated, Staelin believed that ████████████████████████████████████████████████████████████

1    ████████.[3] Ex 31 at 5; Ex. 4 (Peters) at 316:2-317:19.[4]

2          **G.    Infor terminated the plaintiffs and declined to pay earnout bonuses.**

3          In October 2019, Infor terminated plaintiffs. SAC30. In December 2019, Infor notified

4    plaintiffs that it determined FY19 bookings to be $22,757,872, resulting in earnout bonuses of

5    $492,204.10 to Peters, $140,629.76 to Staelin, and $193,365.92 to Gray. SAC34. But Infor had

6    mistakenly included some FY20 bookings in its FY19 calculation. Ex. 33 at 10. In May 2020,

7    Infor asked each plaintiff to return those funds, explaining that "[u]nder Infor's revised analysis,

8    FY 19 bookings did not exceed the $21 million threshold required to trigger an FY 19 Earnout

9    Bonus." SAC38-39. Plaintiffs have refused, and Infor counterclaims for return of the funds.

10          Plaintiffs filed this action against Infor on December 11, 2019. Their Second Amended

11   Complaint alleges six causes of action based on failure to pay earnout bonuses—namely, breach

12   of contract (COA 1), breach of the implied covenant of good faith and fair dealing (COA 2),

13   promissory estoppel (COA 3), failure to pay wages to Staelin and Peters in violation of California

14   Labor Code §§ 201 and 203 (COAs 4 and 5), and failure to pay wages to Peters in violation of

15   Revised Code of Washington Chapters 49.48 et seq. and 49.52 et seq. (COA 6).

16          Infor has filed six counterclaims and seeks summary judgment on two of them: its first

17   counterclaim for conversion of erroneously paid FY19 earnout bonuses, and its second

18   counterclaim for unjust enrichment by retention of those bonuses.

19   **IV.    ARGUMENT**

20          **A.    This motion avoids factual disputes and meets Rule 56 standards by relying
21                  almost exclusively on evidence from the plaintiffs themselves.**

22          Rule 56(a) states that "[a] party may move for summary judgment, identifying each claim

23   or defense—or the part of each claim or defense—on which summary judgment is sought. The

24   court ***shall*** grant summary judgment if the movant shows that there is no genuine dispute as to

25

26   [3] As explained below, the FY19 figure was about $7 million too high.

27   [4] Peters claimed at his deposition that these figures only represented stand-alone bookings for BE
     and BP (Ex. 4 (Peters) at 316:2-317:19); but he previously told Infor that "[t]he vast majority of
28   [Birst business unit] bookings and revenue come from stand-alone Birst [i.e., BE and BP], either
     core or cross-sell. CloudSuites is a small part of our business[.]" Exs. 16 & 4 (Peters) at 269:2-20.

any material fact and the movant is entitled to judgment as a matter of law." Rule 56(g) further authorizes a court that declines to grant summary judgment to enter instead "an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." "Taken in conjunction with Rule 56 subsection (a), subsection (g) permits the court to establish undisputed factual findings that are brought within a motion for summary judgment." *Hanson v. Safeco Ins. Co. of Am*., 2014 WL 3752114, at *4 (W.D. Wash. July 30, 2014).

Whether directed to all or part of a claim, summary judgment is "appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact." *Acosta v. City Nat'l Corp*., 922 F.3d 880, 885 (9th Cir. 2019).

"To survive a motion for summary judgment, a nonmoving party must present evidence from which a reasonable jury could return a verdict in its favor." *Stephens v. Union Pac. R.R. Co*., 935 F.3d 852, 854 (9th Cir. 2019). A party asserting that a fact cannot be, or is, genuinely disputed "must support that assertion" by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A) & (B). No material fact presented in this motion can be genuinely disputed: nearly every fact was taken from plaintiffs' deposition testimony, documents of undisputed authenticity shown to and identified by plaintiffs at their depositions, or from plaintiffs' expert reports.

**B.      The Court should grant summary judgment for Infor on all of plaintiffs' claims for unpaid earnout bonuses (COAs 1–6).**

Plaintiffs allege six claims for unpaid earnout bonuses (COAs 1-6). As to each of those claims, "there is no genuine dispute as to any material fact and [Infor] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

**1.      The Court should grant summary judgment for Infor on plaintiffs' breach-of-contract claim (COA 1).**

Plaintiffs' first cause of action alleges that Infor breached the earnout-bonus provision in the Offer Letters by failing to pay earnout bonuses to which they are entitled. They are mistaken, because the contractual conditions precedent to their receiving those bonuses never occurred.

"Under the law of contracts, parties may expressly agree that a right or duty is conditional upon the occurrence or nonoccurrence of an act or event." *Platt Pac., Inc. v. Andelson*, 6 Cal.4th 307, 313 (1993). "[A] 'condition precedent' is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises." *Stephens & Stephens XII, LLC v. Fireman's Fund Ins. Co.*, 231 Cal.App.4th 1131, 1147 (2014). "[G]enerally, a party's failure to perform a condition precedent will preclude an action for breach of contract." *Id.*

        a.      **Plaintiffs' claim to have exceeded the earnout thresholds depends on sales of Cloudsuites that include B4CS, but neither B4CS nor the alleged "single code base" is a Birst Offering.**

Here, the parties agreed in the Offer Letters to conditions precedent: the right to earnout bonuses would not accrue unless Bookings of Birst Offerings exceeded $18 million for FY18 and $21 million for FY19. Bookings of a product or service do not count toward satisfying the earnout thresholds unless that product or service qualified as a "Birst Offering." The two products that ***were*** indisputably Birst Offerings were its standalone products, BE and BP, which Birst designed, developed, sold, and licensed before the acquisition. But the combined Bookings of BE and BP were not enough to clear the earnout thresholds.[5] Thus, plaintiffs cannot prove that the condition precedents were met unless they prove that B4CS or some other Birst "product or service" ***also*** qualified as a "Birst Offering" with a enough sales volume and price to exceed the thresholds.

To prove this, plaintiffs have offered two equally meritless theories as to why every sale of an Infor CloudSuite that included B4CS in FY18-19 should have resulted in Bookings equal to a sale of BE, Birst's flagship costly standalone product—even though B4CS is a just stripped-down add-on used as a teaser to drive BE sales.

---

[5] This is undisputed with respect to FY18. *See* Ex. 35 at 16-17. As to FY19, plaintiffs' damages expert asserts that Bookings of BE and BP alone exceeded the $21 million FY19 threshold by over $4 million. *See id.* But he reached that conclusion only by including and assigning a value of nearly $7 million to B4CS "giveaways" (*see* Ex. 38 at ¶16; *see also id.* at ¶¶ 15,54-55). As a matter of law those "zero dollar transactions" cannot count as Bookings, because the Booking definition states that "[t]he amount of any booking shall include only that portion of the ***subscription fees payable under a contract*** that are attributable to the Birst Offerings." Giveaways generate no "subscription fees payable under a contract." Thus, there is no genuine issue of material fact as to whether FY19 Bookings of BE and BP cleared the $21 million threshold. They did not.

**The B4CS-is-BE theory.** This theory posits that B4CS is just "BE plus Infor content." and therefore, like BE, is a "Birst Offering." Even plaintiff Staelin does not buy this one: He conceded—twice—at his deposition that "Birst for CloudSuite is ***not*** a Birst offering." Ex. 5 (Staelin) at 176:22-177:25; *see also id. at* 178:1-3 ("Q. And Birst for CloudSuite's not a Birst offering. A [by Staelin]. It is not, no.").

**The "single code base" theory.** This theory posits that B4CS *shares a "single code base" with* BE and, therefore, is a "Birst Component" of B4CS that is the same product or service as BE, only with lots of BE's advanced features turned off.

As discussed below, both theories fail as a matter of law and undisputed fact.

> **(i)    Plaintiffs' "B4CS-is-BE theory" fails because B4CS did not exist pre-acquisition and is a pale shadow of BE.**

Plaintiffs' first theory, expressed repeatedly at their depositions, maintains that B4CS is just "BE plus Infor content" and therefore, like BE, is a Birst Offering. *See, e.g*., Ex. 4 (Peters) at 278:9-14; Ex. 6 (Gray) at 72:11-23, 74:13-76:24, 82:3-17, 85:9-86:9, 196:8-20. That theory fails as a matter of law and undisputed fact because B4CS concededly did not exist pre-acquisition and is far less capable than BE.

**B4CS didn't exist pre-acquisition.** The B4CS-is-BE theory is doomed because B4CS did not exist before the acquisition, was not part of "the business acquired," and therefore cannot qualify as a "Birst Offering" whose sales count toward meeting the earnout thresholds.

As previously mentioned, the Offer Letters explicitly tied earnout bonuses to "the growth of the business acquired in the Acquisition." Accordingly, the term "Birst Offering" embraces any and all "products or services" that were **(1)** "offered, licensed, provided, sold, distributed or otherwise exploited by Birst at the time of the Acquisition" or **(2)** "already designed and developed by or for Birst at the time of the Acquisition[.]"

But plaintiffs admitted repeatedly that B4CS could not have existed and did not exist at the time of the acquisition—in which case it formed no part of "the business acquired in the Acquisition" and was not a Birst Offering. *See, e.g*., Ex. 4 (Peters) at 252:1-255:15; Ex. 5 (Staelin) at 113:5-114:16,180:11-183:14,188:14-189:7,191:8-18,196:14-197:2; Ex. 6 (Gray) at 72:11-23, 210:21-212:3; Ex. 39 (Taber) at 108:6-14. Plaintiffs' expert estimated that ███

██████████████████████████████ Ex. 24, fn 90. Staelin testified that B4CS was

first provided to a few "Beta" customers post-acquisition, in late 2018, and remained in limited

availability for long after. Ex. 5 (Staelin) at 187:6-23. Moreover, plaintiffs' claim for breach of

the implied good-faith covenant is based on the allegation that Infor wrongfully "delay[ed] and

disrupt[ed] the embedding" of B4CS into CloudSuite until *long after* the acquisition. SAC27.

That's all one needs to know to reject the "B4CS-is-BE" theory. But there's more.

**B4CS is not remotely comparable to BE.** Plaintiffs repeatedly admitted that B4CS is a

different product than, and pale shadow of, BE. Staelin admitted that B4CS and BE are "different

solutions," Ex. 5 (Staelin) at 222:3-16, and vehemently denied that B4CS is a version or later

release of BE "in any way, shape, or form." Ex. 5 (Staelin) at 193:4-21; *see also id. at* 194:8-25;

195:1-23. Peters likewise cautioned Staelin in an email that "[w]e need to make it very clear that

[B4CS] is not full Birst and [that] significant functionality will not be there in the free version."

Ex. 12; Ex. 4 (Peters) at 242:14-243:19. The very phrase "BE plus Infor content" is misleading,

as it tries to put a happy face on the fact that B4CS *lacks* one of BE's most powerful features: The

ability to customize content (e.g. charts, graphs, and KPIs[6]) and to analyze data from any source.

Instead, B4CS customers are confined to pre-built Infor content and CloudSuite data. Ex. 4

(Peters) at 244:8-15, 249:6-250:20; Ex. 5 (Staelin) at 212:21-214:7, 222:3-16; Ex. 8 at 6, 7, 17;

Ex. 14 at 5, 10; Ex. 15 at 14-15, 18. Gray testified that it was this very disparity in capabilities

that created opportunities for Birst-unit salespeople to "upsell" customers from CloudSuite+B4CS

to BE—a practice that would make no sense if the two were the same "product or service," as the

plaintiffs assert. Gray testified that in FY18-19, salespeople told customers that B4CS "'comes

with prebuilt [Infor] content, reports, et cetera, dashboards for your users to consume, but it is

restricted to your . . . [Infor] CloudSuite Data. It can't be used outside of that. . . . If you . . . want

to use Birst more broadly, then there's an opportunity to purchase [BE]. Within [BE], there's

different user profiles with different amounts of capability, license rights to do things, and then

you can access those different data sources.'" Ex. 6 (Gray) at 85:9-86:9; *see also id.* at 82:3-

---

[6] "KPIs," or "key performance indicators," are quantifiable measures of performance over time
for a specific objective.

17,108:7-109:1. Gray did ***not*** testify that salespeople told CloudSuite+B4CS customers not to bother upgrading to BE because they already had access to it.

Data limitations aside, plaintiffs have furnished many more reasons to conclude that B4CS is no BE. Particularly instructive is a September 2017 slide deck that Peters and Staelin presented to Infor salespeople post-acquisition, providing them with a side-by-side comparison of the features and fees associated with BE, BP, and the anticipated B4CS. Ex. 14 at 5. As shown in the deck and confirmed by the plaintiffs at deposition, B4CS customers lack access to ***both*** of the putatively novel and "visionary" Birst innovations—Network BI (available as a BE add-on) and ADR (included in BE). *Id.*; Ex. 8 at 17; Ex. 5 (Staelin) at 142:19-143:26, 148:23-149:20, 161:10-21, 162:21-163:9. B4CS customers likewise lack access to Visualizer (included in BE) and to Pronto (another BE add-on). Ex. 14 at 5; Ex. 4 (Peters) at 234:3-8, 249:6-250:8, 349:20-350:5; Ex. 5 (Staelin) at 133:10-134:11, 137:11-138:14, 144:14-145:2, 204:16-205:12; Ex. 8 at 17. Indeed, every marketing and sales document depicted B4CS and BE as vastly different products. *See, e.g.,* Ex 8 at 7 (comparing features), 21 (CloudSuite licensees "do not own any licenses of" BP or BE); Ex. 14 at 5, 10; Ex. 15 at 14-15, 18; *see also* Ex. 6 (Gray) at 130:1-131:9.

Indeed, a B4CS user has access to even fewer features than a BE ROLITE User—the most restricted of the three BE user profiles. Unlike a BE ROLITE user, B4CS users cannot analyze non-Infor data sources and cannot access the custom reports that a BE Analyst user could create and provide to ROLITE users. Ex. 6 (Gray) at 88:12-89:14, 112:22-113:22; *see also* Ex. 5 (Staelin) at 211:19-213:20, 222:3-16. According to Staelin, "anyone that will access the custom content created with the Enterprise platform will need at least a Read-Only viewer license. . . . Users without that **expanded** license will be entitled to access only the OOTB (out of the box) content included in the Birst for CloudSuites base offering and NOT the custom content created by the Enterprise platform." Ex. 10 at 11. Simply put, the BE ROLITE user has access to all the BE features (Network BI, ADR, custom visualizations, third party data) whereas B4CS users are limited to out of the box capabilities.

Because B4CS did not exist pre-acquisition and is far less capable than BE, the Court should reject the B4CS-is-BE theory and enter summary judgment for Infor on the first claim.

1

2

**(ii)      Plaintiffs' fallback "single code base theory" fails because the purported code base is neither a "product" nor a "service" capable of qualifying as a Birst Offering.**

3    Plaintiffs' fallback theory for why every sale of a CloudSuite that included B4CS should

4    generate BE-sized Bookings is that B4CS and BE share a single body of code, also known as the

5    "single code base," the "Birst platform," or the "Birst component" of B4CS. Thus, B4CS is just

6    BE with many of its best features turned off (by switches contained within the "single code base"

7    itself). *See* Ex. 24 at 13; Ex. 6 (Gray) at 83:2-84:22, 86:22-87:18, 214:1-20.

8    The theory fails. The purported "single code base" cannot qualify as a Birst Offering, and

9    sales of it in FY18-19 cannot qualify as "Bookings," because the "single code base" is neither a

10   "product" nor a "service."[7] Rather, it is a made-for-litigation grab-bag of code, features, and

11   licenses—never before identified or marketed to customers as a product or service—that

12   plaintiffs' experts threw together *post hoc* in order to argue that Birst offered something before

13   the acquisition that could be assigned BE's high price every time someone bought a subscription

14   to an Infor CloudSuite that included B4CS in FY18-19. If accepted, this *post hoc* identification of

15   a "product or service" that no one ever marketed or knowingly purchased would render the terms

16   "Booking" and "Birst Offering" infinitely malleable—and meaningless.

17   The crucial and indisputable fact is that, both before and after the acquisition, the "single

18   code base" lacked any existence as an identifiable "product or service." It was not the subject of

19   any marketing effort. It had no list price and never was assigned its own Stock-Keeping Unit

20   number ("SKU"). Customers have no conception of the "single code base" or "Birst Component"

21   as a product, a service, or anything else. The theory's post hoc, made-for-litigation character is

22   best revealed by expert David Taber's depiction of the "Birst platform"—his term for the single

23   code base—as ████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████    Ex. 24 at 11

26   n.33. No document, before or after the acquisition, marketed or sold a "single code base" or

27

28   ────────────────────
[7] Indeed, Plaintiffs' experts conceded that a single code base can form the basis for different products with different prices. Ex. 39 (Taber) at 81:8-82:3.

"Birst component" and it was never identified as a product or service. *See, e.g.*, Ex. 9.

The "single code base" theory also ignores the Offer Letters' definition of "Booking." Peters bargained for and obtained language tying "Bookings" to identifiable, customer-facing products that have established list prices. Ex. 4 (Peters) at 169:1-171:20. Thus, the "Booking" definition provides that, "[i]f Birst Offerings are sold bundled or in combination with other products or services offered by Infor"—as the purported "single code base" purportedly is—"the subscription revenue for purposes hereof shall be deemed to be the ***list price*** of the Birst Offerings as if [they] had been ***sold individually.***" But the "single code base" has no "list price" and never was "sold individually."[8] *See, e.g.*, Ex. 9. It is therefore not a "product or service" that could qualify as a "Birst Offering." Taber opined that ████████████████████████████ ████████████████████████████████ Ex. 24 at 18. By that reasoning, the "single code base" cannot be used in earnout calculations, either.

It is pure litigation doubletalk to argue that a "single code base" is offering customers the same "product or service" when the same "single code base" **(a)** *blocks* B4CS customers from accessing BE's advanced features and **(b)** *offers* BE customers access to those same features. From the customer's standpoint—the only one that matters when discussing sales of a "product or service"—those are two distinct and very different experiences. Indeed, salespeople used this stark contrast in capabilities as an opportunity to "upsell" customers from the free-of-charge B4CS to the costly BE product—a practice that makes no sense if their "single code base" made them the same "product or service." Ex. 6 (Gray) at 82:3-17, 84:24-88:11,108:7-109:1.

One clear motivation behind the "single code base" theory is manufacturing the appearance of factual disputes by giving software experts an opening to debate whether a definable "Birst platform" exists, and if so, what is in it. We urge the Court to brush aside such pseudo-disputes and see the "single code base" theory for what it is: a rhetorical gimmick. The Court should grant summary judgment on plaintiffs' first claim.

---

[8] Plaintiffs' expert David Taber admitted that a product or service is something that is "offered for sale." Ex. 39 at 89:16-19. But there is no evidence that the single code base or "Birst component" was ever offered for sale in the form suggested by Plaintiffs.

### (iii)   Plaintiffs' arguments would result in absurdly high Bookings inconsistent with the parties' expectations.

Adopting either of Plaintiffs' theories attempting to add in sales of CloudSuites including B4CS as Bookings is also untenable because it creates absurd results. California law requires courts to "avoid an interpretation which will make a contract extraordinary, harsh, unjust, inequitable or which would result in absurdity." *Cty. of Marin v. Assessment Appeals Bd.*, 64 Cal. App. 3d 319, 325 (1976); *see also* CAL. CIV. CODE § 1638. Relatedly, courts "look to the *reasonable* expectation of the parties at the time of contract" when determining what they intended. *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 717 (9th Cir. 2020).

Accepting plaintiffs' interpretation that B4CS qualifies as a "Birst Offering" and should be priced at the BE list price because it is really BE or shares BE's "code base" leads to an absurd result: Each sale of a CloudSuite that included B4CS would generate Bookings in excess of $150,000 even though B4CS was given away *for free* with CloudSuite. Indeed, under the Offer Letters a Booking "shall **only include that portion of subscription fees payable under a contract that are <u>attributable</u> to a Birst Offering**." For B4CS, the "contract" is the contract for the sale of a CloudeSuite that included B4CS as one element. But under Plaintiffs' theory, Bookings attributable to the Birst Component of B4CS can, and often do, exceed the fees payable for the *entire* CloudSuite with which it was purchased.[9] That is the definition of inequitable and absurd.

Even from the standpoint of value to customers rather than revenues to Infor, the theory makes no sense, as the premise must be that CloudSuite's stripped-down, free-of-charge B4CS component somehow provides the same or comparable value to customers as a subscription to the vastly more powerful and costly BE. The plaintiffs know better. Staelin testified at deposition that *BE and BP* have hugely divergent list prices ($150,000+ versus $9,500) because "they deliver different value aimed at different use cases." Ex. 5 (Staelin) at 231. The same reasoning applies to the more divergent pricing of *BE and B4CS* ($150,000+ versus *zero*).

Based on the untenable premise that sales of B4CS and BE generate similar revenues and

---

[9] Infor's expert, Douglas Kidder, has identified multiple respects in which the damages calculations by plaintiffs' expert William Partin ascribe absurdly high values to B4CS sales. *See* Ex. 38 ¶ 36; *see also* Defendant's concurrently filed *Daubert* motion.

convey comparable value, plaintiffs now claim that Birst Bookings totaled nearly $47 million in FY18 and $140 million in FY19—the vast majority of which are attributable to B4CS, even though Birst's pre-acquisition annual bookings historically never exceeded even the $18 million FY18 earnout-bonus threshold, *see* Ex. 32, Ex. 4 (Peters) at 60:24-62:9, and even though, at the time of the acquisition, Peters estimated that the highest FY19 Birst bookings would be was $31 million. Ex. 4 (Peters) at 219:6-24. Peters' legal disclosure to Birst shareholders estimated that the maximum reasonable earnout bonuses for all plaintiffs would total about $6.5 million; now, plaintiffs claim over $70 million. Ex. 28 at 6-7. In short, the undisputed evidence proves that the plaintiffs never believed the extravagant claims they make here (though they planted a phony email thread on Infor's servers to make it seem like they did).

To avoid absurd results, the Court should rule B4CS, the "single code base," "Birst platform," and "Birst component" are not "Birst Offerings" and grant summary judgment for Infor on plaintiffs' first claim.

### (iv)     At minimum, the Court should issue a Rule 56(g) order.

Failing that, the Court should issue an order under Rule 56(g) stating: (i) B4CS, as well as the "single code base," "Birst platform," and "Birst component" identified by plaintiffs' experts, are not "Birst Offerings" under the Offer Letters; and (ii) transactions where "Birst Offerings" were provided at no charge are not "Bookings" under the Offer Letters. Those rulings would cause settlement and thus have "an appreciable effect" on the proceedings. *Tria Beauty, Inc. v. Radiancy, Inc.*, 2012 WL 12919483, at *2 (N.D. Cal. June 12, 2012).

### b.     Plaintiffs' claim to have exceeded the earnout thresholds fails for a second reason: B4CS was not provisioned to enough customers.

Even if one pretends that B4CS or the so-called "single code base" both (1) could otherwise qualify as a Birst Offering and (2) should be assigned the same list price as the far-more-capable BE, the Bookings *still* would not exceed the earnout thresholds because B4CS was not provisioned to enough CloudSuite customers in FY18 and FY19.

Plaintiffs' damages expert, William Partin, admitted that under the GAAP accounting

1  rules adopted in the Offer Letters,[10] CloudSuite sales do not count toward Bookings unless and

2  until B4CS *actually is delivered* ("provisioned") to the customer. Ex. 37 (Partin) at 148:18-149:8,

3  158:19-159:4, 164:2-11. Likewise, Infor's revenue-recognition policy is explicit that "Revenue

4  from Software-as-a-Service should be recognized" only "once the SaaS environment is

5  provisioned." Ex. 36 at 31. Partin conceded, "if a CloudSuite customer was never provisioned

6  with Birst for CloudSuite… [that] is [not] a sale by Infor of Birst for CloudSuite to that customer"

7  and that he would "exclude [those sales] from [his] calculation." Ex. 37 (Partin) at 158:19-160:4.

8      Partin *did*, however, include in his Bookings calculation sales where the customer was

9  never provisioned with the Birst Offering. Ex. 38 at ¶¶ 22-26. If Mr. Partin's Bookings

10  methodology is limited to contracts where BE, BP or B4CS was *actually provisioned* in FY18 or

11  FY19, Bookings were just $20,137,221 for FY19 and $14,203,174 for FY18—below the earnout

12  thresholds. *See* D'Amico Decl. at ¶ 12. This calculation accepts plaintiffs' (incorrect) theory that

13  B4CS (or the "single code base") is a Birst Offering and Plaintiffs' (incorrect) theory that the list

14  price of B4CS for purposes of calculating Bookings be based on the BE list price. *See id*. Even

15  making these assumptions to Plaintiffs' benefit, plaintiffs do not exceed the earnout thresholds

16  when the Bookings calculation is properly limited to subscription fees that were Contracted

17  during the applicable fiscal years, as is required under the terms of the Offer Letters.

18      For this independent reason, the Court should grant summary judgment on the first COA.

19          **2.    The Court should grant summary judgment for Infor on plaintiffs'
20                  claim that Infor's declining to pay earnout bonuses breached the
                    implied covenant of good faith and fair dealing (COA 2).**

21      A covenant of good faith and fair dealing "is implied as a supplement to the express

22  contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the

23  other party's rights to the benefits of the agreement." *Waller v. Truck Ins. Exch., Inc*., 11 Cal. 4th

24  1, 36 (1995). Plaintiffs' second cause of action for breach of the implied covenant turns on the

25  notion that Infor prevented the conditions precedent (meeting the FY18-19 earnout thresholds)

26

27  _____

28  [10] Under the Offer Letters, "Bookings" only include the fees from "subscriptions to the Birst
     Offerings that [were] **Contracted** in the applicable fiscal year." "Contracted," in turn, requires in
     part that "**subscription revenue recognition in accordance with GAAP and Infor's revenue
     recognition policies has commenced.**" *See* Exs. 1 at 3, 2 at 3, 3 at 3.

from occurring by dragging its feet when creating B4CS and embedding it in CloudSuite, thereby foreclosing CloudSuite+B4CS bookings that otherwise would have occurred. SAC ¶¶ 27, 54.

But that claim is implausible because integrating Birst analytics into CloudSuite was squarely in Infor's interest. Infor had been losing business to competitors with better analytics solutions, Ex. 5 (Staelin) at 167:7-19; Ex. 6 (Gray) at 126:4-127:3, and its CEO discussed with Birst "how to get Birst's Analytics capabilities deployed as broadly as possible as quickly as possible." Ex. 5 (Staelin) at 48:1-10. More importantly, though, plaintiffs' implied-covenant claim is legally insufficient. The reason the plaintiffs cannot obtain earnout-bonus credit for sales of CloudSuite+B4CS is *not* that Infor was slow to integrate B4CS—it is because B4CS is not a "Birst Offering." *See* Part IV.B.1., above. Plaintiffs thus claim that Infor frustrated contractual rights that they never had.

Equally conclusively, Plaintiffs' damages expert admitted that he calculated no damages for this claim, Ex. 37 (Partin) at 46:25-47:15, leaving plaintiffs unable to prove—as they must— that they were harmed by the alleged delays. *See* CACI 325.

### 3.   The Court should grant summary judgment for Infor on plaintiffs' promissory-estoppel claim for unpaid earnout bonuses (COA 3).

Plaintiffs' promissory-estoppel claim alleges they were induced to remain employed at Infor by Infor's promises that it would "timely" embed Birst software into Infor's products and "timely" bundle, promote, and sell that software. SAC ¶ 57. This claim restates the "foot-dragging theory" of their breach of the good-faith covenant claim; and the resulting harm appears again to be plaintiffs' failure to receive earnout bonuses they would have received had Infor "timely" performed the alleged promises. But as mentioned above, plaintiffs' expert calculated no "foot-dragging damages," leaving plaintiffs unable to prove, as they must, injury from their reliance. *See Flintco Pac., Inc. v. TEC Mgmt. Consultants, Inc.*, 1 Cal. App. 5th 727, 734 (2016).

And the claim fails for another reason. "Under California law, when the parties have entered into a written contract, a claim arising under it is one for breach of contract and may not be asserted on the separate ground of promissory estoppel." *Porkert v. Chevron Corp.*, 461 F. App'x 245, 252 (4th Cir. 2012); *see also Kliff v. Hewlett Packard Co., Inc.*, 318 Fed. App'x 472, 477 (9th Cir. 2008) (because parties entered into contract, promissory-estoppel claim should have

been for contract breach). That is especially true here, where the contract features an integration clause stating that "[t]hese terms supersede any other agreements . . . or promises made to you by anyone affiliated with Infor, whether oral or written." Ex. 1 at 5. That language bars reliance on Infor's alleged "timely"-integration-and-marketing promises. *See* Cal. Civ. Proc. Code § 1856(b).

Plaintiffs' claim also fails because the act allegedly constituting detrimental reliance—remaining employed by Infor—was bargained for and thus the employment contracts govern. "[P]romissory estoppel claims are aimed solely at allowing recovery in equity where a contractual claim fails for a lack of consideration." *US Ecology, Inc. v. Cal*., 129 Cal. App. 4th 887, 904 (2005). The doctrine's purpose is "to make a promise binding . . . without consideration in the usual sense of something bargained for and given in exchange." *Youngman v. Nevada Irr. Dist*., 70 Cal. 2d 240, 249 (1969). Thus "where the promisee's reliance *was* bargained for, the law of consideration applies; and it is only where the reliance was *un*bargained for that there is room for application of the doctrine of promissory estoppel." *Id*. at 250. Reliance is only "*un*bargained for" where "no benefit flows to the promisor." *Walker v. KFC Corp*., 728 F.2d 1215, 1220 (9th Cir. 1984). And the claim that a plaintiff's detrimental reliance was "*un*bargained for" becomes "totally unpersuasive" where the performance constituting the detrimental reliance consisted of "the very acts which induced [the other party] to enter into the written agreements." *Id*. at 1219.

That is the situation here: The performance that plaintiffs claim satisfies the detrimental-reliance requirement—remaining employed by Infor—is the very act that induced Infor to enter into written employment agreements with them. "That was, in a word, the deal"; and the analysis is unaffected by "the fact that some of the promises that induced that performance"—such as Infor's alleged promise to "timely" integrate Birst software—"were made outside the written agreements." *Id*. at 1220. This is not a case where "no benefit flow[ed] to the promisor," *id*.; rather, the benefits of plaintiffs' remaining as Infor employees (the act constituting their detrimental reliance) constituted consideration flowing to Infor.

Because plaintiffs' reliance was bargained for and furnished consideration to Infor, their claim sounds in contract, and the Court should grant summary judgment for Infor.

**4.      The Court should grant summary judgment for Infor on the statutory unpaid wages claims covering the earnout bonuses (COAs 4, 5, and 6).**

Plaintiffs also bring three statutory claims (COAs 4, 5, and 6) for unpaid wages in the form of unpaid earnout bonuses. But the statutes on which they rely acknowledge the enforceability of contractual conditions on the payment of contingent compensation. *See Schachter v. Citigroup, Inc.*, 47 Cal. 4th 610, 621 (2009) (affirming summary judgment for employer on Cal. Labor Code § 201 claim, where plaintiff had agreed to forfeit stock-based compensation if he resigned before vesting dates); *Hotchkiss v. CSK Auto Inc.*, 918 F. Supp. 2d 1108, 1131 (E.D. Wash. 2013) (granting summary judgment for employer on RCW 49.48 claim, where plaintiff had agreed to forfeit commissions earned the month before resignation).

Here too valid conditions precedent to receiving earnout bonuses did not occur: Bookings did not exceed $18 million for FY18 and $21 million for FY19. No wages owed went unpaid, and the Court should grant summary judgment for Infor on plaintiffs' statutory unpaid-wage claims.

**C.      The Court should grant summary judgment for Infor on its conversion and unjust-enrichment counterclaims.**

Infor's first counterclaim is conversion ("the wrongful exercise of dominion over the property of another," *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015)) and its second is unjust enrichment (receiving a benefit unjustly retained at another's expense, *Prof'l Tax Appeal v. Kennedy-Wilson Holdings, Inc.*, 29 Cal. App. 5th 230, 238–242 (2018)). The material facts are few and undisputed. Plaintiffs received over $800,000 in earnout-bonus payments because errors in Infor's December 2019 earnout calculation—e.g., the inclusion of sales closed in FY20— caused Infor to conclude mistakenly that the $21 million threshold for FY19 had been exceeded. Ex. 33, ¶ 36. Infor explained these errors to plaintiffs who refused to return the payments. Exs. 20-22. The Court should grant summary judgment for Infor on its first two counterclaims.

**V.      CONCLUSION**

For all the reasons stated above, the Court should grant the relief requested in the accompanying Notice of Motion and Motion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated: October 29, 2021                           KEKER, VAN NEST & PETERS LLP


By:   /s/ *R. James Slaughter*
      R. JAMES SLAUGHTER
      BROOK DOOLEY
      STEVEN A. HIRSCH
      CODY GRAY
      GAVIN THOLE
      NICHOLAS R. GREEN

      Attorneys for Defendant/Counterclaimant
      INFOR (US), LLC (F/K/A INFOR (US),
      INC.)

INFOR (US), LLC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 3:19-cv-08102-JCS