# EXHIBIT 1

DocuSign Envelope ID: D82E507B-0505-44C2-BF20-3C6999E8309B



641 Avenue of the Americas
New York, NY 10011
800-260-2640
infor.com

May 26, 2017

Bradley Peters
118 Alta St
San Francisco, CA  94133

     Re:  Employment offer in connection with the acquisition of Birst, Inc.

Dear Brad,

In connection with the anticipated acquisition of Birst, Inc. and its subsidiaries (collectively, "Birst") by Infor (US), Inc. (collectively with its affiliates and subsidiaries, "Infor") in a merger transaction pursuant to which Birst will become a wholly owned subsidiary of Infor (such transaction referred to herein as the "Acquisition"), this letter sets forth the terms of your employment with Infor  beginning on the calendar day immediately following the closing of the Acquisition.

Provided that you sign and deliver this letter as instructed below, subject to the consummation of the Acquistion and the other conditions set forth below, your employment under the terms of this letter will begin on the calendar day immediately after the Acquisition becomes effective (or such later date as you sign and deliver this letter to Infor).  You will initially remain employed by Birst, provided that Infor reserves its right to transfer your employment to another Infor entity.

<u>Position</u>:  The title of your position will be SVP, BI and Analytics, Birst.  In this position you will report to Charles Philips, CEO.  Your principal place of employment shall be located within 35 miles of San Francisco, CA.

<u>Compensation</u>:  Your annual base salary will be $350,000 subject to applicable withholdings, payable semi-monthly and in accordance with Infor's normal payroll procedures.  In addition to your base salary, during your employment with Birst or Infor, you will be eligible for a management bonus of up to $100,000 (on a full year basis) based on the achievement of agreed upon business objectives during the applicable fiscal year.  Such bonus will be payable after the end of Infor's fiscal year, promptly following completion of Infor's financial audit with respect to such fiscal year and in no event later than December 31 of the same calendar year (*e.g.*, the bonus payment for the 2018 fiscal year will be made no later than December 31, 2018).  Infor's 2018 fiscal Year ("FY18") ends April 30, 2018 and any amount payable for FY18 may be prorated to reflect the partial year resulting from the timing of the Acquisition.

<u>Ongoing Equity Awards</u>.  You will be eligible to receive periodic Infor equity grants following the Acquisition that are provided to similarly situated Infor executives.

<u>Retention Bonuses</u>:  You will be eligible to receive a one-time retention bonus in the amount of $2,901,958.50, subject to applicable withholdings (the "First Retention Bonus"), provided that you remain continuously employed by Infor through the date that is six (6) months after the closing of the Acquisition (the "First Retention Bonus Date").  You will no longer be eligible for the First Retention Bonus if you voluntarily resign your employment or if your employment is terminated by Infor for Cause (defined below) prior to the First Retention Bonus Date.  The First Retention Bonus will be paid to you in the event that your employment is terminated by Infor without Cause before the First Retention Bonus Date or in the event of your death before the First Retention Bonus Date.



EXHIBIT

0026

DocuSign Envelope ID: D82E507B-0505-44C2-BF20-3C6999E8309B

You will be eligible to receive a second one-time retention bonus in the amount of $2,901,958.50, subject to applicable withholdings (the "Second Retention Bonus"), provided that you remain continuously employed by Infor through the date that is twelve (12) months after the closing of the Acquisition (the "Second Retention Bonus Date"). You will no longer be eligible for the Second Retention Bonus if you voluntarily resign your employment or if your employment is terminated by Infor for Cause prior to the Second Retention Bonus Date. The Second Retention Bonus will be paid to you in the event that your employment is terminated by Infor without Cause before the Second Retention Bonus Date or in the event of your death before the Second Retention Bonus Date.

You will be eligible to receive a third one-time retention bonus in the amount of $5,803,917.00, subject to applicable withholdings (the "Third Retention Bonus"), provided that you remain continuously employed by Infor through the date that is twenty four (24) months after the closing of the Acquisition (the "Third Retention Bonus Date"). You will no longer be eligible for the Third Retention Bonus if you voluntarily resign your employment or if your employment is terminated by Infor for Cause prior to the Third Retention Bonus Date. The Third Retention Bonus will be paid to you in the event that your employment is terminated by Infor without Cause before the Third Retention Bonus Date or in the event of your death before the Third Retention Bonus Date.

For purposes of this letter, "Cause" means (i) the conviction of, or a plea of plea of nolo contendere to any charge of a felony or any act of fraud or any act or omission involving dishonesty, or material disloyalty with respect to Infor, or any of its customers or suppliers or other material business relations, (ii) misconduct subjecting Infor to  public disgrace or disrepute, (iii) failure or refusal to perform duties as reasonably directed by Infor, following written notice of same and a meaningful opportunity to cure,  (iv) gross negligence or willful misconduct, (v) use of illegal drugs or abuse of other drugs or excessive consumption of alcohol interfering with the performance of your duties to Infor, or (vi) any material breach by you of any agreement between you and Infor, including without limitation, your breach of any provision of any nondisclosure, non-competition, trade secret protection or developments agreement.

In the event that the First Retention Bonus, Second Retention Bonus and/or the Third Retention Bonus becomes payable, it will be paid to you in the first regularly scheduled payroll following the date that the applicable bonus becomes payable.  In no event will the First Retention Bonus, Second Retention Bonus or the Third Retention Bonus be subject to proration or other partial payment.

Earnout Bonuses: You will be eligible to receive an earnout bonus based on the growth of the business acquired in the Acquisition during each of FY18 and FY19 (each an "Earnout Bonus" and together the "Earnout Bonuses"). The Earnout Bonuses (if any) will be payable after the end of the applicable fiscal year, promptly following completion of Infor's financial audit with respect to such fiscal year and in no event later than December 31 of the same calendar year (i.e., the Earnout Bonus for FY18 (if any) will be paid no later than December 31, 2018, and the Earnout Bonus for FY19 (if any) will be paid no later than December 31, 2019).

The FY18 Earnout Bonus shall be an amount equal to 35% of the amount by which FY18 Bookings exceeds $18 million.  The FY19 Earnout Bonus shall be an amount equal to 28% of the amount by which FY19 Bookings exceeds $21 million.

For purposes of calculating the Earnout Bonuses, the following capitalized terms shall have the meanings set forth below:

> "*Annual Contract Value*" or "*ACV*" means the total amount of subscription fees applicable to  Birst Offerings payable under a contract, divided by the term of the

CONFIDENTIAL

INvPSG00000871

DocuSign Envelope ID: D82E507B-0505-44C2-BF20-3C6999E8309B

subscription in years (e.g. $300,000 total subscription fees for a 3 year subscription results in an ACV of $100,000)

*"Allowed Attrition"* means, for any fiscal year, an amount equal 20% of the Year End Subscription Revenue Run Rate for all customers subscribing to the Birst Offerings for the immediately preceding fiscal year.

*"Attrition"* means the ACV of all reductions to previously contracted subscription fees for Birst Offerings determined on a customer by customer for the applicable fiscal year.

*"Birst Offerings"* shall mean any and all products or services offered, licensed, provided, sold, distributed or otherwise exploited by Birst at the time of the Acquisition and any and all products or services already designed and developed by or for Birst at the time of the Acquisition, including all versions and releases of the foregoing, together with any related user documentation.

*"Booking"* means ACV from subscriptions to the Birst Offerings that are Contracted in the applicable fiscal year.  The amount of any Booking shall include only that portion of the subscription fees payable under a contract that are attributable to the Birst Offerings.  If Birst Offerings are sold bundled or in combination with other products or services offered by Infor, the subscription revenue for purposes hereof shall be deemed to be the list price of the Birst Offerings as if the Birst Offerings had been sold individually; provided however, that if Birst Offerings are sold bundled with other products or services offered by Infor where a discount was applied to such sale, the aggregate discount on such sale shall be applied pro rata to each product in such sale, including the applicable Birst Offerings, in accordance with each such product's list price.  Bookings associated with existing customers shall include only the amount of incremental subscription fees (i.e. exclude any amounts representing renewal of prior subscriptions).

*"Contracted"* means that the written contract or order forms have been duly executed by all parties and subscription revenue recognition in accordance with GAAP and Infor's revenue recognition policies has commenced.

*"FY17"* means the fiscal year ending April 30, 2017

*"FY18"* means Infor's fiscal year ending April 30, 2018

*"FY19"* means Infor's fiscal year ending April 30, 2019

*"FY18 Bookings"* means the Bookings for FY18 <u>minus</u> any excess of Attrition over Allowed Attrition for FY18.

*"FY19 Bookings"* means the Bookings for FY19 <u>minus</u> any excess of Attrition over Allowed Attrition for FY18.

*"Year End Subscription Revenue Run-Rate"* means, for any fiscal year, the amount of net revenue (as defined by and determined in accordance with GAAP and Infor's revenue recognition policies) from the sale of the Birst Offerings attributed to the last full month of the fiscal year, multiplied by twelve (12).

By way of example and in no way guaranteeing the amount of any Earnout Bonus, in the event that:

Bookings = $25 million,

FY17 Year End Subscription Revenue Run Rate = $41M

CONFIDENTIAL

INvPSG00000872

DocuSign Envelope ID: D82E507B-0505-44C2-BF20-3C6999E8309B

Allowed Attrition (20%) = $8.2M

Attrition = $12M

FY18 Bookings = $25M Bookings – ($12M Attrition – $8.2 Allowed Attrition)

$$= \$25M - \$3.8M$$

$$= \$21.2M$$

FY18 Bookings exceeds $18M by $3.2M

The FY18 Earnout Bonus amount would be $1,120,000 (i.e. $3.2 million excess x 0.35).

For the avoidance of doubt, in the event that you are no longer employed by Infor at the end of the relevant fiscal year, no Earnout Bonus shall be payable, in whole or in part, regardless of the circumstances under which employment was terminated.

<u>Benefits</u>:  You will continue to be eligible for all employment benefits as generally offered to employees of Birst who remain employed with Infor following the Acquisition.   Your participation in all such employee benefit plans is subject to the terms of such plans, as they may be modified from time-to-time including by transition to the benefits generally offered to employees of Infor.

<u>At-Will Employment</u>:  Your employment shall be considered at all times to be on an "at-will" basis.  This means either you or Infor may terminate your employment at any time, with or without notice, and for any or no reason.  In addition, nothing in this letter summarizing your prospective employment terms shall constitute or be construed as a guarantee of employment for any definite period of time or a contract of employment.  By signing this letter as instructed below, you acknowledge and agree that any prior employment agreement, severance arrangements or terms and conditions of employment between Birst and you (the "Birst Employment Agreement") shall terminate and be of no further force or effect immediately upon the consummation of the Acquisition and that neither Birst nor Infor shall owe any further obligation to you (including, without limitation, any severance or termination payment) under such Birst Employment Agreement.

Infor may modify its policies and practices, including the compensation and benefits it provides from time to time, as it deems necessary; provided that such modifications shall not alter or amend the Compensation, Earnout Bonuses or Retention Bonuses specified in this letter.  However, the at-will nature of your employment may be modified only by a written agreement signed by both you and Infor.

<u>Nondisclosure, Noncompetition and Developments Agreement</u>: It is also a condition of your prospective employment that, prior to the commencement of  employment with Infor, you must sign Infor's Nondisclosure, Noncompetition and Developments Agreement, which contains additional requirements for the protection of Infor's trade secret, confidential and proprietary information, protections pertaining to Infor's business relationships, as well as an assignment to Infor of the ideas, concepts and other intellectual property that you create during your employment.

<u>Immigration</u>:  For purposes of United States' immigration law, you will be required to provide to Infor documentary evidence of your identity and eligibility for employment in the United States.  Such documentation must be provided to us within three (3) business days of your start date.

Acquisition Letter of Employment – B. Peters v6 5/26/17                CONFIDENTIAL                4

CONFIDENTIAL

INvPSG00000873

DocuSign Envelope ID: D82E507B-0505-44C2-BF20-3C6999E8309B

<u>No Employment-Related Claims</u>: You hereby confirm that you have no claims for unpaid wages or other employment-related remuneration against Birst other than for your regular salary for the current pay period as of the effective time of the Acquisition.  As a condition of accepting employment with Infor and by signing below, you confirm your agreement not to make any claim against Infor or any of its past, present or future affiliated companies for any employment-related matters arising from or in any way related to events that occurred prior to the date on which you countersign this letter, including without limitation, any claims for wages earned prior to commencing employment with Infor; provided that the foregoing agreement specifically excludes (i) any rights you may have in your capacity as a security holder of Birst in connection with the Acquisition; and (ii) any rights to indemnification or exculpation from Birst that you may have in your capacity as a former officer or director of Birst.  You also confirm your permission for Birst to provide, and for Infor to receive and maintain copies of your employment records, personnel file and any other materials and information related to your employment with Birst.

Your signature below will acknowledge your understanding and agreement to the terms and conditions set forth in this letter.  These terms supersede any other agreements (including, without limitation the Prior Agreement) or promises made to you by anyone affiliated with Infor, whether oral or written.  Infor reserves the right to withdraw these terms without further notice if they are not timely accepted by you or if any aspect (e.g. job references, education, proof of citizenship, etc.) of your qualifications cannot be verified and these terms shall only become valid upon Infor's final acceptance of this letter, signed by you.

Should you have any questions regarding this letter, please call me at 718-501-3320.

Welcome to Infor we look forward to having you as part of the team!

Sincerely,

Anne Benedict
SVP, Talent

CONFIDENTIAL

DocuSign Envelope ID: D82E507B-0505-44C2-BF20-3C6999E8309B

ACKNOWLEDGEMENT AND ACCEPTANCE:

The undersigned Bradley Peters acknowledges receipt of the foregoing letter setting forth the terms of Infor's offer of employment.  The undersigned accepts such offer subject to the terms of the letter and agrees to its terms, including, without limitation the termination of the Birst Employment Agreement.

Accepted: _____     May 30, 2017
          Bradley Peters                 _____
                                         Date

CONFIDENTIAL

INvPSG00000875

# EXHIBIT 2

DocuSign Envelope ID: 4D4BFA88-F39D-4E2D-95C3-440849889EEB



641 Avenue of the Americas
New York, NY 10011
800-260-2640
infor.com

May 30, 2017

Paul Staelin
1 Lost Valley Ct
Orinda, CA  95463

Re:  Employment offer in connection with the acquisition of Birst, Inc.

Dear Paul,

In connection with the anticipated acquisition of Birst, Inc. and its subsidiaries (collectively, "Birst") by Infor (US), Inc. (collectively with its affiliates and subsidiaries, "Infor") in a merger transaction pursuant to which Birst will become a wholly owned subsidiary of Infor (such transaction referred to herein as the "Acquisition"), this letter sets forth the terms of your employment with Infor  beginning on the calendar day immediately following the closing of the Acquisition.

Provided that you sign and deliver this letter as instructed below, subject to the consummation of the Acquistion and the other conditions set forth below, your employment under the terms of this letter will begin on the calendar day immediately after the Acquisition becomes effective (or such later date as you sign and deliver this letter to Infor).  You will initially remain employed by Birst, provided that Infor reserves its right to transfer your employment to another Infor entity.

<u>Position</u>:  The title of your position will be SVP Customer Success, BI & Analytics, Birst.  In this position you will report to Brad Peters, SVP BI and Analytics, Birst.

<u>Compensation</u>:  Your annual base salary will be $250,000 subject to applicable withholdings, payable semi-monthly and in accordance with Infor's normal payroll procedures.  In addition to your base salary you will be eligible for a management bonus of up to $70,000 (on a full year basis) based on the achievement of agreed upon business objectives during the applicable fiscal year.  Such bonus will be payable after the end of Infor's fiscal year, promptly following completion of Infor's financial audit with respect to such fiscal year and in no event later than December 31 of the same calendar year (*e.g.*, the bonus payment for the 2018 fiscal year will be made no later than December 31, 2018).  Infor's 2018 fiscal Year ("FY18") ends April 30, 2018 and any amount payable for FY18 may be prorated to reflect the partial year resulting from the timing of the Acquisition.

<u>Ongoing Equity Awards</u>.  You will be eligible to receive periodic Infor equity grants following the Acquisition that are provided to similarly situated Infor executives.

<u>Retention Bonuses</u>:  You will be eligible to receive a one-time retention bonus in the amount of $1,153,625.50, subject to applicable withholdings (the "First Retention Bonus"), provided that you remain continuously employed by Infor through the date that is six (6) months after the closing of the Acquisition (the "First Retention Bonus Date").  You will no longer be eligible for the First Retention Bonus if you voluntarily resign your employment or if your employment is terminated by Infor for Cause (defined below) prior to the First Retention Bonus Date.  The First Retention Bonus will be paid to you in the event that your employment is terminated by Infor without Cause before the First Retention Bonus Date or in the event of your death before the First Retention Bonus Date.

You will be eligible to receive a second one-time retention bonus in the amount of $1,153,625.50, subject to applicable withholdings (the "Second Retention Bonus"), provided



Exhibit
00065

CONFIDENTIAL

INvPSG00000876

DocuSign Envelope ID: 4D4BFA88-F39D-4E2D-95C3-440849889EEB

that you remain continuously employed by Infor through the date that is twelve (12) months after the closing of the Acquisition (the "Second Retention Bonus Date"). You will no longer be eligible for the Second Retention Bonus if you voluntarily resign your employment or if your employment is terminated by Infor for Cause prior to the Second Retention Bonus Date. The Second Retention Bonus will be paid to you in the event that your employment is terminated by Infor without Cause before the Second Retention Bonus Date or in the event of your death before the Second Retention Bonus Date.

You will be eligible to receive a third one-time retention bonus in the amount of $2,307,250.00, subject to applicable withholdings (the "Third Retention Bonus"), provided that you remain continuously employed by Infor through the date that is twenty four (24) months after the closing of the Acquisition (the "Third Retention Bonus Date"). You will no longer be eligible for the Third Retention Bonus if you voluntarily resign your employment or if your employment is terminated by Infor for Cause prior to the Third Retention Bonus Date. The Third Retention Bonus will be paid to you in the event that your employment is terminated by Infor without Cause before the Third Retention Bonus Date or in the event of your death before the Third Retention Bonus Date.

For purposes of this letter, "Cause" means (i) the conviction of, or a plea of plea of nolo contendere to any charge of a felony or any act of fraud or any act or omission involving dishonesty, or material disloyalty with respect to Infor, or any of its customers or suppliers or other material business relations, (ii) misconduct subjecting Infor to public disgrace or disrepute, (iii) failure or refusal to perform duties as reasonably directed by Infor, following written notice of same and a meaningful opportunity to cure, (iv) gross negligence or willful misconduct, (v) use of illegal drugs or abuse of other drugs or excessive consumption of alcohol interfering with the performance of your duties to Infor, or (vi) any material breach by you of any agreement between you and Infor, including without limitation, your breach of any provision of any nondisclosure, non-competition, trade secret protection or developments agreement.

In the event that the First Retention Bonus, Second Retention Bonus and/or the Third Retention Bonus becomes payable, it will be paid to you in the first regularly scheduled payroll following the date that the applicable bonus becomes payable. In no event will the First Retention Bonus, Second Retention Bonus or the Third Retention Bonus be subject to proration or other partial payment.

Earnout Bonuses: You will be eligible to receive an earnout bonus based on the growth of the business acquired in the Acquisition during each of FY18 and FY19 (each an "Earnout Bonus" and together the "Earnout Bonuses"). The Earnout Bonuses (if any) will be payable after the end of the applicable fiscal year, promptly following completion of Infor's financial audit with respect to such fiscal year and in no event later than December 31 of the same calendar year (i.e., the Earnout Bonus for FY18 (if any) will be paid no later than December 31, 2018, and the Earnout Bonus for FY19 (if any) will be paid no later than December 31, 2019).

The FY18 Earnout Bonus shall be an amount equal to 11% of the amount by which FY18 Bookings exceeds $18 million. The FY19 Earnout Bonus shall be an amount equal to 8% of the amount by which FY19 Bookings exceeds $21 million.

For purposes of calculating the Earnout Bonuses, the following capitalized terms shall have the meanings set forth below:

> "**Annual Contract Value**" or "**ACV**" means the total amount of subscription fees applicable to Birst Offerings payable under a contract, divided by the term of the subscription in years (e.g. $300,000 total subscription fees for a 3 year subscription results in an ACV of $100,000)

CONFIDENTIAL

INvPSG00000877

DocuSign Envelope ID: 4D4BFA88-F39D-4E2D-95C3-440849889EEB

*"Allowed Attrition"* means, for any fiscal year, an amount equal 20% of the Year End Subscription Revenue Run Rate for all customers subscribing to the Birst Offerings for the immediately preceding fiscal year.

*"Attrition"* means the ACV of all reductions to previously contracted subscription fees for Birst Offerings determined on a customer by customer for the applicable fiscal year.

*"Birst Offerings"* shall mean any and all products or services offered, licensed, provided, sold, distributed or otherwise exploited by Birst at the time of the Acquisition and any and all products or services already designed and developed by or for Birst at the time of the Acquisition, including all versions and releases of the foregoing, together with any related user documentation.

*"Booking"* means ACV from subscriptions to the Birst Offerings that are Contracted in the applicable fiscal year.  The amount of any Booking shall include only that portion of the subscription fees payable under a contract that are attributable to the Birst Offerings.  If Birst Offerings are sold bundled or in combination with other products or services offered by Infor, the subscription revenue for purposes hereof shall be deemed to be the list price of the Birst Offerings as if the Birst Offerings had been sold individually; provided however, that if Birst Offerings are sold bundled with other products or services offered by Infor where a discount was applied to such sale, the aggregate discount on such sale shall be applied pro rata to each product in such sale, including the applicable Birst Offerings, in accordance with each such product's list price.  Bookings associated with existing customers shall include only the amount of incremental subscription fees (i.e. exclude any amounts representing renewal of prior subscriptions).

*"Contracted"* means that the written contract or order forms have been duly executed by all parties and subscription revenue recognition in accordance with GAAP and Infor's revenue recognition policies has commenced.

*"FY17"* means the fiscal year ending April 30, 2017

*"FY18*" means Infor's fiscal year ending April 30, 2018

*"FY19*" means Infor's fiscal year ending April 30, 2019

*"FY18 Bookings*" means the Bookings for FY18 <u>minus</u> any excess of Attrition over Allowed Attrition for FY18.

*"FY19 Bookings*" means the Bookings for FY19 <u>minus</u> any excess of Attrition over Allowed Attrition for FY18.

*"Year End Subscription Revenue Run-Rate"* means, for any fiscal year, the amount of net revenue (as defined by and determined in accordance with GAAP and Infor's revenue recognition policies) from the sale of the Birst Offerings attributed to the last full month of the fiscal year, multiplied by twelve (12).

By way of example and in no way guaranteeing the amount of any Earnout Bonus, in the event that:

Bookings = $25 million,

FY17 Year End Subscription Revenue Run Rate = $41M

Allowed Attrition (20%) = $8.2M

CONFIDENTIAL
INVPSG00000878

DocuSign Envelope ID: 4D4BFA88-F39D-4E2D-95C3-440849889EEB

Attrition = $12M

FY18 Bookings = $25M Bookings – ($12M Attrition – $8.2 Allowed Attrition)

= $25M - $3.8M

= $21.2M

FY18 Bookings exceeds $18M by $3.2M

The FY18 Earnout Bonus amount would be $352,000 (i.e. $3.2 million excess x 0.11).

For the avoidance of doubt, in the event that you are no longer employed by Infor at the end of the relevant fiscal year, no Earnout Bonus shall be payable, in whole or in part, regardless of the circumstances under which employment was terminated.

<u>Benefits</u>:  You will continue to be eligible for all employment benefits as generally offered to employees of Birst who remain employed with Infor following the Acquisition.   Your participation in all such employee benefit plans is subject to the terms of such plans, as they may be modified from time-to-time including by transition to the benefits generally offered to employees of Infor.

<u>At-Will Employment</u>:  Your employment shall be considered at all times to be on an "at-will" basis.  This means either you or Infor may terminate your employment at any time, with or without notice, and for any or no reason.  In addition, nothing in this letter summarizing your prospective employment terms shall constitute or be construed as a guarantee of employment for any definite period of time or a contract of employment.  By signing this letter as instructed below, you acknowledge and agree that any prior employment agreement, severance arrangements or terms and conditions of employment between Birst and you (the "Birst Employment Agreement") shall terminate and be of no further force or effect immediately upon the consummation of the Acquisition and that neither Birst nor Infor shall owe any further obligation to you (including, without limitation, any severance or termination payment) under such Birst Employment Agreement.

Infor may modify its policies and practices, including the compensation and benefits it provides from time to time, as it deems necessary; provided that such modifications shall not alter or amend the Compensation, Earnout Bonuses or Retention Bonuses specified in this letter.  However, the at-will nature of your employment may be modified only by a written agreement signed by both you and Infor.

<u>Nondisclosure, Noncompetition and Developments Agreement</u>: It is also a condition of your prospective employment that, prior to the commencement of  employment with Infor, you must sign Infor's Nondisclosure, Noncompetition and Developments Agreement, which contains additional requirements for the protection of Infor's trade secret, confidential and proprietary information, protections pertaining to Infor's business relationships, as well as an assignment to Infor of the ideas, concepts and other intellectual property that you create during your employment.

<u>Immigration</u>:  For purposes of United States' immigration law, you will be required to provide to Infor documentary evidence of your identity and eligibility for employment in the United States.  Such documentation must be provided to us within three (3) business days of your start date.

<u>No Employment-Related Claims</u>: You hereby confirm that you have no claims for unpaid wages or other employment-related remuneration against Birst other than for your regular salary for the current pay period as of the effective time of the Acquisition.  As a condition of

CONFIDENTIAL

INvPSG00000879

DocuSign Envelope ID: 4D4BFA88-F39D-4E2D-95C3-440849889EEB

accepting employment with Infor and by signing below, you confirm your agreement not to make any claim against Infor or any of its past, present or future affiliated companies for any employment-related matters arising from or in any way related to events that occurred prior to the date on which you countersign this letter, including without limitation, any claims for wages earned prior to commencing employment with Infor; provided that the foregoing agreement specifically excludes (i) any rights you may have in your capacity as a security holder of Birst in connection with the Acquisition; and (ii) any rights to indemnification or exculpation from Birst that you may have in your capacity as a former officer or director of Birst.  You also confirm your permission for Birst to provide, and for Infor to receive and maintain copies of your employment records, personnel file and any other materials and information related to your employment with Birst.

Your signature below will acknowledge your understanding and agreement to the terms and conditions set forth in this letter.  These terms supersede any other agreements (including, without limitation the Prior Agreement) or promises made to you by anyone affiliated with Infor, whether oral or written.  Infor reserves the right to withdraw these terms without further notice if they are not timely accepted by you or if any aspect (e.g. job references, education, proof of citizenship, etc.) of your qualifications cannot be verified and these terms shall only become valid upon Infor's final acceptance of this letter, signed by you.

Should you have any questions regarding this letter, please call me at 718-501-3320.

Welcome to Infor we look forward to having you as part of the team!

Sincerely,

Anne Benedict
SVP, Talent

CONFIDENTIAL

INvPSG00000880

DocuSign Envelope ID: 4D4BFA88-F39D-4E2D-95C3-440849889EEB

ACKNOWLEDGEMENT AND ACCEPTANCE:

The undersigned Paul Staelin acknowledges receipt of the foregoing letter setting forth the terms of Infor's offer of employment.  The undersigned accepts such offer subject to the terms of the letter and agrees to its terms, including, without limitation the termination of the Birst Employment Agreement.

Accepted: _____     May 30, 2017
                    Paul Staelin                                              _____
                                                                                        Date

# EXHIBIT 3



641 Avenue of the Americas
New York, NY 10011
800-260-2640
infor.com

June 16, 2017

David Gray
Wren House
Shacklestead Lane
Godalming, SURREY GU7 1RP
United Kingdom

Re:     Earnout Bonus Eligibility

Dear David,

In connection with the acquisition of Birst, Inc. and its subsidiaries (collectively, "Birst") by Infor (US), Inc. (together with its subsidiaries (including Birst) and affiliates, "Infor") in a merger transaction pursuant to which Birst became a wholly owned subsidiary of Infor (US), Inc. (such transaction referred to herein as the "Acquisition") and subject to the terms and conditions of this letter, you are eligible to receive certain bonuses based on the growth of the business acquired in the Acquisition as described below.

In addition to your base salary and any variable compensation, bonus or sales commission payable to you in connection with your employment, you will be eligible to receive a bonus based on the growth of the business acquired in the Acquisition during each of Infor's fiscal years ending April 30, 2018 and April 30, 2019 (each an "Earnout Bonus" and together the "Earnout Bonuses"). The Earnout Bonuses (if any) will be payable after the end of the applicable fiscal year, promptly following completion of Infor's financial audit with respect to such fiscal year and in no event later than December 31 of the same calendar year (i.e., the Earnout Bonus for FY18 (if any) will be paid no later than December 31, 2018, and the Earnout Bonus for FY19 (if any) will be paid no later than December 31, 2019).

The FY18 Earnout Bonus shall be an amount equal to 4% of the amount by which FY18 Bookings exceeds $18 million.  The FY19 Earnout Bonus shall be an amount equal to 4% of the amount by which FY19 Bookings exceeds $21 million.

For purposes of calculating the Earnout Bonuses, the following capitalized terms shall have the meanings set forth below.  For the avoidance of doubt, the definitions set forth below apply only to the calculation of Earnout Bonuses pursuant to this letter and shall have no effect on, nor shall they be affected by any contrary or conflicting terms or definitions in the Birst 2017 Sales Compensation Plan or any alternate or successor sales compensation plan in which you may participate.

> "**Annual Contract Value**" or "**ACV**" means the total amount of subscription fees applicable to Birst Offerings payable under a contract, divided by the term of the subscription in years (e.g. $300,000 total subscription fees for a 3 year subscription results in an ACV of $100,000)

> "**Allowed Attrition**" means, for any fiscal year, an amount equal 20% of the Year End Subscription Revenue Run Rate for all customers subscribing to the Birst Offerings for the immediately preceding fiscal year.

> "**Attrition**" means the ACV of all reductions to previously contracted subscription fees for Birst Offerings determined on a customer by customer for the applicable fiscal year.

> "**Birst Offerings**" shall mean any and all products or services offered, licensed, provided, sold, distributed or otherwise exploited by Birst at the time of the Acquisition

and any and all products or services already designed and developed by or for Birst at the time of the Acquisition, including all versions and releases of the foregoing, together with any related user documentation.

*"Booking"* means ACV from subscriptions to the Birst Offerings that are Contracted in the applicable fiscal year. The amount of any Booking shall include only that portion of the subscription fees payable under a contract that are attributable to the Birst Offerings. If Birst Offerings are sold bundled or in combination with other products or services offered by Infor, the subscription revenue for purposes hereof shall be deemed to be the list price of the Birst Offerings as if the Birst Offerings had been sold individually; provided however, that if Birst Offerings are sold bundled with other products or services offered by Infor where a discount was applied to such sale, the aggregate discount on such sale shall be applied pro rata to each product in such sale, including the applicable Birst Offerings, in accordance with each such product's list price. Bookings associated with existing customers shall include only the amount of incremental subscription fees (i.e. exclude any amounts representing renewal of prior subscriptions).

*"Contracted"* means that the written contract or order forms have been duly executed by all parties and subscription revenue recognition in accordance with GAAP and Infor's revenue recognition policies has commenced.

*"FY17"* means the fiscal year ending April 30, 2017

*"FY18*" means Infor's fiscal year ending April 30, 2018

"*FY19*" means Infor's fiscal year ending April 30, 2019

"*FY18 Bookings*" means the Bookings for FY18 <u>minus</u> any excess of Attrition over Allowed Attrition for FY18.

"*FY19 Bookings*" means the Bookings for FY19 <u>minus</u> any excess of Attrition over Allowed Attrition for FY18.

*"Year End Subscription Revenue Run-Rate"* means, for any fiscal year, the amount of net revenue (as defined by and determined in accordance with GAAP and Infor's revenue recognition policies) from the sale of the Birst Offerings attributed to the last full month of the fiscal year, multiplied by twelve (12).

By way of example and in no way guaranteeing the amount of any Earnout Bonus, in the event that:

Bookings = $25 million,

FY17 Year End Subscription Revenue Run Rate = $41M

Allowed Attrition (20%) = $8.2M

Attrition = $12M

FY18 Bookings = $25M Bookings – ($12M Attrition – $8.2 Allowed Attrition)

= $25M - $3.8M

= $21.2M

FY18 Bookings exceeds $18M by $3.2M

Birst Earnout Bonus – D Gray

2

The FY18 Earnout Bonus amount would be $128,000 (i.e. $3.2 million excess x 0.04).

For the avoidance of doubt, there is no guarantee that the performance of the business acquired in the Acquisition will result in any minimum Earnout Bonus.  If the calculation of the Earnout Bonus as described in this letter does not yield a positive amount, no Earnout Bonus will be payable to you.

This letter shall not be construed as an agreement, either express or implied, to employ you for any stated term.  At all times during your employment with Infor your employment shall remain subject to Infor's policy of employment and local employment laws.  In the event that you are no longer employed by Infor at the end of the relevant fiscal year, no Earnout Bonus shall be payable, in whole or in part, regardless of the circumstances under which employment was terminated.  Nothing in this letter shall be construed as an agreement, either express or implied, to pay you any compensation or grant you any benefit beyond the end of your employment with Infor.

By signing and returning this letter, you acknowledge and agree to all terms and conditions hereof.  Any modification to this letter will not be effective unless in a writing that is signed by both you and a duly authorized representative of Infor.

Please scan and email signed letter to Louise.whitehouse@infor.com and mail signed letter to Infor, One Central Boulevard, Blyth Valley Business Park, Solihull, B90 8BG:

Yours Sincerely

Louise Whitehouse
Senior HR Manager UK, Ireland, MEA & Russia

---

I have read and understood the terms regarding the Earnout Bonus.

Signature: _____

Printed Name: _____ DAVID GRAY _____

Date: _____ 20ᵗʰ June 2017 _____

Birst Earnout Bonus – D Gray

3

PGS00001442

# EXHIBIT 4

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4   _____
                                    )
 5   BRAD PETERS, DAVID GRAY, AND   )
     PAUL STAELIN,                  )
 6                                  )
              Plaintiffs,           )
 7                                  )Case No. 19-cv-8102
         vs.                        )
 8                                  )
     INFOR (US), INC.,              )
 9                                  )
              Defendant.            )
10   _____)
11
12
13      VIDEOCONFERENCE DEPOSITION OF BRAD PETERS
14               Tuesday, June 1, 2021
15                    Volume I
16
17
18
19
20
21
22   Reported by:
     KATHLEEN E. BARNEY
23   CSR No. 5698
24   Job No. 4535038
25   PAGES 1 - 354
```

Page 1

```
 1    my other client Paul Staelin, and as well as my

 2    colleagues Michael Hatley and Claire Martirosian.

 3            MR. SLAUGHTER:  And perhaps to expedite

 4    things, I can do the same.  With me from Keker,

 5    Van Nest & Peters are Brook Dooley, Cody Gray, and      09:02:47

 6    Gavin Thole, and on behalf of Infor, Josh Wiersma.

 7            THE VIDEOGRAPHER:  Thank you.

 8            Would the court reporter please swear in the

 9    witness.

10

11                     BRAD PETERS,

12    having been administered an oath, was examined and

13    testified as follows:

14

15            THE VIDEOGRAPHER:  Thank you.  You may          09:03:21

16    proceed.

17

18                     EXAMINATION

19    BY MR. SLAUGHTER:

20       Q    Good morning, Mr. Peters.                       09:03:24

21       A    Good morning.

22       Q    Can you hear me okay?

23       A    I can.

24       Q    Terrific.

25            As you heard, my name is James Slaughter.       09:03:30
```

Page 10

1          (Court reporter clarification.)

2          MR. SLAUGHTER:  I think he said they both

3     analyze data.

4     BY MR. SLAUGHTER:

5       Q   Is that right, Mr. Peters?                    09:29:15

6       A   That is correct.

7       Q   So what was the shift then from Success

8     Metrics to Birst?

9          MR. LIPMAN:  Object to the form of the

10    question.                                           09:29:21

11         THE WITNESS:  Can you rephrase that question

12    to something more specific?

13    BY MR. SLAUGHTER:

14      Q   Sure.  I'm just trying to understand what the

15    difference was between Success Metrics and Birst.   09:29:30

16      A   There were many differences, but I'll give

17    you one.

18         The target audience for Success Metrics was

19    high-end financial services institutions.  The

20    target audience initially for Birst was smaller     09:29:48

21    businesses.

22      Q   Were the products the same?

23         MR. LIPMAN:  Object to the form of the

24    question.

25         THE WITNESS:  Yeah, can you ask it -- what do   09:30:02

                                              Page 33

1          A    Birst was selling a capability.

2          Q    Birst was also selling a product, correct?

3               MR. LIPMAN:   Object to the form.

4               THE WITNESS:   Birst had products that

5     delivered a capability.                              09:32:30

6     BY MR. SLAUGHTER:

7          Q    And what was the capability Birst was

8     selling?

9          A    The capability was to, in general, ingest

10    data, so taking data from applications, make it      09:32:45

11    easy to get it out of applications that people were

12    using and in the process transform that data through

13    very complicated manipulations of that data to make

14    it more useful.  And then ultimately provide user

15    experiences tailored to each individual customer at  09:33:09

16    each use case that would, you know, reflect a

17    business need.

18         Q    Are you familiar with the term ERP,

19    enterprise -- enterprise resource planning?

20         A    I am.                                       09:33:26

21         Q    Was Birst offering ERP software?

22         A    No, it was not.

23         Q    What was your title -- what was your role at

24    Birst when it was, you know, in the -- let's focus

25    on 2008 to 2014.                                      09:33:42

                                            Page 36

```
 1      Q   Okay.  Let's -- let's focus -- I want to
 2   focus, Mr. Peters, now on the time period prior to
 3   Infor's May 2017 acquisition of Birst, okay?  So I
 4   want to talk about Birst as it existed prior to the
 5   acquisition.                                      09:38:25
 6         Do you have that time frame in mind,
 7   Mr. Peters?
 8      A   I'll do my best.
 9      Q   Okay.  Am I correct that at the time, Birst
10   sold an application called Birst Enterprise?        09:38:36
11      A   Correct, yes.
12      Q   And it also sold an application called Birst
13   Professional?
14      A   You know, I wouldn't necessarily refer to
15   them as applications.                              09:38:49
16      Q   Thank you.  What's the -- I want to be
17   sensitive to that.  What is the best way to describe
18   Birst for Enterprise and Birst Professional?
19      A   I would call them solutions.
20      Q   Okay.  You sold a solution called Birst for  09:39:03
21   Enterprise, correct?
22         MR. LIPMAN:  Object to form.
23         THE WITNESS:  Yes, we did.
24   BY MR. SLAUGHTER:
25      Q   Okay.  And you -- and Birst also sold Birst  09:39:10
```

Page 40

```
 1   Professional, correct?

 2       A    Yes, we did.

 3       Q    Who was Birst for Enterprise intended for?

 4       A    The thing about analytics is there are no

 5   hard and fast rules.  So generally Enterprise had      09:39:33

 6   much more sophisticated sets of capabilities, and it

 7   was a very rich Swiss Army knife with lots of

 8   capabilities.

 9           Birst Professional was designed to be simpler

10   and had some tools that were easier to use.  And we    09:39:51

11   were targeting some folks who needed a lot of

12   function, especially on the data side, they were

13   more for Enterprise.  Folks that maybe had simply

14   needs on the data side in particular were targeted

15   for Birst Professional.                                09:40:13

16           But there were combinations and overlaps, and

17   we had thing called Networked BI.  And so these

18   products were oftentimes intended to work together.

19       Q    Was Networked BI a solution that was separate

20   from Birst Enterprise and Birst Professional?          09:40:50

21       A    It was a capability of those products.

22       Q    It was a feature -- is it fair to say it was

23   a feature of Birst for Enterprise or Birst

24   Professional?

25           MR. LIPMAN:  Object to form.                   09:41:04
```

Page 41

```
 1          THE WITNESS:  I prefer to say it's more of a

 2     capability that enhanced what you could do with

 3     those platforms.

 4     BY MR. SLAUGHTER:

 5     Q    It wasn't sold -- Networked BI wasn't sold      09:41:17

 6     separately or apart from Birst Professional and

 7     Birst Enterprise, correct?

 8     A    It was generally sold in conjunction with

 9     those products, yes.

10     Q    Okay.  To put it a different way, one of        09:41:33

11     Birst's customers couldn't have Networked BI without

12     either Birst Enterprise or Birst Professional,

13     correct?

14     A    Networked BI enhanced those two products.

15     Q    So you needed to have one of those two          09:41:47

16     products, either Birst for Enterprise or Birst

17     Professional, to have the capabilities of Networked

18     BI, correct?

19     A    You needed to have a Birst platform.  And if

20     you -- if you did have the Birst admin platform,     09:42:00

21     then BI would apply.

22     Q    What is the Birst admin platform?

23     A    Just the component that runs all of the

24     metadata layer, all of the knowledge of the data

25     that is in Birst.                                    09:42:21
```

Page 42

```
 1              THE WITNESS:  You know, I don't have it off

 2     the top of my head exactly what it is.

 3              I do recall that the platform fee for Birst

 4     Professional was a little less expensive.  And I

 5     also recall that the user fees for Birst          09:47:41

 6     Professional were less expensive.

 7     BY MR. SLAUGHTER:

 8        Q    Why?

 9        A    As I recall, there was a -- there were

10     several differences between the products, but     09:47:55

11     between what we enabled -- it's all the same

12     product, but what we enabled users to do with the

13     product.

14              And one of the key differences was the data

15     modeling engine.  The data modeling engine, the full  09:48:09

16     data modeling engine which handled really, really

17     complicated things, not all of that was made

18     available to Birst Professional users.

19        Q    As a result, the Birst Professional had --

20     strike that.  Withdrawn.                           09:48:30

21              Is it fair to say, then, that Birst

22     Professional had more limited features and

23     capabilities, and that's why it had a lower platform

24     fee and lower user fees?

25              MR. LIPMAN:  Object to the form of the    09:48:42
```

Page 47

```
 1    question.  Compound several times over.
 2        THE WITNESS:  Yeah, I think some of the
 3    features were identical.  For example, dashboards in
 4    both the products were identical.  Some of the
 5    features were limited.  Some of the features didn't    09:48:56
 6    exist.  It was a -- it was a mix.
 7    BY MR. SLAUGHTER:
 8      Q   And the reason that the Birst Professional
 9    price was lower was because there were fewer
10    features, correct?                                     09:49:08
11      A   Not necessarily.  Birst Professional, the
12    primary purpose initially was to sell to much
13    smaller companies and make it easier for someone to
14    do a smaller implementation that was very, very
15    un-complex very, very quickly.                         09:49:28
16        So we were -- we were -- the goal was to
17    provide something that was, you know, easier to get
18    going, but not as rich.  And if somebody wanted to
19    upgrade to the full thing, they could.
20      Q   They would have to upgrade to get the           09:49:43
21    additional features, for instance, the data modeling
22    engine, correct?
23      A   Data engine, yes, they would have to upgrade
24    to get the data engine.
25      Q   And as a result, Birst Professional was         09:49:52
```

Page 48

```
1    priced lower because it didn't have data modeling,

2    among other things, correct?

3        A   No, that's not correct.  It had data

4    modeling, but it had a simplified data modeling for

5    people who didn't have as much training.          09:50:08

6        Q   At the time of the acquisition, did both

7    Birst for Enterprise and Birst Professional include

8    a Visualizer?

9        A   I'm not sure of the exact timing.  I believe

10   they did.                                         09:50:30

11       Q   Can you explain to me how the Visualizer

12   works?

13       A   That's complicated.  Quite complicated, in

14   fact.

15           Visualizer is one of the rendering engines  09:50:47

16   for Birst.  It allowed users to manipulate charts

17   and graphs and reports.  And it allowed folks to

18   create new reports based on the data modeling

19   engine.  It also -- it also served as the primary

20   rendering engine for those reports.               09:51:15

21       Q   Okay.  And so it was the rendering engine,

22   and it allowed customers to customize reports?

23           MR. LIPMAN:  Object to the form of the

24   question.

25           Hold on, hold on.                         09:51:28
```

Page 49

```
 1           Object to the form of the question.

 2    Mischaracterizes testimony.

 3    BY MR. SLAUGHTER:

 4       Q    Go ahead, Mr. Peters.

 5       A    I mean, the principal thing was it was the      09:51:38

 6    rendering engine for the individual elements of

 7    content that went on a dashboard.  But it also

 8    allowed you to create or modify that content.

 9       Q    What were Birst's revenues for the calendar

10    year '15, approximately?                               09:51:58

11       A    I don't know.  I don't recall.

12       Q    Do you have any sense?

13           MR. LIPMAN:  Object to form.

14           THE WITNESS:  Only a really high level, like

15    we had services revenues, we had software revenues.    09:52:20

16    And I wasn't doing the finances at the time.  I was

17    mostly being the evangelist.

18           I believe we were doing around 45 to 50

19    million in recurring revenue, but that could be

20    wrong.                                                 09:52:39

21    BY MR. SLAUGHTER:

22       Q    We're going to try our first exhibit here,

23    Mr. Peters.  I just introduced Exhibit -- what I'm

24    marking as 31, Avi.  I'm going to mark exhibits

25    consecutively from our prior depositions.              09:52:53
```

Page 50

```
 1    marketplace --

 2         MR. SLAUGHTER:  I will withdraw the question,

 3    and I will ask the question differently.

 4         (Court reporter clarification.)

 5         MR. LIPMAN:  Hold on.

 6         Go ahead, Kathy.

 7         THE COURT REPORTER:  Relative to other --

 8         THE WITNESS:  Software as a service

 9    companies.  Birst was a software as service company,

10    and we were competing with many other software as a    09:55:44

11    service companies in our space, and they had -- they

12    had financial models as well.

13    BY MR. SLAUGHTER:

14      Q   I'm asking --

15         MR. LIPMAN:  And, Kathy, for the record, it's    09:55:52

16    capital S, lower case A, lower case A, capital S.

17    SaaS.

18    BY MR. SLAUGHTER:

19      Q   What was Birst's net income for FY '15?

20      A   According to this, it's negative 41 million    09:56:08

21    dollars.

22      Q   So there was a 41 million dollar loss?

23         MR. LIPMAN:  Object to the form of the

24    question.

25         THE WITNESS:  It looks that way.    09:56:22
```

Page 53

1    '16, Birst had lost nearly 100 million dollars,

2    correct?

3          MR. LIPMAN:  Object to the form of the

4    question.

5          And, Counsel, just know if you're referring      10:00:06

6    to FY '14, I don't know if you mean to be doing

7    that, but that's not in this document.

8    BY MR. SLAUGHTER:

9      Q    Mr. Peters, you can answer the question.

10         You lost -- Birst lost nearly 100 million        10:00:17

11   dollars over three years, correct, before the

12   acquisition?

13         MR. LIPMAN:  Object to form.

14         THE WITNESS:  Birst acquired customers during

15   that period of time, and those customers cost more     10:00:27

16   money than they initially paid for in that first

17   year.

18   BY MR. SLAUGHTER:

19     Q    Mr. Peters, it's a yes or no question.

20     A    It's not.                                        10:00:38

21     Q    Did Birst -- did Birst have net income losses

22   of nearly 100 million dollars over the final three

23   years prior to the acquisition by Infor?

24         MR. LIPMAN:  Object to the form.

25         THE WITNESS:  GAAP -- like I said a second        10:00:49

                                                  Page 57

1    ago, the GAAP income measures it that way.  SaaS

2    companies have typically not used that to measure

3    their success.

4    BY MR. SLAUGHTER:

5        Q   Mr. Peters, that was not the question I        10:01:03

6    asked.  The question I asked was, Birst's net income

7    for the final three years, '14, '15 and '16, prior

8    to the acquisition by Infor, totaled losses of

9    nearly 100 million dollars, correct?

10           MR. LIPMAN:  Object to the form of the          10:01:21

11   question.

12           THE WITNESS:  I can only see FY '15 and

13   FY '16, and I can see the GAAP measurement of net

14   income, and those numbers are negative, yes.

15   BY MR. SLAUGHTER:                                       10:01:33

16       Q   Are you not able to scroll over and see

17   FY '14 as well under column AS?

18       A   Now I can see it, yes.

19       Q   So FY '14, there was a loss of $36,710,000?

20       A   That's what it says.                            10:01:55

21       Q   And FY '15, there was a loss of $41,300,000?

22       A   Yes.

23       Q   And FY '16, there was a loss of $28,111,000,

24   correct?

25       A   Correct.                                        10:02:08

                                                      Page 58

```
 1   BY MR. SLAUGHTER:

 2      Q   Prior to the acquisition, had annual contract

 3   value ever exceeded over 16 million dollars in

 4   bookings?

 5      A   I don't recall.  And I don't see it on here.   10:03:29

 6          MR. LIPMAN:  And, counsel, we've been going

 7   for about an hour.  Can we take a short restroom

 8   break?

 9          MR. SLAUGHTER:  Avi, if it's okay, I'm going

10   to finish up a couple things on bookings and then I   10:03:48

11   think it'll be a more natural break.  Just two

12   minutes, okay?

13          MR. LIPMAN:  No problem.

14   BY MR. SLAUGHTER:

15      Q   Mr. Peters, I've just introduced, or   10:03:55

16   attempted to, Exhibit 32, I hope.

17      A   Okay.

18          (Exhibit 32 was marked for identification

19      electronically and is attached hereto.)

20   BY MR. SLAUGHTER:   10:04:10

21      Q   Do you have that up, Mr. Peters?

22      A   It's loading.

23          Okay, I see it.

24      Q   This is information that Birst provided to

25   Infor in connection with the acquisition.  And at   10:04:24
```

Page 60

1    the top there it says "Bookings ACV."

2         Do you see that?

3    A    Yes.

4    Q    And bookings ACV, as you just described, in

5    use at Birst as of the acquisition would have been          10:04:37

6    annual contract value; is that right?

7    A    Correct.  That's how we typically defined it,

8    yes.

9    Q    And as of 2016 -- you have to do a little

10   math in your head, but you see Q1, 2, 3, 4 of 2016?          10:04:55

11        Do you see that?

12   A    Uh-huh.

13   Q    You're probably better at math than I am,

14   Mr. Peters, but I get to about 16.4 million in ACV

15   bookings.                                                    10:05:15

16   A    I didn't do the exact math, but that looks --

17   that looks right, or reasonable.

18   Q    Was 2016 the largest year for ACV bookings by

19   Birst at the time?

20   A    2016 was the year we spent the most on                  10:05:28

21   customer acquisition, and as a result, we had the

22   largest acquisition of customers and the most

23   bookings.

24   Q    Okay.  So as of 2016 -- so in 2016, you had

25   spent the most and your annual -- your annual              10:05:44

                                                         Page 61

```
 1    contract value of bookings was the highest it had

 2    ever been?

 3        A    Correct.

 4        Q    And calendar year -- as a result, if you look

 5    at, again, calendar year for 2015, which I believe      10:05:53

 6    is your calendar year numbers Q1, 2, 3, 4, 5 there,

 7    the ACV is less, it's just shy of 15 million,

 8    correct?

 9        A    That looks about right.

10             MR. LIPMAN:  Counsel, can I just verify with    10:06:10

11    you that we're on the summary tab, because there are

12    a number of tabs here.

13             MR. SLAUGHTER:  Correct.

14             MR. LIPMAN:  Okay, go ahead.

15    BY MR. SLAUGHTER:                                        10:06:19

16        Q    What is the relationship, Mr. Peters, between

17    bookings and revenue?

18             MR. LIPMAN:  Object to form.

19             THE WITNESS:  Bookings are dramatically more

20    valuable than revenue.                                   10:06:34

21    BY MR. SLAUGHTER:

22        Q    Do bookings lead to revenue?

23        A    Yes, they do.

24        Q    Why do you think that bookings -- if bookings

25    lead to revenue, why are bookings more valuable than    10:06:43
```

Page 62

```
 1          THE WITNESS:  Historically, principally

 2    the -- yes, that is the primary driver.

 3    BY MR. SLAUGHTER:

 4      Q    There came a time, as we were just

 5    discussing, that Birst sought to be acquired; is      10:19:57

 6    that right?

 7      A    That is true.

 8      Q    When did you decide to start the process of

 9    having Birst be acquired?

10      A    That's a difficult question because we had     10:20:12

11    had unsolicited interest in Birst for some time.

12    But we embarked on a formal process -- I don't

13    recall the exact date, but some number of months

14    before.

15      Q    I've seen documents suggesting that you were   10:20:40

16    in the formal process at least -- at latest in the

17    fall of 2016.

18          Does that refresh your recollection?  Does

19    that sound about right?

20      A    That sounds --                                 10:20:52

21          MR. LIPMAN:  Object.  Hold on.  Object to the

22    form of the question.  Counsel's testimony can't

23    refresh his recollection.

24          Go ahead, Mr. Peters.

25          THE WITNESS:  Fall 2016, I believe that         10:21:01
```

                                        Page 67

```
 1    was -- that's right.

 2    BY MR. SLAUGHTER:

 3        Q    From whom had Birst received unsolicited

 4    offers prior to the formal process?

 5        A    I'm not sure that I'm allowed to talk about       10:21:13

 6    that.

 7        Q    Unless your counsel instructs you not to

 8    answer, you have to.  And the only basis upon which

 9    he can instruct you not to answer is privilege.

10            We've got a protective order in place that       10:21:27

11    can -- that keeps things confidential.  So if you --

12    so, you know, you'll do what Mr. Lipman tells you,

13    but I'm entitled to an answer to the question.

14            MR. LIPMAN:  Can you repeat the question,

15    Counsel, or can the court reporter read it back?       10:21:43

16            (Record read.)

17            MR. LIPMAN:  So, Mr. Peters, we can and will

18    designate certain portions of your testimony as

19    confidential or AOE as warranted after the fact.

20            Subject to those limitations and our right to       10:22:08

21    designate later, you can answer the question.

22            THE WITNESS:  One of the firms that made an

23    offer for us was Software AG.

24    BY MR. SLAUGHTER:

25        Q    What other firms made an offer for Birst?       10:22:25
```

Page 68

1    decision by the board?

2       A    Yes, I was.

3       Q    Now, there came a time when you started a

4    formal process in 2016 with Morgan Stanley, correct,

5    to seek a sale of Birst, correct?                    10:31:31

6            MR. LIPMAN:  Object to form.

7            THE WITNESS:  I believe that was the time

8    frame that -- that sounds about right.

9    BY MR. SLAUGHTER:

10      Q    Why at that time did Birst seek to be        10:31:40

11   acquired?

12      A    There were a whole host of reasons that we

13   thought that might make sense.

14           One of them was the competitive dynamics in

15   the industry were changing pretty quickly.           10:31:56

16      Q    Why don't you tell me all of them, please.

17           MR. LIPMAN:  Object to the form.

18           THE WITNESS:  I can do them one by one here.

19           I think, you know, one of them, we were

20   seeing the rise of Microsoft Power BI in the         10:32:13

21   marketplace.  It's a business intelligence product

22   by Microsoft.  They released that as part of their

23   Office -- Microsoft Office product suite.

24   BY MR. SLAUGHTER:

25      Q    So increased competition at the time?        10:32:35

                                                  Page 76

```
 1        A    That's one source.

 2        Q    So the overall question here, Mr. Peters, is

 3   why Birst sought to be acquired.  You talked about

 4   competitive dynamics changes, the rise of Microsoft

 5   Power BI.                                         10:32:50

 6             Anything else?

 7        A    The capital markets, you know, were getting a

 8   little soft at that time.

 9        Q    What does that mean, that they were soft?

10        A    Well, my understanding -- and this is more of  10:33:02

11   my board's decision because they're more plugged

12   into that than I am, is there are times when raising

13   money is easier and times when it's harder.  So this

14   was one of the -- this was a little harder than

15   usual.                                            10:33:20

16        Q    So there wasn't -- okay, well, so harder to

17   raise money.

18             Any other reasons you sought to be acquired

19   at that time?

20             MR. LIPMAN:  Object to the form of the     10:33:32

21   question.

22             THE WITNESS:  We felt that also that, you

23   know, we weren't the only acquisition that was

24   happening.  We saw others being acquired too.  And

25   we felt that we could -- if we were combined with    10:33:46
```

Page 77

```
 1   BY MR. SLAUGHTER:

 2       Q    Well, let's take it a little bit piece by

 3   piece.

 4            You mentioned that you hired Morgan Stanley

 5   as your banker, correct?                              10:37:40

 6       A    Correct.

 7       Q    And Mr. Dunn at Morgan Stanley was your

 8   primary banker at Morgan Stanley, correct?

 9       A    Correct.

10       Q    You don't recall exactly when you hired him   10:37:50

11   with respect to this formal process; is that right?

12       A    That's correct.

13       Q    And Morgan Stanley solicited interest in the

14   marketplace, correct?

15       A    Correct.                                       10:38:11

16       Q    Do you know how many potential buyers Morgan

17   Stanley reached out to?

18       A    I don't recall the exact number, no.

19       Q    Do you know if it was more than ten?

20       A    It was like maybe around ten.                 10:38:28

21       Q    Was the -- did you expect Morgan Stanley to

22   engage with as many possible buyers as possible?

23       A    That was the goal.

24       Q    Any reason to believe that Morgan Stanley

25   didn't do that?                                        10:38:55
```

Page 81

```
 1          MR. LIPMAN:  Object to the form of the
 2     question.
 3          THE WITNESS:  I don't know.  I mean, I just
 4     saw the buyers that I saw when they came to us.  Is
 5     it possible that Morgan Stanley missed some things?   10:39:06
 6     Yeah.
 7     BY MR. SLAUGHTER:
 8       Q   Were there obvious potential buyers that were
 9     not coming through that you expected to be
10     interested?                                          10:39:18
11          MR. LIPMAN:  Object to the form of the
12     question.
13          THE WITNESS:  There were buyers that I think
14     should have been and, you know, for various reasons
15     they hadn't come to the table.                       10:39:28
16     BY MR. SLAUGHTER:
17       Q   Give me an example of those, please.
18          MR. LIPMAN:  Hold on, Counsel.  I think
19     because of Zoom maybe it sounds like you interrupted
20     Mr. Peters' answer.                                  10:39:38
21          Mr. Peters, were you done?
22          THE WITNESS:  I think so, yeah.
23          MR. LIPMAN:  Okay.
24     BY MR. SLAUGHTER:
25       Q   Which potential buyers that didn't come to    10:39:44
```

Page 82

1    the table are you referring to?

2        A    Well, there was another earlier attempt to --

3    not formal, but to potentially invest or buy in

4    Birst by Salesforce.  And we would have been a

5    fantastic partner for Salesforce.              10:40:08

6        Q    When was that -- when were those -- did you

7    have direct discussions with Salesforce?

8        A    Years previous, yes.

9        Q    Did you ask Mr. Dunn if he had reached out to

10   Salesforce?                                    10:40:22

11       A    I did.

12       Q    And what did he say to you?

13       A    He said that -- I don't recall, actually.  He

14   just wasn't able to get a meeting set up or wasn't

15   able to motivate a conversation.               10:40:35

16           His impression was -- at least the impression

17   I had was that Salesforce launched its own analytics

18   product and it was not doing well, and so Salesforce

19   had concluded that analytics wasn't a good area.

20       Q    Any other potential buyers that you expected   10:40:49

21   to be involved in the process that were not?

22       A    I would have thought SAP would have been a

23   good partner.

24       Q    Did you ask Mr. Dunn about SAP?

25       A    I did.                               10:41:05

                                                Page 83

```
 1      Q   And what did he tell -- what did he say to

 2   you?

 3      A   He said that SAP was potentially going

 4   through some changes and it would be -- you know, we

 5   had to find the right people.  And it's -- if we        10:41:17

 6   found the right people, it would be a good place.

 7   If we didn't, it would be challenging.  And

 8   unfortunately, I don't think he found the right

 9   people.

10      Q   Do you -- but you -- but it's your             10:41:30

11   understanding he told you that he was reaching out

12   to SAP and Salesforce, but they didn't get -- he

13   didn't get interest from either SAP or Salesforce,

14   right?

15      A   Not at that time.                             10:41:43

16      Q   With how many potential buyers did Birst have

17   formal discussions?

18          MR. LIPMAN:  Object to the form of the

19   question.

20          THE WITNESS:  I don't -- I really don't       10:41:55

21   remember.  It was a number probably less than ten,

22   maybe ten.  I don't know.

23   BY MR. SLAUGHTER:

24      Q   Between five and ten?

25      A   Feels about right.                            10:42:10
```

Page 84

1        Q    You recall that in April of 2017 you signed

2    an indication of interest letter with Infor,

3    correct?

4        A    I remember something like that, yeah.  That

5    was part of the Morgan Stanley process.              10:42:30

6        Q    Okay.  Did you get an indication of interest

7    letter from any other bidders?

8        A    I don't recall.

9        Q    Did you get the best price you could for

10   Birst?                                                10:42:48

11            MR. LIPMAN:  Object to the form of the

12   question.

13            THE WITNESS:  I think, by definition, best

14   price, you know, is always something more.  Would I

15   have liked a better price?  Sure.                     10:43:05

16   BY MR. SLAUGHTER:

17       Q    But there weren't any other bidders at a

18   better price, correct?

19       A    Not at that time.

20       Q    Let's focus on the discussions with Infor.   10:43:21

21            Do you recall when Birst and Infor first

22   started discussing a potential deal?

23       A    Vaguely.

24       Q    What do you remember?

25       A    I remember Morgan Stanley had reached out to  10:43:35

                                                           Page 85

```
1    them, and they had relayed to me that there may be

2    some interest.

3          And I remember them telling -- Morgan Stanley

4    telling me that Charles Phillips was the CEO, and I

5    remember fondly Charles from the Siebel acquisition    10:43:52

6    by Oracle.

7    Q    Do you remember when that was, when you

8    learned about that conversation -- strike that.  Let

9    me get a good question out here.  I apologize.

10         Do you remember when Morgan Stanley first      10:44:19

11   told you that Infor might be interested?

12   A    Not exactly, no.  I remember that they were

13   on a list, and I remember that there was something

14   going on at -- we were told there was something

15   going on at Infor, so we didn't talk to them --       10:44:48

16   well, I actually don't -- there was something

17   complicated happening.

18   Q    With whom did you personally discuss the

19   acquisition?  With whom from Infor -- strike that.

20         With whom from Infor did you personally        10:45:09

21   discuss the acquisition prior to -- I want to focus

22   these questions, Mr. Peters, on the period of time

23   before you signed the indication of interest in

24   April of 2017.

25         So with whom from Infor did you have           10:45:21
```

Page 86

1    discussions about an acquisition?

2      A   I don't remember me personally having

3    conversations prior to that.

4      Q   So you don't recall any conversations with

5    anybody at Infor prior to signing the indication of        10:45:39

6    interest in April 2017?

7      A   It's possible there was, but I -- I don't --

8    I think we were working through the bankers

9    principally at that point.

10     Q   Okay.  What was your role with respect to the    10:45:48

11   acquisition negotiations?

12     A   Initially, it wasn't -- my role was simply to

13   tell the story, to give people an understanding of

14   what Birst was and be able to help them understand

15   the business and the marketplace and educate them        10:46:07

16   on, you know, where BI was and where we fit.

17     Q   Did you have separate meetings with potential

18   buyers where you made that presentation?

19     A   I did, yes.

20     Q   Approximately how many?                            10:46:23

21     A   Again, I don't remember, but it was in the

22   same neighborhood of whatever we were discussing.

23     Q   That's five or ten or more than ten or --

24     A   Call it ten-ish.

25     Q   Describe for me with as much detail as you        10:46:35

```
 1    can, Mr. Peters, that -- and maybe you don't

 2    remember, but describe to me the process between

 3    when you first get interest from Infor and when you

 4    get a letter of indication of interest from them.

 5         MR. LIPMAN:  Object to the form of the          10:47:04

 6    question.  Vague.  Calls for a narrative.

 7         THE WITNESS:  Again, I don't remember that

 8    part in that much detail.  Morgan Stanley was

 9    driving the process at that point.

10    BY MR. SLAUGHTER:                                    10:47:16

11       Q    And Morgan Stanley was actively

12    discussing pursuing Infor and -- as well as other

13    bidders at the time, correct?

14       A    That was my understanding, yes.

15       Q    And that was your understanding based on    10:47:25

16    conversations you had with Morgan Stanley?

17       A    Correct.

18       Q    Do you recall attending any in-person

19    meetings with Infor prior to signing the indication

20    of interest?                                         10:47:47

21       A    I believe -- again, it's a long time ago.  I

22    believe we had a -- we had a meeting in New York.

23    I'm thinking that was prior to the indication of

24    interest, but I'm not sure.

25       Q    Who from Birst attended that meeting?       10:48:00
```

Page 88

1     A    I'm going to speculate.  I believe Jay would

2    have been there.  Me.  Paul may or may not have been

3    there.  I don't recall.  It was kind of a rotating

4    band, but I was generally the principal person.

5     Q    Okay.  You were generally the principal          10:48:38

6    person having discussions with potential bidders?

7     A    Being the principal person telling the story

8    of Birst.

9     Q    Infor and Birst eventually signed this

10   document, indication of interest, correct?             10:49:03

11    A    That's my understanding, yes.

12    Q    Did -- and I apologize if I asked this.  Did

13   Birst get an indication of interest from any other

14   bidders?

15    A    I don't recall.                                   10:49:17

16    Q    I'm going to -- I'm going to show you in a

17   second a new exhibit, Mr. Peters.  It's just running

18   a little bit slow.

19        All right.  It should be up there.

20        (Exhibit 33 was marked for identification         10:50:08

21     electronically and is attached hereto.)

22   BY MR. SLAUGHTER:

23    Q    Do you have Exhibit 33, Mr. Peters?

24    A    33 or 88?

25    Q    At the bottom number -- Exhibit 33, Bates         10:50:23

Page 89

```
 1     stamped ending in 88, but it's Exhibit 33.

 2         A    Got it, yes.

 3         Q    Okay.  And you see that this is an e-mail at

 4     the top in which Kempton Dunn sends to you and Doug

 5     Leone, correct?                                     10:50:45

 6         A    Yes, I see that.

 7         Q    And Doug Leone was your lead outside investor

 8     at Sequoia, correct?

 9         A    Yes.

10         Q    Mr. Dunn was forwarding on to you the first    10:51:09

11     draft of an indication of interest by Infor,

12     correct?

13         A    That looks to be what that is, yes.

14         Q    Do you recall receiving this document?

15         A    I recall something like this.  This probably   10:51:24

16     could be it, yes.

17         Q    Okay.  And if you scroll down to the second

18     page of Exhibit 33, this is a letter addressed to

19     Mr. Dunn from Infor.  It's not signed because

20     it's -- you know, it -- well, strike that.          10:51:43

21             It's a letter addressed to Mr. Dunn about a

22     potential acquisition of Birst by Infor, correct?

23             MR. LIPMAN:  Object to the form of the

24     question.  The documents speak for themselves.

25             THE WITNESS:  I see the document, yes.       10:52:00
```

Page 90

```
 1          Do you see that?

 2     A    I see that, yes.

 3     Q    And this e-mail is dated April 13, 2017,

 4  which is the same day as the indication of interest

 5  was signed with Infor.                            12:04:18

 6          Do you see that?

 7     A    I do.

 8          Can you remind me which date was the user

 9  conference?

10     Q    In all candor, Mr. Peters, I don't recall the  12:04:29

11  day of the Birst user conference.  I can represent

12  to you, and Mr. Lipman can represent to you, I

13  believe the merger agreement itself was signed on or

14  about April 24 or 25, if that helps orient you

15  timing-wise.                                      12:04:48

16     A    Okay.  That's a -- that's a fixture for me.

17     Q    Yeah.  And, you know, at the time that you

18  were negotiating with Infor about the sale, did

19  Birst analyze how the deal proceeds would be

20  allocated amongst Birst shareholders?             12:05:07

21     A    It's common practice, as I was told by our

22  investors, that some percentage of the acquisition

23  would be distributed to employees, and there was a

24  mechanism for doing that.

25     Q    Okay.  There was a little bit of a -- I think  12:05:30
```

```
1    you were getting perhaps my second or third

2    question, Mr. Peters.

3         But my first question was just a higher-level

4    one, which was you were analyzing how the deal

5    proceeds would be allocated amongst shareholders,     12:05:40

6    correct?

7    A    Correct.

8    Q    Okay.  And is this document one of those

9    times in which Birst was doing that analysis

10   figuring out how deal proceeds would be distributed   12:06:00

11   amongst investors?

12   A    I believe so.  Sam was in charge of that, but

13   yes.

14   Q    Okay.  There's two items here.  One is

15   estimated deal proceeds by investor, and then the    12:06:17

16   second one in his e-mail is estimated carve-out

17   worksheet.

18        Is the carve-out what you were just referring

19   to about distribution to employees?

20   A    Yes, it was.                                     12:06:28

21   Q    Okay.  Let's, if you can, please proceed to

22   the third page of this document, which is titled

23   "Deal Proceeds Summary."  And it says "5319.xls" at

24   the bottom.

25   A    Yes.                                             12:06:54
```

                                                    Page 139

1      Q    And this indicates at the time, April 13, an

2    enterprise value of 90 million, correct?

3      A    That's, what it says yes.

4      Q    Transaction cost estimate, that was the

5    transaction cost that would come out of the -- well,    12:07:08

6    strike that.

7           Did you understand the enterprise value

8    essentially referred to the sale price?

9      A    I think that's generally how I understood it,

10   yes.                                                    12:07:19

11     Q    And there were transaction costs associated

12   with the sale, and Mr. Wolff takes those out to get

13   to a gross proceeds to shareholders.

14          Do you see that?

15     A    I see that.  I wasn't actually sure where all   12:07:31

16   those costs came from.

17     Q    Okay.  Did you -- and then there's -- then

18   there's that third line which says "Management

19   Carve-Out, 11 million."

20          Do you see that?                                12:07:42

21     A    I see that, yeah.

22     Q    Is that the carve-out to which we were

23   just -- you were just referring about a payment to

24   the existing employee option holders?

25     A    Yes, I believe so.                              12:07:54

                                                      Page 140

1        Q    Okay.  So the net proceeds after taking out

2    the transaction costs and the management carve-out

3    were 63 million dollars to shareholders?  And this

4    is as of April 13th, your best estimate?

5        A    That's true --                          12:08:08

6             MR. LIPMAN:  Hold on.  Objection.  The

7    document speaks for itself.

8             Go ahead, Mr. Peters.

9             THE WITNESS:  Yeah, that's what the document

10   says.                                             12:08:16

11   BY MR. SLAUGHTER:

12       Q    And at the time, you had raised 157 million

13   dollars from outside investors?

14       A    Yes, I believe that's the number.

15       Q    So the shareholder return was negative 60    12:08:33

16   percent, correct?

17       A    That's what the document indicates, yes.

18       Q    Is that your -- do you have any reason to

19   believe that's not accurate?

20       A    Different funds calculate things differently.  12:08:45

21   Each venture fund has multiple sub funds that invest

22   at different values at different times.  So

23   different funds would have had different returns.

24       Q    Fair enough.

25            But overall the investors -- the outside     12:09:06

                                              Page 141

```
 1    investors lost 59.9 percent, correct?

 2          MR. LIPMAN:  Object to the form of the

 3    question.  The document speaks for itself.

 4          THE WITNESS:  Yes, it looks like that's the

 5    number here, yes.                              12:09:18

 6    BY MR. SLAUGHTER:

 7       Q   And the carve -- did the -- did the outside

 8    shareholders, Sequoia, Hummer Winblad and others,

 9    have to agree to the terms of the carve-out?

10          MR. LIPMAN:  Object to the form of the    12:09:33

11    question.  It calls for a legal conclusion.

12          Go ahead.

13          THE WITNESS:  My understanding is they did,

14    yes.

15    BY MR. SLAUGHTER:                              12:09:38

16       Q   And the idea was that they agreed to allocate

17    15 percent of their proceeds to the employee option

18    holders who otherwise wouldn't have gotten anything,

19    right?

20       A   That's my understanding, yes.           12:09:49

21       Q   Did you -- do you recall discussions with

22    those investors about the amount of the carve-out

23    and the size of the carve-out?

24       A   I do.  I remember advocating for the

25    carve-out and --                               12:10:04
```

Page 142

```
 1            MR. SLAUGHTER:  Okay.  We'll see.  I don't
 2     think that will be a problem.
 3     BY MR. SLAUGHTER:
 4        Q    Did you have any discussion, Mr. Peters,
 5     prior to the signing of the merger agreement about    12:12:50
 6     whether Birst would be folded into Infor or would be
 7     an independent business unit?
 8        A    I believe that was a conversation I had with
 9     Charles.  We had done -- you know, based on that
10     Siebel and Oracle experience.                          12:13:16
11        Q    And what do you recall about that
12     conversation with Charles?
13        A    I recall relaying that keeping the business
14     units separate, as we had it at Siebel, worked
15     really well.                                           12:13:33
16        Q    What did -- what did he say?
17        A    I think he agreed.
18        Q    So it was your -- so you pressed to have a
19     situation where Birst would have -- would be a
20     dedicated business unit within Infor, correct?        12:13:53
21            MR. LIPMAN:  Objection to form.
22            THE WITNESS:  Yeah, sorry.
23            I didn't press.  That was -- that was also
24     Charles's belief as well.  He believed that when
25     things were integrated, they didn't tend to function  12:14:06
```

1    as well.

2    BY MR. SLAUGHTER:

3       Q    That's what he told you?

4       A    Yeah.  He said that -- he said they had mixed

5    history with integrations at Infor.  And for a          12:14:18

6    product like Birst, it seemed to make most sense to

7    be a separate product line.

8       Q    So the decision was made not to integrate

9    Birst into Infor in that way?

10      A    Yes.  He felt that that -- my understanding     12:14:33

11   also was that the entire executive team felt that.

12   The entire Infor executive team, I'm sorry.

13      Q    And what is that understanding based upon?

14           You said it was your understanding that the

15   entire Infor executive team believed that was the      12:14:51

16   best course.

17           What is that understanding based on,

18   Mr. Peters?

19      A    I had been told numerous anecdotes about

20   previous failed acquisitions at Infor.                 12:15:04

21      Q    Told anecdotes by whom?

22      A    Different members of the executive teams.

23      Q    Which ones?

24      A    Oh, jeez.  Pam Murphy was one.

25      Q    And is this before the close of the            12:15:20

                                                   Page 146

```
 1          Anybody else?
 2      A   I recall -- I think I recall Kevin, actually,
 3   Kevin Samuelson also saying that they had mixed
 4   history in the past too.
 5      Q   Did you have -- all of these conversations        12:18:01
 6   that you've identified, Phillips, Murphy, Soma,
 7   Van Houten, Samuelson, were those before the deal
 8   closed?
 9      A   They were not before it was signed.  And
10   honestly, I don't remember whether it was before we     12:18:18
11   signed the management contracts and the deal closed
12   or not.
13          There was a month between the two, and I --
14   we were so busy just trying to integrate the
15   company, I don't recall the exact time.                 12:18:30
16      Q   Okay.  But, regardless, you had conversations
17   with Charles -- and Charles was the CEO at the
18   time --
19      A   Yes.
20      Q   -- at Infor?                                     12:18:40
21          Okay.  You had conversations with Charles,
22   and you guys decided that Birst would retain its own
23   brand and be a business unit within Infor; is that
24   right?
25      A   Yeah.  We had discussed that at our user          12:18:51
```

Page 149

1    conference.  Charles had come to the user

2    conference, and we discussed that there.

3        Q    And by discussed it, you mean publicly with

4    users?

5        A    Well, he -- actually, he did on stage in          12:19:00

6    front of our employees say that that is what he

7    intended to do.

8        Q    And Birst would retain the sales and service

9    functions as an independent business unit within

10   Infor, correct?                                            12:19:17

11       A    The idea was that Birst would retain its

12   sales and service functions and leverage Infor's as

13   an extended sales capability.

14       Q    So, but it was going -- they were going to

15   have -- Birst was going to have its own sales            12:19:35

16   organization that was presumably going to report to

17   you?

18       A    That is correct, yes.

19       Q    And it was going to have a services

20   organization that was going to report to you?            12:19:44

21       A    That is correct, yes.

22       Q    Did you have discussions with Mr. Phillips or

23   anybody from Infor prior to the close of the

24   transaction about whether Birst would be added to

25   the Infor CloudSuite product?                            12:20:02

                                                      Page 150

1    going to now have access to resources that we didn't

2    have access to before and be able to do new and

3    exciting things.

4    BY MR. SLAUGHTER:

5        Q    How much did you personally receive in          12:24:47

6    connection with the sale of Birst to Infor?

7            MR. LIPMAN:  Object to the form of the

8    question.  Vague.

9            THE WITNESS:  The sale itself, I believe it

10   was the 3 million dollars that you presented in that    12:25:10

11   previous exhibit.

12   BY MR. SLAUGHTER:

13       Q    The carve-out bonus?

14       A    Correct.

15       Q    And so you received a few million dollars in    12:25:19

16   carve-out bonus, and you were also, in connection

17   with the sale, entitled to a retention bonus,

18   correct?

19       A    I had to work for a retention bonus.

20       Q    You considered the retention bonus to be part   12:25:32

21   of the deal consideration, correct?

22       A    No.  I considered the retention bonus to be

23   part of the integration process and the successful

24   integration process.

25       Q    You never told anybody that you thought the     12:25:48

Page 155

```
 1   retention bonus was part of the deal consideration?

 2      A   I thought that in aggregate there was value

 3   to be -- to be gathered there, but it wasn't the

 4   consideration in itself, no.

 5      Q   So you never told anybody that you thought      12:26:09

 6   the retention bonus was part of the deal

 7   consideration?

 8      A   I might have mentioned that they were

 9   related.

10      Q   How much was your retention bonus?            12:26:17

11      A   I believe mine was around 12 million dollars.

12      Q   So you had a 12 million dollar retention

13   bonus and a few million dollars in carve-out.  So

14   that's approximately 15 million dollars in

15   connection with the transaction.                   12:26:34

16         Is that right, Mr. Peters?

17         MR. LIPMAN:  Object to the form of the

18   question.  Vague.  Mischaracterizes the record.

19         THE WITNESS:  There was a few million dollars

20   associated with buying the company.  And then there  12:26:43

21   was significantly more money based on successfully

22   integrating the products into the organization,

23   staying around and being -- you know, being the

24   leader of the business going forward.  The idea was

25   to build a huge business with Infor.               12:27:01
```

Page 156

```
 1    BY MR. SLAUGHTER:

 2       Q   The retention bonus wasn't based upon

 3    success, it was just based upon you being there for

 4    two years, correct?

 5       A   That was the primary measurement, yes.        12:27:12

 6       Q   Was there any other measurement in connection

 7    with the retention bonus?

 8           MR. LIPMAN:  Objection to the form of the

 9    question.  It calls for a legal conclusion.

10           Go ahead if you understand the question.      12:27:24

11           THE WITNESS:  You know, as I understand it,

12    that was the main goal, that I had to be a good

13    employee and work to make the product successful,

14    which is what I did.

15    BY MR. SLAUGHTER:                                    12:27:35

16       Q   So did you receive that 12 million dollars in

17    retention bonus?

18       A   I did.

19       Q   And you received the few million dollars in

20    connection with the sale directly, so that was       12:27:40

21    approximately 15 million dollars in connection with

22    the transaction, correct?

23       A   Correct.

24           MR. SLAUGHTER:  I think this is a good time,

25    Avi, to take a lunch break.                          12:27:51
```

Page 157

```
 1            THE WITNESS:  I see 38.

 2    BY MR. SLAUGHTER:

 3        Q    Okay.  Hopefully you can refresh and you'll

 4    see Exhibit 26.  It might be at the top because I

 5    think it's done by alphabetical.                    01:27:41

 6        A    Got it.  Yes, I see it.

 7        Q    If you scroll to the very last page, you'll

 8    see your DocuSign signature on that document?

 9        A    Yes.

10        Q    Did you DocuSign this on or about May 30th,  01:28:04

11    2017?

12        A    I think so, yes.

13        Q    And is this your offer letter, the final

14    version of the offer letter that you had with Infor?

15        A    It looks like it, yes.                      01:28:15

16        Q    I want to direct your attention to the second

17    page with the title "Earn-Out Bonus."

18            Do you see that?

19        A    Yes.

20        Q    And the first sentence of that paragraph     01:28:26

21    says:

22               "You will be eligible to receive

23            an earn-out bonus based on the growth

24            of the business acquired in the

25            acquisition during each of FY '18 and       01:28:39
```

Page 166

1        Q    Okay.  And so I'm focused for you now on the

2    first paragraph of the earn-out bonus, and it says

3    that you're eligible to receive a bonus based upon

4    the growth of the business acquired, correct?

5        A    That's what it says, yes.                    01:30:06

6        Q    And so the -- so your bonus was contingent

7    upon the business growing, correct?

8        A    The business as defined by what?

9        Q    As referenced in this paragraph.

10       A    I'm sorry.  I'm sorry, but it seems like      01:30:24

11   there's multiple ways to define the growth of a

12   business.  And the way I look at business is the

13   value that that business is delivering to its

14   customers.

15       Q    You understood that your earn-out bonus could  01:30:37

16   be zero, correct?

17       A    I understood that that was a possibility.

18       Q    I mean, it's in the text of the agreement.

19   The earn-out bonus, if any, is payable at the end of

20   the fiscal -- applicable fiscal year.

21            So you understood the earn-out bonus could be

22   zero, correct?

23       A    I understood that, yes.

24       Q    This language in your agreement with Infor

25   was -- strike that.                                   01:31:12

                                                  Page 168

1          The language in the -- your agreement with

2    Infor under earn-out bonuses was proposed by Infor,

3    correct?

4        A   My understanding, yes.  Some of the -- some

5    of the language was.  In a conversation, they wrote      01:31:33

6    pieces of it, yes.

7        Q   What pieces did -- well, strike that.

8          Did you personally write any piece of it?

9        A   I made comments, but I didn't -- I don't

10   believe I actually wrote any of the actual              01:31:49

11   agreement.

12       Q   Did you make any comments directly to

13   Mr. Samuelson or Mr. Grabow about it, about the

14   language?

15       A   I did.                                          01:31:57

16       Q   Okay.  What comments did you make to

17   Mr. Samuelson?

18       A   I made several comments.

19       Q   Did you propose any changes to the language

20   proposed to Mr. Samuelson or Mr. Grabow or anybody      01:32:13

21   from Infor, any changes to this earn-out provision?

22       A   I relayed to them a situation that I wanted

23   to have remedied with the language.

24       Q   Okay.  What is that?

25       A   Well, I had some prior experience with         01:32:27

                                                    Page 169

1    embedded software in the past, in previous

2    employment situations, and I'd seen how most

3    agreements, companies could potentially change the

4    value of such an agreement artificially, and I

5    wanted to prevent that from happening.                01:32:49

6        Q   So specifically what language did you ask

7    Infor to change in that regard?

8        A   Well, one of the areas that I asked was with

9    regards to -- let me take a look here.  With regards

10   to bookings.                                          01:33:18

11       Q   Almost spilled the water.

12           You asked them -- you asked Infor to change

13   that language?

14       A   I said -- the language that they had

15   originally proposed was challenging.  I didn't        01:33:28

16   think it -- I thought it was open to problems, and I

17   was hoping to get it fixed.

18       Q   Is it your contention, Mr. Peters, that that

19   definition of bookings as it is reflected in your

20   offer letter changed over time, over the course of    01:33:44

21   negotiation?

22       A   My recollection is, yes, we -- there was an

23   original version and then there was a new one.

24   Maybe it wasn't just bookings.  There were several

25   things that changed.                                  01:33:58

                                                  Page 170

```
 1      Q   Okay.  So your recollection is that the
 2   definition of bookings -- who originally proposed
 3   the definition of bookings?
 4      A   I believe actually the original contract
 5   wasn't even a bookings contract, it was a revenue     01:34:08
 6   contract.
 7      Q   Okay.  That's a good memory.  I think I've
 8   seen earlier versions which had the earn-out based
 9   upon revenue.  And it was subsequently changed to
10   earn out based upon bookings; is that your            01:34:23
11   recollection?
12      A   That's my recollection, yes.
13      Q   And when it changed to being an earn-out
14   based upon bookings, who proposed the bookings
15   language?                                             01:34:35
16      A   I believe Infor proposed the language.
17      Q   Did you propose any changes to that language
18   once you received it?
19      A   My attorney, I believe, had some back and
20   forth.  I don't recall.                               01:34:50
21      Q   Tell me more about what you told
22   Mr. Samuelson about your prior experience and what
23   you wanted to be reflected in this -- as a result,
24   wanted to be reflected in this offer letter?
25      A   Well, in my previous experience at Siebel      01:35:18
```

Page 171

1    regard had you changed the definition of booking?

2       A    I'm sorry, I didn't -- I don't believe that I

3    testified that I changed the definition of booking.

4            I believe I changed the definition of what

5    was being constituted as a being a measure from          01:43:05

6    revenue to bookings.

7       Q    Okay.  So when you testified earlier that

8    you -- that you had proposed changes to

9    Mr. Samuelson, what you were referring to were

10   changes from revenue to bookings; is that right?        01:43:15

11           MR. LIPMAN:  Object to the form of the

12   question.

13           THE WITNESS:  That was one of the things.

14           And I was looking for the language to

15   encapsulate the goals that I had -- I had requested.    01:43:30

16   BY MR. SLAUGHTER:

17      Q    And the language in this booking definition

18   encapsulates the goals that you had requested; is

19   that right?

20      A    I believe so at the time, yes.                   01:43:40

21      Q    Do you believe so today?

22      A    I think it does, yes.

23      Q    Let's -- I want to go up to the second page

24   of this exhibit.  Hold on a second.  I'm sorry.

25           Let's go to the first page because I want to    01:44:10

                                                 Page 178

```
 1        A    I do, yes.

 2        Q    So one of the issues that you were

 3   negotiating on your offer letter was the -- was your

 4   salary, your compensation, correct?

 5        A    Correct.                                    01:45:18

 6        Q    And you asked that Infor increase your

 7   salary, correct?

 8        A    Yes.

 9        Q    And another issue that you had -- that you

10   were negotiating for was whether your bonuses would    01:45:30

11   be guaranteed or not, your target bonuses would be

12   guaranteed or not, correct?

13        A    Yes.  That's one of the things.  There was a

14   lot going on here, but yes, as I recall, that was

15   case.                                                 01:45:47

16        Q    Okay.  And you recall having conversations

17   about whether your bonus would be guaranteed or not,

18   correct?

19        A    I remember that, yeah.

20        Q    And there was some back -- sorry.           01:45:54

21        A    Yeah, there was a little bit of discussion

22   about that with Kevin.

23        Q    There was a little back and forth about

24   whether the -- the amount of the salary versus the

25   amount of the bonus and whether it would be           01:46:03
```

Page 180

1    guaranteed or not, correct?

2        A    Uh-huh, yes.

3        Q    Thanks for getting that "yes" out.  I know

4    sometimes we say "uh-huh".

5             And you also have -- it was important to you        01:46:13

6    that your retention bonus be accelerated on death or

7    disability, correct?

8        A    Yes, that's correct.

9        Q    And that's because you believed that the

10   retention bonuses were akin to deal consideration,        01:46:27

11   correct?

12       A    No.  I felt that -- I felt that the work that

13   I was doing was important, and I wanted to make sure

14   that my family was taken care of.  And I was going

15   to commit to Infor a ton of time, and I wanted to        01:46:51

16   make sure that I could take care of my family.

17       Q    Okay.  So when Mr. Grimm wrote to Infor's

18   counsel that "Brad believes that retentions bonuses

19   are akin to deal consideration that should be paid

20   unless he" -- "unless Brad voluntarily leaves the        01:47:09

21   company or is terminated for cause," Mr. Grimm

22   didn't have that correct?

23            MR. LIPMAN:  Object to the form of the

24   question.  Mischaracterizes testimony on the -- hold

25   on.  Argumentative.                                       01:47:21

                                                        Page 181

```
 1          Do you see that?

 2      A   I see that, yes.

 3      Q   And you might have to blow it up a little

 4  bit.  But if you go to the attachment, that shows

 5  you with your carve-out amount and your retention        02:09:44

 6  amounts, correct?

 7      A   Correct.

 8      Q   And a -- this is -- you were receiving 14.3

 9  million dollars, right?

10      A   That is the total in that column, yes.         02:09:56

11      Q   And Mr. Staelin was receiving 5.7 million; is

12  that right?

13      A   That is the total in that column, yes.

14      Q   And the retention portion is approximately

15  11.6 million, correct?                                   02:10:14

16      A   I'm sorry, is that for me or for --

17      Q   For you personally, you were receiving 11.6

18  million in retention and there was 2.6 million in

19  the carve-out amount, correct?

20      A   I trust your math.  Yeah, that sounds about     02:10:30

21  right.

22      Q   Well, I'm just looking at that top of that

23  page, 5.8 and 5.8 is 11.6, correct?

24      A   I don't have a calculator, but yes, that

25  sounds about right.                                      02:10:45
```

Page 198

```
 1      Q    And the total retention pool was 25 million?

 2      A    Yes, that is correct.

 3      Q    So you proposed, and Mr. Samuelson agreed,

 4   but you proposed allocating 11 of the 25 million to

 5   yourself?                                              02:10:56

 6      A    Yes, that is correct.

 7      Q    If you take a look, Exhibit 40 should be

 8   popping up momentarily.

 9           Do you have it?

10      A    I don't have it, actually, no.                 02:11:40

11      Q    Let me know when you do.  Hit refresh.

12      A    I keep clicking on it.  There it is.

13      Q    Okay.  Exhibit 40, it starts at the top,

14   there's an exchange of e-mails between you and Sam

15   Wolff.                                                 02:12:03

16           Do you see that?

17      A    Yes, I see that one.

18           (Exhibit 40 was marked for identification

19      electronically and is attached hereto.)

20   BY MR. SLAUGHTER:                                      02:12:06

21      Q    And if you scroll down, please, to what's

22   Bates -- the last three numbers are 290.  And

23   there's an e-mail from Sam Wolff to a number of

24   people, Kevin Samuelson and yourself and others.

25      A    I see that, yes.                               02:12:23
```

Page 199

```
 1     A    Yes, I'm looking at that.

 2     Q    (As read):

 3              "In order for executive" --

 4          meaning you -- "to retain and be paid

 5          the excess payments, the parachute          02:21:15

 6          provisions require that the excess

 7          payments be approved by stockholders

 8          of the company owning stock possessing

 9          more than 75 percent of the voting

10          power."                                      02:21:25

11          And it goes on.

12          That was the purpose of the 280G, correct?

13          MR. LIPMAN:  Object to the form of the

14     question.  Calls for a legal conclusion.

15          THE WITNESS:  The specifics weren't as       02:21:30

16     important.  So as I understood it, it was to make

17     sure that our shareholders -- certainly our

18     investors knew what was going on.

19     BY MR. SLAUGHTER:

20     Q    Okay.  If you could go to Bates stamped 100,  02:21:46

21     which is the second page of the attachment that we

22     were just -- that we were just looking at.  And for

23     reference, Bates stamp number 99 just has the

24     heading -- or the document "280G Information

25     Statement Relating to Written Consent to Approve the  02:22:06
```

Page 207

```
 1    Compensatory Payments."  So that's the document

 2    we're on.

 3        A    Okay.

 4        Q    Are you on page 100 now?

 5        A    Is this the one that has Valuation of        02:22:15

 6    Payments?

 7        Q    Yes, sir.

 8             And so under -- so that's -- let's start

 9    there.  Under Valuation of Payments it says:

10                 "The discussion below sets forth        02:22:30

11             the material facts of each

12             compensatory payment expected, which

13             stockholder approval is being

14             solicited, and the company's

15             good-faith estimate of the value of        02:22:39

16             each such compensatory payment under

17             the valuation rules set forth in the

18             parachute provisions."

19             Do you see that?

20        A    I do.                                        02:22:48

21        Q    And you understand "company" in that sentence

22    refers to Birst?

23        A    Yes.

24        Q    And you understand that the valuation

25    provided in this 280G was the company's good-faith     02:22:56
```

Page 208

1    estimate of the fair value, correct?

2        A    I understand with the limited information at

3    the time, we did our best to give a good faith

4    value.

5        Q    And in the next paragraph, in the middle of          02:23:13

6    the paragraph:

7                "The company disclosed, and you

8             agreed, the company generally has

9             otherwise made such assumptions and

10            judgments.  As a result, the              02:23:25

11            compensatory payments having the

12            highest possible value reasonably

13            determinable under the parachute

14            provisions based on the information

15            available as of the date of this            02:23:36

16            information statement."

17            Do you see that?

18        A    I do.

19        Q    So the goal was to make a value having the

20    highest possible value reasonably determinable,          02:23:43

21    correct?

22            MR. LIPMAN:  Objection to the form.  Object

23    to the form of the question.  The document speaks

24    for itself.  Calls for a legal conclusion.

25            THE WITNESS:  Not exactly.  Because I think          02:23:54

                                                        Page 209

```
 1    the key thing here was based on the information that
 2    was available at that date.  We had almost no
 3    information at that date.
 4    BY MR. SLAUGHTER:
 5       Q   You had -- as of the time you were merging       02:24:08
 6    with Infor, you don't have any information about the
 7    items in this 280G?
 8           Did you disclose that to your -- to the 280G
 9    shareholders, that you didn't have information?
10           MR. LIPMAN:  Hold on, hold on.  Object to the    02:24:20
11    form of the question.  Mischaracterizes testimony.
12    Argumentative.
13           Go ahead, Mr. Peters.
14           THE WITNESS:  I think it's entirely
15    unreasonable to expect that we would understand all    02:24:29
16    the financials and software models and all details
17    of Infor.  We didn't understand Infor very well at
18    all.  We knew our business for sure.
19    BY MR. SLAUGHTER:
20       Q   Did you have conversations with Infor about      02:24:40
21    this 280G?
22       A   I believe it was discussed.  I believe Kevin
23    Samuelson knew about this.
24       Q   And, in fact, the document we were just
25    looking at -- I don't have the exhibit in front of     02:24:52
```

<div align="right">Page 210</div>

```
 1        Q    And you disclosed to -- that you personally
 2   were going to receive approximately 2.6 million in
 3   the -- in the carve-out, correct?
 4        A    Correct, yes, we did.
 5        Q    How large was the carve-out entirely, in its    02:26:17
 6   entirety?  Do you know?
 7        A    I don't recall.
 8        Q    Was it 15 percent of the purchase price?
 9        A    That sounds about right.
10        Q    And the purchase price was 75 million?         02:26:29
11        A    That sounds about right.
12        Q    So the carve-out was about 11 or so million?
13        A    I guess, yeah, that sounds about right.
14        Q    And 2.6 million of that was allocated to you?
15        A    The allocation was based on, as I discussed,   02:26:45
16   vested shares.  So yes.
17        Q    Moving on to cash retention bonuses,
18   number 4, item 4 in the 280G.
19             Do you see that?
20        A    Uh-huh.                                        02:27:04
21        Q    Yes?
22        A    Yes, I do.
23        Q    Okay.  Just we need to say "yes" or "no" for
24   the court reporter, Mr. Peters.
25             And this reports the retention bonus that you  02:27:12
```

Page 212

1      A    Of course, it never had access to the

2   resources that an organization like Infor had.

3      Q    And when the company -- in that last sentence

4   before the table on Bates stamped 104, the

5   disclosure that Birst makes to its shareholders is      02:32:51

6   that the company has assumed bookings of 4.5 million

7   above the target for FY '18.  And the target from

8   the prior paragraph is 18.1 million.

9          So am I correct that the target was in the

10  neighborhood of 22 to 23 million in bookings for        02:33:13

11  FY '18?

12         MR. LIPMAN:  Object to the form of the

13  question.

14  BY MR. SLAUGHTER:

15     Q    Excuse me, the reasonable maximum target.        02:33:21

16         MR. LIPMAN:  Object to form of the question.

17         THE WITNESS:  Based on the information we had

18  at the time, that seemed like a reasonable target.

19  BY MR. SLAUGHTER:

20     Q    A reasonable maximum target?                     02:33:32

21     A    As best we could tell from the information

22  that we had, yes.

23     Q    Did you not have any idea of what Infor's

24  business was or the size of Infor, the scope of

25  Infor?                                                   02:33:43

Page 218

```
 1            MR. LIPMAN:  Object to the form of the
 2    question.  Argumentative.  Compound.
 3    Mischaracterizes his testimony.
 4            THE WITNESS:  We knew -- we knew very little.
 5    BY MR. SLAUGHTER:                                    02:33:51
 6       Q    And for FY '19, you thought that the
 7    reasonable maximum amount of potential software
 8    bookings were approximately 31 million, correct?
 9       A    Like I said, based on some very rough guesses
10    and what information we had at the time, that seemed   02:34:11
11    like a reasonable assumption with wide variation.
12       Q    Reasonable maximum amount of potential
13    bookings would be 31 million for FY '19, correct?
14            MR. LIPMAN:  Object to the form of the
15    question.  Again, the document speaks for itself.    02:34:27
16            Go ahead, Mr. Peters.
17            THE WITNESS:  It was an estimate based on the
18    information we had at the time.
19    BY MR. SLAUGHTER:
20       Q    And that estimate was, for FY '18 and FY '19,  02:34:33
21    the reasonable maximum amount of your potential
22    earn-out was 4.5 million, correct?
23       A    Again, based on the information we had at the
24    time, that seemed like a reasonable estimate.
25       Q    So the reasonable maximum amount of your      02:34:51
```

Page 219

```
 1       Q   Did you have discussions internally about

 2   including Visualizer in Birst for CloudSuite?

 3       A   Like I said, Visualizer was included in Birst

 4   for CloudSuite.  Different user personas were able

 5   to use different features in Visualizer.            03:01:23

 6       Q   The Visualizer included in Birst for

 7   CloudSuite was not the full Visualizer, right?

 8       A   That's not true either.

 9       Q   At the time of the acquisition, did every

10   Birst product, including those embedded, include a   03:01:37

11   Visualizer?

12       A   In order for any Birst product to render

13   visualizations in the dashboard, the Visualizer must

14   have been included.

15       Q   So the answer is yes, at the time of the     03:01:50

16   acquisition, everyone had -- every Birst product,

17   including those embedded, had a Visualizer, correct?

18       A   Not every user license entitled the user to

19   use Birst Visualizer.

20       Q   Did the user license with respect to Birst   03:02:05

21   for CloudSuite preclude those users from accessing

22   the Visualizer?

23       A   The user license for Birst for CloudSuite

24   included some features of Visualizer, but not all.

25       Q   The user license is what defined the scope of 03:02:21
```

Page 233

1    what the user could use in the software, correct?

2        A    That's generally what it's for, yes.

3        Q    Okay.  So when you licensed -- when Infor

4    licensed Birst for CloudSuite, it didn't license --

5    it didn't permit users to access the Visualizer,          03:02:41

6    correct?

7        A    It did not permit every user to access the

8    Visualizer.

9        Q    Did you get complaints that -- about the lack

10   of a Visualizer in -- the access to a Visualizer in       03:02:55

11   Birst for CloudSuite?

12            MR. LIPMAN:  Hold on.  Object to the form of

13   the question.

14            Go ahead, Mr. Peters.

15            THE WITNESS:  I had other Infor product          03:03:07

16   managers want to include full Visualizer

17   functionality in all users.  That's the complaint I

18   received, but I did not receive anything from any

19   direct customers.

20   BY MR. SLAUGHTER:                                          03:03:22

21       Q    Did you say "full Visualizer functionality"?

22   Is that what you said, Mr. Peters?

23       A    Yes.

24       Q    And so the Birst for CloudSuite customers

25   didn't have full Visualizer functionality, correct?       03:03:32

                                              Page 234

```
 1        A    Again, I think that question is a

 2   mischaracterization.  Not all user licenses did.

 3        Q    And I'm sorry if I'm being dense, but the

 4   Birst for CloudSuite user licenses did not include

 5   full Visualizer functionality, correct?              03:03:48

 6        A    Again, the majority, the vast majority of

 7   user licenses did not.

 8        Q    So the vast majority of Birst for CloudSuite

 9   user licenses did not include an authorization to

10   use the full Visualizer?                             03:04:05

11        A    That is correct, yes.

12        Q    At the time of the acquisition, did Birst

13   sell a product that included -- that -- strike that.

14   Strike that.

15             At the time of the acquisition, did Birst   03:04:18

16   license a product that permitted users only to use

17   the features that were later licensed in Birst for

18   CloudSuite?

19        A    Yes.

20        Q    So at the time that -- of the acquisition,   03:04:30

21   Birst licensed products that had -- that didn't

22   permit full Visualizer functionality?

23        A    That is correct.

24        Q    What percentage of the -- estimate, what

25   percentage of the products that were licensed prior   03:04:55
```

Page 235

```
1    to the acquisition didn't permit full Visualizer

2    functionality?

3         MR. LIPMAN:  Object to form of the question.

4         Hold on.  Vague.  Specifically the reference

5    to the word "percentage."                        03:05:15

6         Go ahead.  If you understand the question,

7    Mr. Peters, go ahead.

8         THE WITNESS:  I don't recall the specific

9    percentages, no.

10   BY MR. SLAUGHTER:                                03:05:22

11     Q   Okay.  If you can look at what has been

12   marked as Exhibit 45, please.

13        (Exhibit 45 was marked for identification

14     electronically and is attached hereto.)

15        THE WITNESS:  Okay.                          03:05:46

16   BY MR. SLAUGHTER:

17     Q   Do you have that up?

18     A   Yes.

19        MR. LIPMAN:  Hold on just one second,

20   Counsel.  Mine is still spinning.               03:05:50

21        Okay, I've got it.

22   BY MR. SLAUGHTER:

23     Q   And the top e-mail is from Christina

24   Van Houten to Charles Phillips and Soma, copying you

25   and Paul Staelin, forwarding on an e-mail that Paul   03:06:11
```

Page 236

```
 1      had sent to a larger Birst team, including you.

 2            Do you see that?

 3         A   I see that, yeah.

 4         Q   And this is September 2017?

 5         A   It looks like that, yes.                    03:06:20

 6         Q   Okay.  And do you recall a large meeting in

 7      September of 2017 amongst Birst and Infor personnel

 8      regarding packages in the CloudSuite that would be

 9      offered?

10         A   I'm trying to remember.  There may have       03:06:41

11      been -- I think this was a phone call.  I think.

12         Q   Okay.  And Mr. Staelin says:

13                  "Thank you for the time this

14            morning.  I hope you all found it

15            helpful.  Now that we have the basic         03:06:54

16            offerings for Birst platform defined,

17            let's focus on driving value for our

18            customers."

19            Do you see that?  It's at the top of this

20      e-mail.                                            03:07:04

21         A   Yes.

22         Q   Okay.

23         A   Yes, I see that.

24         Q   And four lines down he writes:

25                  "As we discussed, the business        03:07:08
```

                                                      Page 237

```
 1    that it was not the full Birst and would have

 2    significantly less functionality than Birst

 3    Enterprise or Birst Professional, correct?

 4          MR. LIPMAN:  Object to the form of the

 5    question.                                    03:12:34

 6          THE WITNESS:  Birst for CloudSuites -- and,

 7    again, this is before the actual Birst for

 8    CloudSuites was built, so this was still based on

 9    limited information at the time.  But even in this

10    case, the vast majority of the functionality of the   03:12:49

11    entire Birst stack and Enterprise stack was being --

12    was intended to be used.

13    BY MR. SLAUGHTER:

14       Q    Okay.  Can you look at Exhibit 46, please.

15            (Exhibit 46 was marked for identification   03:13:00

16       electronically and is attached hereto.)

17    BY MR. SLAUGHTER:

18       Q    Do you have that up?

19       A    Yes.

20       Q    Okay.  I want to direct your attention to --   03:13:18

21    Exhibit 46 is an exchange of e-mails in

22    October 2017, and the middle one on that first page

23    is from you to Mike McDade and Paul Staelin.

24            Do you see that?

25       A    Yes, I see that.                          03:13:27
```

Page 242

```
 1        Q    Who is Michael McDade?

 2        A    He was our -- sorry, he was our head of North

 3    American sales.

 4        Q    And it says -- you write in the last sentence

 5    to Michael:

 6                    "We need to make it very clear

 7            that it," meaning Birst for

 8            CloudSuite, "is not full Birst and

 9            significant functionality will not be

10            there in the free version."                03:14:00

11            Do you see that?

12        A    I see that, yeah.

13        Q    And was that accurate at the time you wrote

14    it?

15        A    That was -- that was the goal.             03:14:05

16        Q    That was the goal at the time?

17        A    The goal was to make sure that there was

18    differentiation between Birst for CloudSuite and

19    Birst Enterprise.

20        Q    And that was what ultimately happened was   03:14:23

21    that there was differentiation between Birst for

22    CloudSuite and Birst Enterprise, correct?

23        A    There was some differentiation, yes.

24        Q    And the differentiation was that Birst

25    Enterprise was a much more fulsome product than      03:14:37
```

Page 243

```
 1    Birst for CloudSuite, correct?

 2        A    That's --

 3             MR. LIPMAN:   Objection.   Asked and answered.

 4    Mischaracterizes the record.

 5             Go ahead.                                  03:14:47

 6             THE WITNESS:   That is incorrect.

 7    BY MR. SLAUGHTER:

 8        Q    What was the -- what was the differentiation?

 9        A    The primary differentiation between the two

10    products was what data sets the end users were         03:14:53

11    licensed to access.

12             The entire suite was utilized, but Birst for

13    CloudSuite was limited to Infor data only.   Birst

14    Enterprise entitled you to access any data from any

15    source.                                              03:15:12

16        Q    And it also permitted you to customize

17    reports in a way that you couldn't customize in

18    Birst for CloudSuite, correct?

19        A    That's incorrect.

20        Q    So Birst for CloudSuite had the same          03:15:21

21    capability to customize -- it licensed users and

22    gave them the same capability to customize and

23    visualize reports as Birst Enterprise?

24        A    That's not the question you asked.

25        Q    Okay.   Then I hope that question was better.   03:15:35
```

Page 244

```
 1            bring in additional data sources, or

 2            to modify/extend the existing data

 3            model."

 4            Do you see that?

 5       A    I see that, yeah.

 6       Q    Does that refresh your recollection that you

 7    had to upgrade to Birst Professional Plus or

 8    Enterprise in order to access Visualizer?

 9       A    This is what -- this is what our salespeople

10    were instructed as the core capabilities, but it was    03:21:50

11    not the entire story.

12       Q    That's what the salespeople were telling

13    their customers?

14       A    No, this is what we were guided to sell.  We

15    wanted to make sure that this is -- this             03:22:04

16    encapsulated the core of the functionality, but if

17    you couldn't modify or extend the data model in

18    Birst for CloudSuite, it would have been largely

19    unusable.

20       Q    So is this sentence wrong then, the last        03:22:17

21    sentence on page 737?

22       A    For purposes of the majority of users, if the

23    goal was to have, as in our Enterprise customers,

24    the majority of users have access to Visualizer,

25    then the difference here is the majority of users       03:22:35
```

Page 249

1    did not have access to Visualizer in that case.

2         Modifying and extending, you know -- and the

3    data sources were different as well, yes.  That's

4    definitely true.

5         Q    But the majority of Birst for CloudSuite        03:22:51

6    customers didn't have access to Visualizer?

7         A    The majority of the users.

8         Q    Thank you.

9         The majority of Birst for CloudSuite users

10   didn't have access to Visualizer, correct?            03:23:03

11        A    They didn't have access to creating or

12   modifying content with Visualizer.

13        Q    And that was an issue for those users that

14   you guys got complaints that people wanted that

15   functionality, correct?                              03:23:16

16        A    I'm not aware of any complaints.  I know the

17   product managers, the Infor product managers wanted

18   to include that functionality.

19        Q    Did you want to include that functionality?

20        A    I didn't think it was necessary.           03:23:43

21        MR. SLAUGHTER:  It's not quite an hour.

22   Let's take a short break because I'm going to shift

23   to a different topic.

24         So it's 3:23.  Do you want to take five

25   minutes and come back at 3:28?                        03:23:53

Page 250

1        Q   Had you -- so in FY '18, it's your position

2    that CloudSuites had included Birst for CloudSuite?

3        A   If the customers who bought those products

4    were entitled to use them, then they effectively got

5    the value of it.                                    03:39:27

6        Q   Are you aware of any customers in FY '18

7    being able -- any customers -- any users in FY '18

8    being able to use Birst products in the CloudSuite?

9        A   I'm aware of the customers being told at the

10   beginning of the FY '18 that they would and that     03:39:41

11   ultimately those customers were provisioned to be

12   able to use it.

13       Q   In FY '18?

14       A   The product wasn't available in FY '18.

15       Q   Well, that's my question is FY '18.  Was the  03:39:53

16   product available in FY '18?

17       A   I'm sorry, that was a different question.

18   The product was not available in FY '18.

19       Q   So the product -- Birst for CloudSuite was

20   not available in FY '18, correct?                    03:40:08

21       A   Correct, the product hadn't been built yet.

22       Q   Okay.  So as of -- so my questions were with

23   respect to FY '18.

24           Did you -- did you or Mr. Staelin or anybody

25   on your behalf do any calculations following the     03:40:18

                                            Page 252

```
 1   close of FY '18 with respect to bookings associated

 2   with your potential earn-out bonus?

 3       A    There was no -- no reason or ability to do

 4   that at that time.

 5       Q    Because you didn't exceed the bookings        03:40:32

 6   threshold?

 7       A    No, because --

 8           MR. LIPMAN:  Hold on.  Object to the form of

 9   the question.  Mischaracterizes the record.

10           Go ahead.                                      03:40:40

11           THE WITNESS:  No, because the Birst for

12   CloudSuite components of that year hadn't been

13   determined yet.

14   BY MR. SLAUGHTER:

15       Q    I'm -- but I'm sorry if I'm being dense, but  03:40:48

16   didn't you just tell me that Birst for CloudSuite

17   was not available in FY '18?

18       A    What I told you is that the entitlements the

19   customers purchased entitled them to have access to

20   it, and they ultimately did.                           03:41:02

21       Q    In FY '18?

22       A    I don't see how that's --

23           MR. LIPMAN:  Hold on.  Object to the form of

24   the question.  It's vague what you're asking about.

25           If you understand, go ahead.                   03:41:10
```

                                                    Page 253

```
 1    BY MR. SLAUGHTER:

 2       Q   I'm sorry, Mr. Peters.  Are you saying that

 3    there were sales of CloudSuites that entitled users

 4    in FY '18 to Birst for CloudSuite, and even though

 5    it wasn't available to those users, that you believe    03:41:22

 6    that you're entitled to the value of those sales for

 7    the purposes of your earn-out?

 8           MR. LIPMAN:  Object to the form of the

 9    question.

10           THE WITNESS:  I'm saying that if a customer      03:41:35

11    was sold something that entitled them to Birst for

12    CloudSuite and that sale occurred within those two

13    years, then we are entitled to that credit.

14    BY MR. SLAUGHTER:

15       Q   And there were sales -- you believe that         03:41:50

16    there were sales of CloudSuite in FY '18 that

17    provided customers entitlement to Birst for

18    CloudSuite and you're entitled to compensation for

19    those if they exceed the thresholds?

20       A   Those customers purchased CloudSuite with the    03:42:09

21    full knowledge that Birst for CloudSuite would be in

22    that, expected it to come, and so therefore -- and

23    they were ultimately entitled, so yes.

24       Q   And so they didn't -- prior to close of

25    FY '18, Birst was not included in CloudSuite,           03:42:26
```

Page 254

```
 1    correct?

 2        A    That's --

 3            MR. LIPMAN:  Object -- hold on, hold on.

 4    Object to the form of the question.

 5    Mischaracterizes his testimony and the record.        03:42:35

 6            Go ahead.

 7            THE WITNESS:  Prior to close of FY '18, the

 8    products had not yet been integrated, and those

 9    capabilities hadn't yet been made available.

10    BY MR. SLAUGHTER:                                      03:42:46

11        Q    In the CloudSuite, correct?

12        A    In the CloudSuite, yes.

13        Q    You had been selling Birst Enterprise and

14    Birst Professional in FY '18, correct?

15        A    Yes, we had been selling, yes.              03:42:57

16        Q    And prior to filing this lawsuit, you didn't

17    tell anybody at Infor that you thought you were

18    entitled to an earn-out bonus based upon FY '18

19    bookings, correct?

20        A    I'm sorry, prior to --                       03:43:09

21        Q    Prior to filing this lawsuit, had you ever

22    told anyone at Infor that you thought you personally

23    were entitled to an earn-out bonus based upon the

24    FY '18 bookings?

25        A    We informed people of what we thought once we  03:43:21
```

Page 255

```
 1    bookings for the purpose of your earn-out provision

 2    would be limited to that portion of the fees payable

 3    under contract that are attributable to the Birst

 4    offering, correct?

 5         MR. LIPMAN:  Object to form of the question.    03:46:08

 6    The document speaks for itself.

 7         Go ahead.

 8         THE WITNESS:  I agree that it should be the

 9    portion that is attributable to Birst and, you know,

10    the value that is attributable to Birst.            03:46:21

11    BY MR. SLAUGHTER:

12    Q    But value is not in that sentence, is it?

13    A    No, but that sentence exists in conjunction

14    with other sentences which discuss how to determine

15    value.                                              03:46:45

16    Q    In fact, the word "value" doesn't appear

17    anywhere in your earn-out bonus language, correct?

18         Strike that.  The document speaks for itself.

19    I'll withdraw the question.

20         The CloudSuite was a -- is ERP software,       03:47:00

21    correct?

22    A    Correct.

23    Q    And the Birst for CloudSuite was sometimes

24    referred to as an edge feature in a CloudSuite,

25    correct?
```

Veritext Legal Solutions
866 299-5127

```
 1    the form of the question.  Vague.  Assumes facts not

 2    in evidence.

 3         Go ahead.

 4         THE WITNESS:  Absolutely not.

 5    BY MR. SLAUGHTER:                                    03:48:49

 6      Q   Okay.  Can you look at what has been marked

 7    as Exhibit 48, please.

 8         (Exhibit 48 was marked for identification

 9         electronically and is attached hereto.)

10    BY MR. SLAUGHTER:                                    03:49:07

11      Q   Do you have that in front of you?

12      A   Yes.

13      Q   Okay.  And if you -- there's two e-mail

14    chains here.  The first one is an e-mail from

15    Mr. Staelin to you in June of 2019, and he is        03:49:19

16    forwarding to you an exchange from earlier in 2019

17    and 2018.

18         Do you see that?

19      A   I do.  It's a long e-mail.

20      Q   I'll hopefully shortcut it.                    03:49:32

21         I'll direct you to the e-mail at the top of

22    the second page, which ends in 656.  Ms. Bellavia to

23    Mr. Staelin, among others, including you.

24         Do you see that?

25      A   I see that, yes.                               03:49:54
```

Page 260

1      Q    And Ms. Bellavia says:

2               "I know the 10 percent revenue

3           allocation for the earn-out was

4           approved.  I believe finance is taking

5           care of that part."                        03:50:03

6           Do you see that?

7      A    I do.

8      Q    And that earn-out is referring to your

9    management earn-out, isn't it?

10     A    It may or may not be.  It also could have    03:50:10

11   been the shareholder earn-out.

12     Q    What makes you think --

13     A    It was a revenue allocation, and the

14   shareholder earn-out was a revenue allocation.

15     Q    The shareholder earn-out also had revenue    03:50:22

16   allocation.

17          Do you see -- what leads you to believe this

18   10 percent was related to the shareholder earn-out?

19          MR. LIPMAN:  Object to the form of the

20   question.  Mischaracterizes the testimony.          03:50:33

21          Go ahead and answer the question.

22          THE WITNESS:  Primarily, I -- her response

23   was completely out of context to the rest of the

24   e-mail chain, and there was a much more urgent thing

25   that we were trying to deal with, which is sales      03:50:48

                                          Page 261

```
 1    compensation.  So this particular issue, you know,

 2    it wasn't really on topic at all.

 3         But to the extent that it might have referred

 4    to an earn-out, because it was a revenue allocation,

 5    not a bookings one, an assumption could have been it    03:50:59

 6    was management -- sorry, shareholder.

 7    BY MR. SLAUGHTER:

 8      Q   Okay.  And you were talking about this, the

 9    ongoing -- you had an ongoing debate with Infor

10    about the 10 percent allocation for salespeople,       03:51:14

11    correct?

12      A   Correct.  We wanted our sales people to get

13    paid for the work that they were doing.

14      Q   And Ms. Bellavia, in her July 8, 2018 e-mail,

15    just below says:                                        03:51:34

16             "The Birst that will be included

17          in the suites is not the full-blown

18          version of Birst, but, rather, the

19          Lite version in that the customer

20          would be getting very little                      03:51:44

21          functionality beyond what they receive

22          today, either Infor BI or Cognos.  The

23          real opportunity lies in showing the

24          customer all the great capabilities

25          that Birst has and selling them                   03:51:53
```

Page 262

```
 1        Q    And the reason you asked -- well, strike

 2   that.

 3            I want to move back to the -- to the -- and

 4   you can set aside 48.

 5            The reason -- and you also -- you were also      03:53:05

 6   discussing a 10 percent allocation with respect to

 7   revenue for the first business unit, correct?

 8        A    Yes, 10 percent for that too, yes.

 9        Q    And so for the -- for the purposes of

10   calculating the Birst business unit revenue, you          03:53:18

11   asked that Infor allocate 10 percent of the

12   CloudSuite revenue to Birst, correct?

13        A    That was our goal, yes.

14        Q    And you asked for that 10 percent allocation

15   because you thought that was a reasonable measure of      03:53:32

16   the value of the CloudSuite attributable to Birst

17   for CloudSuite, correct?

18        A    That is incorrect --

19            MR. LIPMAN:  Hold on.  Object to the form of

20   the question.                                             03:53:41

21            Go ahead, Mr. Peters.

22            THE WITNESS:  That is incorrect.

23   BY MR. SLAUGHTER:

24        Q    Why did you ask for the 10 percent

25   allocation?                                               03:53:45
```

Page 264

```
 1    BY MR. SLAUGHTER:

 2      Q   You write to Ms. Hunter and others on

 3    September 3:

 4              "Christine, we definitely need to

 5          follow up on this.  I'm not sure I              03:58:55

 6          understand the intent, motivation or

 7          business goal here.  The vast majority

 8          of our bookings and revenue come from

 9          stand-alone Birst, either core or

10          cross-sell.  CloudSuites is a small          03:59:04

11          part of our business and one where we

12          already" -- "we are already embedded

13          in the suite, and hence there's no

14          voluntary purchase decision to be made

15          that can be influenced by marketing."        03:59:14

16          Do you see that?

17      A   I see that, yes.

18      Q   And this is in September 2019, well after the

19    close of FY '19, right?

20      A   At that point, yes.                            03:59:23

21      Q   And you and Mr. Staelin had spent the summer,

22    among other things, doing the best you could to

23    calculate what you thought your earn-out bonus would

24    be, correct?

25      A   We had done with the best -- the best          03:59:42
```

Page 269

```
1        Q    And you understood, as we discussed earlier,

2   that your earn-out bonus was based upon the growth

3   of the Birst business during FY '18 and FY '19,

4   right?

5        A    It was based on results from FY '18 and        04:02:08

6   FY '19.

7        Q    But it was based upon assumptions of growth

8   compared to pre-acquisition, correct?

9        A    The way it was measured was relative to

10  specific targets.                                        04:02:22

11       Q    Growth targets, right?

12       A    They could be interpreted that way, yes.

13       Q    Well, they could be interpreted -- well,

14  okay.  The documents are what they are.

15            But the offer letter talks about growth,       04:02:34

16  correct?

17       A    Yeah, the letter more specifically mentions

18  those specific numbers, which if we had just hit

19  those numbers, those numbers were above any numbers

20  that were -- any numbers that had been from prior        04:02:50

21  years.

22       Q    Do you recall what the bookings target was

23  for FY '19?

24       A    I'm sorry, for which purpose?

25       Q    For your business -- for the Birst business.   04:03:08
```

Page 272

```
 1      Q   Okay.  Then I'm not following.  I apologize.

 2          What's the list price for Birst for

 3   CloudSuite?

 4      A   I'm not sure that -- I don't -- I'm not sure

 5   there has to be a list price for Birst for          04:09:35

 6   CloudSuite.

 7      Q   I'm not -- and that's where I started, which

 8   is I don't -- is it your contention -- strike that.

 9          Did Birst ever market Birst for CloudSuite as

10   a stand-alone product?                              04:09:50

11      A   The combination, which is Birst for

12   CloudSuite, includes a stand-alone product that is

13   Birst Enterprise plus Infor content that goes with

14   it.

15      Q   And when you --

16      A   By necessity, that content was required to be

17   in conjunction with the rest of the Infor

18   CloudSuite.

19      Q   And the license that Birst for CloudSuite

20   users -- that defined their ability to use the      04:10:22

21   product was more limited than the license associated

22   with Birst Enterprise, correct?

23      A   That's not true.  There was a -- it was more

24   limited than the business user license, but there

25   was a license that would satisfy.                   04:10:42
```

                                              Page 278

1    those were preserved.

2    BY MR. SLAUGHTER:

3        Q   I'd like to -- you exchanged some text

4    messages, on again, off again, with Mr. Staelin

5    about Birst-Infor, correct?                        04:32:11

6        A   Yep.

7        Q   I'd like to direct your attention to

8    Exhibit 54.

9            (Exhibit 54 was marked for identification

10           electronically and is attached hereto.)    04:32:31

11           MR. LIPMAN:  Counsel, when you get a chance,

12   could we take a five-minute break?

13           MR. SLAUGHTER:  Yeah, let me go through a few

14   of these.

15           MR. LIPMAN:  That's fine.                   04:32:38

16   BY MR. SLAUGHTER:

17       Q   Do you have that open, Mr. Peters?

18       A   It's still spinning.

19           Okay.

20           MR. LIPMAN:  Give me one second, guys.  I'm  04:32:56

21   waiting for my file to populate.

22           Okay, I'm there.

23   BY MR. SLAUGHTER:

24       Q   Mr. Peters, Exhibit 54 was produced to us in

25   discovery by your counsel and appears to be text    04:33:12

                                              Page 296

```
 1    messages by you exchanged with various people,

 2    including Mr. Staelin and Mr. Gray.

 3          And I'd like to direct your attention to

 4    messages dated September 30th, 2019 at 4:32 p.m.

 5          MR. LIPMAN:  Which tab, Counsel?              04:33:37

 6          MR. SLAUGHTER:  I think there's only one tab

 7    for Exhibit 54.

 8          MR. LIPMAN:  I see.

 9          MR. SLAUGHTER:  I'm sorry.  I'm sorry, the

10    middle tab.                                        04:33:42

11          MR. LIPMAN:  Can you give us a row number?

12          MR. SLAUGHTER:  Well, it's September 30, so

13    if you go to September 30 at 4:32, it's row 29.

14          MR. LIPMAN:  Thank you.

15    BY MR. SLAUGHTER:                                  04:34:00

16       Q   Do you see that, Mr. Peters?

17       A   I do, yeah.

18       Q   And do you recognize (781) 223-7965 as

19    Mr. Staelin?

20       A   I believe that's his phone number, yes.     04:34:09

21       Q   And he texts you:

22              "2.9B post discount if we use all

23          platforms plus seats."

24          Did you understand that to be an earn-out

25    estimate of bookings revenue?                      04:34:22
```

<div align="right">Page 297</div>

```
 1        A    Paul was doing a bunch of calculations trying

 2   to see, you know, if he could come up with something

 3   with the data he had.   That was the number he came

 4   up with.

 5        Q    And so that was one estimate that he came up      04:34:32

 6   with that he shared with you by text, correct?

 7        A    It looks like that, yes.

 8        Q    And you responded a few minutes later:

 9              "Okay.  Was hoping for something

10              like 250 to 400."                                04:34:43

11         Do you see that?

12        A    Yeah, I see that.

13        Q    And what were you trying to convey to

14   Mr. Peters -- excuse me -- Mr. Staelin there?

15        A    Just that, you know, that number was higher       04:34:51

16   than I expected.  You know, it's a big number, so

17   was hoping that, you know, we could do something

18   that was -- maybe was not quite so big.

19         But, you know, the numbers were what the

20   numbers were.                                              04:35:10

21        Q    If the numbers were what the numbers were and

22   your earn-out basis was based on that, why wouldn't

23   you say, "2.9 billion, terrific, let's do it"?

24        A    I had just spent the last two years fighting

25   over every nickel for people in compensation with          04:35:32
```

Page 298

```
1     Infor, so, you know, numbers -- the higher the
2     number, the more challenging it was going to be.  So
3     I was, you know -- you know, I wasn't relishing
4     having to have any conflict over this.
5         Q   Do you contend that the appropriate bookings    04:35:52
6     allocation is 2.9 billion?
7         A   Look, I mean, we still don't have all the
8     information.  Our experts are going to do the
9     calculations with the information that we get.
10            So, you know, when they do that, we'll have a    04:36:06
11    much more precise number.  This was just Paul's --
12    one of Paul's shots.
13        Q   And he responds to you:
14                "When using the number of
15            employees for the number of seats, we    04:36:17
16            get 317 million as the number."
17            And you respond, "Perfect."
18            Do you see that?
19        A   Yup.
20        Q   Was the plan to use that number as a    04:36:24
21    negotiating tactic with Infor?
22        A   The plan was simply to initiate a
23    conversation to get them to talk to us.  And we
24    wanted to make sure that, you know, we did something
25    that -- you know, we were trying to get them to talk    04:36:38
```

Page 299

```
 1    to us.

 2         That seemed like a much better number to get

 3    that conversation going, even though that didn't

 4    actually happen.

 5    Q   And that's -- you had already told Infor that   04:36:49

 6    you thought the number was 50 million for Birst for

 7    CloudSuite, correct?

 8    A   Paul had circulated a spreadsheet that

 9    suggested that was a way to calculate it.

10    Q   And --                                          04:37:03

11    A   Again, that spreadsheet was simply a

12    mechanism for us to say, "Can you guys do the actual

13    math because you have the information and we don't."

14    Q   And here he comes up with two different

15    versions, 2.9 billion and 317 million, and when he    04:37:17

16    said "317," you said, "Perfect," right?

17         MR. LIPMAN:  Object to the form of the

18    question.  The document speaks for itself.

19         Go ahead.

20         THE WITNESS:  Yeah, I was happy that that      04:37:26

21    seemed like it was going to be an easier number for

22    us to start a conversation with.  But still, we

23    didn't have the information to do the real

24    calculations.

25    ////
```

Page 300

```
 1   BY MR. SLAUGHTER:

 2      Q    If you go down to -- I'm sorry, hold on one

 3   second, Mr. Peters -- October 1 at 3:51.

 4           MR. LIPMAN:  Got a row number for us,

 5   Counsel?                                          04:38:05

 6           MR. SLAUGHTER:  39.

 7           MR. LIPMAN:  Okay.

 8   BY MR. SLAUGHTER:

 9      Q    You text somebody at 206-356-1877.

10           Do you see that?                          04:38:12

11      A    I do.

12      Q    Do you know whose phone number that is?

13      A    I don't have it memorized because my phone

14   has usually names on it.  It's possible that was my

15   girlfriend at the time.                           04:38:30

16      Q    And you wrote to that person:

17              "It does appear that I'm going to

18           be fired on Monday."

19           Do you see that?

20      A    Yes.                                      04:38:38

21      Q    So consistent with what you testified

22   earlier, this is October 1st, no later than

23   October 1st you were -- had a pretty good sense that

24   you were likely to be fired, correct?

25      A    Like I said, from the moment that week ago,  04:38:50
```

Page 301

```
 1    probably at least a week before that when that

 2    meeting got set up, the radar was definitely up.

 3         You know, there was other indications, but,

 4    yeah, I had a pretty good sense at that time.

 5       Q   Thank you.

 6         MR. SLAUGHTER:  Let's take our five minutes

 7    now, Avi.

 8         MR. LIPMAN:  Thank you, appreciate it.

 9         THE VIDEOGRAPHER:  Off the record.  The time

10    is 4:39.                                    04:39:17

11         (Recess.)

12         THE VIDEOGRAPHER:  We're back on the record.

13    The time is 4:50.

14    BY MR. SLAUGHTER:

15       Q   Mr. Peters, if I could direct your attention  04:50:23

16    to row 141 of Exhibit 54.

17         MR. LIPMAN:  Middle tab?

18         MR. SLAUGHTER:  Yes.

19    BY MR. SLAUGHTER:

20       Q   And you text Mr. Staelin:

21            "Working on wiping my machine

22         right now."

23         And Mr. Staelin responds to you:

24            "I will do so this weekend."

25         Do you see that?                         04:50:55
```

                                                    Page 302

1    A    What I'm seeing is in military time, so is

2  that 2239?

3    Q    Correct.

4    A    Okay, got it.

5    Q    2239 and 30 seconds on the third page.          04:53:39

6         Do you see that?

7    A    Yes, I see that.

8    Q    That's the same text we were just looking at:

9             "Working on wiping my machine

10        right now."                                      04:53:51

11        Do you see that?

12   A    I see it, yes.

13   Q    And Mr. Staelin responds:

14            "I'll do so this weekend"?

15   A    Yes.                                             04:53:58

16   Q    Now, moving up to the e-mail -- the texts

17  that were exchanged just in the minute immediately

18  preceding that at 10:38, starting at 30 seconds,

19  Mr. Staelin texts you:

20            "I guess I send the 300 million            04:54:16

21        number to you so they find it in

22        discovery and not ahead of the

23        layoff."

24        Do you see that?

25   A    Yeah.                                            04:54:25

```
 1    have to go off the record now.  I'm just asking as a

 2    professional courtesy of having an off-the-record

 3    discussion at some point about these because I

 4    believe that they were subject of back and forth in

 5    discovery that I'm not particular familiar with, and    04:56:57

 6    I don't think Mr. Peters is either.

 7    BY MR. SLAUGHTER:

 8       Q    Mr. Peters, as far as you know, you didn't

 9    delete these texts?

10       A    Correct.                                        04:57:07

11       Q    And when Mr. Staelin writes, "I guess I send

12    the 300 million number to you now so they find it in

13    discovery," did you understand he was saying, "I'm

14    going to send you an e-mail so that later on in

15    litigation they find that e-mail in discovery"?         04:57:21

16       A    I was understanding that, like I said before,

17    we didn't have a ton of confidence that the

18    calculations and things would be done in a way that

19    we thought was correct, so we wanted to make sure

20    that there was a record of at least our thoughts on     04:57:39

21    the way to do the calculations.

22       Q    Sorry?

23       A    What's that?

24       Q    Sorry, I interrupted you, I apologize.

25       A    Yeah, so we definitely wanted them to be         04:57:52
```

Page 308

```
 1    found, yes.
 2        Q   You wanted them to be found in discovery even
 3    though you had already sent them what you thought
 4    the appropriate methodology of the calculation was
 5    on September 11, correct?                          04:58:03
 6        A   We sent --
 7            MR. LIPMAN:  Object to the -- hold on, hold
 8    on.  Object to the form of the question.
 9            THE WITNESS:  We sent them to one person,
10    but, you know, Infor had a way of stuff getting lost  04:58:13
11    and not working its way around.  So our hope was
12    that, you know, this would be something that would
13    be broadly discovered.
14    BY MR. SLAUGHTER:
15        Q   Well, why didn't -- if you wanted it to be   04:58:28
16    broadly discovered, why didn't you just e-mail it to
17    everybody that wanted to see it, from Mr. Samuelson,
18    Ms. Blotner or whoever else?
19        A   Well, keep in mind, we were getting
20    terminated right then and there.  That was not our
21    primary goal.  Our goal was to see if we could have
22    conversations at some point.
23        Q   And you could -- and, again, in September, on
24    September 11, you sent it to Mr. -- Ms. Blotner.
25    You could have sent the same calculation to          04:58:52
```

Page 309

```
 1    Samuelson, to Soma, to everybody, but you just sent

 2    it to Mr. Blotner, right?  I mean Ms. Blotner,

 3    excuse me.

 4       A   Well, that's who we were told to send it to.

 5    Both Pam and Kevin said, "Work with Wendy, she'll        04:59:04

 6    work with you," so we were following directions.

 7       Q   And Mr. Staelin, the day after he exchanged

 8    this text message with you, sends you an e-mail with

 9    the 300 million dollar number, correct?

10       A   I don't have it in front of me, but I believe   04:59:17

11    so.

12       Q   Take a look at Exhibit 56.

13       A   Okay.

14          (Exhibit 56 was marked for identification

15          electronically and is attached hereto.)          04:59:46

16    BY MR. SLAUGHTER:

17       Q   Is this the -- this is -- this e-mail is from

18    Mr. Staelin just to you.

19          Do you see that?

20       A   The last bit is to me.                           04:59:49

21       Q   Correct.  The first bit is just respond -- he

22    is forwarding to you the -- that September 11

23    e-mail, right?

24       A   Right.  And then Wendy, I guess, responded.

25          No, I guess -- yeah, he is resending            05:00:01
```

Page 310

1    something to Wendy.

2        Q   And so this e-mail is dated October 4, 2019,

3    which is the morning -- at 5:32 a.m. the morning

4    after you exchanged those texts in which Mr. Staelin

5    said, "I guess I send the 300 million number to you      05:00:18

6    so they can find it in discovery and not ahead of

7    layoffs," correct?

8        A   That's the timing of it, yes.

9        Q   And so the -- after -- at 10:32 at night, he

10   says he is going send the e-mail, and the next          05:00:34

11   morning he sends this e-mail.  And he sends it just

12   to you, he doesn't send it to Wendy or Kevin

13   Samuelson or anybody else, correct?

14       A   It doesn't appear on the e-mail that he sent

15   it to them, no.                                          05:00:48

16       Q   Did you ask Mr. Staelin to send it just to

17   you and not to Ms. Blotner or Mr. Samuelson or

18   anybody else?

19       A   I don't recall specifically saying not to

20   send it to anybody else.  But I remember him saying      05:01:00

21   we should make sure this is a memorialized.  The

22   calculation was up to date, and at least a better

23   estimate from Paul's perspective and he didn't want

24   that to get lost.

25       Q   Why did you think it was going to be lost?      05:01:18

Page 311

```
 1        A    Because most of the time we attempted to

 2    engage with Infor on something, if it didn't suit --

 3    if it didn't suit Infor's desired interpretation or

 4    outcome, those e-mails tended to get lost.

 5        Q    But you were -- but Mr. Staelin had a copy of     05:01:32

 6    it, you had a copy of it.  You could -- you had it

 7    in your Gmail.  Why -- in what world was this e-mail

 8    going to be lost?  This was just planted for

 9    discovery, wasn't it?

10        A    No, it would have been lost at Infor.  If          05:01:41

11    somebody -- if it was not discovered -- if he didn't

12    mail it, then, you know, how would any -- our

13    thought was someone would have overlooked it.

14        Q    There was nothing that was going to stop you

15    from sending this to Infor at any time after you         05:01:55

16    were terminated or at any time in the course of

17    litigation and say, "Here is what we think the

18    proper calculation was."

19             But instead, you sent this e-mail -- asked

20    Mr. Staelin to send this e-mail in order to have it     05:02:07

21    found in discovery to appear as a reasonable

22    calculation, correct?

23        A    That's not true.

24             MR. LIPMAN:  Hold on.  Object to the form of

25    the question.  Assumes facts not in evidence.          05:02:19
```

Page 312

```
 1          Go ahead, Mr. Peters.
 2          THE WITNESS:  No, that's not true.  We were
 3     hoping that Infor would use this kind of information
 4     when it actually came to do the calculation, would
 5     understand that this math was an appropriate way to     05:02:27
 6     do it.  So when it actually came time to do the
 7     calculations for our earn-out, they would
 8     potentially use this.  And we had hoped that they
 9     would.  They ultimately didn't, but we hoped that
10     they would.                                             05:02:44
11     BY MR. SLAUGHTER:
12       Q   And rather than doing that, which is to send
13     to Ms. Blotner, Mr. Samuelson or somebody else,
14     "Here's what we think the appropriate math is and
15     here's what we think the appropriate figures are,
16     and they're actually somewhere between 2.9 billion
17     and 317 million," you just had Mr. Staelin just send
18     it to you so that hopefully it would later be
19     discovered in discovery?
20          MR. LIPMAN:  Objection to form of the             05:03:04
21     question.  Assumes facts not in evidence.
22     Argumentative.
23          THE WITNESS:  We wanted it to be -- I don't
24     know if he sent this to anybody else, but I guess we
25     assumed that they would find it.                       05:03:17
```

                                                       Page 313

```
 1    go.  I was curious.

 2       Q   Referring you back to Exhibit 55, the last

 3    text in this exhibit, sent on October 6 at 8:53

 4    presumably in the morning, which is that Sunday you

 5    were to meet with Mr. Samuelson, Mr. Staelin sends      05:06:41

 6    you a text in which he says:

 7              "Quick stats we may want to

 8          reference with Kevin today.  FY '17,

 9          16 million bookings.  FY '18, 14

10          million bookings.  FY '19, 22 million       05:06:58

11          sales bookings.  Total bookings 26

12          million.  Gross margin FY '19, 65-plus

13          percent.  Clear plan for improvement."

14          Do you see that?

15       A   Yes.                                       05:07:14

16       Q   Did you think that that was accurate?

17       A   Those were numbers Kevin was interested in.

18    He wanted to understand our stand-alone in addition

19    to Birst for CloudSuite, so we wanted him to know

20    that that business was improving too.              05:07:26

21       Q   So these stats were put together by

22    Mr. Staelin as a result of a question from

23    Mr. Samuelson?

24       A   These stats were put -- again, we were

25    trying -- we had a good sense that we were going to   05:07:36
```

                                                    Page 316

```
 1    be fired, but we didn't necessarily agree that that
 2    was the right option, and we believed that the
 3    business could continue to grow.
 4         We had just seen our marketing get cut and
 5    didn't think that was the right thing, so we were      05:07:49
 6    still advocating for the success in investment in
 7    the business as a whole.
 8    Q    And Mr. Staelin said that:
 9              "FY '17 bookings were 16 million
10         and FY '18 bookings were 14, and FY            05:08:05
11         '19 were total bookings of 26."
12         Correct?
13    A    I believe that was the stand-alone business.
14    I believe that's what those numbers were.
15    Q    Why do you believe that that refers to the      05:08:16
16    stand-alone business?
17    A    Because I think that's what we were referring
18    to.  I don't know.  I don't have the numbers in
19    front of me.
20    Q    Can you go back to Exhibit 56, please.          05:08:28
21    A    That must be -- that must be the BU bookings
22    then.
23    Q    Can you go back to Exhibit 56, please.
24         This was Mr. Staelin's e-mail that he sent to
25    you after exchanging the text and hoping it would be  05:08:58
```

Page 317

```
 1    anything that Infor didn't have.

 2       Q   But you weren't permitted to keep that after

 3    you left Infor, correct?

 4           MR. LIPMAN:  Object to the form of the

 5    question.                                         06:00:37

 6           THE WITNESS:  I was -- like I said, in

 7    hindsight I probably shouldn't have done it.  But I

 8    thought, going into this situation, I was protecting

 9    myself by making sure that I had that information.

10    BY MR. SLAUGHTER:                                 06:00:53

11       Q   Mr. Peters, why were Birst Professional and

12    Birst Enterprise priced differently?

13       A   We had two different target markets that we

14    were going after.

15           So Birst Professional was meant to be an     06:01:10

16    entry-level product for people who couldn't do

17    sophisticated data modeling.  In particular, the

18    most complicated piece of our product was the data

19    modeling, and so Birst Professional was designed to

20    make that simpler.                                 06:01:29

21       Q   So it was -- so what did that mean in terms

22    of pricing with respect -- in comparison, excuse me,

23    to Birst Enterprise?

24       A   There were restrictions -- well, we -- the

25    price was lower.  We had a lower price because, you   06:01:53
```

Page 341

1    know, obviously, the degree of sophistication was --

2    with what you could build with Birst Professional

3    was less than what you could build with Birst

4    Enterprise.

5       Q   And what was the degree of sophistication in      06:02:09

6    terms of what you could build with Birst for

7    CloudSuite as compared to Birst Professional?

8           MR. LIPMAN:  Objection to the form of the

9    question.  Vague.

10          If you understand, you can go ahead and           06:02:31

11   answer.

12          THE WITNESS:  The content that was Birst for

13   CloudSuite reflected the most complicated

14   application ever built in the history of Birst.  We

15   had never built anything that sophisticated with any    06:02:47

16   other customer.

17          MR. SLAUGHTER:  Madam Court Reporter, would

18   you please reread my question.  I don't think that

19   the answer was responsive to my question.

20          (Record read.)                                   06:03:11

21   BY MR. SLAUGHTER:

22      Q   The question, Mr. Peters, if I was

23   inarticulate, was related to what the user could

24   build using Birst for CloudSuite in comparison to

25   what the user -- an end user would build with          06:03:22

                                              Page 342

```
1    form of the question.  Vague.

2        Go ahead.

3        THE WITNESS:  The business user license

4    didn't necessarily apply to Birst for CloudSuite.

5    BY MR. SLAUGHTER:                              06:11:03

6        Q    The admin user license did apply to Birst for

7    CloudSuite?

8        A    Well, I suppose for the admin users, but

9    there was another license that worked in that

10   scenario just fine.                            06:11:20

11       Q    Okay.  To whom did the business user license

12   typically apply?

13       A    When we sold stand-alone, sometimes we

14   would offer business user licenses, sometimes we

15   would offer other user licenses.               06:11:42

16       Q    What were the -- what were the examples of

17   other user licenses?

18       A    There were admin users, there were analyst

19   users, there were dashboard-only users.

20       Q    And for Birst for CloudSuite, what was the   06:11:54

21   typical user license?

22       A    The license that would apply would have been

23   dashboard only.

24       Q    Okay.  And the dashboard-only user was the

25   typical license with respect to Birst for        06:12:12
```

Page 349

1    CloudSuite, correct?

2         A    That would be the one that would apply, yes.

3         Q    And the dashboard-only user license didn't

4    permit those users to have -- to use a Visualizer to

5    customize reports, correct?                          06:12:25

6         A    That is correct.

7         Q    And the vast majority of Birst for CloudSuite

8    licenses were dashboard-only user licenses, correct?

9         A    That's correct.

10        Q    And dashboard-only user licenses provided      06:12:37

11   less value to the user than the business user

12   license, correct?

13        A    They were priced differently, yes.

14        Q    And the dashboard-only user licenses were

15   priced much, much less, correct?                     06:12:53

16        MR. LIPMAN:   Object to the form of the

17   question.

18        THE WITNESS:   Dashboard-only users were

19   priced less, yes.

20   BY MR. SLAUGHTER:                                    06:13:03

21        Q    Were there Birst Enterprise dashboard-only

22   licenses?

23        A    Yes, there were.

24        Q    And how were the Birst Enterprise

25   dashboard-only users priced?                         06:13:11

                                              Page 350

1

2

3        I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby

5    certify:

6            That the foregoing proceedings were taken

7    before me at the time and place herein set forth;

8    that any witnesses in the foregoing proceedings,

9    prior to testifying, were placed under oath; that a

10   record of the proceedings was made by me using

11   machine shorthand which was thereafter transcribed

12   under my direction; further, that the foregoing is

13   an accurate transcription thereof.

14           I further certify that I am neither

15   financially interested in the action nor a relative

16   or employee of any attorney of any of the parties.

17           IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated:  June 16, 2021.

21

22

23   _____

         KATHLEEN E. BARNEY

24       CSR No. 5698

25

                                          Page  354

# EXHIBIT 5

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4                   ---oOo---

5    BRAD PETERS, DAVID GRAY, AND
     PAUL STAELIN,
6
              Plaintiffs,
7
                 vs.           No. 10-cv-8102
8
     INFOR (US), INC.,
9
              Defendant.
10   _____/
11   AND RELATED CROSS-ACTION.
     _____/
12

13

14

15

16        REMOTE VIDEOTAPED DEPOSITION OF

17              PAUL STAELIN

18     _____

19          THURSDAY, JUNE 3, 2021

20

21

22   REPORTED BY:  HOLLY THUMAN, CSR No. 6834, RMR, CRR

23   JOB NUMBER 4535045

24

25

                                        Page 1

```
 1              (Discussion off the record.)              09:04:54

 2              MR. DOOLEY:  Brook Dooley,                09:05:04

 3    Keker, Van Nest & Peters, for Defendant Infor.      09:05:05

 4              I'm joined by my colleagues Jamie         09:05:08

 5    Slaughter and Cody Gray, along with Josh Wiersma,   09:05:11

 6    in-house counsel for Infor.                         09:05:16

 7              MR. LIPMAN:  Good morning.  Avi Lipman     09:05:19

 8    from McNaul Ebel.                                   09:05:22

 9              With me today are my client, Paul Staelin,09:05:25

10    who is the witness, and also David Gray and         09:05:27

11    Brad Peters, and my colleague Claire Martirosian.   09:05:30

12              It's possible that one of our other       09:05:34

13    colleagues, Michael Hatley, may join today; not    09:05:36

14    present as of now.                                  09:05:39

15              (Reporter clarification of audio.)        10:41:13

16              THE VIDEO OPERATOR:  And the court        09:05:57

17    reporter may swear in the witness.                  09:05:59

18                        --oOo--                         09:06:13

19                     PAUL STAELIN,                      09:06:13

20    _____             09:06:13

21       called as a witness, having been first duly     09:06:13

22       sworn, was examined and testified as follows:   09:06:13

23                       ---oOo---                        09:06:13

24                                                        09:06:14

25    //
```

Page 7

| | | |
|---|---|---|
| 1 | A.  Product management is one of the more | 09:31:46 |
| 2 | interesting and complex jobs in the software space, | 09:31:48 |
| 3 | so it's hard to summarize, but the basic gist is | 09:31:51 |
| 4 | that you are supposed to talk to customers, figure | 09:31:56 |
| 5 | out what they need, work with your engineers to | 09:31:59 |
| 6 | build it, and then work with the salespeople to how | 09:32:03 |
| 7 | to describe what you built to the people you now | 09:32:07 |
| 8 | want to sell that product to. | 09:32:09 |
| 9 | Q.  Okay.  And were you in that product | 09:32:16 |
| 10 | management role the entire time you were at Siebel? | 09:32:19 |
| 11 | A.  Yes, I was. | 09:32:22 |
| 12 | Q.  And how long were you at Siebel?  From | 09:32:23 |
| 13 | when until when? | 09:32:26 |
| 14 | A.  I joined in the summer of 2001, and I left | 09:32:27 |
| 15 | at the very end of 2004. | 09:32:31 |
| 16 | Q.  And what did you do when you left Siebel? | 09:32:44 |
| 17 | A.  When I left Siebel in 2004, Brad Peters | 09:32:47 |
| 18 | and I started Success Metrics, which eventually | 09:32:52 |
| 19 | became Birst. | 09:32:57 |
| 20 | Q.  Okay.  Focusing on the period between 2004 | 09:32:59 |
| 21 | and spring of 2007 when Birst was acquired by | 09:33:05 |
| 22 | Infor, what were your -- what was your role at | 09:33:11 |
| 23 | Success Metrics and then Birst? | 09:33:17 |
| 24 | A.  And just a quick point:  You said -- I | 09:33:20 |
| 25 | think you meant to say 2017, not 2007 -- | 09:33:23 |

Page 29

```
 1   chief customer officer?                         09:44:08

 2        A.  Since January of 2020.                 09:44:10

 3        Q.  Mr. Staelin, have you ever been a party to  09:44:17

 4   a lawsuit other than this one?                  09:44:19

 5        A.  I have not, no.                         09:44:21

 6        Q.  Mr. Staelin, do you recall that in     09:44:26

 7   approximately 2016, Birst began a formal process to  09:44:29

 8   solicit interest in acquiring the company?      09:44:35

 9        MR. LIPMAN:  Object to the form of the     09:44:39

10   question.                                       09:44:40

11        I think you have a mistake in that         09:44:41

12   question.                                       09:44:46

13   BY MR. DOOLEY:                                   09:44:48

14        Q.  You can answer.                         09:44:48

15        A.  I am aware -- there are -- you know, all  09:44:51

16   startups try to have a conversation with potential  09:44:55

17   acquirers all along.                            09:44:57

18        If by "formal" you mean that we had        09:44:58

19   engaged Morgan Stanley, then yes, I am aware that  09:45:02

20   we had engaged Morgan Stanley.                  09:45:06

21        Q.  Okay.  And Birst engaged a fellow named  09:45:09

22   Kempton Dunn at Morgan Stanley in approximately the  09:45:11

23   second half of 2016.  Is that about right?      09:45:15

24        A.  That sounds about right.  I wasn't     09:45:24

25   particularly point on that process, so you'd    09:45:26
```

                                                    Page 38

```
 1    probably get more accurate answers from          09:45:31

 2    Mr. Peters --                                    09:45:33

 3         Q.   Okay.   What --                         09:45:33

 4         A.   -- but that sounds about right.         09:45:34

 5         Q.   And what do you mean when you say you   09:45:36

 6    "weren't point on that process"?                  09:45:37

 7         A.   That process was predominantly led by, I 09:45:40

 8    think, Jay Larson.   I know Brad supported it.  He 09:45:46

 9    went to a lot of -- he had to go to most meetings  09:45:51

10    to talk about Birst.   I showed up rarely in that  09:45:55

11    process; but when asked, I showed.                 09:45:59

12         Q.   Okay.   Well, let me ask you this question: 09:46:02

13    You said you showed up "rarely."                   09:46:19

14              Did you -- did you personally participate 09:46:21

15    in the formal process led by Morgan Stanley of     09:46:25

16    soliciting interest in acquiring Birst?            09:46:30

17              MR. LIPMAN:   Object to the form.         09:46:34

18              THE WITNESS:   I'm not sure how to answer 09:46:36

19    that.   I mean, I really don't know what you mean  09:46:38

20    because "participate" could be I showed up to one  09:46:43

21    meeting, and it could mean I was in every one.     09:46:47

22              What exactly are you trying to ask?  I'm 09:46:50

23    happy to answer.                                   09:46:52

24         Q.   I'm trying to understand, Mr. Staelin,   09:46:53

25    what your role was in connection with the formal   09:46:55
```

Page 39

```
 1        Q.   Okay.  Do you remember anything else that      09:56:29
 2   was said about the integration of products at this       09:56:33
 3   all-day meeting --                                       09:56:40
 4        A.   Yes.                                            09:56:44
 5        Q.   -- other than the comment about Infor's        09:56:44
 6   current offer?                                           09:56:47
 7        A.   Yes.  One of the other topics we discussed     09:56:48
 8   was how to get Birst's Analytics capabilities            09:56:50
 9   deployed as broadly as possible as quickly as            09:56:54
10   possible.                                                09:56:57
11        Q.   And who discussed that topic?                  09:56:58
12        A.   The principal participants in that portion     09:57:03
13   of the conversation, I believe -- and certainly,         09:57:07
14   there were a lot of people there -- but were             09:57:10
15   Charles Phillips, and I always butcher his last          09:57:14
16   name, but I'm going to say Duncan Angove.                09:57:20
17         Soma, whose last name I would also                 09:57:25
18   butcher.  Somasundarami?  I never got it right, but      09:57:27
19   thank God he went by "Soma."  Somasundaram, I            09:57:31
20   think.                                                   09:57:35
21         Brad, and at the time, we had a gentleman          09:57:36
22   on our side, Southard Jones, who was our product         09:57:38
23   marketing lead at the time.                              09:57:43
24        Q.   Okay.  And what do you remember that --        09:57:46
25   strike that question.                                    09:57:56
```

Page  48

| | | |
|---|---|---|
| 1 | negotiation of the terms that appear in that merger | 10:21:36 |
| 2 | agreement? | 10:21:42 |
| 3 | A.   Limited, if any. | 10:21:42 |
| 4 | Q.   I want to focus your recollection on the | 10:21:49 |
| 5 | time before the merger agreement was signed; so | 10:21:51 |
| 6 | April 25th. | 10:21:55 |
| 7 | Before April 25th, 2017, when the merger | 10:21:57 |
| 8 | agreement was signed, did anyone at Infor make any | 10:22:00 |
| 9 | promises to you prior to the time the merger | 10:22:05 |
| 10 | agreement was signed? | 10:22:09 |
| 11 | MR. LIPMAN:   Object to form of the | 10:22:14 |
| 12 | question.  Vague.  Overbroad. | 10:22:14 |
| 13 | THE WITNESS:  Prior to that?  No, I -- I'm | 10:22:21 |
| 14 | struggling a little bit through the -- through the | 10:22:23 |
| 15 | lens of time here. | 10:22:26 |
| 16 | I don't recall any -- any specifics prior | 10:22:28 |
| 17 | to that agreement being signed; but, you know, I -- | 10:22:33 |
| 18 | I could be -- could be misremembering. | 10:22:36 |
| 19 | BY MR. DOOLEY: | 10:22:39 |
| 20 | Q.   Okay.  And I'll represent -- do you recall | 10:22:39 |
| 21 | that you signed your offer letter at the end of | 10:22:42 |
| 22 | May 2017? | 10:22:43 |
| 23 | A.   That sounds about right. | 10:22:49 |
| 24 | Q.   Did anyone at Infor make any promises to | 10:22:51 |
| 25 | you prior to the time you signed your offer letter? | 10:22:54 |

Page 58

| | | |
|---|---|---|
| 1 | would receive any specific amount of Infor stock, | 10:34:11 |
| 2 | does it? | 10:34:16 |
| 3 | MR. LIPMAN:  Object to the form of the | 10:34:17 |
| 4 | question.  Document speaks for itself. | 10:34:18 |
| 5 | THE WITNESS:  Again, I'd have to reread it | 10:34:21 |
| 6 | to answer that with 100 percent confidence, but my | 10:34:23 |
| 7 | recollection is that it does not grant us a | 10:34:25 |
| 8 | specific number of shares; it merely mentions | 10:34:28 |
| 9 | participation in a program. | 10:34:32 |
| 10 | MR. DOOLEY:  I'm just marking the next | 10:34:56 |
| 11 | exhibit here. | 10:34:58 |
| 12 | Q.  Mr. Staelin, if you could look at the | 10:35:17 |
| 13 | "Marked Exhibits" folder there, should be | 10:35:18 |
| 14 | Exhibit 65. | 10:35:20 |
| 15 | Do you see that? | 10:35:21 |
| 16 | A.  I do not.  I've got to wake my other | 10:35:22 |
| 17 | computer up to see it. | 10:35:25 |
| 18 | (Deposition Exhibit 65 was marked for | 10:35:26 |
| 19 | identification.) | 10:35:28 |
| 20 | THE WITNESS:  I do see Exhibit 65, yes. | 10:35:49 |
| 21 | BY MR. DOOLEY: | 10:35:51 |
| 22 | Q.  Okay.  And if you look at the first page | 10:35:51 |
| 23 | of -- | 10:35:57 |
| 24 | MR. DOOLEY:  Well, for the record, | 10:35:58 |
| 25 | Exhibit 65 is a 6-page document dated -- a letter | 10:35:59 |

Page 68

| | | |
|---|---|---|
| 1 | to Mr. Staelin from Infor dated May 30th, 2017, | 10:36:06 |
| 2 | ending in Bates-- Bates number ending in 876. | 10:36:11 |
| 3 | Q.  Do you see on the first page of your offer | 10:36:16 |
| 4 | letter -- first of all, is this a copy of your | 10:36:18 |
| 5 | offer letter, Mr. Staelin, that you signed? | 10:36:20 |
| 6 | A.  Looks like it, but give me a minute to | 10:36:25 |
| 7 | just scan through and make sure. | 10:36:28 |
| 8 | (Examining document.) | 10:36:39 |
| 9 | Yes.  This looks like my offer letter. | 10:36:39 |
| 10 | Sorry.  I wasn't looking. | 10:36:43 |
| 11 | Yes, it looks like my offer letter. | 10:36:44 |
| 12 | Q.  Okay.  And your offer letter doesn't state | 10:36:46 |
| 13 | that you'd received receive any specific amount of | 10:36:48 |
| 14 | Infor stock, does it? | 10:36:51 |
| 15 | MR. LIPMAN:  Object to the form of the | 10:36:53 |
| 16 | question.  The document speaks for itself. | 10:36:53 |
| 17 | But go ahead, Mr. Staelin. | 10:36:56 |
| 18 | THE WITNESS:  No.  The document does not | 10:36:57 |
| 19 | list a specific number of shares. | 10:36:59 |
| 20 | BY MR. DOOLEY: | 10:37:01 |
| 21 | Q.  And, in fact, on the first page, there's a | 10:37:02 |
| 22 | section that says "Ongoing Equity Awards."  Right? | 10:37:05 |
| 23 | A.  Give me a second. | 10:37:09 |
| 24 | (Examining document.) | 10:37:17 |
| 25 | Yes, there is a section called "Ongoing | 10:37:17 |

Page 69

| | | |
|---|---|---|
| 1 | shared among the employees, yes. | 10:42:22 |
| 2 | Q.  Okay.  And from that fund, you received, | 10:42:25 |
| 3 | give or take, a million dollars. | 10:42:27 |
| 4 | A.  That is approximately correct, yes. | 10:42:30 |
| 5 | Q.  Okay.  And do you recall that there was | 10:42:32 |
| 6 | also an employee retention pool as part of the | 10:42:35 |
| 7 | merger agreement? | 10:42:38 |
| 8 | A.  I do recall there was a retention pool | 10:42:39 |
| 9 | that was part of the agreement?  Yes. | 10:42:42 |
| 10 | Q.  And that was -- $25 million was set aside | 10:42:43 |
| 11 | for employee retention? | 10:42:48 |
| 12 | A.  I -- I believe that's about right.  I'm | 10:42:49 |
| 13 | not sure what the specifics are, but that sounds | 10:42:52 |
| 14 | about right. | 10:42:54 |
| 15 | Q.  And Mr. Peters was in charge of allocating | 10:42:55 |
| 16 | the funds that were set aside for employee | 10:42:58 |
| 17 | retention.  Is that right? | 10:43:00 |
| 18 | MR. LIPMAN:  Object to the form of the | 10:43:02 |
| 19 | question.  Mischaracterizes the record.  Calls for | 10:43:02 |
| 20 | speculation. | 10:43:04 |
| 21 | THE WITNESS:  Yeah, I'm not sure Brad was | 10:43:05 |
| 22 | in charge of that.  I know he was working in | 10:43:07 |
| 23 | concert with Charles and Kevin to allocate that | 10:43:09 |
| 24 | pool. | 10:43:13 |
| 25 | // | |

Page 75

```
 1    BY MR. DOOLEY:                                    10:43:13

 2        Q.   Did you work with Mr. Peters in -- on    10:43:13

 3    dividing up the employee retention pool?          10:43:20

 4        A.   Each of the different functional heads   10:43:25

 5    across the business had a certain amount to       10:43:28

 6    allocate to our employees, and we absolutely      10:43:31

 7    participated in nominating certain amounts for    10:43:33

 8    certain players in our organization, yes.         10:43:36

 9        Q.   And Mr. Peters allocated approximately   10:43:39

10    $4 1/2 million to you out of the retention pool.  10:43:42

11    Is that right?                                    10:43:47

12        A.   My recollection is that that's a -- again, 10:43:49

13    give or take, that is approximately the amount that 10:43:52

14    I was awarded through the retention pool, yes.    10:43:55

15        Q.   Okay.  And so fair to say that you took  10:43:58

16    home approximately $5 1/2 million as a result of  10:44:01

17    the acquisition.                                  10:44:06

18             Is that fair, Mr. Staelin?               10:44:07

19             MR. LIPMAN:  Object to the form of the   10:44:09

20    question.                                         10:44:09

21             Hold on.                                 10:44:10

22             Object to the form of the question.      10:44:10

23             THE WITNESS:  Sadly, we all have a       10:44:13

24    business partner known as "the government," so I  10:44:14

25    took home a significantly smaller portion than that 10:44:17
```

Page 76

| | | |
|---|---|---|
| 1 | amount that you just added, yes. | 10:44:20 |
| 2 | BY MR. DOOLEY: | 10:44:22 |
| 3 | Q.  Okay, Mr. Staelin.  But before taxes, it's | 10:44:22 |
| 4 | fair to say that you took home 5-point -- | 10:44:24 |
| 5 | $5 1/2 million as a result of the acquisition.  Is | 10:44:28 |
| 6 | that right? | 10:44:31 |
| 7 | MR. LIPMAN:  Object to the form. | 10:44:32 |
| 8 | THE WITNESS:  I -- I'm just going to | 10:44:34 |
| 9 | object to the "take home" because we all know | 10:44:35 |
| 10 | take-home pay is net of taxes. | 10:44:37 |
| 11 | But yes, the gross pay in those two | 10:44:41 |
| 12 | buckets added up to approximately $5 1/2 million. | 10:44:43 |
| 13 | BY MR. DOOLEY: | 10:44:47 |
| 14 | Q.  Okay.  Looking at Exhibit 65 again, | 10:44:47 |
| 15 | Mr. Staelin -- this is your -- this is your -- | 10:44:52 |
| 16 | excuse me one second. | 10:44:59 |
| 17 | MR. DOOLEY:  I seem to have having some -- | 10:45:00 |
| 18 | just having a technical issue with my computer.  I | 10:45:07 |
| 19 | apologize. | 10:45:11 |
| 20 | Could we go off the record for just one | 10:45:12 |
| 21 | second?  I'm just having a technical problem that I | 10:45:13 |
| 22 | would like to resolve. | 10:45:17 |
| 23 | THE VIDEO OPERATOR:  Going off the record | 10:45:20 |
| 24 | at 10:45 A.M. | 10:45:21 |
| 25 | (Discussion off the record, 10:45 A.M. | 10:45:23 |

Page 77

| | | |
|---|---|---|
| 1 | incentives to make sure the integration was | 10:58:33 |
| 2 | successful and to help grow the overall seats and | 10:58:35 |
| 3 | licenses and revenue and presence in Infor and | 10:58:38 |
| 4 | market presence and all those things for Birst, | 10:58:43 |
| 5 | yes. | 10:58:46 |
| 6 | Q.  Mr. Staelin, I want to make sure I | 10:58:50 |
| 7 | understand the "ex-post pricing game" that you're | 10:58:52 |
| 8 | describing. | 10:58:54 |
| 9 | Could you describe for me again what the | 10:58:55 |
| 10 | ex-post pricing game, to use your language, that | 10:58:58 |
| 11 | you were concerned about? | 10:59:04 |
| 12 | What was the pricing game that you were | 10:59:06 |
| 13 | concerned about? | 10:59:08 |
| 14 | A.  One tactic that was, you know, | 10:59:09 |
| 15 | unfortunately employed by my previous employer, | 10:59:15 |
| 16 | Siebel Systems, was to promise an OEM provider that | 10:59:19 |
| 17 | they would get a big chunk of revenue.  And they'd | 10:59:24 |
| 18 | say, "Hey, look, we do this much business.  You'll | 10:59:28 |
| 19 | get this much percent of it," and the OEM provider | 10:59:31 |
| 20 | would enthusiastically sign on. | 10:59:34 |
| 21 | And then they would create a combined | 10:59:37 |
| 22 | product with a different price after the fact at a | 10:59:40 |
| 23 | lower price, and the ultimate revenue provided to | 10:59:45 |
| 24 | the OEM provider would be a teeny-tiny fraction of | 10:59:49 |
| 25 | that which they had been led to believe. | 10:59:53 |

Page 87

| | | |
|---|---|---|
| 1 | Q.  And is that a result of discounting -- was | 10:59:56 |
| 2 | Siebel discounting the price of the OEM's product? | 10:59:58 |
| 3 | A.  No.  It is not. | 11:00:05 |
| 4 | Q.  Okay.  What -- what was Siebel -- in your | 11:00:07 |
| 5 | experience, what was Siebel doing in this pricing | 11:00:10 |
| 6 | game with respect to the OEM's product? | 11:00:14 |
| 7 | A.  My understanding is that ex-post, they | 11:00:17 |
| 8 | would invent a new product name.  They would | 11:00:21 |
| 9 | allocate some -- some price or -- or other target | 11:00:24 |
| 10 | to it, and then they would honor the -- the -- the | 11:00:30 |
| 11 | allocation but of this new product that was sold | 11:00:34 |
| 12 | sometimes at this really low price, and the OEM | 11:00:39 |
| 13 | would, again, get a teeny-tiny fraction of the | 11:00:43 |
| 14 | credit they should have. | 11:00:49 |
| 15 | Q.  Okay.  And what product do you recall | 11:00:50 |
| 16 | Siebel -- let me start that again. | 11:00:53 |
| 17 | What product did Siebel change the | 11:01:02 |
| 18 | price -- I'm trying to get a good question out. | 11:01:10 |
| 19 | I guess I'd like to understand, | 11:01:24 |
| 20 | Mr. Staelin, what OEMs did you see Siebel engage | 11:01:25 |
| 21 | this pricing trick with? | 11:01:32 |
| 22 | MR. LIPMAN:  Object to form.  Object to | 11:01:35 |
| 23 | form. | 11:01:36 |
| 24 | But go ahead, Mr. Staelin. | 11:01:36 |
| 25 | THE WITNESS:  Go ahead.  No, go ahead and | 11:01:38 |

Page 88

| | | |
|---|---|---|
| 1 | MR. LIPMAN:  Object to the form of the | 11:46:32 |
| 2 | question. | 11:46:33 |
| 3 | THE WITNESS:  No, that is not accurate. | 11:46:34 |
| 4 | BY MR. DOOLEY: | 11:46:35 |
| 5 | Q.  Okay.  What -- what are "Birst for | 11:46:36 |
| 6 | CloudSuites," "Birst Professional," and "Birst | 11:46:41 |
| 7 | Enterprise" if not the products that Birst was | 11:46:46 |
| 8 | offering in September 2017? | 11:46:49 |
| 9 | MR. LIPMAN:  Object to the form. | 11:46:50 |
| 10 | THE WITNESS:  The specific products that | 11:46:53 |
| 11 | Birst was offering were Birst Professional and | 11:46:54 |
| 12 | Birst Enterprise and their various add-ons and | 11:46:57 |
| 13 | seats. | 11:47:01 |
| 14 | BY MR. DOOLEY: | 11:47:02 |
| 15 | Q.  Okay.  And Birst for CloudSuite was a | 11:47:02 |
| 16 | product that you anticipated offering in the | 11:47:05 |
| 17 | future.  Is that fair to say? | 11:47:08 |
| 18 | A.  That is not fair to say.  Birst for | 11:47:09 |
| 19 | CloudSuite was going to be a combination of those | 11:47:12 |
| 20 | Birst products with Infor content, and it would be | 11:47:15 |
| 21 | available at a later date, yes. | 11:47:18 |
| 22 | Q.  Okay.  So Birst Enterprise was a product | 11:47:19 |
| 23 | that Birst was selling in October -- or in | 11:47:29 |
| 24 | September of 2017.  Correct? | 11:47:32 |
| 25 | A.  Birst Enterprise was our primary product, | 11:47:37 |

Page 113

```
 1    but -- leading into the acquisition and certainly        11:47:39
 2    the postacquisition, yes.  We sold that a lot.           11:47:41
 3         Q.  Okay.  And Birst Professional was also a        11:47:43
 4    product that you were selling -- that Birst was          11:47:46
 5    selling in September of 2017.  Correct?                  11:47:48
 6         A.  Birst Professional was also an offering         11:47:50
 7    that we had been selling prior to the acquisition        11:47:51
 8    and certainly in its wake as well, yes.                  11:47:53
 9         Q.  Okay.  And as of September 2017, Birst for      11:47:55
10    CloudSuite was a product that you anticipated would      11:47:59
11    be sold in conjunction with Infor's CloudSuites in       11:48:02
12    the future.  Is that fair to say?                        11:48:08
13         A.  Birst for CloudSuites was intended to be        11:48:10
14    the combination of one of those offerings with          11:48:13
15    Infor content, and it would be available in the          11:48:17
16    future, yes.                                             11:48:19
17         Q.  And Birst for CloudSuite was a separate         11:48:20
18    product from Birst Professional and Birst                11:48:23
19    Enterprise.                                              11:48:25
20             That was the intention in September 2017.       11:48:26
21    Correct?                                                 11:48:28
22             MR. LIPMAN:  Object to form.                    11:48:32
23             Go ahead, Mr. Staelin.                          11:48:32
24             THE WITNESS:  That's not accurate.  Birst       11:48:33
25    for CloudSuite is not actually a -- you can't --         11:48:35
```

Page 114

| | | |
|---|---|---|
| 1 | it's not really a product.  It's the combination of | 11:48:40 |
| 2 | other products, and it was included in CloudSuite. | 11:48:42 |
| 3 | It was not going to be sold separately. | 11:48:46 |
| 4 | BY MR. DOOLEY: | 11:48:49 |
| 5 | Q.  Why did you include Birst for CloudSuite | 11:48:49 |
| 6 | on this "Packaging" slide, Mr. Staelin, if it's not | 11:48:52 |
| 7 | a -- if it's not a product that you anticipated | 11:48:57 |
| 8 | offering? | 11:49:01 |
| 9 | A.  The -- the -- one of the questions we got | 11:49:03 |
| 10 | from the Infor field was what analytic content will | 11:49:06 |
| 11 | be included in the CloudSuites, and that content | 11:49:12 |
| 12 | is -- is -- you know, this is our part of that | 11:49:17 |
| 13 | answer. | 11:49:23 |
| 14 | Q.  Okay.  Is it fair to say, then, that the | 11:49:24 |
| 15 | chart on page 3 of this 2017 Birst platform options | 11:49:26 |
| 16 | PowerPoint accurately reflects the analytic content | 11:49:32 |
| 17 | that was available in Birst Enterprise and Birst | 11:49:48 |
| 18 | Professional as of September 2017? | 11:49:52 |
| 19 | Is that fair to say? | 11:49:56 |
| 20 | MR. LIPMAN:  Object to form. | 11:49:58 |
| 21 | Go ahead, Mr. Staelin. | 11:49:58 |
| 22 | THE WITNESS:  Yeah, there was a huge pause | 11:50:00 |
| 23 | in the middle.  I'm not sure I heard everything. | 11:50:01 |
| 24 | BY MR. DOOLEY: | 11:50:04 |
| 25 | Q.  Sure.  The question is:  Is it fair to say | 11:50:04 |

Page 115

| | | |
|---|---|---|
| 1 | A.  Generally -- | 11:57:20 |
| 2 | MR. LIPMAN:  Hold on, Paul. | 11:57:21 |
| 3 | Object to form. | 11:57:24 |
| 4 | Go ahead, Mr. Staelin. | 11:57:25 |
| 5 | THE WITNESS:  Generally -- and again, this | 11:57:26 |
| 6 | is a hypersimplified thing to try to educate a lot | 11:57:28 |
| 7 | of people quickly. | 11:57:31 |
| 8 | So subject to the fact that there were | 11:57:32 |
| 9 | some simplifications made for the purposes of this | 11:57:34 |
| 10 | table, generally, a blank was indicated -- was | 11:57:37 |
| 11 | intended to indicate that that particular row was | 11:57:40 |
| 12 | not available. | 11:57:45 |
| 13 | BY MR. DOOLEY: | 11:57:48 |
| 14 | Q.  Okay.  So let's go down to the -- to the | 11:57:48 |
| 15 | row that says "Visualizer," and it says | 11:57:51 |
| 16 | "(discovery/visualization)." | 11:57:53 |
| 17 | How would you describe "Visualizer" to | 11:57:56 |
| 18 | the -- or how did you describe "Visualizer" to the | 11:57:59 |
| 19 | product leads when you presented this presentation? | 11:58:03 |
| 20 | A.  Visualizer is a significant component of | 11:58:06 |
| 21 | the overall Birst platform. | 11:58:09 |
| 22 | Q.  Okay.  And why is Visualizer a significant | 11:58:12 |
| 23 | component of the overall Birst platform? | 11:58:17 |
| 24 | A.  Visualizer performs two primary functions: | 11:58:20 |
| 25 | One was the rendering of kind of autoscaling graphs | 11:58:25 |

Page 121

| | | |
|---|---|---|
| 1 | that could go up and down with the size of your | 11:58:32 |
| 2 | page, so a very web-friendly rendering of charts | 11:58:35 |
| 3 | and graphs, which are a main part of any analytic | 11:58:38 |
| 4 | solution. | 11:58:42 |
| 5 | Q.  Okay.  And what was the second thing that | 11:58:45 |
| 6 | Visualizer did? | 11:58:48 |
| 7 | A.  The second thing, which is in the parens | 11:58:49 |
| 8 | here in that row, is it allowed people to interact | 11:58:54 |
| 9 | with those charts dynamically, adding and removing | 11:58:57 |
| 10 | columns, other types of things, to change the | 11:59:02 |
| 11 | report's content.  And that's the part highlighted | 11:59:07 |
| 12 | in this row. | 11:59:10 |
| 13 | Q.  Okay.  And when you say the Visualizer | 11:59:13 |
| 14 | "allowed people to interact with those charts | 11:59:22 |
| 15 | dynamically," that means that Visualizer allowed a | 11:59:25 |
| 16 | Birst user to change or edit the -- the charts that | 11:59:30 |
| 17 | came with the offering kind of out of the box? | 11:59:37 |
| 18 | Is that a fair description? | 11:59:41 |
| 19 | A.  Visualizer was used to show pretty much | 11:59:45 |
| 20 | every chart.  One component of Visualizer was that | 11:59:49 |
| 21 | which allowed a user to then dynamically interact | 11:59:54 |
| 22 | with that chart as well, yes. | 11:59:57 |
| 23 | Q.  Okay.  So let me just -- I'm just trying | 11:59:59 |
| 24 | to make sure I understand. | 12:00:01 |
| 25 | Visualizer is the piece of the Birst | 12:00:03 |

Page 122

| | | |
|---|---|---|
| 1 | platform that powers pretty much all the charts in | 12:00:06 |
| 2 | the -- in the Birst offering.  Fair to say? | 12:00:12 |
| 3 | A.  Visualizer -- well, we had two -- two | 12:00:16 |
| 4 | engines that you could use.  The preponderance for | 12:00:20 |
| 5 | most of the customers was absolutely created and | 12:00:23 |
| 6 | displayed with Visualizer. | 12:00:26 |
| 7 | Q.  Okay.  And Visualizer also allowed the | 12:00:28 |
| 8 | user to change those charts.  Correct? | 12:00:31 |
| 9 | MR. LIPMAN:  Object to form. | 12:00:40 |
| 10 | BY MR. DOOLEY: | 12:00:41 |
| 11 | Q.  To edit the charts. | 12:00:41 |
| 12 | MR. LIPMAN:  Object to form. | 12:00:44 |
| 13 | THE WITNESS:  Yeah, one of the things that | 12:00:45 |
| 14 | many of our customers used, some specific UI and | 12:00:46 |
| 15 | Visualizer to do, was to change, edit, modify, and | 12:00:50 |
| 16 | interact with those reports, yes. | 12:00:53 |
| 17 | BY MR. DOOLEY: | 12:00:54 |
| 18 | Q.  And that was a feature of Visualizer that | 12:00:55 |
| 19 | many of your customers used.  Is that fair to say? | 12:00:58 |
| 20 | A.  Yes.  There -- a lot of users would modify | 12:01:01 |
| 21 | reports, but certainly not all. | 12:01:04 |
| 22 | Q.  And did your customers find it valuable to | 12:01:06 |
| 23 | be able to modify reports using Visualizer? | 12:01:08 |
| 24 | MR. LIPMAN:  Object to form. | 12:01:12 |
| 25 | THE WITNESS:  Depending on your role in | 12:01:16 |

Page 123

| | | |
|---|---|---|
| 1 | the organization, it may or may not be important | 12:01:17 |
| 2 | for you to modify the reports, yes. | 12:01:19 |
| 3 | BY MR. DOOLEY: | 12:01:22 |
| 4 | Q.  And looking at the Slide 3 of this 2017 | 12:01:22 |
| 5 | PowerPoint, Visualizer was not available with a | 12:01:29 |
| 6 | license to a CloudSuite that included Birst for | 12:01:39 |
| 7 | CloudSuite. | 12:01:44 |
| 8 | That's what that blank under Birst for | 12:01:45 |
| 9 | CloudSuite means.  Is that right? | 12:01:48 |
| 10 | MR. LIPMAN:  Object to form. | 12:01:49 |
| 11 | Mischaracterizes the testimony and the record. | 12:01:50 |
| 12 | But go ahead, Mr. Staelin. | 12:01:53 |
| 13 | THE WITNESS:  Yeah, again, this chart is | 12:01:54 |
| 14 | an oversimplification, but the general indication | 12:01:56 |
| 15 | is that for most users of that kind of incorporated | 12:01:59 |
| 16 | CloudSuite solution, most users would not be able | 12:02:04 |
| 17 | to access that interactive portion of Visualizer. | 12:02:08 |
| 18 | BY MR. DOOLEY: | 12:02:16 |
| 19 | Q.  And were there any users of -- well, let | 12:02:17 |
| 20 | me -- I'll ask this question in two parts because I | 12:02:21 |
| 21 | know we're talking about -- this is 2017. | 12:02:23 |
| 22 | In 2017, did you anticipate that there | 12:02:25 |
| 23 | would be any -- any users of Birst for CloudSuite | 12:02:28 |
| 24 | who would be able to use the function in Visualizer | 12:02:32 |
| 25 | to edit reports and content? | 12:02:35 |

Page 124

| | | |
|---|---|---|
| 1 | sounds. | 12:17:49 |
| 2 | So the content and capabilities that were | 12:17:50 |
| 3 | included as part of the CloudSuites did not have | 12:17:53 |
| 4 | line-item user things that you could then choose | 12:17:57 |
| 5 | and buy. | 12:18:00 |
| 6 | BY MR. DOOLEY: | 12:18:01 |
| 7 | Q.  Okay.  Let me stop you so that I | 12:18:01 |
| 8 | understand. | 12:18:04 |
| 9 | When -- when a customer in FY19 | 12:18:05 |
| 10 | purchased -- well, let me take even a step back. | 12:18:09 |
| 11 | Infor sells a number of different | 12:18:15 |
| 12 | CloudSuites.  Fair to say? | 12:18:20 |
| 13 | A.  A surprising number, yes.  They do. | 12:18:23 |
| 14 | Q.  And they generally track different | 12:18:26 |
| 15 | industries.  There's a CloudSuite for financial, | 12:18:29 |
| 16 | there's a CloudSuite for hospitality, there's a | 12:18:32 |
| 17 | CloudSuite for manufacturing.  I know there are | 12:18:35 |
| 18 | others. | 12:18:37 |
| 19 | But is that fair to say? | 12:18:38 |
| 20 | A.  They do have CloudSuites for verticals, | 12:18:40 |
| 21 | but they also have CloudSuites for function. | 12:18:42 |
| 22 | There's CloudSuite financials and some other things | 12:18:45 |
| 23 | as well, so it's not all vertical. | 12:18:47 |
| 24 | Q.  Okay.  And if a customer -- if a customer | 12:18:49 |
| 25 | bought a CloudSuite in FY19, were there different | 12:18:56 |

Page 131

```
 1    levels of user licenses that the customer could      12:19:04

 2    purchase with the CloudSuite?                        12:19:08

 3         A.  My understanding is that the -- the --      12:19:14

 4    that combination of Birst and Infor content came     12:19:19

 5    with certain entitlements that just came with it,    12:19:23

 6    and you didn't get to pick and choose this many of   12:19:25

 7    this type and this many of that type and this many   12:19:28

 8    of this type and more here and less there.  You      12:19:30

 9    just kind of got it.                                 12:19:33

10         Q.  So in FY19, when a customer bought a        12:19:34

11    CloudSuite, they would buy the CloudSuite for a      12:19:37

12    number of end users, but there wasn't the option to  12:19:39

13    pick different levels of user licenses.              12:19:46

14             Is that fair to say?                        12:19:49

15             MR. LIPMAN:  Object to form.                12:19:52

16             THE WITNESS:  In general, the offering      12:19:54

17    came with what it came with, yes.                    12:19:55

18    BY MR. DOOLEY:                                       12:19:57

19         Q.  And what it came with was one level of      12:19:58

20    user license.                                        12:20:00

21             There weren't multiple levels of user      12:20:01

22    licenses with CloudSuites.  Correct?                 12:20:03

23         A.  There was one level of end-user license,    12:20:06

24    yes.                                                 12:20:08

25         Q.  So if I'm a -- if I'm an insurance company  12:20:10
```

Page 132

```
1    and I buy CloudSuite Financial, I specify the        12:20:14

2    number of end users who are going to use it, but I   12:20:19

3    don't specify that I want X number of admin users     12:20:23

4    and X number of business users and X number of        12:20:26

5    analyst users.                                        12:20:30

6            Is that fair to say?                          12:20:31

7        A.   I believe that that is fair; you were not    12:20:34

8    given the options to purchase different levels of     12:20:37

9    different users.                                      12:20:39

10       Q.   Okay.  And so given that there was only      12:20:40

11   one level of user license associated with            12:20:43

12   CloudSuites in FY19, there wasn't a user license     12:20:47

13   that a customer could purchase that would allow a    12:20:55

14   user to modify reports and charts using Visualizer.  12:21:01

15   Correct?                                              12:21:10

16           THE WITNESS:  I -- go ahead, Avi?  Or was     12:21:12

17   that not you?                                         12:21:18

18           Subject to the qualification that -- "end     12:21:20

19   user," then yes, there were not options to buy        12:21:22

20   access to Visualizer for your end users.             12:21:24

21   BY MR. DOOLEY:                                        12:21:27

22       Q.   Okay.  And when you're emphasizing "end      12:21:27

23   user," was there an option for -- what do you        12:21:30

24   mean -- when you use "end user" there, what do you   12:21:33

25   mean?                                                 12:21:35
```

Page 133

```
 1        A.  The end user is the person kind of working        12:21:39

 2   in the business, the manager, the frontline person,        12:21:41

 3   the director logging in to the system, able to see         12:21:45

 4   the dashboards and content.                                12:21:48

 5        Q.  The end user is the actual human who sits         12:21:50

 6   in front of the computer and uses the software.            12:21:52

 7             Fair to say?                                      12:21:55

 8             MR. LIPMAN:  Object to form.                      12:21:57

 9             Go ahead.                                         12:21:58

10             THE WITNESS:  Yes.  The end user is the           12:21:59

11   ultimate consumer of the dashboards, yes.                  12:22:01

12   BY MR. DOOLEY:                                             12:22:04

13        Q.  And so there was -- and let's just -- and         12:22:04

14   let's call the end user -- the end user works for a        12:22:08

15   company, and the company buys a CloudSuite in FY19.        12:22:13

16             The company could not select a user              12:22:19

17   license that would allow its employee end users to         12:22:23

18   modify existing -- the pre-existing charts and             12:22:28

19   graphs using Visualizer.  Is that correct?                 12:22:32

20        A.  Yes, that is correct.  The company could          12:22:37

21   not buy licenses that would entitle their end users        12:22:39

22   to engage with that interactive portion of                 12:22:43

23   Visualizer and change their reports.  That's               12:22:46

24   correct.                                                    12:22:48

25        Q.  Okay.  Could the company itself engage --         12:22:49
```

                                                    Page 134

| | | |
|---|---|---|
| 1 | modify the pre-existing charts and graphs using the | 12:26:16 |
| 2 | dynamic feature of Visualizer? | 12:26:20 |
| 3 | A.  I -- again, not part of the implementation | 12:26:24 |
| 4 | teams.  I can't name a specific one, no, but I know | 12:26:27 |
| 5 | they had those rights. | 12:26:31 |
| 6 | Q.  I want to ask a few more questions about | 12:26:47 |
| 7 | this Slide 3, and then we can take lunch. | 12:26:49 |
| 8 | A.  Sorry.  I've got to wake my computer back | 12:26:58 |
| 9 | up. | 12:27:00 |
| 10 | Q.  The next row down says "Pronto." | 12:27:07 |
| 11 | What is "Pronto," Mr. Staelin? | 12:27:10 |
| 12 | A.  Pronto, in general, is a way for end users | 12:27:13 |
| 13 | to take a spreadsheet or some other piece of | 12:27:17 |
| 14 | information and -- and bring it into Birst to | 12:27:23 |
| 15 | generate charts and reports and other things. | 12:27:28 |
| 16 | Q.  Okay.  So it's a way for end users to take | 12:27:38 |
| 17 | content from -- from documents like spreadsheets | 12:27:44 |
| 18 | and bring it into Birst to generate a report. | 12:27:48 |
| 19 | Is that fair to say? | 12:27:52 |
| 20 | A.  At its highest possible level, that's a | 12:27:54 |
| 21 | pretty fair characterization, yes. | 12:27:57 |
| 22 | Q.  Okay.  And in September 2017, did you | 12:28:00 |
| 23 | anticipate that the Birst for CloudSuite offering | 12:28:03 |
| 24 | would not generally include Pronto? | 12:28:06 |
| 25 | A.  It was certainly our intention to -- to | 12:28:13 |

Page 137

| | | |
|---|---|---|
| 1 | not, in general, bring that functionality to bear, | 12:28:17 |
| 2 | yes. | 12:28:22 |
| 3 | Q.   Okay.  And in point of fact, in FY19, when | 12:28:22 |
| 4 | a customer bought a CloudSuite with Birst for | 12:28:28 |
| 5 | CloudSuite, did the customer have rights to use | 12:28:32 |
| 6 | Pronto? | 12:28:36 |
| 7 | A.   I believe, very much akin to the | 12:28:38 |
| 8 | Visualizer piece, my understanding is that the end | 12:28:43 |
| 9 | users within the purchasing company did not have | 12:28:47 |
| 10 | rights to Pronto. | 12:28:52 |
| 11 | Implementation partners and Infor | 12:28:54 |
| 12 | consultants who did likely could have brought in | 12:28:58 |
| 13 | information via Pronto as part of the overall | 12:29:01 |
| 14 | solution delivery. | 12:29:04 |
| 15 | Q.   Is it valuable in your experience -- | 12:29:05 |
| 16 | you've dealt with a lot of customers of Birst over | 12:29:06 |
| 17 | the years. | 12:29:09 |
| 18 | Fair to say, Mr. Staelin? | 12:29:10 |
| 19 | A.   It is fair to say I've had my fair share | 12:29:12 |
| 20 | of customer meetings, yes. | 12:29:14 |
| 21 | Q.   And, in fact, that's kind of, at least | 12:29:16 |
| 22 | from your description earlier, that's been a big | 12:29:17 |
| 23 | part of your job, is interacting -- customer | 12:29:20 |
| 24 | experience, interacting with customers. | 12:29:24 |
| 25 | Fair to say? | 12:29:26 |

Page 138

```
 1              MR. LIPMAN:  Object to form.  Overbroad.      12:30:34
 2    Vague.                                                  12:30:36
 3              If you're able to answer the question,        12:30:37
 4    Mr. Staelin, go ahead.                                  12:30:39
 5              THE WITNESS:  Yeah.  Most organizations,      12:30:40
 6    the ultimate end users did very little of that.         12:30:42
 7              Most of the kind of actual report-building    12:30:45
 8    and the sausage being made was done at                  12:30:49
 9    headquarters.  But certainly there are some end         12:30:53
10    users who had the appetite and desire to do so, and     12:30:55
11    those folks found it valuable.                          12:30:59
12    BY MR. DOOLEY:                                          12:31:01
13         Q.  What is "Networked BI"?                        12:31:11
14         A.  Networked BI is probably the -- we have        12:31:21
15    two unbelievably visionary components that went in      12:31:23
16    our platform uniquely in the marketplace.               12:31:26
17    Network BI is one of them.                              12:31:30
18         Q.  Okay.  And what does Network BI do?            12:31:32
19         A.  Network BI allows -- and this is going to      12:31:35
20    get a little technical.  I'll try and keep it           12:31:39
21    simple, and Brad's better answering this than am I.     12:31:42
22              But to my understanding, the way that you     12:31:46
23    can think about it is that you can build metadata       12:31:49
24    describing data in one area and then metadata           12:31:53
25    describing data in another.  And what Network BI        12:31:56
```

Page 140

| | | |
|---|---|---|
| 1 | allowed you to do, which is novel and visionary, is | 12:31:59 |
| 2 | combine those logical models without actually | 12:32:03 |
| 3 | combining the physical data underneath them. | 12:32:08 |
| 4 | All prior solutions required you to | 12:32:11 |
| 5 | combine the data in order to combine the metadata. | 12:32:12 |
| 6 | Birst allowed you to combine the metadata without | 12:32:16 |
| 7 | combining the data.  It was a huge, huge idea. | 12:32:20 |
| 8 | Q.  So if I understand correctly, Network BI | 12:32:22 |
| 9 | allowed a user to combine the metadata associated | 12:32:25 |
| 10 | with one set of data with the metadata associated | 12:32:27 |
| 11 | with another set of data without combining the two | 12:32:30 |
| 12 | underlying sets of data. | 12:32:33 |
| 13 | Did I get that close to right? | 12:32:35 |
| 14 | A.  That -- I think that's -- at the highest | 12:32:37 |
| 15 | level, that's a pretty fair representation, yes. | 12:32:41 |
| 16 | Q.  Okay.  And Network BI was a visionary and | 12:32:43 |
| 17 | novel offering from Birst. | 12:32:46 |
| 18 | A.  Yes.  It surely was. | 12:32:48 |
| 19 | Q.  And is it -- and in September of 2017, | 12:32:50 |
| 20 | you -- Birst did not anticipate that customers who | 12:32:55 |
| 21 | bought a CloudSuite with Birst for CloudSuite would | 12:33:01 |
| 22 | have access to the Network BI offering.  Correct? | 12:33:05 |
| 23 | A.  Certainly our -- our intention -- and just | 12:33:11 |
| 24 | for a little bit of background, Birst is a single | 12:33:15 |
| 25 | codebase.  So these things, much like Visualizer is | 12:33:17 |

Page 141

| | | |
|---|---|---|
| 1 | used to show every report, Network BI can be used | 12:33:21 |
| 2 | to deliver the data without the end user having | 12:33:25 |
| 3 | access to it. | 12:33:27 |
| 4 | Our intention, because it's such a | 12:33:28 |
| 5 | sophisticated feature, takes some training to get | 12:33:30 |
| 6 | good at.  This was not something we wanted to give | 12:33:33 |
| 7 | to end users because they would then have to be | 12:33:36 |
| 8 | trained how to use it, and it is a complex, | 12:33:39 |
| 9 | powerful tool. | 12:33:42 |
| 10 | Q.  Okay.  But the answer -- so but the answer | 12:33:43 |
| 11 | to my question is yes:  In 2017 -- September 2017, | 12:33:46 |
| 12 | Birst did not anticipate that end users using a | 12:33:51 |
| 13 | CloudSuite with Birst for CloudSuite would be able | 12:34:01 |
| 14 | to access Network BI.  Is that right? | 12:34:04 |
| 15 | A.  The intention would not be to give the | 12:34:08 |
| 16 | access to Network BI to those end users because it | 12:34:11 |
| 17 | is so sophisticated, but they can benefit from it | 12:34:14 |
| 18 | without accessing it is my point. | 12:34:17 |
| 19 | Q.  Okay.  And in point of fact, is that how | 12:34:20 |
| 20 | it played out in FY19?  A customer who bought a | 12:34:23 |
| 21 | CloudSuite with Birst for CloudSuite, that | 12:34:28 |
| 22 | customer's end users did not have access to the | 12:34:30 |
| 23 | Network BI tool? | 12:34:35 |
| 24 | A.  In general, the end users absolutely would | 12:34:39 |
| 25 | not have access to manipulate the Network BI | 12:34:41 |

Page 142

| | | |
|---|---|---|
| 1 | modeling. | 12:34:46 |
| 2 | In the ultimate fact, you know, the data | 12:34:50 |
| 3 | model delivered when Birst was combined with Infor | 12:34:52 |
| 4 | content absolutely used Network BI, so they | 12:34:56 |
| 5 | benefited from it, but they didn't have access to | 12:34:59 |
| 6 | it. | 12:35:01 |
| 7 | Q.  And a -- a user of Birst Professional | 12:35:04 |
| 8 | in -- an end user of Birst Professional in 2019 had | 12:35:07 |
| 9 | access to the dynamic features of Visualizer. | 12:35:13 |
| 10 | Correct? | 12:35:17 |
| 11 | A.  I believe if -- let me -- I forget if that | 12:35:21 |
| 12 | was an add-on or not. | 12:35:30 |
| 13 | Q.  There's a checkmark. | 12:35:32 |
| 14 | A.  Yeah, I'm trying to find it.  There it is. | 12:35:33 |
| 15 | Yes.  Yeah.  The end users of Birst | 12:35:35 |
| 16 | Professional did -- most users of Birst | 12:35:38 |
| 17 | Professional had access to the dynamic components | 12:35:43 |
| 18 | of Visualizer. | 12:35:49 |
| 19 | Q.  And the same is true of Birst Enterprise: | 12:35:51 |
| 20 | Most end uses of a customer of Birst enterprise had | 12:35:54 |
| 21 | access to the dynamic features of Visualizer. | 12:35:58 |
| 22 | Correct? | 12:36:01 |
| 23 | A.  Most end users of the Enterprise platform | 12:36:01 |
| 24 | did indeed have access to Visualizer, assuming that | 12:36:09 |
| 25 | they were licensed as a business user, yes. | 12:36:11 |

Page 143

| | | |
|---|---|---|
| 1 | Q.  And a -- an end user of a customer of | 12:36:15 |
| 2 | Birst Professional had access to -- to use Pronto | 12:36:21 |
| 3 | in FY19.  Correct? | 12:36:26 |
| 4 | A.  I'm -- I'm not sure if everybody did.  For | 12:36:35 |
| 5 | it -- my recollection is a little fuzzy here. | 12:36:42 |
| 6 | I'm not sure if every user did for Birst | 12:36:45 |
| 7 | Professional, but the -- you know, the primary | 12:36:48 |
| 8 | difference between Enterprise and Professional, | 12:36:50 |
| 9 | from my perspective, was how one models data. | 12:36:52 |
| 10 | Pronto was the primary way to model data | 12:36:57 |
| 11 | in Birst Professional.  Maybe it was everyone. | 12:36:59 |
| 12 | Maybe it was most people.  I don't really know | 12:37:03 |
| 13 | where that licensing shook out, actually. | 12:37:05 |
| 14 | Q.  But certainly more -- more end users of a | 12:37:08 |
| 15 | Birst Professional customer had access to Pronto | 12:37:11 |
| 16 | than end users of a Birst for CloudSuite customer | 12:37:14 |
| 17 | in 2019. | 12:37:18 |
| 18 | A.  Yeah.  The -- I mean, the primary way that | 12:37:21 |
| 19 | Pronto -- sorry, the Pronto -- that Birst | 12:37:24 |
| 20 | Professional got the data to do the analysis and | 12:37:28 |
| 21 | show the reports and dashboards, the primary way | 12:37:30 |
| 22 | that that whole process happened was via Pronto. | 12:37:33 |
| 23 | In our Enterprise and in Birst for | 12:37:36 |
| 24 | CloudSuites, therefore, the primary mechanism was | 12:37:39 |
| 25 | our -- was our automated data refinement, "ADR." | 12:37:42 |

Page 144

| | | |
|---|---|---|
| 1 | So, yeah.  To use Birst Professional, you | 12:37:46 |
| 2 | needed to have someone using Pronto. | 12:37:49 |
| 3 | MR. DOOLEY:  All right.  I think this is a | 12:37:58 |
| 4 | good time to take a lunch break. | 12:37:59 |
| 5 | Come back at 12 -- 1:40?  It's 12:38 now. | 12:38:01 |
| 6 | THE VIDEO OPERATOR:  All right.  And we | 12:38:09 |
| 7 | are going off the record at 12:38 P.M. | 12:38:09 |
| 8 | (Lunch recess from 12:38 P.M. to | 12:38:18 |
| 9 | 1:44 P.M.) | 13:44:28 |
| 10 | --o0o-- | 13:44:30 |
| 11 | AFTERNOON SESSION | 13:44:30 |
| 12 | THE VIDEO OPERATOR:  And we are going back | 13:44:32 |
| 13 | on the record at 1:44 P.M. | 13:44:33 |
| 14 | BY MR. DOOLEY: | 13:44:35 |
| 15 | Q.  Good afternoon, Mr. Staelin. | 13:44:35 |
| 16 | Can you direct your attention back to | 13:44:38 |
| 17 | Exhibit 45, which is the email from 2017 with the | 13:44:41 |
| 18 | PowerPoint?  We were looking at Slide 3. | 13:44:46 |
| 19 | A.  The one titled "Packaging"? | 13:44:56 |
| 20 | Q.  Correct. | 13:44:58 |
| 21 | A.  Yes. | 13:44:59 |
| 22 | Q.  Do you have that up? | 13:44:59 |
| 23 | A.  I do. | 13:45:01 |
| 24 | Q.  You'll see at the bottom -- well, let me | 13:45:01 |
| 25 | just ask one more line of questioning here about | 13:45:03 |

Page 145

```
 1    what we were talking about before.              13:45:06

 2         There's a feature called "ADR."            13:45:08

 3         What is "ADR"?                              13:45:10

 4    A.   ADR is short for automated data            13:45:12

 5    refinement.  It is Birst's other big and novel  13:45:15

 6    idea.                                            13:45:18

 7         It fundamentally allowed people to more    13:45:19

 8    quickly and readily model very complex data and 13:45:24

 9    make it ready for analysis with metadata on it, and 13:45:29

10    we automated huge amounts of that process.  So it 13:45:33

11    was a huge thing.                                13:45:37

12         Any really complex data model, you know,   13:45:38

13    built using Birst used this feature.             13:45:41

14    Q.   So automated data refinement?  Is that     13:45:48

15    what it is?                                      13:45:51

16    A.   Yes.                                        13:45:52

17    Q.   Okay.  And am I reading this chart,         13:46:04

18    Slide 3 of the PowerPoint attached to Exhibit 45, 13:46:06

19    correctly to understand that a customer who bought 13:46:11

20    a license to CloudSuite with Birst for CloudSuite 13:46:18

21    in fiscal year '19 would not have access to the ADR 13:46:23

22    capability?                                      13:46:29

23    A.   And again, similar to Visualizer, again,   13:46:34

24    Birst, one codebase.  ADR is exercised every time 13:46:36

25    new data comes into the platform.  So every day as 13:46:42
```

Page 146

| | | |
|---|---|---|
| 1 | new data is updated, ADR is exercised and used to | 13:46:45 |
| 2 | prepare that data and the metadata that then get | 13:46:49 |
| 3 | rendered in the reports and visualizations that | 13:46:51 |
| 4 | Visualizer creates for the end user to consume. | 13:46:54 |
| 5 | So the end user in this case had access to | 13:46:57 |
| 6 | the output of ADR, but not necessarily the access | 13:47:01 |
| 7 | to modify what ADR was doing. | 13:47:06 |
| 8 | Q.   Okay.   So in FY19, a customer who bought a | 13:47:14 |
| 9 | license for a CloudSuite with Birst for CloudSuite | 13:47:18 |
| 10 | would not be able to allow its end users to use ADR | 13:47:21 |
| 11 | to modify the data output.  Is that fair? | 13:47:33 |
| 12 | A.   Mostly -- there's a slight shade there. | 13:47:36 |
| 13 | You know, end users in general, like a sales | 13:47:40 |
| 14 | manager for the -- for North Carolina, trust me, | 13:47:43 |
| 15 | you don't want them using the ADR capability. | 13:47:46 |
| 16 | So the vast preponderance of our end users | 13:47:50 |
| 17 | and most customers did not have access to this | 13:47:54 |
| 18 | feature.  It's very sophisticated stuff. | 13:47:56 |
| 19 | So in alignment with that, the end users | 13:47:59 |
| 20 | of the combined B4CS also did not have -- | 13:48:02 |
| 21 | (The reporter requested that people not | 13:48:20 |
| 22 | speak at once.) | 13:48:20 |
| 23 | BY MR. DOOLEY: | 13:48:20 |
| 24 | Q.   I understand, Mr. -- I didn't mean to talk | 13:48:22 |
| 25 | over you, Mr. Staelin. | 13:48:24 |

Page 147

| | | |
|---|---|---|
| 1 | I understand that it's a complicated -- | 13:48:25 |
| 2 | it's a big, novel, capability, but -- and that | 13:48:28 |
| 3 | maybe you don't want the sales manager operating | 13:48:32 |
| 4 | it.  Fine.  I get that. | 13:48:35 |
| 5 | My question is different, though. | 13:48:37 |
| 6 | The -- a customer who bought a CloudSuite | 13:48:40 |
| 7 | in FY19 with Birst for CloudSuite would not have | 13:48:44 |
| 8 | the option of allowing any end user to modify the | 13:48:49 |
| 9 | data output using ADR.  Is that correct? | 13:48:56 |
| 10 | A.  Certainly the intention was to not allow | 13:49:02 |
| 11 | end users to have that access.  Again, | 13:49:05 |
| 12 | implementation teams could have given rights.  I | 13:49:07 |
| 13 | can't guarantee everywhere all the time, but the | 13:49:09 |
| 14 | intention was not to the give end users the power | 13:49:12 |
| 15 | to play with ADR. | 13:49:14 |
| 16 | Q.  Okay.  And, in fact, it wasn't just the | 13:49:16 |
| 17 | intention.  In fact, in FY19, end users were not | 13:49:18 |
| 18 | given the power to modify ADR with the Birst for | 13:49:25 |
| 19 | CloudSuite offering.  Correct? | 13:49:35 |
| 20 | A.  Certainly the intention was to make that | 13:49:38 |
| 21 | so.  I can't speak for every end user everywhere | 13:49:40 |
| 22 | all the time, but certainly that was the intention. | 13:49:43 |
| 23 | Q.  Well, was there a license -- in FY19, was | 13:49:46 |
| 24 | there a license that a customer could buy to a | 13:49:50 |
| 25 | CloudSuite that would allow that customer's end | 13:49:53 |

Page 148

| | | |
|---|---|---|
| 1 | users to modify content using ADR? | 13:49:55 |
| 2 | A.   No.   There was not a license option | 13:50:00 |
| 3 | available where they could purchase that right for | 13:50:02 |
| 4 | their end users.   That's correct. | 13:50:05 |
| 5 | Q.   Okay.   And that's different for Birst | 13:50:06 |
| 6 | Enterprise.   Correct? | 13:50:08 |
| 7 | A customer could buy Birst Enterprise and | 13:50:09 |
| 8 | buy a license that would allow an end user to | 13:50:13 |
| 9 | modify content with ADR.   Correct? | 13:50:16 |
| 10 | A.   Yes.   There were three -- three primary | 13:50:22 |
| 11 | levels of license on the Enterprise version.   There | 13:50:26 |
| 12 | was the -- I believe you called it "analyst" -- | 13:50:29 |
| 13 | colloquially, we called it "admin" -- and those | 13:50:32 |
| 14 | people had power to do everything, Godlike power to | 13:50:35 |
| 15 | do everything with ADR you wanted. | 13:50:38 |
| 16 | The business users did not have that | 13:50:41 |
| 17 | access, but they did have the power to modify kinds | 13:50:42 |
| 18 | of Visualizer and other pieces, and then the | 13:50:47 |
| 19 | read-only light users who did not have those | 13:50:50 |
| 20 | licenses. | 13:50:54 |
| 21 | Q.   I appreciate the explanation about the | 13:50:55 |
| 22 | different license levels, and we'll come back to | 13:50:56 |
| 23 | that. | 13:50:59 |
| 24 | But my question, I guess, was a little | 13:50:59 |
| 25 | more straightforward, which is -- and I just want | 13:51:03 |

Page 149

```
 1    to make sure I have a clear answer.                 13:51:07

 2          In fiscal year '19, a customer could buy      13:51:09

 3    the Birst Enterprise platform and buy a user        13:51:13

 4    license that would allow the customer's end users   13:51:17

 5    to modify content with ADR.  Correct?              13:51:21

 6       A.  The end-user rights that would allow         13:51:26

 7    whomever the company gave it to, to modify that     13:51:30

 8    content would have been -- I believe the name was   13:51:33

 9    "the analyst user"; again, colloquially called      13:51:34

10    "admin."                                            13:51:37

11       Q.  And a customer could buy -- in fiscal year   13:51:39

12    '19, a customer could buy the Birst Enterprise      13:51:42

13    platform and buy an analyst or admin user license,  13:51:45

14    and that would allow the customer's end users to    13:51:55

15    modify content with ADR.  Correct?                 13:51:59

16       A.  Yes, that is correct.  That level of         13:52:03

17    license allowed the user to modify what was going   13:52:05

18    on in ADR.                                          13:52:09

19       Q.  Okay.  And is -- and so that's a             13:52:10

20    difference between Birst for CloudSuite and Birst   13:52:14

21    Enterprise.                                         13:52:17

22          You'd agree with me on that.                  13:52:18

23          MR. LIPMAN:  Object to form.  Hold on.        13:52:21

24    Mischaracterizes his testimony.                     13:52:24

25          Go ahead, Mr. Staelin.                        13:52:26
```

Page 150

| | | |
|---|---|---|
| 1 | A.   Oh.   Okay. | 14:04:15 |
| 2 | Q.   The -- if a customer wanted the | 14:04:18 |
| 3 | opportunity -- I understand that ADR is -- is it | 14:04:20 |
| 4 | fair to say that ADR is kind of an engine that sits | 14:04:22 |
| 5 | within the various Birst platforms and offerings | 14:04:25 |
| 6 | and drives some of the data analysis? | 14:04:30 |
| 7 | Is that a colloquially fair way to | 14:04:34 |
| 8 | describe it? | 14:04:37 |
| 9 | A.   I think the fairest characterization is | 14:04:38 |
| 10 | that ADR is the primary data-modeling engine used | 14:04:40 |
| 11 | by Birst Enterprise. | 14:04:44 |
| 12 | Q.   Okay.   And I understand that ADR is the | 14:04:51 |
| 13 | primary data-modeling engine.   It sits under all of | 14:04:53 |
| 14 | the -- all the Birst offerings.   Correct? | 14:04:57 |
| 15 | A.   It is the primary component of Enterprise, | 14:05:02 |
| 16 | yes. | 14:05:05 |
| 17 | Q.   Okay.   Is it the primary component of | 14:05:05 |
| 18 | Birst Professional? | 14:05:07 |
| 19 | A.   ADR is not available for Birst | 14:05:11 |
| 20 | Professional.   Birst Professional had a very | 14:05:12 |
| 21 | different use case and data-modeling approach. | 14:05:15 |
| 22 | Q.   Okay.   So a customer who bought Birst | 14:05:17 |
| 23 | Enterprise in fiscal year '19 would get the rights | 14:05:22 |
| 24 | to the benefits of ADR, but a customer who bought | 14:05:26 |
| 25 | Birst Professional in FY19 would not get the rights | 14:05:29 |

Page 159

```
1    to the benefits of ADR.  Correct?                    14:05:33

2         A.  That is correct.  Birst Professional did    14:05:35

3    not provide those rights.                            14:05:38

4         Q.  Okay.  And a customer who bought -- in       14:05:39

5    FY19, a customer who bought a CloudSuite that         14:05:44

6    contained Birst for CloudSuite would also not get     14:05:51

7    the rights to the benefits of ADR.  Correct?          14:05:56

8         MR. LIPMAN:  Object to form and asked and        14:06:00

9    answered.                                             14:06:01

10        THE WITNESS:  Completely incorrect.              14:06:01

11   Couldn't be more wrong.                               14:06:03

12   BY MR. DOOLEY:                                        14:06:04

13        Q.  And is that because, unlike Birst            14:06:05

14   Professional, ADR was the data-modeling engine that   14:06:08

15   operated Birst for CloudSuite?                        14:06:19

16        A.  Yes.  The ADR component of the Birst         14:06:23

17   Enterprise platform was the primary data-modeling     14:06:26

18   engine deployed to deliver the content that was       14:06:29

19   Burst for CloudSuite.                                 14:06:39

20        Q.  That's helpful.  I appreciate that.          14:06:40

21        There is a difference, though, between           14:06:42

22   what a customer who paid the $100,000 platform fee    14:06:43

23   for Birst Enterprise could do with ADR versus the     14:06:46

24   customer who bought a CloudSuite that contained       14:06:49

25   Birst for CloudSuite.  Correct?                       14:06:54
```

                                              Page 160

| | | |
|---|---|---|
| 1 | MR. LIPMAN:  Object to form. | 14:06:57 |
| 2 | Mischaracterizes testimony. | 14:06:57 |
| 3 | THE WITNESS:  Yeah, I -- the difference | 14:06:58 |
| 4 | really comes in the end-user licensing.  I don't | 14:06:59 |
| 5 | think it's a function of the overall kind of | 14:07:01 |
| 6 | solution.  It is very specific to the role the user | 14:07:06 |
| 7 | has and the rights that they have; the access | 14:07:08 |
| 8 | rights that they have. | 14:07:11 |
| 9 | BY MR. DOOLEY: | 14:07:13 |
| 10 | Q.  Okay.  And that's where I was going, which | 14:07:13 |
| 11 | is, a customer who paid the $100,000 platform fee | 14:07:15 |
| 12 | for Birst Enterprise in fiscal year '19 had the | 14:07:21 |
| 13 | opportunity to buy an end-user license that would | 14:07:26 |
| 14 | allow an end user to modify data using ADR. | 14:07:31 |
| 15 | Correct? | 14:07:38 |
| 16 | A.  Correct.  The Enterprise -- a customer | 14:07:39 |
| 17 | purchasing the Enterprise platform had the ability | 14:07:43 |
| 18 | to purchase a user that would have the access | 14:07:46 |
| 19 | rights to change what was happening in ADR.  They | 14:07:51 |
| 20 | also had the opportunity to buy a user who was just | 14:07:54 |
| 21 | going to use dashboards. | 14:07:58 |
| 22 | Q.  And a customer who purchased a CloudSuite | 14:08:00 |
| 23 | with Birst for Enterprise did not have the ability | 14:08:05 |
| 24 | to purchase a user license that would have the | 14:08:09 |
| 25 | access rights to change what was happening in ADR. | 14:08:13 |

Page 161

```
 1    Correct?                                              14:08:16

 2          MR. LIPMAN:  Object to form.                    14:08:17

 3          I think there was a mistake in the              14:08:18

 4    question, but go ahead if you understand it.          14:08:19

 5          THE WITNESS:  Yeah, I honestly -- that was       14:08:22

 6    a long sentence with a lot of very precise words,      14:08:24

 7    and you lost me about halfway through.                 14:08:26

 8          If you could -- I'm trying to listen.            14:08:29

 9    It's hard.                                             14:08:30

10    BY MR. DOOLEY:                                         14:08:31

11       Q.  And I'm trying to -- I'm trying to -- I         14:08:32

12    want to use your language so that we're -- we're      14:08:34

13    speaking -- we're not passing each other.              14:08:38

14          A moment ago -- two questions ago or one        14:08:40

15    question ago, you testified that a customer           14:08:42

16    purchasing the Enterprise platform had the ability    14:08:46

17    to purchase a user license that would give the user   14:08:49

18    access rights to change what was happening in ADR.    14:08:54

19          That's correct.  Right?                          14:08:59

20       A.  That is correct.  Yes.                          14:09:01

21       Q.  Okay.  Now, a customer -- on the other          14:09:02

22    hand, a customer purchasing a CloudSuite that         14:09:05

23    contained Birst for CloudSuite did not have the       14:09:12

24    ability to purchase a user license that would allow   14:09:17

25    the end user access rights to change what was         14:09:21
```

                                                  Page 162

```
 1   happening in ADR.  Correct?                    14:09:24

 2        A.  I believe that is correct.  The end user   14:09:28

 3   at the customer consuming Birst for CloudSuites did  14:09:31

 4   not have the option to get the analyst- or       14:09:35

 5   admin-level access.                              14:09:39

 6            Sorry, I probably shouldn't be doing the  14:09:45

 7   air quotes.  I think that's hard for the court   14:09:48

 8   reporter to type in.  I'll just call it "admin"  14:09:51

 9   from now on.  My apologies.                      14:09:53

10        Q.  Okay.  And I'm back on this exhibit on   14:10:25

11   Slide 3.                                         14:10:26

12            If you -- in the "Platform Fee" row, if  14:10:27

13   you slide over from Birst Enterprise under Birst 14:10:32

14   Professional, the platform fee is $9500 a year and  14:10:35

15   includes five users.                            14:10:42

16            Was that the platform fee for Birst     14:10:45

17   Professional in 2017?                            14:10:48

18        A.  I certainly expect that it is.  I       14:10:50

19   certainly believe this would be accurate as of that  14:10:53

20   time.                                            14:10:55

21        Q.  Okay.  And why was Birst Enterprise     14:10:55

22   platform fee $100,000 when Birst Professional's  14:10:58

23   platform fee was $9500?                          14:11:03

24        A.  I think the short answer -- there's a long  14:11:09

25   answer and a short answer.                       14:11:11
```

Page 163

| | | |
|---|---|---|
| 1 | The short answer is Birst Enterprise had a | 14:11:12 |
| 2 | lot more capabilities than Birst Professional. | 14:11:15 |
| 3 | Q.   Okay.   And so the capabilities that a | 14:11:18 |
| 4 | platform or offering has is a significant factor in | 14:11:20 |
| 5 | determining the -- the price of the platform or | 14:11:24 |
| 6 | offering. | 14:11:27 |
| 7 | Would you agree with that? | 14:11:28 |
| 8 | A.   The way that I would characterize it is | 14:11:31 |
| 9 | fundamentally, Birst Enterprise, much like its name | 14:11:34 |
| 10 | says, is able to tackle big, complicated enterprise | 14:11:37 |
| 11 | problems -- you know, datasets from, you know, an | 14:11:43 |
| 12 | entire ERP, for instance -- and take that data and | 14:11:45 |
| 13 | turn it into useful and actionable dashboards for | 14:11:50 |
| 14 | the end users to look at in relatively simple | 14:11:53 |
| 15 | reports, and they can understand all this | 14:11:57 |
| 16 | complicated data on the back end. | 14:12:00 |
| 17 | Birst Professional was really aimed at | 14:12:02 |
| 18 | taking a couple of spreadsheets and letting the | 14:12:03 |
| 19 | user tinker with them a little bit and then provide | 14:12:05 |
| 20 | dashboards on that greatly simpler use case. | 14:12:08 |
| 21 | So by capabilities, I'm talking largely | 14:12:13 |
| 22 | about the types of use cases that you can tackle | 14:12:16 |
| 23 | and the value that those use cases can provide. | 14:12:19 |
| 24 | Birst Enterprise was designed for the most | 14:12:22 |
| 25 | complicated, the most valuable, the biggest | 14:12:24 |

Page 164

| | | |
|---|---|---|
| 1 | Enterprise problems, and Birst Professional was | 14:12:28 |
| 2 | really designed for a small team with a couple of | 14:12:31 |
| 3 | spreadsheets. | 14:12:34 |
| 4 | Q.  Okay.  And the types of use cases that a | 14:12:34 |
| 5 | customer can tackle with one of your offerings is | 14:12:39 |
| 6 | determined by the capabilities of the offering. | 14:12:43 |
| 7 | Correct? | 14:12:46 |
| 8 | MR. LIPMAN:  Object to form. | 14:12:47 |
| 9 | THE WITNESS:  That's not exactly what I | 14:12:50 |
| 10 | would say.  You're mixing capabilities a little | 14:12:51 |
| 11 | bit.  But the complexity of the use case absolutely | 14:12:54 |
| 12 | drives value. | 14:12:57 |
| 13 | BY MR. DOOLEY: | 14:13:08 |
| 14 | Q.  Well, would you agree with me, | 14:13:09 |
| 15 | Mr. Staelin, that a software offering that had more | 14:13:11 |
| 16 | capabilities would generally be more valuable to a | 14:13:15 |
| 17 | customer than a software solution with fewer | 14:13:20 |
| 18 | capabilities? | 14:13:25 |
| 19 | A.  It depends how you're measuring the term | 14:13:27 |
| 20 | "capabilities." | 14:13:30 |
| 21 | Q.  Well, features, like the ones we're | 14:13:31 |
| 22 | looking at on Slide 3. | 14:13:33 |
| 23 | A.  Yeah, that -- Slide 3 confounds platform | 14:13:38 |
| 24 | capabilities with end-user access. | 14:13:44 |
| 25 | So I'm going to be -- I'm not going to | 14:13:50 |

Page 165

```
 1    10 percent revenue allocation to Birst to help      14:15:52
 2    cover our costs of providing that service was       14:15:56
 3    called out 'cause the reps asked, how much are you  14:15:58
 4    getting, or the product managers wanted to know how 14:16:01
 5    much of the revenue we'd be getting to cover our    14:16:03
 6    costs.                                              14:16:06
 7         Q.  So a customer who bought -- and why was    14:16:16
 8    the -- why was the -- why wasn't there a separate   14:16:23
 9    platform fee for Birst for CloudSuite?              14:16:28
10         A.  You'd have to ask the product managers,    14:16:36
11    but the intent, strategically, of Infor in          14:16:37
12    acquiring Birst was to bring to bear best in        14:16:41
13    market, best in class analytic capabilities to      14:16:44
14    their CloudSuites, and they wanted everybody to     14:16:47
15    have it.                                            14:16:49
16            They were losing to Workday and SAP and     14:16:50
17    others that had much better analytics solutions,    14:16:53
18    and they wanted this out there to everybody,        14:16:57
19    everywhere, as a primary differentiation edge.      14:17:00
20         Q.  Wasn't the reason that Birst for           14:17:14
21    CloudSuite -- the price of Birst for CloudSuite --  14:17:16
22    the reason it was included in the price of the      14:17:19
23    CloudSuite was because it came with fewer features, 14:17:20
24    fewer capabilities, than Birst Professional or      14:17:25
25    Birst Enterprise?                                   14:17:28
```

Page 167

```
 1    couldn't buy it by itself.                       14:27:06

 2         Q.  And would you agree that the statement  14:27:25

 3    "Birst for CloudSuite cannot be purchased on its 14:27:28

 4    own as a stand-alone product" also means that Birst 14:27:31

 5    for CloudSuite cannot be purchased individually?  14:27:35

 6              Would you agree with that?             14:27:40

 7              MR. LIPMAN:  Object to form.           14:27:44

 8              Go ahead if you understand the question, 14:27:45

 9    Mr. Staelin.                                      14:27:47

10              THE WITNESS:  Yeah, I think I understand 14:27:47

11    what you're asking; but certainly, if you can't buy 14:27:48

12    it on its -- on its own, it would be hard to buy 14:27:50

13    individually, yes.                                14:27:54

14    BY MR. DOOLEY:                                    14:27:55

15         Q.  Okay.  So in FY19, it's true that Birst 14:27:55

16    for CloudSuite could not be bought individually.  14:27:58

17         A.  I believe that that is true, yes.       14:28:04

18         Q.  And likewise, neither Infor nor Birst in 14:28:08

19    FY19 could sell Birst for CloudSuite individually. 14:28:12

20    Correct?                                          14:28:15

21         A.  Yes.  That is correct.                  14:28:15

22         Q.  It's also fair to say that Birst for    14:28:21

23    CloudSuite was a Birst offering that could only be 14:28:24

24    purchased embedded in another offering.  Correct? 14:28:28

25              MR. LIPMAN:  Object to form.           14:28:38
```

Page 176

```
 1    Mischaracterizes his testimony.  Vague as to the        14:28:38
 2    term "offering."                                        14:28:41
 3            THE WITNESS:  Yeah, I would agree.               14:28:43
 4            Birst for CloudSuite is not a Birst              14:28:44
 5    offering.                                                14:28:46
 6    BY MR. DOOLEY:                                           14:28:46
 7        Q.  Okay.  Well, would you agree that -- how         14:28:46
 8    would you describe it?  A solution?                      14:28:50
 9        A.  Birst for CloudSuite is the combination of       14:28:52
10    content from the Infor CloudSuite and certain of         14:28:56
11    the components from the Birst capabilities as well       14:28:59
12    packaged up as a solution.                               14:29:03
13        Q.  Okay.  And it's your testimony --                14:29:05
14        A.  So it's not -- not a Birst offering              14:29:08
15    per se.                                                  14:29:10
16        Q.  Okay.  So it's your testimony that Birst         14:29:11
17    for CloudSuite is a combination of Birst                 14:29:15
18    capabilities and Infor content.                          14:29:19
19        A.  Yes.                                             14:29:26
20        Q.  Birst for CloudSuite is not a Birst              14:29:27
21    product.  Is that your understanding?                    14:29:29
22        A.  That -- yeah, that's how I would -- how I        14:29:33
23    would characterize it.  It was the combination of        14:29:36
24    Infor content and Birst products and capabilities,       14:29:40
25    yes.                                                     14:29:42
```

Page 177

| | | |
|---|---|---|
| 1 | Q. And Birst for CloudSuite's not a Birst | 14:29:43 |
| 2 | offering. | 14:29:45 |
| 3 | A. It is not, no. | 14:29:47 |
| 4 | Q. In 2017 -- well, sorry, let's just do | 14:30:29 |
| 5 | it -- in fiscal year '19, did Birst sell any | 14:30:32 |
| 6 | other -- I'm trying to stay away from offerings and | 14:30:36 |
| 7 | products because I know you're not going to agree | 14:30:40 |
| 8 | with me on that. | 14:30:42 |
| 9 | In fiscal year 2019, did Birst sell any | 14:30:44 |
| 10 | other combinations of Birst capabilities and | 14:30:51 |
| 11 | content from Infor other than Birst for CloudSuite? | 14:31:05 |
| 12 | A. The -- the long-term vision was to provide | 14:31:19 |
| 13 | some add-on analytics solutions for different | 14:31:23 |
| 14 | offerings where they could do some really | 14:31:28 |
| 15 | value-added stuff that would be sold above and | 14:31:31 |
| 16 | beyond what that which was included in CloudSuite. | 14:31:34 |
| 17 | I can't recall precisely if those kinds of | 14:31:39 |
| 18 | more advanced offerings were brought to market in | 14:31:41 |
| 19 | fiscal 2019 or later or what, but I know that they | 14:31:45 |
| 20 | were on the -- there was a vision to do some of | 14:31:48 |
| 21 | those higher value-added analytics -- prebuilt | 14:31:51 |
| 22 | higher value-ad analytics offerings -- or | 14:31:55 |
| 23 | solutions, not offerings. | 14:31:58 |
| 24 | Q. In fiscal year 2019, did Birst sell any | 14:32:00 |
| 25 | combination of its capabilities with content from | 14:32:04 |

Page 178

```
 1   itself did not sell a combination of its          14:33:32

 2   capabilities with content from a third party.  Is  14:33:37

 3   that right?                                        14:33:42

 4       A.  It's not entirely right.  It's mostly     14:33:46

 5   right, but not entirely right.                     14:33:49

 6           We did have some prebuilt solution         14:33:51

 7   accelerators for common data sources like          14:33:53

 8   Salesforce or other things.                        14:33:56

 9           But, generally speaking, we did not do     14:33:59

10   that, no.                                          14:34:01

11       Q.  Birst for CloudSuite was developed         14:34:52

12   after -- this is probably an obvious question, but 14:34:54

13   Birst for CloudSuite was developed after Infor     14:34:58

14   acquired Birst.  Correct?                          14:35:01

15           MR. LIPMAN:  Object to form.               14:35:06

16           THE WITNESS:  As the combination of        14:35:07

17   content from the Infor applications and the Birst  14:35:09

18   components that comprised it, it naturally happened 14:35:13

19   after the acquisition.                             14:35:17

20   BY MR. DOOLEY:                                     14:35:24

21       Q.  At the -- prior to the acquisition, had    14:35:25

22   Birst designed or developed a combination of       14:35:28

23   content from some other third-party application and 14:35:35

24   Birst capabilities?                                14:35:40

25       A.  I --                                       14:35:46
```

Page 180

```
 1            MR. LIPMAN:  Object to the form.          14:35:47

 2            THE WITNESS:  Yeah, could you rephrase     14:35:47

 3    that?  I'm a little confused by your question.     14:35:48

 4    BY MR. DOOLEY:                                     14:35:50

 5        Q.  Sure.  Sure.  So I understand your         14:35:51

 6    testimony -- your understanding is that Birst for  14:35:52

 7    CloudSuite is -- you've testified to this a number 14:35:54

 8    of times -- a combination of Infor content with    14:35:57

 9    Birst capabilities.                                14:36:01

10            Is that fair?                              14:36:06

11        A.  Yes.  I believe that that's a fair         14:36:06

12    summary, yes.                                      14:36:08

13        Q.  Okay.  I want to be -- I want to make sure 14:36:09

14    we're on the same page.                            14:36:11

15            So your testimony is that Birst for        14:36:13

16    CloudSuite is a combination of Infor content with  14:36:16

17    Birst analytic capability.  Correct?              14:36:21

18        A.  Correct.                                   14:36:24

19        Q.  And prior to the acquisition by Infor,     14:36:32

20    Birst was not selling a combination of its analytic 14:36:42

21    capability and some other third party's content.   14:36:48

22    Correct?                                           14:36:52

23            MR. LIPMAN:  Object to form.               14:36:53

24            THE WITNESS:  Broadly speaking, we were    14:36:57

25    not selling prebuilt content, although, again, we  14:36:59
```

Page 181

| | | |
|---|---|---|
| 1 | had a few solution accelerators that had some | 14:37:02 |
| 2 | prebuilt content in them for things like Salesforce | 14:37:05 |
| 3 | and some other very common applications. | 14:37:09 |
| 4 | But broadly, in the broad aspect, that's a | 14:37:12 |
| 5 | reasonably fair synopsis. | 14:37:15 |
| 6 | BY MR. DOOLEY: | 14:37:18 |
| 7 | Q.  Okay.  Now my question is just slightly | 14:37:18 |
| 8 | different.  I'm not asking about selling.  I'm | 14:37:28 |
| 9 | asking about whether Birst had designed or | 14:37:30 |
| 10 | developed such a combination. | 14:37:33 |
| 11 | So let me ask the question. | 14:37:36 |
| 12 | Prior to the acquisition, had Birst | 14:37:38 |
| 13 | designed or developed a combination of its analytic | 14:37:43 |
| 14 | capability and some other third party's content? | 14:37:48 |
| 15 | A.  I'm struggling with the "Birst designed" | 14:37:55 |
| 16 | part.  In general, in the OEM business, when | 14:37:59 |
| 17 | someone purchased our capabilities to build such a | 14:38:02 |
| 18 | combined solution, our professional services would | 14:38:05 |
| 19 | help them do it. | 14:38:08 |
| 20 | I don't know if you were -- in your -- | 14:38:09 |
| 21 | however you mean this, if that means Birst designed | 14:38:11 |
| 22 | or just Birst helped. | 14:38:14 |
| 23 | BY MR. DOOLEY: | 14:38:19 |
| 24 | Q.  I'm not asking about Birst helped.  I'm | 14:38:20 |
| 25 | asking about, this is something that Birst designed | 14:38:21 |

Page 182

| 1 | and developed on its own prior to the acquisition. | 14:38:24 |
| 2 | Prior to the acquisition, had Birst | 14:38:29 |
| 3 | designed or developed a combination of its analytic | 14:38:31 |
| 4 | capability and some other third party's content? | 14:38:36 |
| 5 | A.   In general, in the OEM business, our | 14:38:43 |
| 6 | customers were the experts in their applications | 14:38:45 |
| 7 | and the content within them.  We were the experts | 14:38:48 |
| 8 | in the analytic capabilities.  We would work with | 14:38:51 |
| 9 | them to build that and advise them.  We did much | 14:38:54 |
| 10 | the same thing at Infor. | 14:38:57 |
| 11 | Again, the one callout is there are some | 14:38:59 |
| 12 | third-party applications that were quite common for | 14:39:02 |
| 13 | which we had built our own little content for, | 14:39:04 |
| 14 | Salesforce being the primary example. | 14:39:09 |
| 15 | Q.   Okay.  I guess -- I guess what I'm trying | 14:39:12 |
| 16 | to understand is prior to the acquisition, had | 14:39:15 |
| 17 | Birst designed -- you testified that Birst for | 14:39:17 |
| 18 | CloudSuite is a combination of Birst analytic | 14:39:22 |
| 19 | capability and Infor content. | 14:39:25 |
| 20 | I'm trying to understand -- I understand | 14:39:27 |
| 21 | you weren't -- Birst wasn't selling something like | 14:39:29 |
| 22 | that prior to the acquisition. | 14:39:32 |
| 23 | My question is:  Had Birst designed a | 14:39:34 |
| 24 | combination of its analytic capability and some | 14:39:36 |
| 25 | other third party's content akin to Birst for | 14:39:40 |

Page 183

| 1 | customer?  When was it first delivered to a | 14:57:52 |
| 2 | customer? | 14:57:55 |
| 3 |     A.  Well, provisioning is different than | 14:57:55 |
| 4 | selling.  But -- | 14:57:58 |
| 5 |     Q.  I understand. | 14:57:59 |
| 6 |         When was Birst for CloudSuite first | 14:58:00 |
| 7 | provisioned? | 14:58:02 |
| 8 |     A.  I believe the early beta customers -- and | 14:58:03 |
| 9 | I'd have to go look at emails -- but I think it was | 14:58:08 |
| 10 | late 2018, there were a few customers in beta, and | 14:58:12 |
| 11 | then it went to limited availability and was | 14:58:15 |
| 12 | trapped at that level for a long time. | 14:58:18 |
| 13 |     Q.  So the first beta customers were | 14:58:20 |
| 14 | provisioned Birst for CloudSuite in late 2018, and | 14:58:22 |
| 15 | then it was in limited availability. | 14:58:29 |
| 16 |         And at what point did Birst for CloudSuite | 14:58:31 |
| 17 | become generally available for sale with | 14:58:35 |
| 18 | CloudSuite? | 14:58:38 |
| 19 |     A.  I believe that the -- there's a whole host | 14:58:40 |
| 20 | of politics behind this. | 14:58:43 |
| 21 |         But the general availability level was | 14:58:46 |
| 22 | withheld, and Birst was kept in limited | 14:58:49 |
| 23 | availability for a long, long time. | 14:58:53 |
| 24 |     Q.  Okay.  Well, we'll probably have an | 14:58:56 |
| 25 | opportunity to come back to that. | 14:58:57 |

Page 187

```
 1           I think you testified earlier that Birst     14:59:09

 2    for CloudSuite didn't -- wasn't developed until      14:59:13

 3    after the acquisition.  Is that right?               14:59:18

 4           That was -- once you were a part of Infor,     14:59:21

 5    that's when Birst for CloudSuite was developed?       14:59:24

 6       A.   The -- yeah, the combination of Infor         14:59:26

 7    content and the Birst platform happened               14:59:29

 8    predominantly postacquisition as the product          14:59:32

 9    managers began to familiarize themselves with         14:59:35

10    things they could do and as we worked with them to    14:59:37

11    figure out those things and build and deliver them.    14:59:40

12           Much like we did with every other OEM          14:59:45

13    customer.                                              14:59:49

14       Q.   So Birst for CloudSuite hadn't been           14:59:56

15    designed or developed at the time of the              14:59:58

16    acquisition.  It was designed and developed after     15:00:00

17    the acquisition when Infor and Birst created this     15:00:03

18    combination.  Is that right?                          15:00:07

19           MR. LIPMAN:  Object to form.                   15:00:10

20           THE WITNESS:  Yeah.  I mean, we worked         15:00:14

21    with Infor product managers postacquisition,          15:00:15

22    predominantly, to develop these solutions and bring   15:00:20

23    them to market.                                        15:00:23

24    BY MR. DOOLEY:                                          15:00:25

25       Q.   But the design and development of Birst       15:00:25
```

Page 188

| | | |
|---|---|---|
| 1 | for CloudSuite, that happened postacquisition. | 15:00:26 |
| 2 | Correct? | 15:00:28 |
| 3 | A.  Yes.  Predominantly, yes, absolutely. | 15:00:32 |
| 4 | Q.  And there obviously weren't any sales of | 15:00:35 |
| 5 | Birst for CloudSuite prior to the acquisition. | 15:00:38 |
| 6 | Correct? | 15:00:40 |
| 7 | A.  No, there were not. | 15:00:41 |
| 8 | Q.  And you testified earlier that you | 15:00:53 |
| 9 | consider Birst Enterprise and Birst platform to be | 15:00:55 |
| 10 | Birst's two products.  Correct? | 15:00:59 |
| 11 | MR. LIPMAN:  Object to form. | 15:01:01 |
| 12 | BY MR. DOOLEY: | 15:01:02 |
| 13 | Q.  Or let me rephrase just to get the time | 15:01:03 |
| 14 | frame straight. | 15:01:05 |
| 15 | I think my -- my understanding of your | 15:01:06 |
| 16 | testimony earlier was that during the relevant | 15:01:08 |
| 17 | time -- so between the time of the acquisition and | 15:01:10 |
| 18 | the end of the time that you left -- at the time | 15:01:14 |
| 19 | you left Infor, my understanding of your testimony | 15:01:16 |
| 20 | is that the two Birst products were Birst | 15:01:20 |
| 21 | Enterprise and Birst Platform -- or Birst | 15:01:24 |
| 22 | Professional.  Is that right? | 15:01:26 |
| 23 | A.  Yes.  Our primary offerings were Birst | 15:01:29 |
| 24 | Professional and Birst Enterprise. | 15:01:32 |
| 25 | Q.  Okay.  And do you use "offerings" and | 15:01:35 |

Page 189

```
 1    particular product?  Is that how would you describe      15:02:33

 2    it?                                                       15:02:35

 3         A.  That's how I would describe it because          15:02:35

 4    it's a -- it's a product, but it has a lot of            15:02:37

 5    add-ons and features and other things that you can        15:02:40

 6    do.  It's really one of the anchor things that we         15:02:43

 7    sold, yes.                                                15:02:46

 8         Q.  Okay.  And Birst Professional is the other      15:02:46

 9    anchor offering that you sold.                            15:02:48

10         A.  Yes.  I believe that's a fair                    15:02:50

11    characterization.                                         15:02:52

12         Q.  And you don't consider -- Birst for             15:02:54

13    CloudSuite is not, I think you testified earlier, a       15:02:59

14    product or an offering in the same way that Birst         15:03:02

15    Professional or Birst Enterprise are.  Correct?          15:03:04

16         A.  No.  I think Birst for CloudSuite is a          15:03:09

17    combination of Infor content with Birst components,       15:03:11

18    yeah.                                                     15:03:14

19         Q.  Okay.  So is -- would you say that Birst        15:03:14

20    for CloudSuite is a -- is like a -- like a                15:03:19

21    Version 2.0 of Birst Professional or Birst                15:03:22

22    Enterprise?                                               15:03:28

23              MR. LIPMAN:  Objection.                         15:03:29

24    BY MR. DOOLEY:                                            15:03:29

25         Q.  Or 2.1 or something?                            15:03:29
```

Page 191

| | | |
|---|---|---|
| 1 | combination of Birst Enterprise and other things | 15:04:26 |
| 2 | combined with Infor content. | 15:04:29 |
| 3 | Q.  Okay.  And so let me just ask it again. | 15:04:31 |
| 4 | Would you characterize Birst for | 15:04:35 |
| 5 | CloudSuite as a different version of Birst | 15:04:37 |
| 6 | Enterprise? | 15:04:42 |
| 7 | A.  I wouldn't -- | 15:04:44 |
| 8 | MR. LIPMAN:  Object to form. | 15:04:45 |
| 9 | THE WITNESS:  I would not characterize it | 15:04:45 |
| 10 | as a different version.  "Version" generally means | 15:04:46 |
| 11 | you do a release, there's a later release, a later | 15:04:48 |
| 12 | release, a later release, and those all get version | 15:04:52 |
| 13 | numbers. | 15:04:55 |
| 14 | I would not characterize Birst for | 15:04:55 |
| 15 | CloudSuite using that Enterprise component as a | 15:04:58 |
| 16 | version of that in any way, shape, or form. | 15:05:03 |
| 17 | BY MR. DOOLEY: | 15:05:06 |
| 18 | Q.  Similarly, would you characterize Birst | 15:05:06 |
| 19 | for CloudSuite as a version of Birst Professional? | 15:05:08 |
| 20 | A.  I would not characterize it as a version | 15:05:13 |
| 21 | of Birst Professional, no. | 15:05:15 |
| 22 | Q.  Okay.  And would you characterize Birst | 15:05:17 |
| 23 | for CloudSuite as a -- you mentioned "release," so | 15:05:21 |
| 24 | I want to ask about that word, too. | 15:05:23 |
| 25 | Would you characterize Birst Professional | 15:05:25 |

Page 193

| | | |
|---|---|---|
| 1 | as a new release of Birst Enterprise? | 15:05:27 |
| 2 | MR. LIPMAN:  Object to form. | 15:05:36 |
| 3 | THE WITNESS:  Yeah, Birst Professional is | 15:05:37 |
| 4 | a different offering from Birst Enterprise. | 15:05:38 |
| 5 | BY MR. DOOLEY: | 15:05:42 |
| 6 | Q.  Sure.  I think I misspoke.  I'm getting my | 15:05:42 |
| 7 | Professionals and my CloudSuites mixed up. | 15:05:45 |
| 8 | Would you characterize Birst for | 15:05:48 |
| 9 | CloudSuite as a release of Birst Enterprise? | 15:05:49 |
| 10 | A.  I -- I don't really understand what you | 15:05:56 |
| 11 | just asked.  A "release" generally means we, you | 15:06:00 |
| 12 | know, add a little of this, fix a bug there, do | 15:06:06 |
| 13 | those things, and then you release kind of the same | 15:06:10 |
| 14 | product. | 15:06:13 |
| 15 | Birst for CloudSuite used those same Birst | 15:06:14 |
| 16 | Enterprise things as the -- you know, the platform, | 15:06:18 |
| 17 | primarily, that made that solution possible.  So it | 15:06:20 |
| 18 | used the updated versions, but it is not in and of | 15:06:23 |
| 19 | itself a version. | 15:06:27 |
| 20 | Q.  And it's not -- in the same vein, Birst | 15:06:28 |
| 21 | for CloudSuite is not a release of Birst | 15:06:31 |
| 22 | Enterprise.  Fair to say? | 15:06:33 |
| 23 | A.  No.  Birst for CloudSuite is the | 15:06:35 |
| 24 | combination of Infor content and Birst analytic | 15:06:36 |
| 25 | capabilities best embodied by Enterprise. | 15:06:42 |

Page 194

```
 1        Q.   Okay.   And Birst for CloudSuite is not a      15:06:45

 2   release -- a new release of Birst Professional.          15:06:48

 3   Correct?                                                  15:06:54

 4        A.   Birst for CloudSuite, again, is the            15:06:58

 5   combination of content with Birst capabilities           15:06:59

 6   that -- Birst capabilities of Professional were not      15:07:01

 7   those used in Birst for CloudSuite.                      15:07:06

 8           (Reporter clarification of audio.)               10:41:13

 9   BY MR. DOOLEY:                                            15:07:15

10        Q.  So it would be fair to say, Mr. Staelin,        15:07:15

11   that Birst for CloudSuite is -- it's just -- it's        15:07:17

12   different in your mind from Birst Enterprise and         15:07:22

13   Birst Professional in that it is a combination of        15:07:25

14   Birst analytic capability and Birst -- and Infor         15:07:28

15   content?                                                 15:07:34

16           MR. LIPMAN:   Object to form.                    15:07:34

17   Mischaracterizes the testimony.                          15:07:35

18           THE WITNESS:   I would agree that Birst for      15:07:38

19   CloudSuite is the combination of Birst components,       15:07:41

20   analytic components, with Infor content.                 15:07:43

21           Again, we had a pretty vibrant OEM               15:07:46

22   business.  This is kind of what we did with those        15:07:49

23   customers, too.                                          15:07:51

24   BY MR. DOOLEY:                                            15:07:56

25        Q.   In what way is it like what you did with       15:07:56
```

Page 195

```
 1    OEM customers?                                       15:07:58

 2         A.  In most of our OEM cases -- not all, but   15:08:01

 3    most were application service -- or, sorry,          15:08:04

 4    independent software vendors -- "ISVs" is the        15:08:09

 5    acronym -- who had their software solution that      15:08:13

 6    would track whatever data it was.                    15:08:15

 7              And when they wanted to bring, you know,   15:08:19

 8    dashboards and analytics to those solutions, they   15:08:21

 9    would purchase the appropriate Birst components,     15:08:25

10    we'd work with them to build the content using      15:08:29

11    their data, and then they would turn around and     15:08:31

12    sell it or give it to their customers, however they 15:08:34

13    thought it would best help them in the marketplace. 15:08:36

14         Q.  But fair to say, one difference between    15:08:38

15    Birst for CloudSuite and the OEM products you're    15:08:42

16    describing is that in the OEM context, the OEM sold 15:08:45

17    the -- sold the combination.                         15:08:48

18              And the Birst for CloudSuite context, it  15:08:49

19    was Birst as part of Infor that was selling it.     15:08:52

20    Correct?                                             15:08:56

21              MR. LIPMAN:  Object to form.               15:08:57

22              THE WITNESS:  Yeah, I -- I think you've   15:08:57

23    just mischaracterized it.                            15:08:59

24              Again, when a customer buys the           15:08:59

25    CloudSuite, they get the solution.  We weren't      15:09:03
```

                                                   Page 196

| | | |
|---|---|---|
| 1 | selling this.  It's a solution.  It's just part of | 15:09:05 |
| 2 | the overall CloudSuite. | 15:09:09 |
| 3 | BY MR. DOOLEY: | 15:09:21 |
| 4 | Q.  Okay.  I'm moving an exhibit that was | 15:09:22 |
| 5 | marked at Mr. Peters' deposition, Exhibit 47, into | 15:10:04 |
| 6 | the "Marked Exhibits" folder, so let me know when | 15:10:07 |
| 7 | you see that there. | 15:10:11 |
| 8 | A.  I see it.  I am now opening it. | 15:10:12 |
| 9 | Okay.  I see the title slide. | 15:10:18 |
| 10 | Q.  And do you recognize Exhibit 47 as a | 15:10:20 |
| 11 | "Birst Pricing and Packaging" PowerPoint prepared | 15:10:23 |
| 12 | by Pedro Arellano? | 15:10:29 |
| 13 | A.  It certainly looks like a presentation | 15:10:33 |
| 14 | prepared by Pedro for our sales kickoff. | 15:10:35 |
| 15 | Q.  And do you remember, in fact, that this | 15:10:39 |
| 16 | presentation was given at the sales kickoff for | 15:10:41 |
| 17 | FY19 in July of 2018? | 15:10:44 |
| 18 | A.  I -- I don't specifically remember this | 15:10:48 |
| 19 | being given, but I have no reason to believe that | 15:10:55 |
| 20 | it wasn't. | 15:10:58 |
| 21 | Q.  And who is Mr. Arellano -- am I | 15:10:58 |
| 22 | pronouncing his name correctly? | 15:11:01 |
| 23 | A.  You got it perfectly.  Arellano. | 15:11:03 |
| 24 | Q.  Who is Mr. Arellano? | 15:11:04 |
| 25 | A.  Pedro Arellano, at the time, ran our | 15:11:06 |

Page 197

```
1   there, but if not, ask a follow-up.  There's a lot     15:18:05
2   in that.                                               15:18:10
3      Q.  And then the next sentence reads:               15:18:11
4         "These capabilities include access to            15:18:13
5      Dashboards, Designer, Report Bursting, and          15:18:14
6      Mobile."                                             15:18:18
7         And then the next sentence reads:                15:18:18
8         "Upgrading to Birst Professional Plus or         15:18:21
9      Birst Enterprise is required to access              15:18:23
10     Visualizer, to bring in additional data             15:18:26
11     sources, or to modify/extend the existing           15:18:28
12     data model."                                         15:18:33
13        I want to understand every one of those          15:18:34
14  components.                                             15:18:35
15     A.  Okay.  What --                                  15:18:41
16     Q.  I'm going to ask you -- there's no              15:18:42
17  question.  I was just reading that sentence.           15:18:44
18        The question, Mr. Staelin, is:  Is it true       15:18:46
19  that in fiscal year '19, a Birst for CloudSuite        15:18:49
20  user had to upgrade to Birst Professional Plus or      15:19:00
21  Birst Enterprise to access Visualizer?                 15:19:04
22        Is that true?                                     15:19:11
23     A.  Yes.  The preponderance of the users in         15:19:13
24  Birst for CloudSuite were read-only users, and         15:19:16
25  additional licenses would need to be purchased to      15:19:19
```

Page  203

```
1    make them more than that.                        15:19:21
2        Q.  Okay.  And I -- we talked about this     15:19:22
3    earlier -- were there additional licenses where  15:19:25
4    customers -- sorry, let me ask the question again. 15:19:34
5            In fiscal year '19, were customers who   15:19:36
6    bought a CloudSuite with Birst for CloudSuite able 15:19:38
7    to buy licenses to allow their end users to access 15:19:44
8    Visualizer?                                       15:19:53
9        A.  The -- again, the vast majority of end   15:19:56
10   users did not have access to these things.  They  15:19:59
11   were effectively read-only or dashboard-only light 15:20:02
12   users.                                            15:20:06
13       Q.  Okay.  And is it also true that in fiscal 15:20:07
14   year '19, in order for a -- sorry, let me ask that 15:20:19
15   question again.                                   15:20:24
16           Is it also true that in fiscal year FY19, 15:20:24
17   a CloudSuite user would have to upgrade to Birst  15:20:29
18   Professional Plus or Birst Enterprise to access   15:20:32
19   Pronto?                                           15:20:37
20       A.  Yeah, I -- the licenses that were -- the  15:20:43
21   end-user licenses that were kind of comprised and 15:20:47
22   packaged as part of Birst for CloudSuite were     15:20:51
23   predominantly read-only, and to get more rights,  15:20:53
24   you were going to have to purchase an additional  15:20:57
25   platform and additional user licenses.            15:21:00
```

Page 204

```
 1        Q.   And is the same -- it's also true that in      15:21:06

 2   fiscal year '19, a Birst for CloudSuite user would       15:21:09

 3   have to upgrade to Birst Professional Plus or Birst      15:21:14

 4   Enterprise to access Networked BI.   Correct?            15:21:17

 5        A.   To have -- and I just want to be precise       15:21:26

 6   because, again, they're -- they're getting the           15:21:28

 7   benefit of these features every day.   As data loads     15:21:31

 8   and things happen and the charts render, they're         15:21:34

 9   benefiting from them.                                    15:21:36

10            But to have the access rights to change         15:21:38

11   those things, they would need to purchase                15:21:39

12   additional licenses.                                     15:21:42

13        Q.   And the same is true with ADR; that in         15:21:45

14   order for a Birst for CloudSuite user to have            15:21:50

15   access rights to change the data model using ADR,        15:21:54

16   they would have to upgrade to Birst Professional         15:22:01

17   Plus or Birst Enterprise.   Correct?                     15:22:02

18        A.   It's not entirely correct.                     15:22:08

19        Q.   What's not correct about it?                   15:22:12

20        A.   For instance, the ADR was only in              15:22:16

21   Enterprise.   It did not exist in Professional.          15:22:19

22        Q.   Ah, okay.   So it's true that in fiscal        15:22:23

23   year '19 in order for a Birst for CloudSuite user        15:22:25

24   to have access rights to change the model -- the         15:22:28

25   data model using ADR, they'd have to upgrade to          15:22:30
```

Page 205

```
 1    Birst Enterprise.  Correct?                      15:22:33

 2          MR. LIPMAN:  Object to form.  Vague as to   15:22:35

 3    "upgrade to Birst Enterprise."                    15:22:35

 4    BY MR. DOOLEY:                                    15:22:40

 5       Q.  You can answer.                            15:22:40

 6       A.  So for an end user to have the rights to   15:22:41

 7    access the very sophisticated ADR data models that 15:22:48

 8    used Networked BI -- I mean, these were not simple 15:22:53

 9    things -- we were basically encouraging the       15:22:58

10    customer to upgrade their overall license to      15:23:03

11    Enterprise and to upgrade the rights of a few      15:23:06

12    people to get to that analyst level.              15:23:09

13          Again, third-party consultants and Infor    15:23:12

14    had the right to do such things without such an   15:23:16

15    upgrade.                                          15:23:19

16       Q.  The sentence continues:                    15:23:23

17          "Upgrading the Birst Professional Plus or   15:23:24

18          Birst Enterprise is required to access      15:23:26

19          Visualizer" --                              15:23:29

20          And then it says:                           15:23:29

21          "-- to bring in additional data sources."   15:23:30

22          What does that mean?                        15:23:33

23       A.  Because the Birst for CloudSuite is a      15:23:37

24    combination of Infor content with Birst analytic  15:23:43

25    components and you get a whole host of things      15:23:47
```

                                               Page 206

```
 1   prebuilt and predelivered, if you want to add data      15:23:52

 2   that's not part of that solution, new data from         15:23:56

 3   somewhere else, you would need to have someone who      15:23:59

 4   has the ability to do data-modeling to accomplish       15:24:02

 5   that if not a partner or Infor doing it on your         15:24:05

 6   behalf if you wanted to do it.                          15:24:09

 7            So bringing in any additional data sources     15:24:11

 8   would require that access to data-modeling.             15:24:14

 9       Q.  And when you say it would "require access       15:24:21

10   to data-modeling," that -- what you mean is you         15:24:23

11   would have to buy an additional -- would you have       15:24:25

12   to upgrade to either Birst Professional or Birst        15:24:31

13   Enterprise?                                             15:24:36

14            MR. LIPMAN:  Object to form.  Vague as to      15:24:37

15   "upgrade to."                                           15:24:37

16            MR. DOOLEY:  I'm just reading the language     15:24:41

17   in the document.                                        15:24:42

18       Q.  What it says is:                                15:24:44

19            "Upgrading to Birst Professional Plus or       15:24:45

20        Birst Enterprise is required to bring in           15:24:48

21        additional data sources."                          15:24:50

22            Is that accurate?                              15:24:53

23       A.  By and large.  The main thrust is that to       15:24:54

24   be able to do data-modeling, you need someone who       15:24:57

25   has the power and the rights to do data-modeling.       15:25:01
```

Page 207

| | | |
|---|---|---|
| 1 | Could be via Pronto in Birst Professional or, in | 15:25:05 |
| 2 | general, through ADR in Birst Enterprise, although | 15:25:10 |
| 3 | Pronto was available in both, but ... | 15:25:13 |
| 4 | And again -- | 15:25:42 |
| 5 | Q.  If a customer -- | 15:25:43 |
| 6 | A.  Hold -- again, not entirely accurate | 15:25:43 |
| 7 | because third-party partners and Infor consultants | 15:25:45 |
| 8 | could make those changes on your behalf without | 15:25:48 |
| 9 | such a thing. | 15:25:50 |
| 10 | Q.  When you talk about third-party partners | 15:25:59 |
| 11 | and Infor consultants, that's -- those are services | 15:26:01 |
| 12 | that the customer would have to pay for, of course. | 15:26:05 |
| 13 | Right? | 15:26:07 |
| 14 | A.  Yes.  As part of their implementation, the | 15:26:08 |
| 15 | vast preponderance of customers buy services; but, | 15:26:11 |
| 16 | yes, that services team for which you are paying | 15:26:13 |
| 17 | would have to invest the time to do it. | 15:26:16 |
| 18 | Q.  Okay.  And a customer who bought Birst | 15:26:18 |
| 19 | Enterprise, the Birst Enterprise platform in FY19, | 15:26:22 |
| 20 | would not have to upgrade or buy any additional | 15:26:25 |
| 21 | products to access additional data sources in the | 15:26:36 |
| 22 | way that a Birst for CloudSuite customer would.  Is | 15:26:43 |
| 23 | that correct? | 15:26:46 |
| 24 | MR. LIPMAN:  Object to form. | 15:26:48 |
| 25 | THE WITNESS:  Sort of.  I mean, it depends | 15:26:52 |

Page 208

| | | |
|---|---|---|
| 1 | In FY19 -- I'm sorry, I'm just thinking | 15:29:37 |
| 2 | about the question. | 15:29:48 |
| 3 | A.  Okay. | 15:29:53 |
| 4 | Q.  You said "intention."  But, in fact, in | 15:30:00 |
| 5 | FY19, when a customer bought CloudSuite with Birst | 15:30:02 |
| 6 | for CloudSuite, the Birst Analytic capabilities | 15:30:05 |
| 7 | were only being applied to the Infor content. | 15:30:09 |
| 8 | Correct? | 15:30:12 |
| 9 | MR. LIPMAN:  Object to form. | 15:30:15 |
| 10 | THE WITNESS:  Yeah, my only quibble is | 15:30:15 |
| 11 | with the word "only" because I'm not sure what | 15:30:17 |
| 12 | healthcare was -- I'm just going to put the marker | 15:30:20 |
| 13 | in healthcare. | 15:30:23 |
| 14 | But to the best of my understanding | 15:30:24 |
| 15 | outside of the clinical data for healthcare, my | 15:30:26 |
| 16 | understanding is that yes, that is, by and large, | 15:30:28 |
| 17 | correct. | 15:30:30 |
| 18 | BY MR. DOOLEY: | 15:30:31 |
| 19 | Q.  Okay.  So just so we have a clean question | 15:30:31 |
| 20 | and answer, with the possible exception of the | 15:30:35 |
| 21 | healthcare CloudSuite, in FY19, when a customer | 15:30:36 |
| 22 | bought a CloudSuite with Birst for CloudSuite, the | 15:30:41 |
| 23 | Birst Analytic capabilities were only being applied | 15:30:45 |
| 24 | to Infor content.  Correct? | 15:30:48 |
| 25 | A.  Yes.  That is my best recollection, yes. | 15:30:51 |

Page 211

```
 1          Q.  And when a customer bought Birst        15:31:02

 2   Enterprise in FY19, was the customer limited to    15:31:08

 3   applying the Birst analytic capabilities to Infor  15:31:20

 4   content?                                           15:31:25

 5          MR. LIPMAN:  Object to form.  Vague as to   15:31:26

 6   the term "Enterprise."                             15:31:27

 7          THE WITNESS:  Again, Birst for CloudSuite   15:31:31

 8   is the combination of Infor content with Birst     15:31:36

 9   Enterprise and other capabilities.  So it kind of  15:31:40

10   is naturally defined by that content and the bounds 15:31:44

11   of that content.                                   15:31:49

12          The Birst Enterprise solution that we sold  15:31:50

13   broadly on the marketplace, customers didn't have a 15:31:52

14   prebuilt anything.  They didn't have any data in   15:31:55

15   it, and they would need the ability to pull in     15:31:57

16   whatever data they wanted to build an analytic     15:31:59

17   solution.                                          15:32:03

18          They didn't get the benefit of that         15:32:03

19   combination, so they had to do their own work to   15:32:05

20   build whatever the solution was.                   15:32:07

21          Q.  Okay.  So in -- a customer -- a customer 15:32:11

22   who bought Birst for Enterprise in FY19 had the    15:32:17

23   ability to pull in whatever data they wanted to    15:32:24

24   build an analytic solution and apply the Birst     15:32:27

25   Analytic capabilities to.                          15:32:33
```

                                                    Page 212

```
 1              Is that accurate?                       15:32:35

 2              MR. LIPMAN:  Object -- hold on.  Object to   15:32:36

 3       form.  Again, vague as to the term "Enterprise."    15:32:38

 4              THE WITNESS:  Yeah, I --                 15:32:41

 5       BY MR. DOOLEY:                                  15:32:42

 6          Q.  I thought I said "Birst Enterprise," but  15:32:42

 7       if I didn't, that's what I meant?               15:32:45

 8              MR. LIPMAN:  Right.  But --              15:32:47

 9              (The reporter requested that people not  15:32:50

10              speak at once.)                          15:32:50

11              MR. LIPMAN:  Hold on.  My objection      15:32:52

12       stands.  It's vague.  It's unclear what you're  15:32:54

13       referring to.                                   15:32:56

14              THE WITNESS:  To the extent I get what   15:32:59

15       you're asking, a customer who bought Birst      15:33:01

16       Enterprise and the end-user licenses that gave them   15:33:06

17       the access rights to do the ADR would have the  15:33:08

18       right and ability to analyze other data, but they   15:33:13

19       also had the obligation to because they didn't have   15:33:17

20       anything prebuilt.                              15:33:19

21       BY MR. DOOLEY:                                  15:33:33

22          Q.  Is the same true of Birst Professional;  15:33:33

23       that a customer who bought Birst Professional and   15:33:36

24       the appropriate end-user licenses would have the   15:33:40

25       rights to pull in whatever data they wanted to?   15:33:46
```

                                              Page 213

```
 1        A.  Broadly speaking, if you bought Birst      15:33:52

 2   Professional -- and again, maybe it's the business   15:33:54

 3   user instead of the admin in this case -- but        15:33:58

 4   whatever the right license was, they would have the  15:34:00

 5   right and power to pull in any data they wanted,      15:34:02

 6   but they would also have the obligation because it    15:34:05

 7   would be empty when they got there.                  15:34:07

 8        Q.  Okay.  Why don't you flip, if you could --  15:34:09

 9   if you could flip back to Slide 12 in the same --     15:34:34

10   in the same exhibit.                                 15:34:37

11        A.  I can't read the page numbers.  What's the  15:34:43

12   Bates number?                                        15:34:46

13        Q.  I'll just tell you what it says.  It says:   15:34:47

14           "FAQs.  What are the differences between      15:34:49

15        Birst user licenses?"                           15:34:51

16        A.  Yep.                                         15:34:57

17        Q.  Okay.                                        15:34:58

18           MR. LIPMAN:  What is the Bates reference      15:35:00

19   here?                                                15:35:01

20           THE WITNESS:  It's -32.  -732.               15:35:02

21   BY MR. DOOLEY:                                       15:35:05

22        Q.  First of all, Mr. Staelin, the Birst user   15:35:06

23   license -- the top of this slide says:               15:35:08

24           "What are the differences between Birst      15:35:15

25        user licenses?"                                 15:35:16
```

Page 214

| | | |
|---|---|---|
| 1 | don't have; they are. | 15:46:10 |
| 2 | BY MR. DOOLEY: | 15:46:12 |
| 3 | Q.  Birst for CloudSuite and Birst Enterprise | 15:46:14 |
| 4 | are different solutions. | 15:46:15 |
| 5 | MR. LIPMAN:  Object to form.  Vague as to | 15:46:19 |
| 6 | the term "Enterprise." | 15:46:20 |
| 7 | THE WITNESS:  Again, Birst for CloudSuite | 15:46:22 |
| 8 | is the combination of, I would argue, Birst | 15:46:24 |
| 9 | Enterprise and the appropriate seat licenses with | 15:46:28 |
| 10 | Infor content, and only in the context of that | 15:46:32 |
| 11 | combination does that make any sense whatsoever. | 15:46:35 |
| 12 | Birst Enterprise purchased separately | 15:46:38 |
| 13 | doesn't have any of that context.  It doesn't have | 15:46:41 |
| 14 | the content, doesn't have the value of that | 15:46:43 |
| 15 | content, and it's used for different things.  So | 15:46:46 |
| 16 | they are different, with different contexts. | 15:46:49 |
| 17 | MR. DOOLEY:  Okay.  Let me mark the next | 15:47:00 |
| 18 | exhibit. | 15:47:01 |
| 19 | MR. LIPMAN:  Counsel, can we just take a | 15:47:02 |
| 20 | five-minute restroom break? | 15:47:04 |
| 21 | MR. DOOLEY:  Sure.  Yep.  Come back at | 15:47:06 |
| 22 | 3:52? | 15:47:10 |
| 23 | MR. LIPMAN:  Sounds good.  Thank you. | 15:47:12 |
| 24 | THE VIDEO OPERATOR:  All right.  And going | 15:47:14 |
| 25 | off the record at 3:47 P.M. | 15:47:14 |

Page 222

```
 1        Q.  And what's your understanding of why not?        16:10:01

 2        A.  My -- my understanding of why not is that        16:10:05

 3   the way revenue flows through Finance required            16:10:10

 4   certain items to be there that weren't there, so          16:10:17

 5   the revenue, they just never flowed it over.              16:10:19

 6        Q.  What were the items that you understood           16:10:23

 7   needed to be there for the revenue to flow?               16:10:24

 8        A.  One of the ways that Infor's product             16:10:29

 9   managers were able to stymie the flow of revenue          16:10:35

10   from their products to ours was by keeping Birst in       16:10:38

11   limited availability or -- and/or not providing a         16:10:42

12   SKU.                                                      16:10:47

13        Q.  Let's look at the next exhibit -- I want         16:11:03

14   to come back to that topic -- Exhibit 70.                 16:11:06

15        (Deposition Exhibit 70 was marked for                16:11:12

16        identification.)                                     16:11:14

17        MR. DOOLEY:  For the record, email from              16:11:23

18   Paul Staelin into a number of people including John       16:11:25

19   Duda, Erica Bellavia, February 27, 2019, document         16:11:28

20   ending in Bates number 9068.                              16:11:33

21        Q.  Again, Mr. Staelin, I'm only going to ask        16:11:36

22   you about the top email, but you're welcome to take       16:11:38

23   a quick look at the rest of it if you'd like.             16:11:40

24        A.  Sure.                                            16:11:43

25        (Examining document.)                                16:12:24
```

Page 231

| | | |
|---|---|---|
| 1 | Do you know what the reference to "direct" | 16:26:36 |
| 2 | is in -- on this slide? | 16:26:38 |
| 3 | A.  I believe "direct" is essentially -- means | 16:26:43 |
| 4 | non-OEM. | 16:26:50 |
| 5 | Q.  Okay.  And OEM is when you sell a product | 16:26:54 |
| 6 | to a third party and they embed it in their | 16:26:56 |
| 7 | solution, something like that? | 16:26:59 |
| 8 | A.  Yes.  OEM is the embedded. | 16:27:01 |
| 9 | Q.  Okay.  So "direct" is -- you're selling | 16:27:04 |
| 10 | the Birst solution or offering directly to the | 16:27:08 |
| 11 | customer; not through a third-party OEM. | 16:27:11 |
| 12 | Fair to say? | 16:27:16 |
| 13 | A.  Correct. | 16:27:17 |
| 14 | Q.  Okay.  And is it true that prior to the | 16:27:18 |
| 15 | acquisition of Birst by Infor, Birst had two direct | 16:27:23 |
| 16 | offerings:  A Professional version and an | 16:27:34 |
| 17 | Enterprise version? | 16:27:37 |
| 18 | A.  Yes. | 16:27:42 |
| 19 | MR. LIPMAN:  Object to form. | 16:27:43 |
| 20 | THE WITNESS:  Yes.  The primary offerings | 16:27:45 |
| 21 | were Birst Professional and Birst Enterprise. | 16:27:47 |
| 22 | BY MR. DOOLEY: | 16:27:51 |
| 23 | Q.  Okay.  And there were no other primary | 16:27:51 |
| 24 | direct offerings in 2017; it was those two. | 16:27:53 |
| 25 | Correct? | 16:27:57 |

Page 238

```
 1        A.   Yes.  I believe that's correct.           16:28:03

 2        Q.   Okay.  Under the -- there's two boxes that  16:28:04

 3   say "Enterprise."                                   16:28:15

 4            One says "Platform and User pricing"; the   16:28:18

 5   other says "Departmental pricing."                  16:28:21

 6            What was the difference between platform    16:28:23

 7   and user pricing versus departmental pricing?       16:28:24

 8        A.   At this point, I was trying to deliver the  16:28:30

 9   best customer experience I could.  I was not that   16:28:33

10   involved in the packaging and pricing conversations  16:28:36

11   at this time.                                       16:28:39

12        Q.   Okay.  What's your best understanding of   16:28:40

13   the difference between platform and user pricing    16:28:43

14   versus departmental pricing?                        16:28:46

15            MR. LIPMAN:  Object to the form of the      16:28:52

16   question.                                           16:28:52

17            Don't speculate, Mr. Staelin.  If you know  16:28:53

18   the answer, you can answer it.                      16:28:54

19            THE WITNESS:  I don't really know the fine  16:28:56

20   points of this at all, no.                          16:28:57

21   BY MR. DOOLEY:                                      16:28:58

22        Q.   Okay.  Mr. Staelin, is it fair to say that  16:28:59

23   you were the number two person at Birst in 2017?    16:29:00

24        A.   It -- I wish I had been the number two     16:29:06

25   person at Birst; but no, I was not the number two   16:29:10
```

Veritext Legal Solutions
866 299-5127

```
 1    and interpretation -- I'm not an attorney, nor am I        17:55:09

 2    an expert forensic accountant.                             17:55:12

 3          However, that said, it is my belief that            17:55:15

 4    the right way to price for the purposes of the             17:55:19

 5    earnout letter, the Birst for CloudSuite part of           17:55:24

 6    the CloudSuite broadly defined, is for those list          17:55:29

 7    prices of the Birst components that were primarily         17:55:34

 8    used to create that combined offering -- combined          17:55:37

 9    solution, not offering, combined solution.  And            17:55:42

10    that is the Birst Enterprise platform, and I could         17:55:45

11    tell you exactly why I believe that is the                 17:55:49

12    absolutely correct platform to use, and I would            17:55:52

13    also state that the correct end-user license to be         17:55:55

14    combined is the read-only lite user or                     17:56:00

15    dashboard-only user.                                       17:56:04

16    BY MR. DOOLEY:                                             17:56:08

17       Q.  Okay.  And so tell me:  If you were trying          17:56:09

18    to calculate the bookings value of a sale of a             17:56:11

19    CloudSuite in FY19, how would you go about                 17:56:19

20    calculating the bookings value for the sale of a           17:56:25

21    CloudSuite that included Birst for CloudSuite in           17:56:30

22    2019?                                                      17:56:32

23       A.  Okay.  So the way that I would go about             17:56:33

24    this is the customer, who is provided the Birst            17:56:35

25    Enterprise platform and the read-only users as part        17:56:45
```

Page 279

| | | |
|---|---|---|
| 1 | of the CloudSuite offering, would have as a | 17:56:48 |
| 2 | starting list price -- everyone okay? -- would have | 17:56:55 |
| 3 | as the starting list price the appropriate Birst | 17:56:58 |
| 4 | Enterprise platform fee, which is $100,000 for the | 17:57:01 |
| 5 | platform, has ADR.  It also needs Network BI | 17:57:08 |
| 6 | because Network BI was absolutely used in the | 17:57:14 |
| 7 | creation and the delivery of this solution. | 17:57:18 |
| 8 | So it would be plus $50,000, so $150,000 | 17:57:19 |
| 9 | for the platform, plus the number of end-user | 17:57:22 |
| 10 | licenses, times the price for the read-only lite | 17:57:28 |
| 11 | user, which I believe is $200 per person per year. | 17:57:31 |
| 12 | Once you have the combined list price -- | 17:57:37 |
| 13 | this is where it gets tricky -- you then have to | 17:57:39 |
| 14 | look at the discount that was applied to that sale. | 17:57:42 |
| 15 | So if Infor discounted the deal 50 percent | 17:57:44 |
| 16 | as part of the sales process, you would take that | 17:57:48 |
| 17 | resulting Birst list price times 50 percent, and | 17:57:51 |
| 18 | that's how you would get the booking as defined in | 17:57:55 |
| 19 | the offer letter. | 17:57:58 |
| 20 | Q.  Okay.  And why do you believe the correct | 17:58:07 |
| 21 | starting -- do you -- is -- do you believe that | 17:58:08 |
| 22 | that's the -- that the formula you just described, | 17:58:11 |
| 23 | the Birst Enterprise platform fee plus the | 17:58:16 |
| 24 | Network BI product fee -- is that what the $50,000 | 17:58:21 |
| 25 | is? | 17:58:26 |

Page 280

| | | |
|---|---|---|
| 1 | A.   Yes.   The -- my -- and I have to look, but | 17:58:27 |
| 2 | I'm pretty sure Network BI was a $50,000 add-on to | 17:58:29 |
| 3 | Birst Enterprise. | 17:58:34 |
| 4 | Q.   Okay.   So your belief is that for purposes | 17:58:35 |
| 5 | of the earnout provision in your offer letter, the | 17:58:37 |
| 6 | list price of Birst for CloudSuite, as if it had | 17:58:41 |
| 7 | been sold individually, is the platform fee for | 17:58:45 |
| 8 | Birst Enterprise plus the $50,000 add-on for | 17:58:51 |
| 9 | Network BI plus the read-only lite user license fee | 17:58:55 |
| 10 | times the number of users for which the CloudSuite | 17:59:06 |
| 11 | was purchased.   Is that right? | 17:59:10 |
| 12 | A.   Broadly speaking, yes.   Times the number | 17:59:15 |
| 13 | of people entitled to use that CloudSuite, yeah. | 17:59:17 |
| 14 | Q.   Okay.   And why do you believe that the -- | 17:59:20 |
| 15 | the Birst Enterprise platform fee is the | 17:59:23 |
| 16 | appropriate starting point for the -- the list | 17:59:26 |
| 17 | price of Birst for CloudSuite as if it had been | 17:59:30 |
| 18 | sold individually? | 17:59:33 |
| 19 | MR. LIPMAN:   Object to form. | 17:59:35 |
| 20 | THE WITNESS:   The primary reason is that | 17:59:39 |
| 21 | the only product on the planet that contained | 17:59:40 |
| 22 | automated data refinement, ADR, which was our | 17:59:44 |
| 23 | secret sauce by far, our primary secret sauce -- | 17:59:48 |
| 24 | that and Network BI being the other -- but to get | 17:59:53 |
| 25 | ADR and use it, you had to have a license to | 17:59:57 |

Page 281

| | | |
|---|---|---|
| 1 | have any bookings for Q1 or Q2 of FY19.  Correct? | 18:50:26 |
| 2 | A.  I -- you have to forgive me.  It's late in | 18:50:36 |
| 3 | the day, and that was a long question. | 18:50:40 |
| 4 | Q.  I'm just focused on the middle of the page | 18:50:42 |
| 5 | where it says "Birst for CloudSuites," and there's | 18:50:44 |
| 6 | Q1 of '19 and Q2 of '19, and there's no bookings | 18:50:47 |
| 7 | shown. | 18:50:54 |
| 8 | A.  Yes.  My understanding and recollection is | 18:50:57 |
| 9 | that the Birst sales reps were not being allocated, | 18:51:00 |
| 10 | so the BU bookings were not being -- the sales | 18:51:05 |
| 11 | bookings for the business unit were not being | 18:51:09 |
| 12 | allocated for those two quarters.  That was my | 18:51:12 |
| 13 | understanding. | 18:51:15 |
| 14 | Q.  Okay.  So for purposes -- this calculation | 18:51:15 |
| 15 | in Exhibit 75 is for purposes of your earnout. | 18:51:18 |
| 16 | Correct? | 18:51:22 |
| 17 | A.  Yeah.  I'm conflating two consents here, | 18:51:25 |
| 18 | but broadly speaking, I'm trying to, again, take | 18:51:28 |
| 19 | these early calculations of the earnout and figure | 18:51:32 |
| 20 | out what's going on, yes. | 18:51:34 |
| 21 | Q.  Okay.  So the -- the bookings numbers that | 18:51:36 |
| 22 | are in here are your attempt to calculate bookings | 18:51:39 |
| 23 | based on the definition of "bookings" in your offer | 18:51:43 |
| 24 | letter.  Correct? | 18:51:45 |
| 25 | A.  That is not correct. | 18:51:46 |

Page 308

| | | |
|---|---|---|
| 1 | And I think you can find in some | 18:51:50 |
| 2 | subsequent emails where I actually went back and | 18:51:52 |
| 3 | read the language and started trying to follow the | 18:51:55 |
| 4 | language in the earnout provision. | 18:51:57 |
| 5 | At this point, I had conflated BU bookings | 18:52:00 |
| 6 | with the earnout, and that's not accurate.  It's | 18:52:04 |
| 7 | not what's stated in the letter. | 18:52:06 |
| 8 | Q.  Okay.  So, Mr. Staelin, your testimony is, | 18:52:08 |
| 9 | notwithstanding the definition of "bookings" in | 18:52:11 |
| 10 | your offer letter, and notwithstanding that your | 18:52:14 |
| 11 | earnout is -- was important to you, you simply | 18:52:17 |
| 12 | plugged in business unit bookings for purposes of | 18:52:22 |
| 13 | calculating your earnout when drafting this letter | 18:52:26 |
| 14 | on June 3rd, 2019 -- 2019? | 18:52:32 |
| 15 | MR. LIPMAN:  Object to form. | 18:52:36 |
| 16 | Argumentative.  Mischaracterizes his testimony. | 18:52:37 |
| 17 | Go ahead. | 18:52:39 |
| 18 | THE WITNESS:  Yeah.  I mean, this was, | 18:52:41 |
| 19 | again, a very early attempt, and I hadn't yet kind | 18:52:43 |
| 20 | of refreshed my memory on the language of that | 18:52:46 |
| 21 | clause. | 18:52:48 |
| 22 | So I believe -- and, you know, what I was | 18:52:48 |
| 23 | doing here was conflating the BU bookings with the | 18:52:52 |
| 24 | earnout, which is incorrect. | 18:52:58 |
| 25 | // | |

Page 309

```
 1   BY MR. DOOLEY:                                    18:52:59

 2      Q.   Okay.  And how did you calculate the Birst   18:53:00

 3   for CloudSuite bookings numbers that appear in    18:53:03

 4   Exhibit 75?                                        18:53:06

 5           Did you use 10 percent of the CloudSuite   18:53:07

 6   ACV?                                               18:53:10

 7      A.   I -- I believe for the purposes of this    18:53:12

 8   exercise, I was using either the sales and -- there  18:53:14

 9   is slight differences between all of these terms,  18:53:19

10   so it gets a little confusing, but I believe I was  18:53:22

11   using the sales bookings, which may not actually be  18:53:25

12   the BU bookings.                                   18:53:28

13           It's possible I was using the BU bookings   18:53:30

14   for it, but I'm not entirely sure.  And, candidly,  18:53:33

15   it was a long time ago.  I'm not entirely clear    18:53:35

16   what pieces were which here.                       18:53:37

17      Q.   Well, in the prior exhibit that we just    18:53:41

18   looked at, Exhibit 50, you were explicit that you  18:53:43

19   were using 10 percent of the sale of the           18:53:46

20   CloudSuite.                                        18:53:50

21           In Exhibit 75 in your subsequent email on   18:53:52

22   June 3rd, did you calculate bookings for purposes  18:53:55

23   of Exhibit 75 using 10 percent of the -- either --  18:54:00

24   of the ACV of the CloudSuite sale?                 18:54:03

25      A.   I -- I believe I was using -- for some     18:54:07
```

Page 310

| | | |
|---|---|---|
| 1 | part, the sales credit, which used 10 percent, and | 18:54:13 |
| 2 | for some part, I was using the BU bookings, which | 18:54:19 |
| 3 | was more focused on the revenue allocation, the | 18:54:23 |
| 4 | internal revenue allocation, which also happened to | 18:54:26 |
| 5 | be 10 percent, erroneously in both cases, but that | 18:54:30 |
| 6 | was my attempt at this, yes. | 18:54:33 |
| 7 | Q.   Okay.  And your calculation of bookings | 18:54:36 |
| 8 | for purposes of your earnout in Exhibit 75 includes | 18:54:40 |
| 9 | no bookings for Q1 or Q2 of FY19.  Correct? | 18:54:44 |
| 10 | MR. LIPMAN:  Object to the form of the | 18:54:52 |
| 11 | question.  Asked and answered.  The document speaks | 18:54:53 |
| 12 | for itself. | 18:54:54 |
| 13 | Go ahead, Mr. Staelin. | 18:54:55 |
| 14 | THE WITNESS:  My recollection -- and | 18:54:58 |
| 15 | again, you know, at this point, it's a couple | 18:55:01 |
| 16 | years -- but that the first part of this is the | 18:55:03 |
| 17 | selling effort.  So I was using the sales credit | 18:55:07 |
| 18 | that our sales reps had gotten.  So, again, which | 18:55:11 |
| 19 | was that kind of a running gun battle over being | 18:55:14 |
| 20 | paid for the 10 percent or not, that continued well | 18:55:17 |
| 21 | after the year closed, but using those numbers. | 18:55:20 |
| 22 | And then for the BU bookings and the flow | 18:55:23 |
| 23 | of the revenue, I was anchoring on the provisioning | 18:55:26 |
| 24 | date, which is not the booking date, and it's not | 18:55:30 |
| 25 | the right way to do it, but I was saying, "Hey, you | 18:55:32 |

Page 311

| | | |
|---|---|---|
| 1 | know, in Q4, we provisioned these," which, again, | 18:55:35 |
| 2 | not a booking, but that was my first stab at this, | 18:55:39 |
| 3 | yes. | 18:55:44 |
| 4 | BY MR. DOOLEY: | 18:55:44 |
| 5 | Q.   Okay.  And you testified earlier that you | 18:55:45 |
| 6 | believed you were entitled for bookings -- that as | 18:55:47 |
| 7 | early as July of 2018, you believed you were | 18:55:51 |
| 8 | entitled to bookings credit for sales of | 18:55:54 |
| 9 | CloudSuites beginning in July of 2018.  Correct? | 18:55:57 |
| 10 | A.   I did testify earlier that once Charles | 18:56:03 |
| 11 | announced that Analytic content would be part of | 18:56:06 |
| 12 | every CloudSuite and every customer would expect | 18:56:10 |
| 13 | it, customers bought with that expectation; and | 18:56:13 |
| 14 | therefore, I believed the bookings credit should be | 18:56:15 |
| 15 | allocated, yes. | 18:56:17 |
| 16 | Q.   And CloudSuites were sold in Q1 and Q2 of | 18:56:18 |
| 17 | FY19.  Correct? | 18:56:22 |
| 18 | A.   Yes.  The CloudSuites were sold | 18:56:23 |
| 19 | continuously. | 18:56:25 |
| 20 | Q.   So why didn't you include any bookings | 18:56:26 |
| 21 | credit in Exhibit 75 if you -- if it was your view, | 18:56:29 |
| 22 | going back to 2018, that you were entitled to | 18:56:32 |
| 23 | bookings credit on all sales of CloudSuites? | 18:56:36 |
| 24 | A.   So there are a lot of -- a lot of flaws in | 18:56:43 |
| 25 | the logic applied in this particular email. | 18:56:46 |

Page 312

```
 1          Very preliminary cut, but I conflated BU        18:56:50
 2   bookings, sales credit, and earnout, all of which      18:56:54
 3   are different things.                                  18:56:57
 4          And I conflated provisioning with booking,      18:56:58
 5   which is also a different thing.                       18:57:02
 6          And I just, candidly, was confused on a         18:57:04
 7   number of fronts when I wrote this.                    18:57:07
 8      Q.   Okay.  Let's look at another exhibit.  I'm     18:57:09
 9   hoping this will load properly.                        18:57:15
10          MR. LIPMAN:  Could we just get a brief          18:57:20
11   time check while counsel is loading that exhibit?      18:57:22
12          Noah, if you're there, can you do that?         18:57:31
13          THE VIDEO OPERATOR:  I'm here.  I'm just        18:57:35
14   adding up the last minutes here.                       18:57:36
15          MR. LIPMAN:  Thanks.  I appreciate it.          18:57:39
16          THE WITNESS:  What number are we looking        18:57:47
17   for, Brook?                                            18:57:49
18          MR. DOOLEY:  I haven't loaded it.               18:57:50
19          THE VIDEO OPERATOR:  6 hours and                18:57:53
20   40 minutes and counting.                               18:57:54
21          MR. LIPMAN:  Thank you.                         18:57:56
22          MR. DOOLEY:  I'm sorry, let me go off the       18:58:41
23   record.  This technology is not working.  I'm          18:58:43
24   having a problem with the Exhibit Share.               18:58:45
25          THE VIDEO OPERATOR:  We're going off the        18:58:47
```

Page 313

| | | |
|---|---|---|
| 1 | (Recess from 7:08 P.M. to 7:20 P.M.) | 19:08:12 |
| 2 | THE VIDEO OPERATOR:  And back on the | 19:20:01 |
| 3 | record at 7:20 P.M. | 19:20:01 |
| 4 | BY MR. DOOLEY: | 19:20:03 |
| 5 | Q.  Mr. Staelin, do you recall that you met | 19:20:07 |
| 6 | with Mr. Samuelson -- was it on a Sunday in | 19:20:12 |
| 7 | October 2019 when you were informed that you were | 19:20:17 |
| 8 | being let go from Infor? | 19:20:20 |
| 9 | A.  Yes.  The Sunday -- I'm going to guess the | 19:20:22 |
| 10 | 5th, but in early October, that Sunday, yes. | 19:20:25 |
| 11 | Q.  Okay.  And did you know before that | 19:20:29 |
| 12 | meeting that you were going to be terminated by | 19:20:30 |
| 13 | Mr. Samuelson? | 19:20:32 |
| 14 | A.  I had very strong suspicions that that | 19:20:35 |
| 15 | would be the content of that conversation, yes. | 19:20:39 |
| 16 | Q.  Okay.  And how far in advance of that | 19:20:40 |
| 17 | meeting did you have "strong suspicions" that you | 19:20:43 |
| 18 | were going to be terminated by Mr. Staelin? | 19:20:45 |
| 19 | A.  By Mr -- | 19:20:50 |
| 20 | Q.  -- Mr. Samuelson. | 19:20:51 |
| 21 | A.  A couple of days.  Two, three, four -- a | 19:20:55 |
| 22 | handful of days. | 19:20:57 |
| 23 | Q.  Okay.  If you could open up Exhibit 55, | 19:20:58 |
| 24 | please, it's open, and scroll to page 3. | 19:21:01 |
| 25 | (Previously marked Exhibit 55 was | 19:21:08 |

Page 320

| | | |
|---|---|---|
| 1 | Q.   Is that Mr. Spickelmier? | 19:22:17 |
| 2 | A.   Yes. | 19:22:20 |
| 3 | Q.   And did you ask Mr. Spickelmier whether | 19:22:20 |
| 4 | you should just wipe or delete all the files on | 19:22:25 |
| 5 | your laptop? | 19:22:27 |
| 6 | A.   I asked him -- actually, I don't recall | 19:22:28 |
| 7 | exactly what I asked him, but we had a conversation | 19:22:30 |
| 8 | where I was going through, you know, file by file | 19:22:32 |
| 9 | by file, deleting things. | 19:22:35 |
| 10 | I didn't think I was going to be able to | 19:22:38 |
| 11 | get through everything.  So I asked him, A, you | 19:22:40 |
| 12 | know, what benefit, if any, is there fundamentally | 19:22:45 |
| 13 | from deletion; and then what -- kind of what's the | 19:22:49 |
| 14 | policy and how would I most cleanly separate kind | 19:22:52 |
| 15 | of my personal from the work stuff. | 19:22:55 |
| 16 | And that was kind of the genesis of the | 19:22:56 |
| 17 | conversation. | 19:22:58 |
| 18 | Q.   Okay.  Mr. Staelin, back to Exhibit 55, at | 19:22:59 |
| 19 | the top, there's a text message from you to | 19:23:01 |
| 20 | Mr. Peters that reads: | 19:23:06 |
| 21 | "I guess I send the $300 million number | 19:23:08 |
| 22 | to you so they find it in discovery and not | 19:23:11 |
| 23 | ahead of the layoffs." | 19:23:14 |
| 24 | Do you see that? | 19:23:16 |
| 25 | A.   I do see that.  It looks likes row 2 on | 19:23:17 |

Veritext Legal Solutions
866 299-5127

```
 1    page 3.                                         19:23:20
 2        Q.  Exactly.  And were you advised by -- well,   19:23:23
 3    let me -- let me ask you:  What did you mean by   19:23:25
 4    this text message, "I guess I send the $300 million   19:23:30
 5    number so they find it in discovery"?           19:23:34
 6        A.  Well, you know I, I -- I'm not an attorney   19:23:37
 7    in any way, shape, or form or familiar with this   19:23:40
 8    process.                                         19:23:43
 9        But at this point, we suspected we were     19:23:43
10    potentially heading for a fight and that I wanted   19:23:46
11    to share kind of the best and most recent thinking,   19:23:50
12    which is still not final.  It's all part and parcel   19:23:53
13    of a growing process here.  I wanted to put it in a   19:23:57
14    place where a rational mind could find it.       19:24:02
15        And, candidly, I was concerned that if I     19:24:04
16    shared it with the people who had heard the earlier   19:24:07
17    number from me and clearly decided to whack me and   19:24:10
18    have me leave the business, that if I shared a   19:24:15
19    bigger number, they might actually make more of the   19:24:18
20    people from Birst disappear as part of the layoff   19:24:21
21    and I would be causing the departure of kind of   19:24:23
22    friends and colleagues.                          19:24:27
23        So I thought I would put it in a place      19:24:29
24    where if there was a fight, candidly, you would   19:24:31
25    find it and see what our thinking at the time was.   19:24:35
```

Page 323

| | | |
|---|---|---|
| 1 | Q.  And you knew what the term "discovery" | 19:24:39 |
| 2 | referred to when you sent this email -- or this | 19:24:43 |
| 3 | text? | 19:24:50 |
| 4 | Let me ask another question:  Mr. Staelin, | 19:24:51 |
| 5 | what did "discovery" mean to you when you sent this | 19:24:53 |
| 6 | text? | 19:24:55 |
| 7 | A.  I had a vague idea -- believe me, I've | 19:24:55 |
| 8 | learned a lot over the last couple of years -- but | 19:24:58 |
| 9 | I had a vague idea that if we were to begin a | 19:25:01 |
| 10 | fight, that people would go looking at -- at, you | 19:25:05 |
| 11 | know, kind of my emails and communications and try | 19:25:09 |
| 12 | to figure out what -- if there was a fight about | 19:25:12 |
| 13 | the earnout, what -- kind of what the thinking was | 19:25:14 |
| 14 | and what the kind of main levers of the | 19:25:17 |
| 15 | disagreement would be. | 19:25:20 |
| 16 | Q.  And at the time you sent this text message | 19:25:21 |
| 17 | on the evening of October 3rd, you anticipated that | 19:25:23 |
| 18 | you were going to be in litigation with Infor. | 19:25:27 |
| 19 | Correct? | 19:25:29 |
| 20 | A.  I -- | 19:25:30 |
| 21 | MR. LIPMAN:  Hold on.  Object to form. | 19:25:31 |
| 22 | Mischaracterizes his testimony. | 19:25:33 |
| 23 | Go ahead. | 19:25:35 |
| 24 | THE WITNESS:  I certainly suspected that | 19:25:36 |
| 25 | we were going to be heading in that direction, but | 19:25:38 |

Page 324

```
 1    I didn't know, candidly.                        19:25:40

 2         Infor still had a chance to pay the bonus  19:25:42

 3    as expected by December, and I had my suspicions 19:25:44

 4    but no certainty.                               19:25:47

 5    BY MR. DOOLEY:                                  19:25:50

 6         Q.  But you -- as of October 3, 2019, you  19:25:50

 7    anticipated that there was a reasonable possibility 19:25:54

 8    that you were going to be in litigation with Infor. 19:25:57

 9    Is that fair to say?                            19:25:59

10         MR. LIPMAN:  Object to form.               19:26:00

11         THE WITNESS:  I certainly thought that     19:26:01

12    that was one possibility, yes.                  19:26:02

13    BY MR. DOOLEY:                                  19:26:04

14         Q.  Okay.  And did -- did -- were you      19:26:04

15    advised -- did you speak with an attorney about 19:26:07

16    potential litigation -- this is a yes-or-no     19:26:09

17    question -- did you speak with an attorney about 19:26:11

18    potential litigation with Infor prior to        19:26:13

19    October 3rd, 2019?                              19:26:18

20         MR. LIPMAN:  Object to form of the         19:26:21

21    question.                                       19:26:21

22         I think it's fair to ask him when he       19:26:22

23    retained counsel.  I don't think it's fair to ask 19:26:26

24    him about when he spoke to a lawyer or didn't speak 19:26:28

25    to a lawyer about a particular subject.         19:26:32
```

                                           Page 325

```
1    BY MR. DOOLEY:                                    19:27:26

2         Q.  No, I'm asking anybody.                  19:27:26

3              Did anybody advise you, Mr. Staelin, that  19:27:28

4    you should text Mr. Peters about sending the      19:27:32

5    $300 -- $300 million number so they find it in    19:27:35

6    discovery?                                         19:27:41

7              MR. LIPMAN:  Objection.                  19:27:41

8              I don't think, Mr. Staelin -- I think your  19:27:42

9    testimony was you hadn't spoken to a lawyer yet,  19:27:44

10   but I would instruct you not to answer that       19:27:46

11   question if any conversation you had about this was  19:27:48

12   with an attorney, if that makes sense.            19:27:52

13             Go ahead.                                19:27:54

14             THE WITNESS:  Yeah, a little late in the  19:27:56

15   day, and there's some new -- I'll do my best.     19:27:58

16             I don't believe I had spoken with an     19:28:01

17   attorney.  This was -- you know, I kind of wish I  19:28:02

18   hadn't sent it, but it was my idea to send it.    19:28:07

19   That's true.                                       19:28:10

20   BY MR. DOOLEY:                                     19:28:11

21        Q.  Okay.  And then, subsequently, you did   19:28:12

22   send an email to Mr. Peters that contained a      19:28:18

23   calculation of bookings for FY19 of approximately  19:28:23

24   $300 million.  Correct?                           19:28:29

25        A.  I -- I believe, and I'm assuming you've  19:28:33
```

Page 327

| | | |
|---|---|---|
| 1 | put it in here as an exhibit, I would expect -- | 19:28:36 |
| 2 | that such an email was sent, and I believe that | 19:28:38 |
| 3 | that is the broad strokes of that email, yes. | 19:28:42 |
| 4 | Q.  Why don't you go into the Marked Exhibits | 19:28:49 |
| 5 | and open Exhibit 78. | 19:28:51 |
| 6 | (Deposition Exhibit 78 was marked for | 19:28:52 |
| 7 | identification.) | 19:28:54 |
| 8 | THE WITNESS:  Exhibit 78.  Okay.  Yep. | 19:28:55 |
| 9 | BY MR. DOOLEY: | 19:29:03 |
| 10 | Q.  And there's a reference to "$317 million" | 19:29:03 |
| 11 | in Point 2. | 19:29:07 |
| 12 | Do you see that? | 19:29:08 |
| 13 | A.  Just give me one second here to catch up | 19:29:10 |
| 14 | with you here. | 19:29:12 |
| 15 | (Examining document.) | 19:29:13 |
| 16 | Yes, I see that. | 19:29:22 |
| 17 | Q.  And Exhibit 78 is the -- the email that | 19:29:24 |
| 18 | you wanted to be found in discovery.  Is that | 19:29:28 |
| 19 | right, Mr. Staelin? | 19:29:33 |
| 20 | A.  This is the email to which I was | 19:29:35 |
| 21 | referring. | 19:29:37 |
| 22 | Q.  And you wanted this Exhibit 78 -- | 19:29:38 |
| 23 | MR. LIPMAN:  Let me just stop you there | 19:29:41 |
| 24 | for a second, Counsel. | 19:29:42 |
| 25 | By my calculation, we've now reached | 19:29:43 |

Page 328

```
 1                CERTIFICATE OF REPORTER
 2        I, HOLLY THUMAN, a Certified Shorthand Reporter,
 3   hereby certify that the witness in the foregoing
 4   deposition was by me duly sworn to tell the truth, the
 5   whole truth, and nothing but the truth in the
 6   within-entitled cause; that said deposition was taken
 7   down in shorthand by me, a disinterested person, at the
 8   time and place therein stated; and that the testimony
 9   of said witness was thereafter reduced to typewriting
10   by computer, to the best of my ability via remote
11   videoconferencing, under my direction and supervision;
12        That before completion of the deposition review of
13   the transcript [X] was [] was not requested/offered.
14   If requested, any changes made by the deponent (and
15   provided to the reporter) during the period allowed are
16   appended hereto.
17        I further certify that I am not of counsel or
18   attorney for either or any of the parties to the said
19   deposition, nor in any way interested in the event of
20   this cause, and that I am not related to any of the
21   parties thereto.
22   DATED: June 10, 2021
23        Holly Thuman
24
25        HOLLY THUMAN, CSR
```

Page 337

# EXHIBIT 6

1           UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3              SAN FRANCISCO DIVISION
4                   ---oOo---
5   BRAD PETERS, DAVID GRAY, AND
    PAUL STAELIN,
6
              Plaintiffs,
7
              vs.            No. 19-cv-8102
8
    INFOR (US), INC.,
9
              Defendant.
10  _____/
11  AND RELATED CROSS-ACTION.
    _____/
12
13
14
15
16        REMOTE VIDEOTAPED DEPOSITION OF
17              DAVID ANDREW GRAY
18        _____
19            FRIDAY, JUNE 4, 2021
20
21
22
23  REPORTED BY:  HOLLY THUMAN, CSR No. 6834, RMR, CRR
24  JOB NUMBER 4535049
25

                                      Page 1

| | | |
|---|---|---|
| 1 | Keker, Van Nest & Peters, for the defendant and | 15:33:20 |
| 2 | counterclaimant Infor (US), Inc. | 15:33:23 |
| 3 | With me right now is my colleague Brook | 15:33:25 |
| 4 | Dooley from Keker, Van Nest & Peters.  We may be | 15:33:28 |
| 5 | joined by Jamie Slaughter and Gavin Thole from | 15:33:32 |
| 6 | Keker, Van Nest & Peters, and we're also joined | 15:33:35 |
| 7 | today by Josh Wiersma, in-house counsel for Infor. | 15:33:37 |
| 8 | THE COURT REPORTER:  And Mr. Lipman just | 15:33:51 |
| 9 | joined. | 15:33:52 |
| 10 | THE VIDEO OPERATOR:  And the court | 15:33:54 |
| 11 | reporter may swear in the witness. | 15:33:55 |
| 12 | --o0o-- | 15:33:56 |
| 13 | DAVID ANDREW GRAY, | 15:33:56 |
| 14 | _____ | 15:33:56 |
| 15 | called as a witness, having been first duly | 15:33:56 |
| 16 | sworn, was examined and testified as follows: | 15:33:56 |
| 17 | ---oOo--- | 15:33:56 |
| 18 | EXAMINATION BY MR. CODY GRAY | 00:30:01 |
| 19 | BY MR. C. GRAY: | 15:34:12 |
| 20 | Q.  And good morning -- | 15:34:13 |
| 21 | MS. MARTIROSIAN:  One thing I want to say | 15:34:14 |
| 22 | very briefly at the outset, Mr. Gray is in the UK, | 15:34:15 |
| 23 | as you know, and he is eight hours ahead of us here | 15:34:18 |
| 24 | in British Summer Time, so he's prepared to -- so | 15:34:22 |
| 25 | he's starting this deposition at 3:30 P.M. his | 15:34:25 |

Page 7

| | | |
|---|---|---|
| 1 | Birst's annual bookings was prior to the | 16:10:01 |
| 2 | acquisition? | 16:10:05 |
| 3 |     A.   I believe that the highest new ARR, new | 16:10:12 |
| 4 | license revenue, would have been in calendar year | 16:10:19 |
| 5 | 2016.  It would have been around about 18 million | 16:10:22 |
| 6 | U.S. dollars. | 16:10:28 |
| 7 |     Q.   Okay.  And so you testified that you | 16:10:29 |
| 8 | received $400,000 in connection with the employee | 16:10:40 |
| 9 | retention pool.  Correct? | 16:10:43 |
| 10 |     A.   Correct. | 16:10:45 |
| 11 |     Q.   And about $200,000 in connection with the | 16:10:47 |
| 12 | employee carve-out plan.  Is that right? | 16:10:49 |
| 13 |     A.   Correct. | 16:10:54 |
| 14 |     Q.   And so is it fair to say that you | 16:10:54 |
| 15 | personally made about $600,000 when Infor acquired | 16:10:58 |
| 16 | Birst? | 16:11:01 |
| 17 |     A.   Over a period of time, yes. | 16:11:02 |
| 18 |     Q.   Okay.  And did Birst become a separate | 16:11:04 |
| 19 | business unit within Infor after the acquisition? | 16:11:07 |
| 20 |     A.   Yes, it did. | 16:11:10 |
| 21 |     Q.   Okay.  Mr. Gray, did you receive an | 16:11:13 |
| 22 | employment contract in connection with Infor's | 16:11:16 |
| 23 | acquisition of Birst? | 16:11:18 |
| 24 |     A.   Yes, I did. | 16:11:22 |
| 25 |         MR. C. GRAY:  Okay.  I'm introducing an | 16:11:24 |

Page 36

| | | |
|---|---|---|
| 1 | And, you know -- so I -- yeah, I | 17:11:39 |
| 2 | definitely spoke with Brad, but I -- the specifics | 17:11:43 |
| 3 | that we -- we covered, I'm -- I couldn't tell you. | 17:11:47 |
| 4 | I am assuming, again, it's going to be about the | 17:11:52 |
| 5 | contents of the spreadsheet and the broad | 17:11:54 |
| 6 | opportunity, et cetera. | 17:11:57 |
| 7 | Q.  Okay.  Mr. Gray, after the acquisition, | 17:11:59 |
| 8 | what products did Birst sell? | 17:12:12 |
| 9 | A.  I apologize.  You mean at the point of the | 17:12:17 |
| 10 | acquisition? | 17:12:19 |
| 11 | Q.  After.  In the time period after the | 17:12:20 |
| 12 | acquisition, what were the products that Birst | 17:12:23 |
| 13 | sold? | 17:12:26 |
| 14 | MS. MARTIROSIAN:  Object to form. | 17:12:27 |
| 15 | THE WITNESS:  Apologies, Claire. | 17:12:31 |
| 16 | MS. MARTIROSIAN:  No.  Go ahead. | 17:12:33 |
| 17 | THE WITNESS:  Okay.  So after the | 17:12:34 |
| 18 | acquisition, we sold the Birst Enterprise product, | 17:12:35 |
| 19 | Birst's Professional product. | 17:12:41 |
| 20 | And then at a later stage, we also, in | 17:12:46 |
| 21 | conjunction with our colleagues at Infor, we also | 17:12:51 |
| 22 | sold the Birst for CloudSuite product, which is a | 17:12:54 |
| 23 | combination of Birst Enterprise and Infor content. | 17:13:00 |
| 24 | BY MR. C. GRAY: | 17:13:07 |
| 25 | Q.  Did you sell any other products? | 17:13:08 |

Page 72

```
 1    BY MR. C. GRAY:                                  17:14:43

 2        Q.  Well, how many user profiles were there? 17:14:44

 3        A.  There are three.                         17:14:49

 4        Q.  And what were they?                      17:14:51

 5        A.  Analyst, business user, and read-only lite 17:14:54

 6    user.                                            17:15:01

 7        Q.  Okay.  So if you were talking with a     17:15:06

 8    customer who was interested in -- or potentially 17:15:08

 9    interested in acquiring Birst's technology --    17:15:13

10        A.  Yes.                                     17:15:17

11        Q.  -- how would you explain to them the     17:15:17

12    different offerings that Birst had?              17:15:23

13            Excuse me.  How would -- yeah.  How would 17:15:27

14    you explain to them the different offerings that 17:15:29

15    Birst had?                                       17:15:31

16            MS. MARTIROSIAN:  Object to form.        17:15:34

17            THE WITNESS:  So if I was talking about  17:15:37

18    our Enterprise product, I would describe the     17:15:39

19    capabilities of that product and the -- at a     17:15:44

20    platform level, it's suitable for significant    17:15:49

21    amounts of data, significant numbers of users, and 17:15:53

22    that the end user types had different            17:16:02

23    characteristics and different rights and different 17:16:05

24    abilities within them.                           17:16:09

25            And if I was talking about the           17:16:13
```

Page 74

| | | |
|---|---|---|
| 1 | Professional product, I would explain that that was | 17:16:15 |
| 2 | a more restricted product, better suited for | 17:16:19 |
| 3 | smaller numbers of users, smaller datasets, smaller | 17:16:28 |
| 4 | number of sources, and that there were less | 17:16:32 |
| 5 | functionality, typically, compared to Enterprise. | 17:16:38 |
| 6 | BY MR. C. GRAY: | 17:16:43 |
| 7 | Q.  And what about with Birst for CloudSuite? | 17:16:43 |
| 8 | MS. MARTIROSIAN:  Object to form. | 17:16:48 |
| 9 | THE WITNESS:  So Birst for CloudSuite was | 17:16:50 |
| 10 | a component part -- when it was provisioned, when | 17:16:55 |
| 11 | it was created, when the content was created, it | 17:17:02 |
| 12 | was a component part of CloudSuite. | 17:17:09 |
| 13 | So Birst for CloudSuite itself is a | 17:17:11 |
| 14 | combination of Birst Enterprise and Infor content. | 17:17:14 |
| 15 | And in the fullness of time, it was integrated and | 17:17:17 |
| 16 | was a part of CloudSuite and was sold as a much | 17:17:23 |
| 17 | broader value proposition to Infor's customers -- | 17:17:26 |
| 18 | BY MR. C. GRAY: | 17:17:31 |
| 19 | Q.  I'm sorry, so how would you -- | 17:17:32 |
| 20 | I'm sorry.  How would you -- I didn't mean | 17:17:34 |
| 21 | to cut you off, Mr. Gray.  Go ahead. | 17:17:36 |
| 22 | A.  No, no, please.  I think I -- I think I'm | 17:17:38 |
| 23 | done. | 17:17:41 |
| 24 | Q.  Okay.  How would you explain to customers | 17:17:41 |
| 25 | what Birst for CloudSuite was in fiscal year 2018? | 17:17:44 |

Page 75

```
 1        A.   So --                                17:17:50

 2             MS. MARTIROSIAN:   Object to form.    17:17:51

 3             Go ahead, Dave.                       17:17:53

 4             THE WITNESS:   All right.   So Birst for  17:17:56

 5    CloudSuite became the BI analytics capability for  17:17:58

 6    CloudSuite -- or Infor's CloudSuite products.  17:18:06

 7    BY MR. C. GRAY:                                 17:18:10

 8        Q.   And did you position it to customers as  17:18:11

 9    Birst Enterprise?   Because you've said repeatedly  17:18:15

10    now that Birst for CloudSuite was Birst Enterprise  17:18:18

11    included within a CloudSuite.                  17:18:23

12             So is that the way you positioned it to  17:18:25

13    customers in fiscal year 2018?                 17:18:27

14             MS. MARTIROSIAN:   Object to form.    17:18:32

15             THE WITNESS:   So I think it's -- so I'm  17:18:32

16    trying to think of when exactly products became  17:18:37

17    available; when the Birst for CloudSuite products  17:18:42

18    became available.                              17:18:45

19             But Birst for CloudSuite itself is a  17:18:46

20    combination of Birst Enterprise and an Infor   17:18:50

21    content.   And the way that it was jointly created  17:18:55

22    with Infor was that that content was prepackaged,  17:19:02

23    reports and dashboards, for consumption by the  17:19:07

24    CloudSuite users.                              17:19:11

25    //
```

                                                     Page 76

```
 1   for them in forms of dashboards and reports.        17:20:32

 2   BY MR. C. GRAY:                                      17:20:36

 3        Q.  Okay.  Is -- but fair to say, though, that 17:20:37

 4   Birst Enterprise was Birst's most robust product    17:20:41

 5   offering?                                            17:20:45

 6        A.  Birst Enterprise is the most -- well, I     17:20:48

 7   think the first thing I should say is that Birst     17:20:51

 8   product is a single codebase, and with the           17:20:56

 9   Enterprise Edition, that's where you get the most    17:21:03

10   functionality and scalability.                       17:21:07

11        So that -- that would be correct.               17:21:09

12        Q.  Okay.  And did you tell customers in        17:21:12

13   fiscal year 2018 that Birst for CloudSuite was an    17:21:14

14   embedded version of Birst Enterprise?               17:21:19

15        MS. MARTIROSIAN:  Object to form.  Asked       17:21:26

16   and answered.                                        17:21:26

17        THE WITNESS:  So we explained to customers     17:21:29

18   that Infor had acquired Birst and that it would be  17:21:31

19   replacing legacy BI and a lot of its capability     17:21:39

20   with Birst to give them prebuilt content in         17:21:43

21   conjunction with CloudSuite.                         17:21:47

22   BY MR. C. GRAY:                                      17:21:51

23        Q.  Okay.  But I don't really feel like you're 17:21:51

24   answering my question because what I'm interested   17:21:53

25   in is if you were using the phrase "Birst           17:21:55
```

Page 78

```
 1   product, and that's the -- that's the thing to        17:23:21
 2   focus on.                                              17:23:25
 3         So I -- so in terms of talking about the         17:23:28
 4   different editions -- and, as I say, it's that         17:23:31
 5   single codebase -- we were talking about what          17:23:34
 6   capability are they going to get with the Birst for    17:23:37
 7   CloudSuite versus potentially complicating and         17:23:40
 8   talking about different things because it's a very     17:23:44
 9   direct conversation about the BI and reporting         17:23:47
10   within CloudSuite.                                     17:23:55
11         Does that make sense?                            17:23:56
12   BY MR. C. GRAY:                                         17:23:57
13      Q.  So also, you would talk to customers about      17:23:57
14   the different capabilities that they would get with    17:23:59
15   Birst's technology --                                  17:24:01
16         That's what you just said?                       17:24:02
17      A.  What we were focusing on was the new Birst      17:24:09
18   for CloudSuite.  BI analytics was replacing --         17:24:11
19         (Reporter clarification of audio.)               17:24:26
20         THE WITNESS:  It was BI analytics.               17:24:29
21         So what we were focusing on was              17:24:36
22   articulating the functionality the customer is         17:24:38
23   going to get; replacing old legacy BI, Infor BI        17:24:42
24   products, with the new, more functionally rich         17:24:49
25   Birst products.                                        17:24:53
```

Page 80

```
 1    the capability they are going to get with Birst for      17:26:26

 2    CloudSuite.                                              17:26:29

 3           And what I'm asking you is, when you were         17:26:31

 4    talking to customers in fiscal year 2018 or 2019         17:26:33

 5    about the capability that they were going to get         17:26:38

 6    with Birst for CloudSuite, did you tell them that        17:26:40

 7    they would get the same capability that was              17:26:44

 8    available with Birst Enterprise?                         17:26:46

 9           MS. MARTIROSIAN:  Object to form.  Vague          17:26:50

10    as to "Enterprise."                                      17:26:51

11           THE WITNESS:  So in either of those fiscal        17:26:55

12    years, talking to customers about Birst for              17:26:57

13    CloudSuite, we would talk to them about the              17:27:02

14    functionality that they would receive.                   17:27:09

15           Birst for CloudSuite, as we discussed, is         17:27:20

16    a combination of Birst Enterprise and Infor              17:27:23

17    content.                                                 17:27:26

18           But in terms of the data source, it's            17:27:29

19    restricted to the CloudSuite data source.  So if a       17:27:33

20    customer had requirements outside of just the            17:27:36

21    CloudSuite data source -- different transactional        17:27:43

22    applications, for example -- then we would tell          17:27:46

23    them about the Birst Enterprise product, which           17:27:49

24    would be an additional purchase that they could          17:27:53

25    take -- or make, I should say.                           17:27:57
```

Page 82

```
 1    BY MR. C. GRAY:                                  17:28:01

 2        Q.   Okay.  So as I understand it, what you're    17:28:02

 3    saying is that when you were talking to customers     17:28:04

 4    about Birst for CloudSuites in fiscal years 2018      17:28:07

 5    and 2019, you were not representing to them that      17:28:11

 6    they would obtain the same capabilities with Birst    17:28:14

 7    for CloudSuite that were available with Birst         17:28:18

 8    Enterprise.  Is that correct?                         17:28:23

 9             MS. MARTIROSIAN:  Object to form.  Vague      17:28:24

10    as to "Enterprise."                                   17:28:25

11             THE WITNESS:  I wouldn't characterize it     17:28:27

12    that way, no.                                         17:28:28

13             The -- again, Birst for CloudSuite is a      17:28:32

14    combination of Birst Enterprise and Infor content.    17:28:36

15    It's a single codebase.                               17:28:42

16             So the -- the organization that buys         17:28:46

17    CloudSuite gets Birst for CloudSuite as a part of     17:28:52

18    that, and the Birst single codebase is in there,      17:28:54

19    but it's restricted to the CloudSuite data.           17:28:57

20             If the client wants to do -- perform         17:29:03

21    broader analytics, then they have the opportunity     17:29:07

22    to buy an Enterprise license.                         17:29:09

23             And, again, there is this different --       17:29:16

24    there's the platform for that, but, then, there's     17:29:17

25    the different user types which have different         17:29:20
```

Page 83

| | | |
|---|---|---|
| 1 | levels of capability, and we would actually talk to | 17:29:22 |
| 2 | those customers or prospective customers about the | 17:29:24 |
| 3 | different types of capability in those different | 17:29:26 |
| 4 | user types. | 17:29:30 |
| 5 | BY MR. C. GRAY: | 17:29:31 |
| 6 | Q.   Okay.   I still don't feel like you're | 17:29:34 |
| 7 | answering my question, though, because what | 17:29:36 |
| 8 | you're -- | 17:29:38 |
| 9 | A.   I apologize.   I'm -- honestly, I'm trying. | 17:29:38 |
| 10 | Q.   I understand. | 17:29:41 |
| 11 | In fiscal years 2018 and 2019 when were | 17:29:47 |
| 12 | you were talking to customers about Birst for | 17:29:49 |
| 13 | CloudSuite, did you represent to them that they | 17:29:52 |
| 14 | would obtain the same capabilities with Birst for | 17:29:55 |
| 15 | CloudSuite that were available with Birst | 17:29:58 |
| 16 | Enterprise? | 17:30:02 |
| 17 | MS. MARTIROSIAN:   Object to form.   Vague | 17:30:04 |
| 18 | as to "Enterprise."   Asked and answered. | 17:30:05 |
| 19 | THE WITNESS:   So we would say to them that | 17:30:09 |
| 20 | a Birst -- I apologize, I feel like I'm just going | 17:30:17 |
| 21 | to repeat again.   I'll try and mix it up slightly. | 17:30:21 |
| 22 | Birst is a single codebase -- | 17:30:25 |
| 23 | BY MR. C. GRAY: | 17:30:28 |
| 24 | Q.   Sorry.   You would say that to -- I don't | 17:30:29 |
| 25 | want to interrupt you, but you would tell customers | 17:30:31 |

Page 84

```
 1    that Birst was a single codebase?                   17:30:34

 2         A.  When talking to customers -- I'll revert   17:30:41

 3    back to what I said a few minutes ago.              17:30:43

 4            Focusing with customers is the capability   17:30:45

 5    that they get and, in particular, for existing     17:30:47

 6    Infor customers, explaining the differences between 17:30:51

 7    the old legacy BI and analytics capability and the  17:30:53

 8    new stuff.                                          17:30:57

 9            And what we would be specifically saying    17:30:58

10    is that with the new CloudSuite offering, the new   17:31:01

11    Birst for CloudSuite that's in there, I wouldn't -- 17:31:04

12    I'm saying to you that -- just to double-click, the 17:31:07

13    Birst for CloudSuite is a combination of Enterprise 17:31:11

14    plus content -- say to customers, "This is what you 17:31:13

15    get, and this comes with prebuilt content, reports, 17:31:16

16    et cetera, dashboards for your users to consume,    17:31:20

17    but it is restricted to your -- your CloudSuite     17:31:23

18    data.  It can't be used outside of that."           17:31:29

19            So that's what we would be saying to        17:31:33

20    customers.                                          17:31:35

21            But we'd also say to customers that should  17:31:36

22    they want to use -- and customers could have many,  17:31:40

23    many use cases and lots of different functional     17:31:44

24    areas of the business that aren't run by            17:31:47

25    CloudSuite.  They're run by different applications; 17:31:49
```

Page 85

| | | |
|---|---|---|
| 1 | for example, Salesforce, lots and lots of things. | 17:31:52 |
| 2 | If you want to use -- you like what you | 17:31:55 |
| 3 | see, you want to use Birst more broadly, then | 17:31:58 |
| 4 | there's an opportunity to purchase Birst | 17:32:01 |
| 5 | Enterprise. | 17:32:03 |
| 6 | Within Birst Enterprise, there's different | 17:32:03 |
| 7 | user profiles with different amounts of capability, | 17:32:05 |
| 8 | license rights to do things, and then you can | 17:32:08 |
| 9 | access those different data sources. | 17:32:10 |
| 10 | Q.  Okay.  So using Birst Enterprise, | 17:32:13 |
| 11 | potential customers could access additional data | 17:32:15 |
| 12 | sources.  Is that correct? | 17:32:18 |
| 13 | MS. MARTIROSIAN:  Object to form.  Vague | 17:32:20 |
| 14 | as to "Enterprise." | 17:32:21 |
| 15 | THE WITNESS:  So Birst Enterprise has an | 17:32:25 |
| 16 | ability at a platform level to access multiple | 17:32:32 |
| 17 | different data sources.  And then, depending on the | 17:32:38 |
| 18 | users' profiles that are procured, those users have | 17:32:44 |
| 19 | different capabilities that can be deployed. | 17:32:51 |
| 20 | BY MR. C. GRAY: | 17:32:54 |
| 21 | Q.  And -- but you -- okay. | 17:32:55 |
| 22 | So you testified, though, that Birst for | 17:32:57 |
| 23 | CloudSuite limited users to the data that was | 17:33:00 |
| 24 | available within the CloudSuite and that if they | 17:33:06 |
| 25 | wanted to bring in additional data sources, they | 17:33:08 |

Page 86

```
 1    needed to then purchase Birst Enterprise.              17:33:11

 2            Is that fair?                                  17:33:16

 3            MS. MARTIROSIAN:  Object to form.              17:33:18

 4            THE WITNESS:  I wouldn't put it that way.      17:33:22

 5            What I believe I said is that we have a        17:33:24

 6    single codebase, and the code base is exposed and     17:33:27

 7    the functionalities are used based on licensed        17:33:33

 8    metrics, different types of user profile, and other   17:33:38

 9    capabilities as well.                                 17:33:40

10            And very specifically in the case of Birst    17:33:42

11    for CloudSuite -- so Enterprise is there together     17:33:46

12    with the Infor content that's created, and that       17:33:51

13    is -- but that is restricted; it is the -- BI and     17:33:57

14    analytics capability for the CloudSuite application   17:34:02

15    which, again, in the industry is a very standard      17:34:07

16    thing to do to have BI and analytics capability in    17:34:10

17    an application, and that's what Birst for             17:34:14

18    CloudSuite was in that context.                       17:34:16

19    BY MR. C. GRAY:                                       17:34:20

20        Q.  Okay.  But you've said a number of times      17:34:21

21    now that if a customer had additional data needs,     17:34:23

22    wanted to bring in data from outside sources, then    17:34:26

23    they couldn't do that with the Birst for CloudSuite   17:34:29

24    product.  Right?                                      17:34:32

25        A.  Birst for CloudSuite product is -- which      17:34:36
```

Page 87

| | | |
|---|---|---|
| 1 | is Birst Enterprise, and the content created for | 17:34:42 |
| 2 | the clients is specifically for Birst for | 17:34:46 |
| 3 | CloudSuite, the application itself only, which is | 17:34:50 |
| 4 | perfectly reasonable because if somebody's | 17:34:56 |
| 5 | implementing something like that, they have a | 17:34:58 |
| 6 | budget for something like that. | 17:35:00 |
| 7 | If they then have other use cases outside | 17:35:03 |
| 8 | of that, then we -- it wouldn't be -- we would -- | 17:35:05 |
| 9 | that would position Birst Enterprise as an | 17:35:12 |
| 10 | additional sell to the client for a different need | 17:35:16 |
| 11 | that they had. | 17:35:20 |
| 12 | Q.   Okay.  And why did you position Birst | 17:35:21 |
| 13 | Enterprise as an additional sell to the client? | 17:35:23 |
| 14 | Why would you need to do that if they | 17:35:26 |
| 15 | already had Birst for CloudSuite? | 17:35:28 |
| 16 | MS. MARTIROSIAN:  Object to form.  Vague | 17:35:30 |
| 17 | as to "Enterprise." | 17:35:31 |
| 18 | THE WITNESS:  So again, I apologize.  I | 17:35:36 |
| 19 | feel I may repeat myself. | 17:35:42 |
| 20 | So the Birst for CloudSuite -- Birst for | 17:35:46 |
| 21 | CloudSuite is made up of Birst Enterprise and | 17:35:51 |
| 22 | content that Infor had created that is specific to | 17:35:57 |
| 23 | that -- that application. | 17:36:02 |
| 24 | But in terms of the -- the functionality, | 17:36:05 |
| 25 | it's -- it's restricted to the application, and | 17:36:11 |

Page 88

```
1    it's restricted very similar or identical in          17:36:17

2    profile to a "lite user," in Birst terms.            17:36:20

3           If a client is potentially interested in a    17:36:24

4    different use case, accessing different data         17:36:27

5    sources, might be in a completely different part of  17:36:29

6    the business, the way we would license that for     17:36:32

7    them would be with a Birst Enterprise platform plus 17:36:36

8    any additional add-ons -- things they might wish to 17:36:40

9    have such as Network BI -- and then we would have   17:36:43

10   user profiles that they could choose from:          17:36:47

11   Analyst, business, and the read-only lite user      17:36:50

12   because they may need that different capability,    17:36:56

13   and this is a completely different use case away    17:36:58

14   from Infor transfers.                               17:37:01

15   BY MR. C. GRAY:                                     17:37:08

16       Q.   Okay.   When you were describing Birst for 17:37:08

17   CloudSuite to customers, did you describe it to     17:37:10

18   them as "the combination of Birst Enterprise with   17:37:13

19   Infor content"?                                     17:37:16

20           MS. MARTIROSIAN:   Object to form.          17:37:18

21           THE WITNESS:   What we focused on was what   17:37:22

22   was important, you know, to those clients and       17:37:24

23   prospective clients.                                17:37:29

24           And what's important to them is BI, and     17:37:33

25   analytics capability comes with CloudSuite.   What  17:37:36
```

Page 89

| | | |
|---|---|---|
| 1 | additional sources" -- I won't read the rest of it, | 18:14:49 |
| 2 | but -- the piece that you just read out -- but the | 18:14:52 |
| 3 | additions, create new content, et cetera, if the | 18:14:55 |
| 4 | client wishes to do that, then they would also need | 18:14:59 |
| 5 | to buy one of the other Birst editions, either | 18:15:02 |
| 6 | Birst Enterprise or Birst Professional. | 18:15:05 |
| 7 | Q.  And did they need to buy one of the other | 18:15:08 |
| 8 | editions, Birst Enterprise or Birst Professional, | 18:15:13 |
| 9 | because those capabilities were not available to | 18:15:16 |
| 10 | them if they purchased a CloudSuite that contained | 18:15:21 |
| 11 | Birst for CloudSuite? | 18:15:26 |
| 12 | MS. MARTIROSIAN:  Object to form as to | 18:15:28 |
| 13 | "editions." | 18:15:28 |
| 14 | THE WITNESS:  So Birst for CloudSuite | 18:15:34 |
| 15 | component is part of CloudSuite.  And in terms of | 18:15:41 |
| 16 | the data that it could be used against, it's the | 18:15:46 |
| 17 | data within CloudSuite. | 18:15:51 |
| 18 | And in terms of the functionality that is | 18:15:54 |
| 19 | enabled within the Birst Enterprise element of | 18:15:57 |
| 20 | Birst for CloudSuite, there is a certain amount of | 18:16:01 |
| 21 | capability that is enabled. | 18:16:03 |
| 22 | If a customer needs a greater amount of | 18:16:09 |
| 23 | capability and/or accessing different data sources, | 18:16:10 |
| 24 | then they would also need to purchase one of the | 18:16:14 |
| 25 | two editions:  Birst Enterprise or | 18:16:18 |

Page 108

| | | |
|---|---|---|
| 1 | Birst Professional. | 18:16:23 |
| 2 | BY MR. C. GRAY: | 18:16:24 |
| 3 | Q.  Okay.  But I just want to state this a | 18:16:24 |
| 4 | little more directly. | 18:16:26 |
| 5 | The second paragraph there reads: | 18:16:27 |
| 6 | "If customer wants to analyze data from | 18:16:29 |
| 7 | additional sources, edit, or create new | 18:16:31 |
| 8 | analytical reports, build custom dashboards, | 18:16:34 |
| 9 | etc., they need to buy Birst Enterprise or | 18:16:37 |
| 10 | Birst Professional." | 18:16:40 |
| 11 | Correct? | 18:16:44 |
| 12 | A.  Correct. | 18:16:45 |
| 13 | Q.  And is the reason that the customer needed | 18:16:45 |
| 14 | to buy Birst Enterprise or Birst Professional that | 18:16:47 |
| 15 | they did not have access to those enumerated | 18:16:50 |
| 16 | capabilities if they had only purchased a | 18:16:54 |
| 17 | CloudSuite that contained Birst for CloudSuite? | 18:16:57 |
| 18 | MS. MARTIROSIAN:  Object to form.  Vague | 18:17:00 |
| 19 | as to "Enterprise." | 18:17:01 |
| 20 | THE WITNESS:  So Birst for CloudSuite made | 18:17:05 |
| 21 | up of Birst Enterprise and Infor content is -- has | 18:17:11 |
| 22 | certain functionalities enabled, and it is | 18:17:17 |
| 23 | restricted to the CloudSuite data, and the | 18:17:19 |
| 24 | functionalities that are enabled are identical to | 18:17:25 |
| 25 | the Birst read-only lite user. | 18:17:30 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | could consume the content that had been created, | 18:19:14 |
| 2 | but they couldn't create additional new content. | 18:19:17 |
| 3 | Q.  Okay.  So read-only lite users could not | 18:19:21 |
| 4 | analyze data from additional sources outside the | 18:19:24 |
| 5 | CloudSuite, edit, or create new analytical reports, | 18:19:27 |
| 6 | or build custom dashboards.  Is that correct? | 18:19:31 |
| 7 | A.  I think there was a slight | 18:19:37 |
| 8 | mischaracterization there, and that is that you're | 18:19:39 |
| 9 | correct that the users -- which is everybody that | 18:19:43 |
| 10 | has a license for CloudSuite -- those users can | 18:19:47 |
| 11 | only access data inside CloudSuite, and they can | 18:19:53 |
| 12 | only consume it in the way that we've described, | 18:19:57 |
| 13 | and they can't create new analytics. | 18:19:59 |
| 14 | To be specific, though, if outside of | 18:20:06 |
| 15 | that, away from CloudSuite, if a client purchased | 18:20:08 |
| 16 | Birst Enterprise and had the ability -- I mean | 18:20:13 |
| 17 | wanted to connect to multiple different sources, | 18:20:16 |
| 18 | then those RO lite users are able to consume the | 18:20:20 |
| 19 | data from those different sources. | 18:20:25 |
| 20 | I hope I'm distinguishing appropriately | 18:20:32 |
| 21 | for you. | 18:20:34 |
| 22 | Q.  So as I understand what you just said, if | 18:20:35 |
| 23 | they wanted to consume data from additional | 18:20:37 |
| 24 | sources -- if a customer, a read-only lite customer | 18:20:39 |
| 25 | wanted to consume data from additional sources, it | 18:20:41 |

Page 111

```
 1    would need to purchase Birst Enterprise.              18:20:44
 2            MS. MARTIROSIAN:  Object to form.  Vague        18:20:48
 3    as to "Enterprise."  Mischaracterizes testimony.      18:20:49
 4            THE WITNESS:  So outside of CloudSuite, if      18:20:56
 5    a customer purchased Birst Enterprise, they could     18:21:00
 6    then choose which profiles of user type they would    18:21:05
 7    buy.                                                   18:21:13
 8            And in a case of the read-only lite user,      18:21:15
 9    that read-only lite user would be able to consume     18:21:20
10    any data that was created for it by one of the more   18:21:25
11    functionally rich users, and that may or may not      18:21:30
12    come from more than one data source.                  18:21:35
13    BY MR. C. GRAY:                                        18:21:39
14       Q.  Okay.  I'm going to ask this question one       18:21:39
15    more time because I don't feel like I'm getting a     18:21:41
16    direct answer.  I appreciate that you're trying       18:21:44
17    very hard.                                             18:21:46
18            I'm going to ask it one more time, and if      18:21:48
19    it continues to be the same, we may just have to      18:21:50
20    take this to the court or deal with it in some        18:21:53
21    other way.                                             18:21:56
22            But this is my question:                       18:21:56
23            The second paragraph here reads:               18:21:58
24            "If customer wants to analyze data from        18:21:59
25         additional sources, edit, or create new          18:22:02
```

Page 112

```
 1          analytical reports, build custom dashboards,        18:22:04
 2          etc., they need to buy Birst Enterprise or          18:22:09
 3          Birst Professional."                                18:22:12
 4              Correct?  That's what the paragraph says?       18:22:13
 5          A.  That's what the paragraph says.                 18:22:15
 6          Q.  Okay.  And is the reason that they need to      18:22:16
 7      buy Birst Enterprise or Birst Professional that         18:22:20
 8      they would not be able to analyze data from             18:22:25
 9      additional sources, edit, or create new analytical      18:22:28
10      reports or build custom dashboards if they had only     18:22:32
11      purchased a CloudSuite that contained Birst for         18:22:36
12      CloudSuite?                                             18:22:37
13              MS. MARTIROSIAN:  Object to form.  Vague        18:22:39
14      as to "Enterprise."                                     18:22:40
15              THE WITNESS:  So to perform the                 18:22:50
16      functionalities that you just read out to me --         18:22:51
17      i.e., accessing data, analyzing data from different     18:22:57
18      sources, edit, or creating new analytical reports,      18:23:00
19      et cetera -- that functionality would need -- would     18:23:07
20      require purchasing Birst Enterprise in addition to      18:23:12
21      the Birst for CloudSuite component of Infor             18:23:21
22      CloudSuite.                                             18:23:24
23      BY MR. C. GRAY:                                         18:23:25
24          Q.  Okay.  Just give me a moment to introduce      18:23:26
25      an exhibit.                                             18:24:05
```

Page 113

```
 1    Birst for CloudSuite, by definition, is Infor       18:31:13
 2    clients that purchased CloudSuite because Birst for  18:31:20
 3    CloudSuite is an integral part of Infor CloudSuite.  18:31:22
 4    So that's the sole market for the Birst for          18:31:31
 5    CloudSuite component.                                18:31:34
 6            Professional, you could take that            18:31:38
 7    proposition to other -- other people inside the      18:31:41
 8    organization, so it had a much broader potential     18:31:47
 9    applicability.                                       18:31:54
10       Q.  And is that also true of Birst Enterprise     18:31:57
11    Edition; it had a much broader applicability?        18:32:00
12            MS. MARTIROSIAN:  Object to form.            18:32:04
13            THE WITNESS:  So, again, it's -- because     18:32:05
14    Birst for CloudSuite is a component part of Infor    18:32:09
15    CloudSuite, that's the only address that will knock  18:32:13
16    it.                                                  18:32:18
17            If a client has a different ERP -- i.e.,     18:32:19
18    not a CloudSuite, a different ERP -- Enterprise      18:32:23
19    could perform -- access that data and perform        18:32:27
20    analytics on that data.                              18:32:39
21            (Reporter clarification of audio.)           18:32:40
22    BY MR. C. GRAY:                                      18:32:41
23       Q.  Okay.  I want to direct your attention to     18:32:41
24    the "Price Point" row, and we've already talked      18:32:43
25    about the entry for Birst for CloudSuite.            18:32:47
```

Page 119

| | | |
|---|---|---|
| 1 | The entry for Birst Professional Edition | 18:32:50 |
| 2 | says "$10K to $50K." | 18:32:52 |
| 3 | Do you see that? | 18:32:55 |
| 4 | A.  I do. | 18:32:56 |
| 5 | Q.  And the entry for Birst Enterprise Edition | 18:32:57 |
| 6 | says "$100K to $2 million." | 18:33:01 |
| 7 | Do you see that? | 18:33:04 |
| 8 | A.  I do. | 18:33:04 |
| 9 | Q.  What accounted for the different price | 18:33:05 |
| 10 | points for Birst Professional Edition and | 18:33:07 |
| 11 | Birst Enterprise Edition? | 18:33:12 |
| 12 | A.  So there's a number of different factors, | 18:33:15 |
| 13 | one of which is that Professional and Enterprise | 18:33:19 |
| 14 | have different platform fees. | 18:33:26 |
| 15 | Q.  And why did they have different platform | 18:33:29 |
| 16 | fees? | 18:33:31 |
| 17 | A.  They had different platform fees because | 18:33:34 |
| 18 | in part, there are different functionalities | 18:33:38 |
| 19 | enabled between the two products, much more in | 18:33:46 |
| 20 | Enterprise.  And in part, because, with the data | 18:33:51 |
| 21 | volumes, the numbers of users the Professional | 18:33:54 |
| 22 | could comfortably accommodate, it was a much, much | 18:33:58 |
| 23 | smaller number of users and therefore was priced | 18:34:01 |
| 24 | more cheaply. | 18:34:05 |
| 25 | Q.  Okay.  So you said there were much more | 18:34:17 |

Page 120

| | | |
|---|---|---|
| 1 | functionalities enabled in Enterprise than there | 18:34:19 |
| 2 | were in Birst Professional.  Is that correct? | 18:34:22 |
| 3 | A.  Yes. | 18:34:25 |
| 4 | Q.  And were there more functionalities | 18:34:26 |
| 5 | enabled in Birst Enterprise than there were in | 18:34:28 |
| 6 | Birst for CloudSuite? | 18:34:33 |
| 7 | MS. MARTIROSIAN:  Object to form.  Vague | 18:34:33 |
| 8 | as to "Enterprise." | 18:34:34 |
| 9 | THE WITNESS:  I think, again, it's worth | 18:34:38 |
| 10 | pointing out that in the case of Birst Enterprise, | 18:34:40 |
| 11 | there are three different profiles of user: | 18:34:44 |
| 12 | Analyst user, business user, and RO lite user. | 18:34:47 |
| 13 | And depending on what functionalities you | 18:34:51 |
| 14 | wish that each of those users to have would guide | 18:34:53 |
| 15 | our clients on which users' profiles they would | 18:34:57 |
| 16 | purchase. | 18:35:01 |
| 17 | Whereas, within Birst for CloudSuite, as a | 18:35:02 |
| 18 | component part of Infor CloudSuite, the enabled | 18:35:04 |
| 19 | functionalities are akin to the read-only lite | 18:35:09 |
| 20 | user; i.e., the lightest one of the three. | 18:35:13 |
| 21 | BY MR. C. GRAY: | 18:35:17 |
| 22 | Q.  And the functionalities for read-only lite | 18:35:18 |
| 23 | users that were enabled -- excuse me.  Let me start | 18:35:20 |
| 24 | that again. | 18:35:24 |
| 25 | The functionalities that were enabled for | 18:35:24 |

Page 121

```
 1    read-only lite users in Birst Enterprise were less     18:35:26

 2    than the functionalities that were enabled for         18:35:33

 3    analyst users.  Is that correct?                       18:35:36

 4         MS. MARTIROSIAN:  Object to form.                 18:35:41

 5         THE WITNESS:  So we're talking here               18:35:43

 6    specifically -- we're not talking about Infor          18:35:46

 7    CloudSuite.  Is that correct?  And Birst for           18:35:48

 8    CloudSuite?                                            18:35:50

 9    BY MR. C. GRAY:                                        18:35:51

10         Q.  Yeah.  I want to focus on the differences     18:35:51

11    between -- in the functionalities that were enabled    18:35:53

12    for analyst users, business users, and                18:35:56

13    read-only-lite users because what I understood you    18:35:58

14    to be saying is that they have different              18:36:01

15    functionalities, and read-only lite user has the      18:36:03

16    fewest enabled functionalities.                        18:36:05

17         A.  That's right.                                 18:36:07

18         Q.  Business user has the next-most-enabled       18:36:08

19    functionalities, and analyst user has the highest     18:36:11

20    enabled functionalities.                               18:36:14

21         Is that right?                                    18:36:17

22         A.  The -- yes.  The -- the three different       18:36:19

23    user profiles for Enterprise had to have              18:36:23

24    different -- to have different capabilities.           18:36:26

25         So the most functionally rich is what we          18:36:31
```

Page 122

| | | |
|---|---|---|
| 1 | refer to as "analyst," which, in sort of common | 18:36:34 |
| 2 | parlance in the industry, think of it as an | 18:36:37 |
| 3 | administrative user; somebody that, you know, sets | 18:36:39 |
| 4 | things up and creates user profiles and lots of -- | 18:36:42 |
| 5 | does technical work. | 18:36:45 |
| 6 | "Business" user is -- is a business person | 18:36:47 |
| 7 | using it inside the organization, and they have the | 18:36:53 |
| 8 | ability to create reports, et cetera. | 18:36:57 |
| 9 | Whereas the "read-only lite" user, as the | 18:37:01 |
| 10 | name suggests, read-only, has the ability to | 18:37:04 |
| 11 | consume analytics and reports that have been | 18:37:07 |
| 12 | created for them. | 18:37:12 |
| 13 | Q.  And the customers who purchased Birst for | 18:37:16 |
| 14 | CloudSuite had capabilities akin to the | 18:37:19 |
| 15 | read-only lite user? | 18:37:23 |
| 16 | A.  The -- within Birst for CloudSuite, | 18:37:28 |
| 17 | because as we discussed before, it's made up of | 18:37:33 |
| 18 | Birst Enterprise and Infor content, the analytic | 18:37:38 |
| 19 | capability of -- on the Birst side of the house is | 18:37:42 |
| 20 | akin to the read-only lite user. | 18:37:46 |
| 21 | Q.  I want to go to the next slide. | 18:37:53 |
| 22 | Can you just scroll down to the next | 18:37:55 |
| 23 | slide?  It's called "Birst editions - Detailed | 18:37:56 |
| 24 | View." | 18:38:02 |
| 25 | A.  Yes. | 18:38:03 |

Page 123

| | | |
|---|---|---|
| 1 | with us to talk about potentially being able to | 18:40:39 |
| 2 | sell to them, yes. | 18:40:42 |
| 3 | BY MR. C. GRAY: | 18:40:43 |
| 4 | Q.   Okay.   And what was the sales strategy for | 18:40:44 |
| 5 | Birst for CloudSuite?   And I'll explain that in | 18:40:51 |
| 6 | just a little bit. | 18:40:54 |
| 7 | So was Birst for CloudSuite intended to | 18:40:55 |
| 8 | drive upsell of other Birst products or offerings? | 18:40:59 |
| 9 | A.   Okay.   So I think that the strategy for | 18:41:07 |
| 10 | Birst for CloudSuite is -- is much broader.   It's | 18:41:10 |
| 11 | at an Infor company level rather than just a Birst | 18:41:15 |
| 12 | BU level. | 18:41:20 |
| 13 | So what Infor wanted to do was to secure | 18:41:22 |
| 14 | CloudSuite revenues and maintain and keep existing | 18:41:26 |
| 15 | CloudSuite clients. | 18:41:30 |
| 16 | And one of the challenges that they had | 18:41:33 |
| 17 | was not very good BI and analytics capability.   So | 18:41:37 |
| 18 | part of the strategy there for Infor is to replace | 18:41:45 |
| 19 | those legacy not-very-good BI and analytics tools | 18:41:49 |
| 20 | with something that is much better, which ended up | 18:41:53 |
| 21 | being Birst for CloudSuite, which, as we've | 18:41:57 |
| 22 | discussed before, is Enterprise plus the Infor | 18:42:01 |
| 23 | content sold as a component part of Infor | 18:42:05 |
| 24 | CloudSuite. | 18:42:08 |
| 25 | So the strategy from Infor is to win more | 18:42:11 |

Page 126

| | | |
|---|---|---|
| 1 | business and to retain its existing CloudSuite | 18:42:15 |
| 2 | clients by significantly improving the analytics | 18:42:18 |
| 3 | experience. | 18:42:24 |
| 4 | Q.  Okay.  So, in your view, the strategy with | 18:42:26 |
| 5 | Birst for CloudSuite was not to drive upsell of | 18:42:29 |
| 6 | Birst Professional or Birst Enterprise? | 18:42:35 |
| 7 | MS. MARTIROSIAN:  Object to form. | 18:42:37 |
| 8 | Mischaracterizes testimony. | 18:42:38 |
| 9 | THE WITNESS:  That wasn't what I intended. | 18:42:41 |
| 10 | I -- what I intended to say was that the primary | 18:42:45 |
| 11 | focus for Infor's business is around keeping and | 18:42:50 |
| 12 | winning new CloudSuite clients, and Birst was seen | 18:43:01 |
| 13 | as significant assistance in doing that. | 18:43:05 |
| 14 | And naturally, what both the broader Infor | 18:43:08 |
| 15 | and Birst would want is that if the client has a | 18:43:12 |
| 16 | positive experience in consumption of the Birst for | 18:43:19 |
| 17 | CloudSuite component of CloudSuite, then | 18:43:23 |
| 18 | potentially, there's -- that gives us an | 18:43:27 |
| 19 | opportunity to talk about additional sales outside | 18:43:29 |
| 20 | of Birst for CloudSuite within Infor CloudSuite. | 18:43:34 |
| 21 | And clearly, the whole organization, | 18:43:41 |
| 22 | including the Birst business unit, would welcome | 18:43:43 |
| 23 | that potential. | 18:43:45 |
| 24 | BY MR. C. GRAY: | 18:44:15 |
| 25 | Q.  Can you turn to Slide 18. | 18:44:16 |

Page 127

```
 1        Q.   Okay.  Can we go to Slide 21?        18:46:37

 2            This one's called "FAQs" again, and it  18:46:52

 3     says:                                          18:46:56

 4            "If a customer buys 100 CloudSuite      18:46:56

 5        licenses how many Birst licenses do they    18:46:58

 6        own?"                                        18:47:01

 7        A.   I have it.                              18:47:04

 8        Q.   Okay.  And under that bullet it reads:  18:47:04

 9            "Their 100 CloudSuite licenses give them 18:47:09

10        access only to Birst for CloudSuite          18:47:12

11        capabilities and predelivered content via a  18:47:13

12        CSLU, CloudSuite limited use license.  They  18:47:16

13        do not own any licenses of Birst Professional 18:47:20

14        or Birst Enterprise."                        18:47:23

15            Do you see that?                          18:47:24

16        A.   I do.                                    18:47:25

17        Q.   So if a customer purchased Birst for     18:47:31

18     CloudSuite and thus obtained a CloudSuite limited 18:47:34

19     use license, did they have access to the          18:47:38

20     capabilities that were enabled in                 18:47:42

21     Birst Professional or Birst Enterprise?           18:47:46

22            MS. MARTIROSIAN:  Object to form.  Vague  18:47:48

23     as to "Enterprise."                               18:47:49

24            THE WITNESS:  So I think the FAQ is pretty 18:47:54

25     clear here that the number of Birst for CloudSuite 18:47:59
```

Page 130

```
 1    licenses is driven by the number of Infor          18:48:07

 2    CloudSuite licenses because Birst for CloudSuite is  18:48:10

 3    a component part of -- an integral part of Infor    18:48:13

 4    CloudSuite.                                         18:48:19

 5            And the -- the users on the client end      18:48:21

 6    only have the right to the functionality enabled    18:48:27

 7    within Birst for CloudSuite.  They do not           18:48:34

 8    automatically accrue any rights for                 18:48:39

 9    Birst Professional or Birst Enterprise.             18:48:41

10    BY MR. C. GRAY:                                     18:48:43

11        Q.  Okay.  Let's turn to Slide 25.  This is     18:48:43

12    another FAQ and the top bullet reads:               18:49:00

13            "Is it true that Infor BI will still be a    18:49:03

14        part of CloudSuite FSM?"                        18:49:06

15        A.  I have it.                                  18:49:08

16        Q.  Okay.  And under the bullet, it reads:      18:49:09

17            "Yes.  Infor BI has been renamed            18:49:22

18        Infor d/EPM and will be the reporting tool in   18:49:26

19        CloudSuite FSM for financial planning and       18:49:30

20        budgeting.  All other reporting will be         18:49:33

21        delivered with Birst.  Infor BI is not sold     18:49:36

22        stand-alone anymore.  Birst will eventually     18:49:42

23        replace financial reporting currently           18:49:44

24        delivered via d/EPM."                           18:49:47

25            Do you see that?                            18:49:52
```

Page 131

| | | |
|---|---|---|
| 1 | content that pertains to a particular business | 21:13:39 |
| 2 | problem and a use case.  And what we're trying to | 21:13:42 |
| 3 | emphasize, I believe, here is trying to open | 21:13:46 |
| 4 | people's minds to -- to that. | 21:13:49 |
| 5 | And that -- that's my understanding of -- | 21:13:53 |
| 6 | of the objective here. | 21:13:56 |
| 7 | BY MR. C. GRAY: | 21:13:57 |
| 8 | Q.  Okay.  And in fiscal year 2018 -- or | 21:13:58 |
| 9 | fiscal year 2019, could Birst for CloudSuite | 21:14:01 |
| 10 | provide, as you put it, "bespoke content" to a | 21:14:04 |
| 11 | customer? | 21:14:07 |
| 12 | MS. MARTIROSIAN:  Object to form. | 21:14:10 |
| 13 | THE WITNESS:  Okay.  So Birst for | 21:14:12 |
| 14 | CloudSuite, as we know, is a combination of | 21:14:14 |
| 15 | Birst Enterprise and Infor content.  The Infor | 21:14:20 |
| 16 | content was prebuilt content, a specified set of | 21:14:25 |
| 17 | reports, et cetera, and that could not be bespoke | 21:14:32 |
| 18 | because the relevant close -- the relevant license, | 21:14:38 |
| 19 | user license within Birst for CloudSuite, is the | 21:14:46 |
| 20 | read-only lite license. | 21:14:51 |
| 21 | BY MR. C. GRAY: | 21:14:54 |
| 22 | Q.  Okay.  I want to go to the next bullet in | 21:14:55 |
| 23 | this slide.  It says: | 21:14:58 |
| 24 | "We are BI experts, and we are incented | 21:14:59 |
| 25 | to work together." | 21:15:02 |

Page 196

```
 1          groups such as M3 and LN and the associated        21:33:34

 2          support for various integrations, including        21:33:38

 3          to OS and Data Lake, etc., have created a lot      21:33:42

 4          of the noise in the system that you are            21:33:46

 5          hearing."                                          21:33:48

 6              Do you see that?                               21:33:49

 7          A.  I do see that.                                 21:33:51

 8          Q.  Can you explain to me what you meant in        21:33:53

 9     that second sentence where you refer to "OS and         21:33:55

10     Data Lake"?                                             21:33:58

11          A.  Yeah.  So OS and Data Lake:  So these          21:34:02

12     are -- these are Infor products.  The Data Lake is      21:34:07

13     Infor's version of a data lake that -- many, many       21:34:14

14     companies have data lakes.                              21:34:16

15              And the OS, I can't remember what this --      21:34:19

16     these initials stand for.  Something -- it's --         21:34:22

17     it's something associated with a platform or a          21:34:25

18     standard interface that Infor uses.  I apologize.       21:34:29

19     I'm not a product guy.  I can't remember what "OS"      21:34:32

20     stands for.                                             21:34:36

21          Q.  And what did you mean when you said:           21:34:41

22              "...the associated support for various         21:34:43

23              integrations...has created a lot of the noise  21:34:45

24              in the system that you are hearing"?           21:34:50

25          A.  So I think with the overall -- what I'm        21:34:55
```

Page 210

| | | |
|---|---|---|
| 1 | trying to convey here is that -- what date are we | 21:34:57 |
| 2 | here?  We're in December of 2018.  Right? | 21:35:02 |
| 3 | You know, there's been -- this is now over | 21:35:07 |
| 4 | 18 months after the acquisition.  It's taken a | 21:35:12 |
| 5 | very, very long time to create the Birst for | 21:35:16 |
| 6 | CloudSuite component for CloudSuite and to be sure | 21:35:25 |
| 7 | that Birst is integrated into various other | 21:35:30 |
| 8 | systems, middleware, the data lake I refer to.  It | 21:35:35 |
| 9 | took a very long time. | 21:35:38 |
| 10 | And, you know, we had anticipated and | 21:35:44 |
| 11 | hoped that the integrations and the creation of the | 21:35:46 |
| 12 | Birst for CloudSuite component for CloudSuite would | 21:35:51 |
| 13 | have been done, you know, much, much earlier.  And | 21:35:53 |
| 14 | time scales kept slipping, which I -- I'm aware of | 21:35:56 |
| 15 | why rather than the detail -- but, essentially, | 21:36:01 |
| 16 | lack of resources that had been dedicated to it. | 21:36:03 |
| 17 | So when you're having different messages | 21:36:07 |
| 18 | come out at different times and different target | 21:36:09 |
| 19 | objectives and dates and then it changes again, you | 21:36:12 |
| 20 | know, that creates a community of thousands of | 21:36:15 |
| 21 | people, and that creates confusion and, you know, | 21:36:19 |
| 22 | wondering when things are going to come out, what's | 21:36:26 |
| 23 | it going to look like, what's it going to do, all | 21:36:29 |
| 24 | that kind of stuff. | 21:36:32 |
| 25 | I think it's natural that with the | 21:36:33 |

Page 211

```
1    challenges, we had multiple delays, causing        21:36:35
2    confusion.  I think that's probably a lot of what  21:36:42
3    Tony was picking up on.  So --                     21:36:45
4        Q.  Well, you wrote this email -- actually, I  21:36:56
5    understand what you're saying.                     21:36:59
6            In the next paragraph, you write:          21:37:01
7            "I'm not quite sure how the reps get to    21:37:02
8        'Birst for CS is useless' because until now,   21:37:04
9        it has been CA, not GA" --                     21:37:08
10           Is that controlled availability and        21:37:11
11   general availability?                              21:37:12
12       A.  Yes, it is.                                21:37:13
13       Q.  (Reading):                                 21:37:14
14           -- "and therefore only just starting to    21:37:15
15       be deployed to a limited number of clients in  21:37:17
16       the last few months."                          21:37:19
17       Do you see that?                               21:37:21
18       A.  I do.                                      21:37:22
19       Q.  And the next paragraph you write:          21:37:25
20           "But, breaking news.  Attached is a deck   21:37:27
21       Brad and Massimo jointly presented at the ECM  21:37:29
22       yesterday in NYC."                             21:37:34
23           What's the "ECM"?                          21:37:35
24       A.  It's the executive team.                   21:37:38
25       Q.  (Reading):                                 21:37:40
```

                                                    Page  212

```
1         Q.  Can you explain what you were saying in      21:38:59

2    this paragraph?                                        21:39:01

3         A.  I certainly can.  So we've discussed a        21:39:03

4    number of times that Birst for CloudSuite is a         21:39:07

5    component of CloudSuite, and it is made up of Birst    21:39:12

6    Enterprise product on the analytics side and Infor     21:39:23

7    content.                                               21:39:27

8             And for the -- because Birst has a single     21:39:29

9    code base, it's a part of the -- the Birst for         21:39:33

10   CloudSuite component, but the user type within         21:39:41

11   Birst for CloudSuite is the read-only lite user;       21:39:48

12   that is, the capability that is enabled is the         21:39:51

13   read-only lite user.                                   21:39:56

14            And therefore, it is not -- when I say        21:39:58

15   "our full Enterprise version," what I mean is a        21:40:03

16   full Enterprise version as defined by business         21:40:06

17   users or analyst users, and it is also, as I say,      21:40:09

18   confined to -- we discussed this several times --      21:40:12

19   it's confined to the data within the CloudSuite        21:40:16

20   product only.                                          21:40:20

21        Q.  Was it important to customers that they       21:40:27

22   have access to data outside of the CloudSuite          21:40:29

23   product?                                               21:40:33

24            MS. MARTIROSIAN:  Object to form.  Calls      21:40:36

25   for speculation.                                       21:40:37
```

Page 214

| | | |
|---|---|---|
| 1 | paragraph, isn't it? | 21:53:32 |
| 2 | Q.   Yep, towards the end of that paragraph. | 21:53:33 |
| 3 | A.   Yes, I do see it. | 21:53:36 |
| 4 | Q.   Okay.  Was the Birst business unit's | 21:53:38 |
| 5 | bookings target for fiscal year 2020 $28 million? | 21:53:44 |
| 6 | A.   It appears so from this email.  I think I | 21:53:51 |
| 7 | said earlier I couldn't remember what it was, but | 21:53:54 |
| 8 | it looks like it's this number here, yes. | 21:53:57 |
| 9 | Q.   Okay.  And then in the next section of | 21:53:59 |
| 10 | this email, you summarize the Birst business unit's | 21:54:01 |
| 11 | performance in fiscal year 2018 and fiscal year | 21:54:06 |
| 12 | 2019. | 21:54:08 |
| 13 | Do you see that? | 21:54:10 |
| 14 | A.   I do. | 21:54:14 |
| 15 | Q.   Okay.  And in the -- under the "FY18" | 21:54:15 |
| 16 | heading, the first bullet reads: | 21:54:18 |
| 17 | "$14.4 million bookings in total v. BU | 21:54:20 |
| 18 | quota of $18 million." | 21:54:27 |
| 19 | Do you see that? | 21:54:30 |
| 20 | A.   I do. | 21:54:30 |
| 21 | Q.   And according to this document, were | 21:54:32 |
| 22 | Birst's bookings in fiscal year 2018 $14.4 million? | 21:54:34 |
| 23 | A.   I believe so.  I believe that that was my | 21:54:46 |
| 24 | understanding at the time. | 21:54:47 |
| 25 | Q.   Okay.  The next bullet says: | 21:54:48 |

Page 219

```
 1                    CERTIFICATE OF REPORTER
 2           I, HOLLY THUMAN, a Certified Shorthand Reporter,
 3     hereby certify that the witness in the foregoing
 4     deposition was by me duly sworn to tell the truth, the
 5     whole truth, and nothing but the truth in the
 6     within-entitled cause; that said deposition was taken
 7     down in shorthand by me, a disinterested person, at the
 8     time and place therein stated; and that the testimony
 9     of said witness was thereafter reduced to typewriting
10     by computer, to the best of my ability via remote
11     videoconferencing, under my direction and supervision;
12           That before completion of the deposition review of
13     the transcript [X] was [] was not requested/offered.
14     If requested, any changes made by the deponent (and
15     provided to the reporter) during the period allowed are
16     appended hereto.
17           I further certify that I am not of counsel or
18     attorney for either or any of the parties to the said
19     deposition, nor in any way interested in the event of
20     this cause, and that I am not related to any of the
21     parties thereto.
22
23     DATED: June 15, 2021
24     Holly Thuman
25     HOLLY THUMAN, CSR
```

Page 290

# EXHIBIT 7

CONFIDENTIAL

# 2017 Birst Packaging



EXHIBIT
71

# Seed and identify business-driven use cases

## Try and Buy

- Seed LOB with smart self-service data prep

- Differentiate with production capabilities and Birst Analytic Network

## Single User

- Race to bottom (led by MSFT)

- Market is rapidly becoming a commodity

## Departmental

- Core market

- Target LOB business case

- Expand to mid-market and team business use cases

- Win with superior product, economics, and relationship

## Enterprise

- Expand to enterprise IT

- Differentiate with enterprise architecture

- Target CDO and Data-savvy CIO: Data-as-a-service and Data monetization



# Updated packaging



jmperales@infor.com   07.20.2018 13:00   CONFIDENTIAL

*Advanced Enterprise Edition anchored on Automated Machine Learning (later in 2017)

3

# When to position Pro Edition vs Enterprise Edition

| | Eject | Professional Edition | Enterprise Edition |
|---|---|---|---|
| Business use case | "Would like to play around" | Defined business need for group | Defined business need for department(s) |
| Use case complexity | Unknown | Simple to moderate (a few data sources) | Moderate to complex (multiple data sources) |
| # Users | 1 – 5 | 15 – 50 | >50 |
| User location | Unknown | Internal only | Internal / external |
| Business sponsor (authority) | Analyst | Director (LOB or IT) | VP / C- level (LOB / IT) |
| Timing | Unknown | <3 months | <6 months |
| Budget | Not clear | $12k+ | $100k+ |

4

# Direct: Pro Edition and Enterprise Edition Pricing

## PROFESSIONAL: User pricing

- **$12k / year**
  - First 30 users
  - $1000/month
- **Additional users: $360/ year**
  - $30/ user/ month

- Includes capabilities for workgroup
- Requires annual commitment

## ENTERPRISE: Platform and User pricing

- **$100k / platform / year**
- **$750 / user / year**
- **$5,000 / analyst / year**

- Includes capabilities for an enterprise or department
- Additional enterprise capabilities chosen a-la-carte

## ENTERPRISE Departmental pricing

- **Min of $150k / year**

- Guidelines for pricing by buckets of max users (regulated by departmental definition)
- Includes all Birst enterprise capabilities



an-perales@infor.com 07.20.17 CONFIDENTIAL

# Guidelines on departmental edition

| # employees in department | Starting point | Minimum allowed |
|---|---|---|
| <100 | $150k | $100k |
| 100 – 500 | $300k | $150k |
| 500 – 2000 | $500k | $300k |
| 2000 – 5000 | $800k | $500k |
| >5000 | $1.5M - $5M | $750k |



6

# What features are available in Pro vs Enterprise

| | Professional | Enterprise (Per User) | Enterprise (Departmental) |
|---|---|---|---|
| Visualizer | ✓ | ✓ | ✓ |
| Dashboards | ✓ | ✓ | ✓ |
| Mobile | ✓ | ✓ | ✓ |
| Cloud Connectors | ✓ | ✓ | ✓ |
| Connected Data  Prep (Pronto) & End-user Data Blending | ✓ | $ | ✓ |
| Networked Business Analytics (Tops-down and packages) | ✓ | $ | ✓ |
| Automated Data Refinement  (ADR) | | ✓ | ✓ |
| Enterprise Data Prep and complex transformations | | ✓ | ✓ |
| White labeling, SSO, and APIs, Embedding | | ✓ | ✓ |
| Pixel Perfect Reporting | | ✓ | ✓ |
| Always-On | | $ | ✓ |
| Offline Mobile | | $ | ✓ |
| R-Integration | | $ | ✓ |
| Exasol In-Memory Boost | | $ | $ |
| Additional Hosting Site | | $ | $ |
| Optional Cloud Connectors | | $ | $ |
| Accelerators | | $ | $ |

7

# Birst Enterprise Edition



# Birst Professional Edition



# Detailed customer facing packaging

- BIKE: https://birst-bike.jiveon.com/docs/DOC-3778



10

# FAQ on Pro Edition

- Does not include all connectors in Enterprise Edition – only those listed (SFDC, Google Analytics, Marketo, JIRA, & file, initially)
  - This will be enhanced (databases, etc…) as time goes without additional costs
- There is no difference in user fee (no creator, viewer, etc…)
- Pro Edition is not available for Embedded / OEM deals
- Not available on Appliance



# Questions for Pro vs Enterprise

- Sales
  - Pipeline movement & territory changes (pre/post performance)
- Marketing
  - Lead bottlenecks, conforming the customer 'dimension' across data sources
- Supply chain & operations
  - Cross-company networked (internal / external) analytics
  - Conforming internal /external dimensions
- Exec/Finance
  - Cross-department networked analytics
- Services & support
  - Case resolution bottlenecks
- IT
  - Cross-department network
  - Dimensional Modeling, Slowly Changing Dimensions, Snapshots





Enterprise Edition Pricing Updates

# Specific Changes to Enterprise Edition

- Updates
  - Global language pack (folded in)
    - Included in all enterprise editions (per user /department) – now 19 languages ootb
  - End-user Data Blending (folded in)
    - Now part of "Connected Data Prep (pronto)" package
  - Guidelines for standard Hosting, Back-up, & DR: Assume 8X compression to on-premises data
  - Exasol hosting fee* - Required
    - Assume 2X compression to on-premises data
  - Max User Limits and Pricing Mins for Departmental pricing
- New:
  - Connected Data Prep
    - $50k/year add-on to enterprise edition (when sold per user), Included in Departmental edition
  - Additional hosting site
    - $25k annual fee



14

# Subscription add-on options

| Option | Product | Departmental *(per department or business unit - embedded)* | Platform & *(User or Customer or Product - embedded)* |
|---|---|---|---|
| **Enterprise options** | | | |
| | Always-On | ✓ | 25% of ARR or $25k min |
| | Hosting, Back-up & DR (beyond 200 GB) | $25k / TB | $25k / TB |
| | Optional connector package (choose 5) | $20k | $20k |
| | *Additional hosting site* | *$25k* | *$25k* |
| **Use Case Specific** | | | |
| | Offline mobile | ✓ | $1000 / user |
| | In-memory Boost – powered by Exasol* | 20% of ARR* | 20% of ARR* |
| | *In-memory Exasol Hosting* | *$25k / TB* | *$25k / TB* |
| | Centrally provisioned packages | ✓ | $50k |
| | *Connected Data Prep** | ✓ | *$50K* |
| | R- Integration | ✓ | $15,000 |
| | Tableau client interface | $100 / user | $100 / user |
| | Accelerators | $25k / each | $25k / each |

Hosting, back-up, DR applies after initial 200GB.  Appliance customers do not pay for this, but will need to consider their own hosting, back-up, and DR strategy and resources.

Exasol license fee is minimum of $20k. Exasol min hosting fee: $25k

Always-on. Consider additional hosting fees (2X space that is always-on)
Languages:  English, Brazilian Portuguese, German, Arabic, Korean, Simplified Chinese, Japanese, French, Spanish, Dutch, Swedish, Czech, Slovak, Polish, Croatian, Portugese, Slovenian, Hungarian, Serbian

15

# Exasol on Appliance

- Updated Pricing coming soon!
- Only available on AWS and Bare Metal



# Up-sells

- **Anyone who bought End-user Data Blending already owns Pronto**
- What if my account wants to try Pronto?
  - Example:
    - They own departmental pricing or End-user data blending
    - They OWN IT! – please try it and give us feedback. Attend webinars, Get on the Community!
    - Follow up!
  - Example:
    - They own Platform + Per User license
    - Buy Connected Data Prep (Pronto)
  - Example:
    - Sales department owns Enterprise Edition (departmental pricing)
    - Marketing department wants to "try Birst"
    - They can TRY with Pro Edition, but to network to Sales Dept they must by Enterprise Edition
  - If they own the appliance? Wait until Q3



17



Embedded Packaging

# Embedded: Price by User, Customer, or BU/Product Line

## By Platform and User

- **$100k / platform fee**
- **$750 / end-users**
- **$5,000 / analyst**

- Includes all Birst standard capabilities
- Additional enterprise capabilities chosen a-la-carte

## By Customer

- **$100k / platform fee**
- **$1000 / customer**

- Includes all Birst standard capabilities & 5 internal analyst
- Additional enterprise capabilities chosen a-la-carte

## By Product Line or BU

- **Min of $150k**

- Priced in buckets of max users or customers (regulated by departmental definition)
- Includes all Birst enterprise capabilities



19

# Guidelines on By BU or Product Line

| # external users | Starting point | Minimum allowed |
| --- | --- | --- |
| <100 | $150k | $100k |
| 100 – 500 | $300k | $150k |
| 500 – 2000 | $500k | $300k |
| 2000 – 5000 | $800k | $500k |
| >5000 | $1.5M - $5M | $750k |

Note: if prospect does not know # external users, they may know # external concurrent users.  Assume a 10:1 named: concurrent ratio



# FAQ on Embedded Packaging

- No Professional Edition for Embedded
- Aim to sell:
  - At a product / application level to ISVs
  - At a Business Unit level for "data monetization"
- Embedded accounts only get 5 internal users with contract
  - Have to buy Internal Use Separately
  - There is a separate contract for Embedded
- Same pricing on Appliance as Cloud
  - Hosting fee does not  apply for Appliance



21

Professional Edition Services & Education



# Birst 6 Professional – Offerings Summary Sheet

| Target User/Analyst ➜ Offering Components ⬇ | Expert BI / Analytics Professional | Excel Jockey / Business Analyst | Novice User / No Analyst |
|---|---|---|---|
| Birst 6 Professional License | ✔ | ✔ | ✔ |
| Access to Online Enablement Content* | ✔ | ✔ | ✔ |
| Access to Webinars by Birst Support* | ✔ | ✔ | ✔ |
| Go Live Advisory Services# | ✖ | ✔ | ✔ |
| Go Live Delivery Services# | ✖ | ✖ | ✔ |

*Included with License
#Additional fee

# Birst Support Services Compared

| | Free Trial Support | Professional Edition Support | Standard Support | Priority Support |
|---|---|---|---|---|
| Community Support | Yes | Yes | Yes | Yes |
| Response SLO (S0/S1/S2/S3/S4) | N/A | 4hrs/ 1bd (Production Down/Question) | 2 hrs/4 hrs/8 hrs/1 bd/2 bd | 1 hr/2 hr/4 hrs/8 hrs/12 hrs |
| Resolution SLO (S0/S1/S2/S3/S4) | N/A | N/A | 8hrs/16hrs/5 bd/7bd/10 bd | 4 hrs/8 hrs/3 bd/5 bd/8 bd |
| Hours | N/A | Support during Local Business Hours | 24*5 Support for S0/S1 Support for S2/S3/S4 during local business hours | 24x7 Support for S0/S1 24*5 for S2/S3/S4 |
| Number Of Authorized Contacts | None | 1 | 2-4 depending on contract size | 6 |
| Buy Authorized Contacts | No | No | Yes | Yes |
| Access to LMS self-training videos | No | No | No | 2 named users |
| Developer Support | No | No | No (Can be bought separately) | 5 hrs/Quarter INCLUDED! |
| Quarterly Readiness Upgrade Consultation | No | No | No | Yes |
| Birst Forward Tickets | No | No | No | 1 Tickets to Birst Forward INCLUDED! |

24



Key Items to Remember

# When to position Pro Edition vs Enterprise Edition

| | **Eject** | **Professional Edition** | **Enterprise Edition** |
|---|---|---|---|
| Business use case | "Would like to play around" | Defined business need for group | Defined business need for department |
| Use case complexity | Unknown | Simple to moderate (a few data sources) | Moderate to complex (multiple data sources) |
| # Users | 1 – 5 | 15 – 50 | >50 |
| Business sponsor (authority) | Analyst | Director (LOB) | VP / C- level (LOB & IT) |
| Timing | Unknown | <3 months | <6 months |
| Budget | Not clear | $10k+ | $100k+ |



26

# Items to Remember

- Exasol available only:
  - Birst Cloud
  - Appliance on BARE METAL or AWS
- Hosting is not data storage
- Connected Data Prep (Pronto) is an add-on when we price as platform and per user
  - Only available in Cloud until Q3
- Pro Edition IS
  - A way to get started in target account (if Enterprise deal isn't there)
  - NOT a cheap way to sell to small accounts
  - Only available in Cloud (for now)



27



# Descriptions of offerings

# Additional description to help objections

- What do similar companies charge:

- Why do we charge for HOSTING, back-up, and DR:
  - We do NOT charge for data storage, we charge for hosting a complete full-stack BI platform.  They are very different things.  You can use the following language to help explain the difference between hosting and storage to a prospect:
  - We are offering hosting for a complete BI platform.  That involves:  A license for complete Analytical data store, tuning and performance indexing of that analytic data store, maintenance and upgrades and patches of that analytics data store.  Additionally, we are providing, a complete web-based stack that scales horizontally, including load balancing, high-availability with SLA, web-servers, middle tier, admin database, file system, and caching.  For this entire stack, we provide back-up, hot-standby, uptime, disaster recovery, security certifications, hardware refreshes, and many other activities that a customer would have to do if they ran the a complete BI platform on-premises (or in AWS) by themselves.  These are people, hardware, software, and hosting costs - not just data storage. These costs are far greater than providing data storage in AWS. Most of our customers find that if they were to run any BI platform in their own cloud or AWS, their own hosting fees would be much greater (just a single person to run it would be ~$150k - $200k / year)



29

# Additional hosting site

- Ability to deploy in multiple Birst Public cloud sites around the globe.

- Each additional site is charged at $25K.  Birst Public Cloud has hosting sites in EMEA (Dublin), NA(Santa Clara), and APAC (Australia & Singapore.)

- The additional site is managed as separate account; no data or content is replicated across hosting sites.



30

# EXHIBIT 8



**Birst Pricing and Packaging Options**
SKO FY19 – INTERNAL ONLY

Pedro Arellano

July 10, 2018

CONFIDENTIAL

INvPSG00128721

**Exhibit**
00047



CONFIDENTIAL

INvPSG00128722



CONFIDENTIAL

INvPSG00128723

# Birst pricing and packaging summary

## Birst standalone

- Largely unchanged from pre-acquisition
- Differences:
  - No more Departmental licensing
  - "Plus" add-on bundles
  - Birst Pro Read-only Lite user
  - Term licensing for Appliance
  - Perpetual licensing

- Some inconsistencies in CPQ

## Birst+Infor applications

- CloudSuite vs. Non-CloudSuite products
- CloudSuite packaging
  - Everything bundled in one SKU
- Non-CloudSuite packaging
  - Separate SKUs for content (analytic packs), Birst platform, and replication DB if needed

- More details in Wednesday's session on Birst+Infor integration



4

# A Birst edition for every use case

| Try and Buy | ERP Reporting | Workgroup | Enterprise |
|---|---|---|---|
| • Seed LOB with end-user oriented BI and analytics<br><br>• Frictionless method to engage and establish relationship | • Pre-delivered data models, KPIs, reports and dashboards<br><br>• Understand what is happening in core application | • Target LOB business case<br><br>• Land-and-expand to new parts of the organization<br><br>• Win with superior product, economics, and relationship | • Expand to enterprise IT<br><br>• Differentiate with enterprise architecture<br><br>• Target CDO and Data-savvy CIO: Data-as-a-service and Data monetization |

birst

INvPSG00128725

# Birst editions: High-level view

| | Birst for CloudSuite | Birst Professional Edition | Birst Enterprise Edition |
|---|---|---|---|
| Use Case | Standard reporting | Extended Discovery Analytics | Networked Analytics |
| Data Sources | Only CloudSuite application data | Flat files / Popular Cloud Applications / Relational Databases | ERPs / EMRs / Big data apps / 3rd Party, etc. |
| Data Model | Only delivered data structures | Simple relational data model 1 – 20 tables | Dynamic dimensional data model w/ 10 + tables |
| User Count | All CS named users | 5 – 100 users | 50 users – ELA |
| Time to Value | days / weeks | weeks | months |
| Price Point | Included with core app | $10k - $50k | $100k - $2M+ |
| Targets | CS clients requiring basic reporting and analysis | LIO, CS HC clients' small-to-medium Departments | Entire organizations, or departments with large data |

birst

6

CONFIDENTIAL

INvPSG00128726

# Birst editions: Detailed view

| Feature | Birst Trial | Birst for CloudSuite | Birst Professional | Birst Professional Plus | Birst Enterprise | Birst Enterprise Plus |
|---|---|---|---|---|---|---|
| Product Description | Free Trial | Included in multi-tenant CloudSuites | Departmental & SMB Edition | Departmental & SMB Edition | Enterprise Edition | Enterprise Edition |
| Infor Deployment Scenario | | Multi-tenant & new single tenant customers | On-prem, single & multi-tenant | On-prem, single & multi-tenant | On-prem, single & multi-tenant | On-prem, single & multi-tenant |
| Birst Deployment Scenario | | Multi-tenant | Multi-tenant | Multi-tenant | On-prem, single & multi-tenant | On-prem, single & multi-tenant |
| Dashboards | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Live Access (query data in place) | ✓ | | ✓ | ✓ | ✓ | ✓ |
| Ad Hoc discovery & visualization (Visualizer) | ✓ | | ✓ | ✓ | ✓ | ✓ |
| End User data preparation (Pronto) | ✓ | | ✓ | ✓ | Add on | ✓ |
| Pixel-perfect reports (Designer) | | ✓ | | ✓ | ✓ | ✓ |
| Birst Mobile | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Admin report scheduling (Triggered & Time-based distribution) | | ✓ | | ✓ | ✓ | ✓ |
| Notifications (self service scheduling from dashboard) | | | ✓ | ✓ | ✓ | ✓ |
| Column Level Security | | | ✓ | ✓ | ✓ | ✓ |
| Drill Maps (for global drilling) | | | ✓ | ✓ | ✓ | ✓ |
| Global Variables (to support incremental data loads, etc.) | | | ✓ | ✓ | ✓ | ✓ |
| Product Feature Security (based on user group) | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Open Client Interface (Excel/others) | | | Add in per named users | Add in per named users | Add in per named users | Add in per named users |
| Networked BI (model blending) | | | | ✓ | Add in | ✓ |
| Access to Birst Web Services API | | | | ✓ | ✓ | ✓ |
| Single Sign On (SSO) support | | | | ✓ | ✓ | ✓ |
| Embedding Birst into another web-based application | | | | ✓ | ✓ | ✓ |
| Conformed Dimension Automation | | | | | ✓ | ✓ |
| Slowly Changing Dimension Support (Type 2) | | | | | ✓ | ✓ |
| Snapshots of source applications (to build history) | | | | | ✓ | ✓ |
| Auto-detection of source data change | | | | | ✓ | ✓ |
| Support for custom fiscal calendars | | | | | ✓ | ✓ |
| Auto-assignment of users to feature groups | | | | | ✓ | ✓ |
| Row Level security | | | | | ✓ | ✓ |
| Aggregate Awareness | | | | | ✓ | ✓ |
| Offline Mobile | | | | | ✓ | ✓ |
| OLAP cube data source support | | | | | ✓ | ✓ |
| Customized data processing sequence | | | | | ✓ | ✓ |
| In-memory Database for ADR storage | | | | | Add in | Add in |
| Always On (no downtime during data load) | | | | | Add on | ✓ |

INvPSG00128727

## Birst subscription pricing: Platform and users

|  | **Birst Professional** | **Birst Professional Plus** | **Birst Enterprise** | **Birst Enterprise Plus** |
|---|---|---|---|---|
| **Base price** | $9,500/year | Additional $25,000/year | $100,000/year | Additional $95,000/year |
| **Includes** | 5 Business Users | N/A | 2 Analyst Users<br>18 Business Users<br>------------------<br>OEM: 5 Analysts | N/A |
| **User fees** | Business User: $420/year<br>Pro Lite User: $180/year | Business User: $420/year<br>Pro Lite User: $180/year | Analyst User: $5,000/year<br>Business User: $750/year<br>Read-only Lite: $200/year | Analyst User: $5,000/year<br>Business User: $750/year<br>Read-only Lite: $200/year |

- Virtual Appliance: Same price as SaaS if sold as 1-year Term license.
- Perpetual licensing: 4X price of SaaS licenses.



8

CONFIDENTIAL

INvPSG00128728

# Birst subscription pricing: Add-on options

| | Professional | Professional Plus | Enterprise | Enterprise Plus |
|---|---|---|---|---|
| Networked BI | | X | $50,000 | X |
| Connected Data Prep | X | X | $50,000 | X |
| Always On | | | 25% of ACV or min $25K | X |
| R integration | | | $15,000 | $15,000 |
| Offline mobile | | | $1,000/user | $1,000/user |
| Open Client Interface | | | $100/user | $100/user |
| Optional Connector Package | | | $20,000 | $20,000 |
| In-memory boost (Exasol) | | | 20% of ACV or min $20K | 20% of ACV or min $20K |
| Hosting, Backup, DR (> 200GB) | $25K/TB, $5K/200GB | $25K/TB, $5K/200GB | $25K/TB, $5K/200GB | $25K/TB, $5K/200GB |
| Additional hosting site | $25,000 | $25,000 | $25,000 | $25,000 |
| Solution accelerators | $25,000/each | $25,000/each | $25,000/each | $25,000/each |



- *Hosting, back-up, DR applies after initial 200GB. Appliance customers do not pay for this, but will need to consider their own hosting, back-up, and DR strategy and resources.*

- *Always-on. Consider additional hosting fees (2X space that is always-on)*

CONFIDENTIAL



Frequently Asked Questions

10

CONFIDENTIAL

# FAQs

• **What components should be included in a typical Birst quote?**

When selling Birst standalone, a typical quote should include:

- Birst platform: Birst Professional Edition or Birst Enterprise Edition.
  (The Birst platform is not required for a customer who is adding users or add-on features to an existing use case/deployment)

- Named users: When the customer requires more users than those included in the Birst platform. Birst Professional includes 5 Business Users. Birst Enterprise includes 2 Analyst Users and 18 Business Users when selling a "Direct" deal, or 5 Analysts when selling an "Embedded" deal.

- Add-on capabilities: These can be purchased a-la-carte or bundled at a discount via the Birst Professional Plus and Birst Enterprise Plus add-on bundles. Please see the Birst product catalog for a detailed listing of all add-on capabilities.



11

# FAQs

- **What are the differences between Birst user licenses?**

  Analyst User: Access to everything in Birst, including the Administrator console, Designer, Pronto, Visualizer, Dashboards, and Mobile.

  Business User: Access to Designer, Pronto, Visualizer, Dashboards and Mobile.

  Read-only Lite User: Access to Dashboards and Mobile.



CONFIDENTIAL

# FAQs

- **Do users who only receive PDF reports via email need a license?**

  No, PDF report recipients do not require a license. Licenses are required by users who need to login to Birst.



13

CONFIDENTIAL

INvPSG00128733

# FAQs

## • Can I include Direct and Embedded SKUs in the same quote?

If there are two distinct use cases within a customer (i.e. they're using Birst for their Embedded application to serve their customers, but they're also using it to do internal analytics) they'll need to purchase the platform twice. In situations where Direct and Embedded SKUs are genuinely needed for the same use case, the Infor Deal Desk can manually configure the quote appropriately, contingent upon sales management approval.



CONFIDENTIAL

# FAQs

- **Can the Birst virtual appliance be sold using subscription pricing?**
  Yes. It must be sold as a 1-year Term license to use the same pricing as subscription licenses.



CONFIDENTIAL

# FAQs

• **How much storage is included in Birst Professional and Birst Enterprise?**

Birst Professional and Birst Enterprise include 200GB of storage in the Birst cloud. For customers deployed in the Birst cloud, there is a charge for Hosting, Backup and DR beyond 200GB for both editions. There is a 20MB limit per upload (only for files) in both Birst Professional and Birst Enterprise.



10

CONFIDENTIAL

# FAQs

- ### What Birst capabilities will be part of Birst for CloudSuite?

  Birst for CloudSuite gives users access to a pre-delivered data model, KPIs, reports and dashboards on top of the core CloudSuite data. These capabilities include access to Dashboards, Designer, Report Bursting and Mobile. Upgrading to Birst Professional Plus or Birst Enterprise is required to access Visualizer, to bring in additional data sources, or to modify/extend the existing data model.



CONFIDENTIAL

INvPSG00128737

# FAQs

**• How is pre-delivered content licensed with Infor products?**

For Infor CloudSuite products (e.g. FSM, HCM), Birst pre-delivered content (known as Birst for CloudSuite) will be baked into the license cost of CloudSuite. It is not necessary to quote the Birst platform, named users, or add-on capabilities separately.

For non-CloudSuite products (e.g. M3 Analytics, Lawson Analytics) the pre-delivered content will be sold separately from the Birst platform. Sales reps must quote the pre-delivered content pack and the appropriate Birst edition, with named users and add-on capabilities. In some cases a replication database may also be required.



INvPSG00128738

# FAQs

- **Does the pricing for Birst in the attach program include pre-delivered content?**

  No. Pre-delivered content packs for the various Infor products (i.e. M3 Analytics, Lawson Analytics) are sold separately from the Birst platform. The exception is Infor CloudSuite products, which include Birst for CloudSuite capabilities and are baked into the price of CloudSuite.



19

CONFIDENTIAL

# FAQs

- **If a customer owns Birst, do they receive pre-delivered content when it becomes available?**

  Customers will receive the new Birst pre-delivered content at no cost only if they already owned reporting/analytics content pre-delivered with an Infor analytics product (e.g. the customer already owned M3 Analytics content packs that had been built with Infor BI). Purchasing the Birst platform separately may still be required.



# FAQs

- **If a customer buys 100 CloudSuite licenses, how many Birst licenses do they own?**

  Their 100 CloudSuite licenses give them access only to Birst for CloudSuite capabilities and pre-delivered content via a CSLU (CloudSuite Limited Use) license. They do not own any licenses of Birst Professional or Birst Enterprise.



CONFIDENTIAL

# FAQs

- **What happens when a customer who already owns Birst for CloudSuite later buys Birst separately? Do the Birst for CloudSuite users have access to the content created in the separate edition of Birst?**

  No, CloudSuite users are granted access to Birst for CloudSuite content through a CSLU (CloudSuite Limited Use) license. A separate Birst license is required to access content created in Birst Professional or Birst Enterprise.



CONFIDENTIAL

# FAQs

- **What happens when a customer who already owns Birst later buys an Infor product and the attachment program automatically adds Birst?**

a. **Does the customer need to buy the Birst platform again?**

No, a customer does not need to purchase the Birst platform twice if the new users will be part of the same use case or networked to the original use case.



23

INvPSG00128743

# FAQs

- **What happens when a customer who already owns Birst later buys an Infor product and the attachment program automatically adds Birst?**

b.  **Do previously owned Birst user licenses have access to any Birst pre-delivered content in the Infor product?**

No, Infor product user licenses are separate from Birst user licenses. Users would need both a Birst license and an Infor product license.



CONFIDENTIAL

INvPSG00128744

# FAQs

• **Is it true that Infor BI will still be a part of CloudSuite FSM?**

Yes. Infor BI has been renamed Infor d/EPM and will be the reporting tool in CloudSuite FSM for
financial planning and budgeting. All other reporting will be delivered with Birst. Infor BI is not sold
standalone anymore. Birst will eventually replace financial reporting currently delivered via d/EPM.



CONFIDENTIAL

INvPSG00128745

# FAQs

- **Does Birst have the ability to access data in Infor OLAP cubes?**

  Birst does not currently access data from Infor OLAP cubes. This capability is on the Birst product roadmap as a future deliverable.



26

CONFIDENTIAL

INvPSG00128746

# FAQs

- **What is the upgrade path for Birst for CloudSuite customers?**

  Birst for CloudSuite customers should upgrade at a minimum to Birst Professional Plus, not Birst Professional. This is because Networked BI is needed to link new content with existing Birst for CloudSuite content.



# FAQs

- **What happens when a customer upgrades to an edition that lacks features they currently own?**

  This situation can happen with a handful of features: Connected Data Prep (Pronto) and Networked BI when moving from Birst Professional Plus to Birst Enterprise, or Designer and Report Scheduling when moving from Birst for CloudSuite to Birst Professional. Sales reps should guide customers to make sure they upgrade to the appropriate edition so they don't lose features.



28

# FAQs

## • What is the "like-for-like" edition of Birst?

It's intended that very few customers will ever use the "like-for-like" edition. The "like-for-like" edition will be a limited version of the Birst platform that closely mimics the capabilities of Infor BI (or Lawson BI or Infor Reporting, if applicable). In order to get the "like-for-like" edition, (1) the customer must be upgrading from a version of the base ERP that supports the old product to a new ERP version that does not AND (2) they must be live on Infor BI/Lawson BI/Infor Reporting.



29

CONFIDENTIAL

INvPSG00128749

# FAQs

- **Is there any discount for current Infor BI customers who would like to move to Birst?**

  Customers can retire their old Infor BI maintenance and receive a credit towards the purchase of Birst equal to 25% of their Infor BI annual maintenance. This is accomplished with two separate transactions: (1) cancel the Infor BI maintenance, and (2) purchase Birst with the corresponding discount.



CONFIDENTIAL

INvPSG00128750

# FAQs

- **What if I can't configure the quote I need in CPQ?**

  Get management approval and work with the Infor Deal Desk to manually configure the quote as required.



31

INvPSG00128751



Pricing and packaging materials

32

CONFIDENTIAL

INvPSG00128752



INvPSG00128753



CONFIDENTIAL

INVPSG00128754



CONFIDENTIAL

INvPSG00128755

# EXHIBIT 9

**Exhibit 239**

**birst** en | Infor company

| | Trial | Professional | Professional Plus | Enterprise | Enterprise Plus |
|---|---|---|---|---|---|
| | Free | $9,500/year | Additional $25,000/year | $100,000/year | Additional $95,000/year |
| Users included | | 5 Business Users | N/A | 2 Analyst Users / 18 Business Users / OEM: 5 Analysts | N/A |

NOTES: This product catalog document lists SaaS subscription pricing. Perpetual pricing is 4X SaaS pricing. The Birst Virtual Appliance can use subscription pricing if sold as a 1-year Term license. SKUs listed below are for Direct deals. SKUs for Embedded deals are the same except they will have "EENT" instead of "DENT" as part of the SKU code.

## Birst User Licenses

| Birst User Licenses | Trial | Professional | Professional Plus | Enterprise | Enterprise Plus | Product/Component SKU | Product/Component Description |
|---|---|---|---|---|---|---|---|
| Birst Analyst User | | | | $5,000/year | $5,000/year | BBI-S-DENT-ANLU (cloud)<br>BBI-T-DENT-ANLU (virtual appliance) | Analyst users administer, test, develop and create analytics.  Set up and administer data extraction, live access, data models, business model definitions, and user permissions.  Create and distribute reports.  Consume visualizations and perform ad-hoc analysis and data discovery. Access to everything in Birst, including the Administrator console, Designer, Pronto, Visualizer, Dashboards, and Mobile. |
| Birst Business User | Free | $420/year | $420/year | $750/year | $750/year | BBI-S-DENT-BNSU (cloud)<br>BBI-T-DENT-BNSU (virtual appliance)<br>------------------------------------<br>BBI-S-DPRO-PLT (Birst Professional) | Business users consume visualizations and perform ad-hoc analysis and data discovery. This means the user can create dashboards leveraging Visualizer and Dashboards. Receive emails and alerts on reports, that respect data level security. Access to Designer, Pronto, Visualizer, Dashboards and Mobile. Additional Birst Professional Business Users are added with the BBI-S-DPRO-PLT SKU, which is sold on a named user basis. |
| Birst Read-only Lite User | | $180/year | $180/year | $200/year | $200/year | BBI-S-DENT-ROLITE (cloud)<br>BBI-T-DENT-ROLITE (virtual appliance)<br>------------------------------------<br>BBI-S-DPRO-LITE (Birst Professional) | Read-only Lite users consume visualizations or received content from emailed reports. Users will see data and metadata that respects Birst security and permission rules. Within dashboards, these users can filter for data, drill across pages, export data, switch between visualizations and tables, and share content. These users do not have access to Birst Visualizer or Pronto, cannot perform free-form data exploration, edit dashboards, create or publish any content. Access to Dashboards and Mobile. |
| Birst Customer (Embedded only) | | | | $1,000/year | $1,000/year | BBI-S-EENT-CUS (cloud)<br>BBI-T-EENT-CUS (virtual appliance) | Birst Customer is a license type used for OEM/Embedded deals only. This license is applied to the end customers of the OEM/Embedded partner. The end customer can have unlimited users and user types. The OEM/Embedded partner is limited to 5 Analyst users (unless more were purchased separately) for the purposes of developing their product with Birst. |

## Birst Presentation Layer

| Birst Presentation Layer | Trial | Professional | Professional Plus | Enterprise | Enterprise Plus | Product/Component SKU | Product/Component Description |
|---|---|---|---|---|---|---|---|
| Birst Dashboards | X | X | X | X | X | | A container framework that allows users to create and interact with web pages that contain a collection of reports, external images, visualizations, web content and videos in a fully responsive HTML5 interface. Ability to drill from report to report or from dashboard page to another page. |
| Birst Visualizer | | X | X | X | X | | A visual data discovery tool that allows users to easily create analytic queries through a user-friendly drag-and-drop HTML5 user interface.  Underlying recommendation engine suggests visualization types as measures and attributes are dragged onto canvas, and also enforces analytic integrity by only making relevant measures and attributes available as users create new visualizations.  A continuously expanding library of visualization types is available. |
| Birst Pronto (Connected Data Prep) | X | X | X | $50,000/year | X | BBI-S-ADD-CONDP (cloud)<br>BBI-T-ADD-CONDP (virtual appliance) | Ability for a business user to load, prep, and blend data with existing data, and network that data with other Birst spaces. A graphical business interface enables users to prepare data utilizing various different transformations, from splitting columns, to date extraction, to many others. A instant preview and return capability to see transformations as they occur. |
| Birst Designer | | X | X | X | X | | Ability to create specifically formatted, paginated, and banded reports that can be made available for distribution through 'bursting' of reports, or triggered alerts. These reports can be placed on dashboards, embedded in other applications, or distributed through email. |
| Birst Report Bursting | | X | X | X | X | | Report scheduling and distribution (Administrator driven). Ability to create a single base report that delivers customized results to each person viewing that report. |
| Birst Notifications | X | X | X | X | X | | Report scheduling and distribution (End-user driven). Email with an attachment of a single report or entire dashboard, sent on a regular schedule to a list of email recipients. The format of a report notification can be CSV, PPT, Excel, HTML, or RTF/Word. The format of a dashboard notification is PDF. |
| Birst Mobile | X | X | X | X | X | | Full native mobile client app for iOS or Android smartphones and tablets, that shows Birst dashboards, and offers native functionality on these devices to drill, filter, swipe, and zoom to further analyze data.  The dashboards appear  as designed on laptop or desktop, with responsive design to adjust layout to the size and orientation of the device. |
| Birst Offline Mobile | | | | $1,000/user/year | $1,000/user/year | BBI-S-ADD-OFFLNM (cloud)<br>BBI-T-ADD-OFFLNM (virtual appliance) | Extension to Birst Mobile application that allows users to select specific dashboards, on iOS or Android tablets to analyze, view, and drill - while the device is not connected to the network. Each offline user must also be licensed as business user. |
| Birst Open Client Interface | | | | $100/user/year | $100/user/year | BBI-S-ADD-CN-TAB (cloud)<br>BBI-T-ADD-CN-TAB (virtual appliance) | Ability for 3rd-party tools like Tableau, Microsoft Excel and others to connect to Birst semantic layer via ODBC and issue live queries. Licensed per user that is connected from 3rd-party tool to Birst. This fee does not have to be in addition to the business user fee. If end-user is only using 3rd-party tool to connect to Birst, they do not need to license the Birst Business user fee. If user is using both Birst and 3rd-party tool as front-end tools, they need to license Birst Business User and Open Client Interface. |
| Birst R Integration | | | | $15,000/year | $15,000/year | BBI-S-ADD-RINTG (cloud)<br>BBI-T-ADD-RINTG (virtual appliance) | Ability to make calls out to an R Server, receive results back, and display those results or use them in calculations.  Calls to R are made from Birst semantic layer, or from Birst UX layer. |

## Birst Data Layer

| Birst Data Layer | Trial | Professional | Professional Plus | Enterprise | Enterprise Plus | Product/Component SKU | Product/Component Description |
|---|---|---|---|---|---|---|---|
| Birst Networked Business Analytics | | | X | $50,000/year | X | BBI-S-ADD-NTWKBA (cloud)<br>BBI-T-ADD-NTWKBA (virtual appliance) | Ability for administrator to create a "package" of metadata (i.e. subset of a space), and make it available to other users, so that they may subscribe to (or import) that package into another Birst space.  This process "networks" both spaces together, so that they share the metadata contained in the package.  The owner of the package controls the package metadata, while the subscriber inherits changes made by the owner. |

| Feature | | | | | | Code | Description |
|---|---|---|---|---|---|---|---|
| Data connectors and file upload | X | X | X | X | X | | Connectors to extract data from major database platforms and business applications into Birst, that are set up and managed by business users in a simple graphical interface. |
| Birst Optional Connector Package | | | | $20,000/year | $20,000/year | BBI-S-ADD-CN-OPPKG (cloud) BBI-T-ADD-CN-OPPKG (virtual appliance) | Pre-built web service connectors to specific applications. These connectors extract data from these applications and place that data in Birst. Note, there may be other options available to bring data from these applications to Birst (extracts, RESTful connections) that are included in Birst platform. |
| Birst Live Access | X | X | X | X | X | | Ability to map semantic layer directly to data at the source and allow users to query the data in real-time directly from Birst, as it sits in its source location. |
| Automated Data Refinement | | | | X | X | | An engine that automates the process of applying business rules and logic (semantic layer) and transforming data from its raw structure into a dimensional star-schema structure with common business definitions and is ready for analysis. |
| Semantic (Governance) Layer | X | X | X | X | X | | A logical representation of data that helps end users work with data autonomously using common and reusable business terms. Ability for end users and administrators to create and reuse consistent business definitions on top of complex data. Ability to create custom groupings and drill paths to enable relationships between semantic definitions, so that end-user can more easily analyze data. |
| Conformed dimension automation | | | | X | X | | Conformed dimensions allow facts and measures to be categorized and described in the same way across multiple facts and/or data stores, ensuring consistent reporting across the enterprise. |
| Slowing Changing Dimension support | | | | X | X | | Ability to use the Type 2 Slowly Changing Dimension (Type 2 SCD) feature that is modeled at the hierarchy level. Type 2 SCD is a dimension where the data changes over time, rather than changing entirely at one time. |
| Snapshots | | | | X | X | | Snapshots refer to the values of data sources relative to a specific date. A snapshot date is the date that is used to tag and identify your data load for analysis. |
| Auto-detection of source data change | | | | X | X | | Ability to configure how Birst reacts to changes in the source data during subsequent processing. Birst can automatically maks changes when there have been changes in the source data since the last data upload. |
| Support for custom fiscal calendars | | | | X | X | | Ability to define a custom set of time attributes and custom time hierarchy for organizations that have their own specific time attributes and time period shifts. |
| Auto-assignment of users to feature groups | | | | X | X | | Ability for Birst to manage users and groups dynamically, by automatically configuring which users participate in which group. |
| Aggregate awareness | | | | X | X | | Birst's query generation and optimization engine understands where data lies, the most performant path, and multiple locations of physical data based on a logical query. |
| OLAP cube data source support | | | | X | X | | Birst Live Access automatically retrieves hierarchies, dimension elements, and measures from your XMLA repository environment and translates them directly into Birst hierarchies, dimensions and measures. |
| Customized data processing sequence | | | | X | X | | Birst automatically transforms your data and moves it into a database that is designed for dimensional analysis. Successfully processing your data makes it available for analysis and use in reports and dashboards. |
| Row level security | | | | X | X | | Ability to set permissions and security rules so that a user or groups of users can only see certain attributes, measures, subject areas (columns) or restrict visibility of specific measures based on attributes (e.g. Sales Pipeline visibility restricted based on Region attribute). |
| Column level security | | X | X | X | X | | Ability to set permissions and security rules so that a user or groups of users can only see certain attributes, measures, subject areas (columns) or restrict visibility of specific measures based on attributes (e.g. Sales Pipeline visibility restricted based on Region attribute). |
| Product feature security | | X | X | X | X | | Birst manages access to various functionality and data at the group level. To manage access to your data, you create a group or groups with specific access permissions and add users to the groups. |
| Drill maps | | X | X | X | X | | A drill map is built from one or many drill paths. Drill paths specify how one logical column in the system drills to another. |
| Global variables | | X | X | X | X | | To support incremental data loads. For example, when using Birst Connect queries to extract from the source database, if the database tables have been designed to include a date column that records when the record was inserted or last updated, that column can be included in the query. |
| Birst Always On Availability | | | | 25% of ACV/year or min $25,000/year | X | BBI-S-ADD-ALWYSON (cloud) BBI-T-ADD-ALWYSON (virtual appliance) | Automated way to ensure users can interact with data (i.e. view dashboards, create visualizations) when data is being loaded and/or processed. NOTE: Always-on will double the size the "space" you designate as "always-on." This will factor in total data amount for hosting. |
| Birst In-memory Performance Boost Powered by Exasol | | | | 20% of ACV/year or min $20,000/year | 20% of ACV/year or min $20,000/year | BBI-S-ADD-EXAS-INPB (cloud) BBI-T-ADD-EXAS-INPB (virtual appliance) | An option to choose Exasol, an in-memory MPP purpose-built column store analytic database, as the User Data Store in Birst. The Exasol database has been shown to outperform disk-based databases in TPC query benchmarks by margins of up to 10X. NOTE: when purchasing Exasol in Birst Cloud, customer must still pay the Birst hosting fee for data sizes beyond 200GB. **NOTE: this option is only available in Birst Public Cloud, as an Amazon Machine Instance (AMI), or deployed on bare iron. |
| **Birst Embedding** | | | | | | | |
| Embedding Birst | | | X | X | X | | Birst provides a general mechanism for embedding reports and dashboards within web applications, such as for an OEM embedded analytics scenario. |
| Access to Birst Web Services API | | | X | X | X | | Birst Web Services gives Administrators programmatic access to administration commands. Web services can automate routine maintenance tasks. In addition, using web services and single sign-on capabilities, you can tightly integrate Birst with other web applications. |
| Single Sign On (SSO) suport | | | X | X | X | | SSO enables a customer to authenticate the user using their own authentication mechanism within their application and then request an authentication token for that user which can be used for embedding Birst reports and dashboards. |
| **Birst Pre-Packaged Content** | | | | | | | |

INvPSG00022202.xlsx

| | | | | | | |
|---|---|---|---|---|---|---|
| Birst Solution Accelerators | | | | $25,000/accelerator | $25,000/accelerator | Various SKUs | Pre-built data models, KPIs, reports, and dashboards for specific transactional applications. Birst offers accelerators for Sales (Salesforce.com), Marketing (Salesforce.com, Marketo, Google Analytics), and Finance (Netsuite). |

**Birst Cloud Operations**

| | | | | | | |
|---|---|---|---|---|---|---|
| Birst Hosting, Back-up, Data Recovery (Cloud only) | | $5,000/200GB/year $25,000/TB/year | $5,000/200GB/year $25,000/TB/year | $5,000/200GB/year $25,000/TB/year | $5,000/200GB/year $25,000/TB/year | BBI-S-DHSTBUDR (cloud only) | For public cloud customers , provides hosting, back-up, recovery, and high availability with Birst SLAs for data sizes beyond 200 GB of compressed data. All data is stored and backed-up regularly, and housed in secure remote facility for disaster recovery. The hosting fee covers hardware, back-up, recovery, security scans, operations personnel, and security audits fees. |
| Birst Additional Cloud Deployment Site (Cloud only) | | $25,000/year | $25,000/year | $25,000/year | $25,000/year | BBI-S-DEPLOY-ADL (cloud only) | Ability to deploy in multiple Birst Public cloud sites around the globe. Each additional site is charged at the cost shown. Birst Public Cloud has hosting sites in EMEA, NA, and APAC. |

**Education and Support Offerings**

| | | | | | | |
|---|---|---|---|---|---|---|
| Community Support | X | X | X | X | X | | 24x7 access to Think Tank – the Community of Birst Experts! Community includes: knowledge based articles, answers to community member questions and important topics and discussions |
| Standard Support | | X | X | X | X | | Standard Support includes: 2-4 named support contacts (depending on contract size), 24x5 support for S0/S1 cases, and support during local business hours for S2/S3/S4 cases. |
| Priority Support | | 15% of ACV/year or min $15,000/year | 15% of ACV/year or min $15,000/year | 15% of ACV/year or min $15,000/year | 15% of ACV/year or min $15,000/year | BBI-S-DENT-SUPPRI (cloud) BBI-T-DENT-SUPPRI (virtual appliance) | Priority Support includes: up to 6 named support contacts, 24x7 support for S0/S1 cases, 24x5 support for S2/S3/S4 cases, up to 2 named users for Birst University online subscription, 5 hours per quarter of Developer Support, and quarterly upgrade readiness consultations. |
| Support Authorized Contacts (Add'l) | | $1000/contact | $1000/contact | $1000/contact | $1000/contact | BBI-S-DENT-SUPACN (cloud) BBI-T-DENT-SUPACN (virtual appliance) | Add additional support authorized contacts who can initiate and be point of contact for support related needs. |
| Birst University Campus Card | | Choose pre-paid amount | Choose pre-paid amount | Choose pre-paid amount | Choose pre-paid amount | EDU-BBI-NOP-IC | This product contains a credit of dollars to be used on Birst University Pre-defined Instructor Led Courses. The total dollar number is used to purchases specific classes that have specified cost per class. Consult with your Birst account contact to get full list of Birst classes available for use with campus card. This is not to be used for annual subscription or custom SOW trainings. |
| Birst University Online Subscription | | $1,000 | $1,000 | $1,000 | $1,000 | EDU-S-BBI | 1 named license in the Birst Learning Management System. User will receive access to all on demand content except for the Foundations Course material for the duration of their subscription period. The materials are primarily video based, but also include downloadable content for narrative cases and further narrative explanations for some complex topics. Licensed users can access the materials as often as they like during their subscription period and will have access to all new materials as they are added. |
| TAM Express | | $35,000 | $35,000 | $35,000 | $35,000 | PSO-S-BBI-AMS-EXP | The Technical Account Management Program is an engagement model meant to ensure success of the Customer throughout their ongoing use of Birst, resulting in overall Customer Success. It is designed to guide the Customer through a program based, continuous BI process and help evaluate, identify and remediate challenges during the lifecycle. Express: TAM availability 9x5, 8 monthly sessions, plus other activities. |
| TAM Advantage | | $50,000 | $50,000 | $50,000 | $50,000 | PSO-S-BBI-AMS-ADV | The Technical Account Management Program is an engagement model meant to ensure success of the Customer throughout their ongoing use of Birst, resulting in overall Customer Success. It is designed to guide the Customer through a program based, continuous BI process and help evaluate, identify and remediate challenges during the lifecycle. Advantage: TAM availability 9x5, 12 monthly sessions, plus other activities. |
| TAM Premier | | $75,000 | $75,000 | $75,000 | $75,000 | PSO-S-BBI-AMS-PRM | The Technical Account Management Program is an engagement model meant to ensure success of the Customer throughout their ongoing use of Birst, resulting in overall Customer Success. It is designed to guide the Customer through a program based, continuous BI process and help evaluate, identify and remediate challenges during the lifecycle. Premier: TAM availability 12x5, 16 monthly sessions, plus other activities. |

**Birst Platform**

| | | | | | | |
|---|---|---|---|---|---|---|
| Birst Enterprise Edition Platform License | BBI-S-DENT-PLT (cloud) BBI-T-DENT-PLT (virtual appliance) | | | | | | A complete 2-Tier BI and Analytics platform, including data extraction and Live Access, Automated Data Refinement, a Unified Business Model (semantic layer), a ROLAP engine, web services integration and white labeling capabilities, and an adaptive user experience supporting multiple styles of BI. These capabilities are built on an enterprise BI and Analytics cloud architecture supporting forms-based authentication security and authorization via row-level security and feature accessibility. Includes hosting for up to 200 GB of data and over 25 pre-built connectors. Additional fees required for more data and specific priced connectors. Includes 2 Analyst Users and 18 Business Users. <br><br> For the virtual appliance only: The virtual appliance is deployed and operated by the customer in their choice of data center and includes a properly sized set of additional appliances for high-availability and non-production uses (development, testing.) The contract will specify exact not-to-exceed # of appliances to fit the customer's needs If customer desires, additional non-production and disaster recovery appliances can be purchased for an additional fee. Note: for appliance, the User-ready data store is not supplied by Birst. Customer must license and manage a supported database; no hosting fees apply. Includes over 25 pre-built connectors. Additional fees required for specific priced connectors. Includes 5 Analyst Users. |
| Birst Professional Edition Platform License (Cloud only) | BBI-S-DPRO-PLT (cloud only) | | | | | | A quickstart BI and Analytics solution designed for teams and departments, including data extraction and Live Access, a Unified Business Model (semantic layer), a ROLAP engine, and an adaptive user experience supporting multiple styles of BI. Birst Professional Edition provides a seamless upgrade path to Birst Enterprise Edition. Includes 5 Business Users. |

| Birst Enterprise Edition Platform License | BBI-S-ENT-PLS (cloud)<br>BBI-T-ENT-PLS (virtual appliance) | A feature bundle that adds essential add-on capabilities to Birst Enterprise. These add-on capabilities are:<br><br>Birst Networked Business Analytics: Ability for administrator to create a "package" of metadata (i.e. subset of a space), and make it available to other users, so that they may subscribe to (or import) that package into another Birst space.  This process "networks" both spaces together, so that they share the metadata contained in the package.  The owner of the package controls the package metadata, while the subscriber inherits changes made by the owner.<br><br>Birst Connected Data Prep: Ability for a business user to load, prep, and blend data with existing data, and network that data with other Birst spaces. A graphical business interface enables users to prepare data utilizing various different transformations, from splitting columns, to date extraction, to many others. A instant preview and return capability to see transformations as they occur.<br><br>Birst Always-On Availability: Automated way to ensure users can interact with data (i.e. view dashboards, create visualizations) when data is being loaded and/or processed.  NOTE: Always-on will double the size the "space" you designate as "always-on." This will factor in total data amount for hosting. |
| Birst Professional Edition Platform License (Cloud only) | BBI-S-ADD-PROPLS (cloud only) | A feature bundle that adds valuable add-on capabilities to Birst Professional. These add-on capabilities are:<br><br>Birst Networked Business Analytics: Ability for administrator to create a "package" of metadata (i.e. subset of a space), and make it available to other users, so that they may subscribe to (or import) that package into another Birst space.  This process "networks" both spaces together, so that they share the metadata contained in the package.  The owner of the package controls the package metadata, while the subscriber inherits changes made by the owner.<br><br>Birst Designer: Ability to create specifically formatted, paginated, and banded reports that can be made available for distribution through 'bursting' of reports, or triggered alerts. These reports can be placed on dashboards, embedded in other applications, or distributed through email.<br><br>Birst Report Bursting: Report scheduling and distribution (Administrator driven). Ability to create a single base report that delivers customized results to each person viewing that report. |

# EXHIBIT 10

## Contents

Audit Trail.........................................................................................................................2

FAQ - Licensing for Cloudsuites and Birst Content Products.............................................3

Infor Content products – Analytics or Reporting ............................................................3

Infor App and Birst for Reporting ...................................................................................3

    Read Replica for MT ...............................................................................................3

    Read Replica for ST ................................................................................................3

Infor Analytics with Birst – ERP on Premise, Birst In Birst Cloud ......................................3

Infor Analytics with Birst – ERP on Premise, Birst Appliance on Premise ..........................3

Birst Licensing ..............................................................................................................4

Birst Licensing for Cloudsuites .......................................................................................5

    Birst Add Ons – ProPlus ,Enterprise or Enterprise Plus ..............................................5

    Birst for Cloudsuite licensing being enforced in software only with July 2018 Birst Release...................5

    Read Replica for ST ................................................................................................8

MT Cloudsuite Analytics.................................................................................................8

    Embedded MT CS SKUs ..........................................................................................8

    MT CS - Data Sources ............................................................................................8

    MT CS - Data Limits ...............................................................................................9

    MT CS – Core and Add On.......................................................................................9

    Add On Optional Products ......................................................................................10

    Add On Datalake SKUs ..........................................................................................10

    Add On BIRST SKUs...............................................................................................10

    Birst Enterprise – User SKUs ..................................................................................11

Existing MT CS - Adding Datalake and Birst for CS to IDB................................................12

Exhibit
241

CONFIDENTIAL

Audit Trail

March 28 – Initial Creation

March 30 -  Added under Reporting products that cost of read replica needs to be determined – KM

Apr 2 -  Added Datalake Limit explanation provided by Mike Kalinowski

Apr 9 – Birst Enterprise Licensing Nuances

Apr 9 – Added information on the Datalake SKUs

May 17 – Multiple changes -  Removed Birst Pro as Add On for Cloudsuites, Added information on Birst Enterprise User Licenses

CONFIDENTIAL

# FAQ - Licensing for Cloudsuites and Birst Content Products
Items that are not yet finalized are highlighted Yellow

## Infor Content products – Analytics or Reporting
Birst Products should be Birst ProPlus and Birst Enterprise; Not Birst Professional since it does not have Birst Designer

## Infor App and Birst for Reporting
- If a customer purchases XM Stand Alone, customer will purchase Birst ProPlus or Enterprise to leverage XM Reporting with Birst.  Customer needs to purchase Birst ProPlus since it is ProPlus that includes Birst Designer and Network BI
-  Similarly for Optiva, EAM, SCE, WFM
- If the Infor App is in the Cloud, Birst will need to also be in the cloud
- If the Infor App is On Premise, Customer can purchase Birst in the Cloud or Birst On Premise
- **The only on-prem version of Birst is Birst Enterprise (either Enterprise or Enterprise Plus)**

Read Replica for MT
- Cost Model and factoring this into licensing  - Tony Vitelli

Read Replica for ST
- Cost Model and factoring this into licensing  - Tony Vitelli


## Infor Analytics with Birst – ERP on Premise, Birst In Birst Cloud
- Customer purchases ERP Analytics Content SKU
    - M3 Analytics, Distribution Business Analytics, Cloudsuite BI(Syteline Analytics)
- And Customer purchases Birst ProPlus or Birst Enterprise

## Infor Analytics with Birst – ERP on Premise, Birst Appliance on Premise
- Customer purchases ERP Analytics Content SKU
    - M3 Analytics, Distribution Business Analytics, Cloudsuite BI(Syteline Analytics)
- And Customer purchases Birst Enterprise Term License for Birst Appliance On Premise
- **The only on-prem version of Birst is Birst Enterprise (either Enterprise or Enterprise Plus)** Enterprise Plus lets the customers network multiple Enterprise spaces together and empower end analysts to blend their own data sets with the corporate model.

CONFIDENTIAL

Birst Licensing



Summary Feature Comparison – Birst SKUs



Detail Feature Comparison – Birst SKUs

CONFIDENTIAL

## Birst Licensing for Cloudsuites

- BBI-S-DBCS-PLT, "Birst for CloudSuite Edition", will be for multi-tenant cloudsuite
- BBI-S-DBCS-STBC, "Birst for CloudSuite Edition (Single Tenant)", will be for single tenant cloudsuite

Neither of these SKUs will be available to be sold individually. They will only be available as child SKUs for the different CloudSuite products.

## Birst Add Ons – ProPlus ,Enterprise or Enterprise Plus

Note : Birst ProPlus only available for Birst in Cloud



Birst for Cloudsuite licensing being enforced in software only with July 2018 Birst Release

In the interim – Free Trial

From Paul :

Since we do not have the packaging for B4CS in the April release, we will need to give our early B4CS customers Birst Pro Plus. My proposal is that we turn this into a positive for the customers by positioning it as a free trial of Birst Pro Plus rather than a negative but we need the right wording around both the offer and the features that will disappear once the free trial ends. Here is the proposed verbiage for that offer. Please check for accuracy and tone. Thanks!

* * * * * * * * * * * * * * * * * * * * * *

Dear Customer,

INvPSG00022510

Thank you for being a customer of Birst for CloudSuites for APPLICATION_NAME! We believe this new offering will help your organization drive better decision-making at every level and enable you to deliver greater business results. Birst for CloudSuites for APPLICATION_NAME provides your business with out-of-the-box best practice reports and dashboards that enable your organization to effectively analyze LIST KEY OBJECTS. In addition, your Birst for CloudSuites enables you to build additional reports and dashboards using Birst's pixel-perfect reporting tool, "Designer". Your team can also add custom columns to the out-of-the-box data model with help from Infor Consulting Services so your basic APPLICATION_NAME customizations can be captured in your analytics as well. We can't wait for you to experience the product!

As a special thank you for being one the early customers for this product, we are offering you a free trial of Birst Pro Plus until July 27, 2018. As part of the Birst Pro Plus offering, you will also be able to:

1. Extend the data model to include data from other Infor applications or non-Infor systems via Birst's "Pronto" data modeling interface
2. Extend the business model in Birst with new KPIs and objects, including custom objects in APPLICATION _NAME
3. Visually explore the data available in Birst's "Visualizer" interface and publish those visualizations to your business users


We think these features will help make your Birst experience even better and we hope you will love them and decide to purchase Birst Pro Plus at the end of the free trial! If, however, you decide to not purchase Birst Pro Plus, you will still have access to all the great content you created as part of the trial period but you will lose access to "Pronto" and "Visualizer" so future development or changes of the custom content created during the trial period will no longer be possible.

Thank you again for your business and we look forward to working with you to help your organization drive better, more consistent decision-making!

The Birst Team

INvPSG00022511

# Summary Feature Comparison – Cloudsuites



# Detail Feature Comparison – Cloudsuites

INvPSG00022512

ST Cloudsuites – CS Analytics with Birst

- M3 and Lawson ST Cloudsuites will embed this Child SKU
  - **BBI-S-DBCS-STBC**, Birst for CloudSuite Edition (Single Tenant) – Birst Licensing and Enable Provisioning of Birst Connect in ST

## Read Replica for ST

- Cost Model and factoring this into licensing  - Tony Vitelli

# MT Cloudsuite Analytics

## Embedded MT CS SKUs

1) Infor OS CE :  **ION-S-PlatformCE**
2) Infor Datalake **(for certified ERPs)**

   **ION-S-DATALAKE (LM: CSLU)**

   **ION-S-DATALAKE-TB (LM: 1.0TB)**

   Those two SKUs are to be bundled for MT CloudSuites only.

3) Birst for Cloudsuite(MT) :  **BBI-S- DBCS-PLT**
4) Infor d/epm Platform (formerly Infor BI) - **EPM-S-BI-MT  (only MT CSF and CS HCM)**

Note :  CSF/HCM need to wait for ION to support Multifarm before they can bundle

(since there are restrictions to provisioning new tenants in US EAST until multifarm is supported)

## MT CS - Data Sources

**Birst for Cloudsuite**   - only data from Infor apps that are in the Infor MT Cloudsuite

**Infor Datalake** In the CloudSuites, the guiding principle here will be that Data Lake can only be used to work within the Infor eco-system. CloudSuite customers would only be able to use the Data Lake in conjunction with:

- Birst for Cloudsuite
- Enterprise Search
- Coleman AI PaaS
- Infor Graph

Data Lake is a data management strategy to help drive reporting, analytics, AI & machine learning, risk and compliance, etc.

Data limit - 1 TB of "frequent access" and 1 TB of Glacier. The CSLU limit restricts usage to data in Data Lake to only within the Infor ecosystem.

Sizing from ERPs - the average customer to generate between 100 GB – 150GB of data annually.

INvPSG00022513

## MT CS - Data Limits

- 2TB for Transactional DB in CS
- 200GB for Birst
- 2TB for Datalake – Customer determines how much to use for Active or Archive ; ION will have functionality that displays how much Datalake storage is being used.
- Current AWS S3 limit – 2 TB for cloudsuite (including IDM)
  TBD whether to add  OLAP GB limit – 10GB (only for MT CSF)

## MT CS – Core and Add On

| MT Cloudsuite -CORE | Infor App | Part of Core CS ? |
|---|---|---|
| CS Analytics for Core ERP | Core ERP | |
| Data Sources for Datalake<br>For Infor (Birst, Coleman, Enterprise Search, IOT, DSL etc) | Core ERP | |
| Data Source for Birst | Infor Apps in Cloudsuite | |
| Birst Dashboards | Infor Datalake | |
| Birst Guided Adhoc | Anchor ERP | |
| Birst Report Designer and Bursting | Anchor ERP | |

| Add On Capabilities in MT | Infor OS Add On | Birst TAM SKU | Birst Professional | Birst Enterprise |
|---|---|---|---|---|
| Additional Data in Infor Datalake | | | | |
| Basic Extensibility - Include custom fields in Reports | | | | |
| Third Party Data to Infor Datalake | ION-S-HYBRID-CONN | | | |
| Third Party Data to Birst Columnar DB | | | | |
| Change Delivered Star Schemas | | | | |
| Create New Star Schemas | | | | |
| Access Birst Enterprise data model from 3rd party tools | | | | |
| End User access to Birst Dashboards for multiple analytics in Cloudsuite | | | | |
| Visualizer | | | | |
| Pronto (End User Data Prep) | | | | Enterprise Plus |

INvPSG00022514

Add On Optional Products

- XM/XM Reporting (embedded Birst for Cloudsuite) when sold as Add on to CS Corporate/Healthcare/Public Sector
- Optiva/Optiva Reporting ((embedded Birst for Cloudsuite) when sold as Add on to CS F&B
- EAM/EAM Reporting/EAM Analytics (embedded with Birst for Cloudsuite) when sold as Add On to multiple Cloudsuites
- GHRTM/HCM Analytics (embedded with Birst for Cloudsuite) when sold as an Add On for CS Corporate/Healthcare/Public Sector and other cloudsuites

Add On Datalake SKUs

| | |
|---|---|
| **ION-S-DATALAKE-TB** | 1 TB of Data Lake storage + 1 TB of Data Lake archive storage. Packaged with CloudSuites and available as add-on for additional storage. |
| **ION-S-DATALAKE-ENT** | Enterprise full-use license. Required for 3rd party  tools access to Data Lake. Available as add-on only. |

Add On BIRST SKUs

- See CPQ Birst BI

Birst Enterprise – User SKUs



From Paul Staelin  - "The basic answer is a little nuanced but the basic gist is that anyone that will access the custom content created with the Enterprise platform will need at least a Read-Only viewer license. So, assuming the account plans to build custom content and share it with the broader organization, then each user will need some license to access it. Users without that expanded license will be entitled to access only the OOTB(out of the box) content included in the Birst for CloudSuites base offering and NOT the custom content created with the Enterprise platform. So, in most cases, every user will want the Read-Only license so he/she can access the custom content as well as the OOTB reports/dashboards.

Below are the definitions for the Birst Analyst User, Business User, and Read-only Lite User (these apply to Birst Enterprise). In summary, Analyst Users have access to Birst's Administration module. Business Users can author new content (i.e. reports and dashboards). Read-only Lite users can consume existing content, but not author new content.

| BBI-S-DENT-ANLU BBI-T-DENT-ANLU | Birst Analyst User | Analyst users administer, test, develop and create analytics. Set up and administer data extraction, live access, data models, business model definitions, and user permissions. Create and distribute reports. Consume visualizations and perform ad-hoc analysis and |
|---|---|---|

INvPSG00022516

| | | |
|---|---|---|
| | | data discovery. Access to everything in Birst, including Birst Admin, Report Designer, Visualizer, Dashboards, & Mobile. |
| **BBI-S-DENT-BNSU** **BBI-T-DENT-BNSU** | Birst Business User | Business users consume visualizations and perform ad-hoc analysis and data discovery. Access to Birst Visualizer, Dashboards , & Mobile only. This means the user can create dashboards leveraging Visualizer and Dashboards. Receive emails and alerts on reports, that respect data level security. |
| **BBI-S-DENT-ROLITE** **BBI-T-DENT-ROLITE** | Birst Read-only Lite User | Consume visualizations via Birst dashboards (either within Birst or within another application or portal) or received content from emailed reports. Users will see data and metadata that respects Birst security and permission rules. Within dashboards, these users can filter for data, drill across pages, export data, switch between visualizations and tables, and share content. These users do not have access to Birst Visualizer, cannot perform free-form data exploration |

## Existing MT CS - Adding Datalake and Birst for CS to IDB

- Need clarity on which Cloud Ops team will do the configuration.  Infor OS Tech / Birst
- Can be added for Customer to immediately use or enable at a certain time
- Once concrete process/logistics determined, follow up with Elizabeth Hess

CONFIDENTIAL

# EXHIBIT 11

| | |
|---|---|
| **From:** | Paul Staelin </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS /CN=D6D2232F48174345B625B7B657662214-PAUL STAELI> |
| **To:** | Brad Peters |
| **Sent:** | 6/7/2019 8:04:14 AM |
| **Subject:** | FW: Birst rep retention - please approve |

Here is the email chain with Charles allowing the 10% for FY19.

**From:** Paul Staelin <pstaelin@birst.com>
**Date:** Monday, January 28, 2019 at 10:44 AM
**To:** Christine McDade <Christine.McDade@infor.com>
**Subject:** FW: Birst rep retention - please approve

Chris,

Here is the email in which Charles approved the 10% credit for Birst reps on CloudSuite deals in which the Birst rep was engaged and for which the Birst for CloudSuites offering is provided. We are still not 100% aligned on how we track the involvement in Infor CRM since some of the items Erica would like to see are not possible for the Birst reps to enter (even activities on cross-sell deals have proven challenging to record). Anyway, sorry for the delay in digging this item up for you but now you have it.

Paul

**From:** Charles Phillips
**Sent:** Monday, July 9, 2018 6:02 AM
**To:** Brad Peters <bpeters@birst.com>; Erica Bellavia <Erica.Bellavia@infor.com>; Paul Staelin <pstaelin@birst.com>
**Cc:** Christine McDade <Christine.McDade@infor.com>; Ed Auriemma <edward.auriemma@infor.com>; Pam Murphy <pam.murphy@infor.com>
**Subject:** RE: Birst rep retention - please approve

Agree but an important detail discussed has to be included. The BI reps only get paid on deals the worked on. Not a blanket 10%. So if the ERP rep calls them in, presumably they are needed to help close or upsize the deal. Yes it won't be perfect but we want to encourage collaboration this year and let's see how that works.

**From:** Brad Peters
**Sent:** Sunday, July 8, 2018 11:07 PM
**To:** Erica Bellavia <Erica.Bellavia@infor.com>; Paul Staelin <pstaelin@birst.com>
**Cc:** Christine McDade <Christine.McDade@infor.com>; Ed Auriemma <edward.auriemma@infor.com>; Pam Murphy <pam.murphy@infor.com>; Charles Phillips <Charles.Phillips@infor.com>
**Subject:** RE: Birst rep retention - please approve

Erica,

This had been agreed-to already a couple of times (and in fact, reps now expect this – especially the former Infor BI reps that sold as part of the XI Bundle where this was how it was treated). As we've discussed, there are many reasons that this will encourage the cooperative behavior we want on deals but are currently at pains to promote. I discussed this with Charles a week or so ago and he agreed and am copying him on this thread.

Charles, per your instructions I'm copying you on the thread.

Thank you,

Brad

**Exhibit
00048**

CONFIDENTIAL

INvPSG00033655

**From:** Erica Bellavia
**Sent:** Sunday, July 8, 2018 6:10 PM
**To:** Paul Staelin <pstaelin@birst.com>
**Cc:** Christine McDade <Christine.McDade@infor.com>; Ed Auriemma <edward.auriemma@infor.com>; Pam Murphy <pam.murphy@infor.com>; Brad Peters <bpeters@birst.com>
**Subject:** Re: Birst rep retention - please approve

I know that the 10% revenue allocation for the earn out was approved. I believe finance is taking care of that part


**Erica Bellavia** - VP, Global Incentive Compensation
office: 678 319 8132 | mobile: 813 230 6832
erica.bellavia@infor.com | http://www.infor.com


On Jul 8, 2018, at 8:58 PM, Paul Staelin <pstaelin@birst.com> wrote:

Erica,

This is not what we have discussed or agreed. We have seen too many deals end in the Birst portion being shrunk or eliminated by the Infor Rep for us to accept this approach. This is a critical piece of keeping our field engaged with the Infor field and no amount of cheerleading on the topic by Ed, as capable a cheerleader as he is, can make up for this loss. The answer below is a deal-breaker for us and Charles has approved the 10% credit several times. How do we put this in place as agreed?

Paul

**From:** Erica Bellavia
**Sent:** Sunday, July 8, 2018 5:22 PM
**To:** Paul Staelin <pstaelin@birst.com>; Christine McDade <Christine.McDade@infor.com>
**Cc:** Ed Auriemma <edward.auriemma@infor.com>; Pam Murphy <pam.murphy@infor.com>
**Subject:** RE: Birst rep retention - please approve

Hi Paul,

I did some further research after our call last week to better understand what is intended to be included in the Infor Cloudsuites. We did a Product Strategy review of what Birst products or functionality would be included in the Cloudsuites as a go forward strategy. The Birst that will be included in the Suites is not the full blown version of Birst but rather a Lite version and that the Customer would be getting very little functionality beyond what they receive today with either Infor BI or Cognos. The real opportunity lies in showing the Customer all the great capabilities that Birst has and selling them the beefier versions of Birst that have all the great bells and whistles that they would really benefit from. In the past we have not paid any of the BI sales reps on the sale of Cloudsuites even though there is a lite version in the bundle today. Due to this we will be unable to pay Birst sales rep on the 10% of Cloudsuites, but they would be eligible for all the add on's that are sold. The HQ App team will be working on preparing slides like the below for all Cloudsuites to show sales what is available for Birst add on's. Also the HQ App team will be adding to their process to ask the sales team when selling Cloudsuites that contain Birst to ensure they have brought the Birst team in to do the upsell. This is a benefit to everyone, sales and the Customer to Upsell the Higher Enterprise editions.

Sorry about all the confusion but we think it would be best to focus the Birst team, (I think some are focused on cross sell), on selling the add ons vs being paid on the 10% of Cloudsuites. They would be there to help maximize the upsell success and ensure the Customer gets the best benefit.

I think Ed will be able to help with how we re-educate and reinvigorate the Infor sales team on engaging with the Birst sales team to allow them to show the Customer all the great things they can get with the add on's. The Birst included in the Cloudsuites isn't the Best that Birst has to offer and selling as an add on allows us to maximize the value of Birst, by not giving it away for free but selling all the great things that Birst can do.

We should take all the 10% line items out of the compensation presentation that you intended to roll out at

SKO.

Thanks

Erica

Birst for Cloud Suite Finance & Supply Management

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Interactive Dashboards | | | | | |
| [illegible] | | | | | |
| Mobile | | | | | |
| Report Bursting | | | | | |
| Pixel-perfect reports (Designer) | | | | | |
| [illegible] | | | | | |
| [illegible] | | | | | |
| [illegible] | | | | | |
| [illegible] | | | | | |
| [illegible] | | | | | |
| [illegible] | | | | | |
| [illegible] | | | | | |
| [illegible] | [illegible] | | | | |

birst



**Erica Bellavia** - VP, Global Incentive Compensation
office: 678 319 8132 | mobile: 813 230 6832
erica.bellavia@infor.com | http://www.infor.com

**From:** Paul Staelin
**Sent:** Sunday, July 8, 2018 8:00 PM
**To:** Erica Bellavia <Erica.Bellavia@infor.com>; Christine McDade <Christine.McDade@infor.com>
**Subject:** FW: Birst rep retention - please approve

Erica and Chris,

Can you please issue the Birst rep comp plans tomorrow? We have agreement on the retention and all we need to clarify is HOW we track engagement for the Birst reps to qualify for the 10% credit in the CloudSuite deals, which we can specify after SKO if need be. Thank you for your help!

Paul

**From:** Paul Staelin
**Sent:** Sunday, July 8, 2018 4:59 PM
**To:** Charles Phillips <Charles.Phillips@infor.com>; Christine McDade <Christine.McDade@infor.com>
**Cc:** Ed Auriemma <edward.auriemma@infor.com>; Brad Peters <bpeters@birst.com>; Anne Benedict <Anne.Benedict@infor.com>; Erica Bellavia <Erica.Bellavia@infor.com>
**Subject:** RE: Birst rep retention - please approve

Thank you!

**From:** Charles Phillips
**Sent:** Friday, July 6, 2018 3:37 PM
**To:** Paul Staelin <pstaelin@birst.com>; Christine McDade <Christine.McDade@infor.com>

**Cc:** Ed Auriemma <edward.auriemma@infor.com>; Brad Peters <bpeters@birst.com>; Anne Benedict <Anne.Benedict@infor.com>; Erica Bellavia <Erica.Bellavia@infor.com>
**Subject:** RE: Birst rep retention - please approve

That's fine

**From:** Paul Staelin
**Sent:** Friday, July 6, 2018 5:12 PM
**To:** Christine McDade <Christine.McDade@infor.com>; Charles Phillips <Charles.Phillips@infor.com>
**Cc:** Ed Auriemma <edward.auriemma@infor.com>; Brad Peters <bpeters@birst.com>; Anne Benedict <Anne.Benedict@infor.com>; Erica Bellavia <Erica.Bellavia@infor.com>
**Subject:** RE: Birst rep retention - please approve

All –

I have circled the wagons with the two regional leaders for Birst. We have different approaches for the two regions based on the specific personnel concerns in each theater. Given that we have our SKO next week, we need to move ahead with this plan if at all possible. The proposed plan is:

1. For NA (6 reps):
    a. $30K retention payment paid now, recoverable pro-rata from 7/1/18 – 4/30/2019 (10 months) should the rep leave before 4/30/19

2. For EMEA (5 reps):
    a. $25K retention payment paid now, recoverable pro-rata from 7/1/18 – 4/30/2019 (10 months) should the rep leave before 4/30/19
    b. 50% recoverable draw for first 6 months of the year (totaling 25% of Annual Variable Amount, paid monthly for 1FQ18 and 2FQ18). Since many reps will have earned commission in 1FQ19, the actual amount paid will vary per rep.

Please approve so we can proceed with this plan before SKO, even if it's not perfect. Thank you!

Paul

NA Reps:

| |
|---|
| **Brandon Bailey** |
| **Jerry Sullivan** |
| **Jim Broadley** |
| **Jodi Malandaras** |
| **John Hand** |
| **Jason Borens** |

EMEA Reps:

| |
|---|
| **Matti Karell** |
| **Dirk Verweij** |
| **Gareth Hobson** |
| **Richard Brandon** |
| **Mathias Ritter** |

**From:** Christine McDade
**Sent:** Tuesday, July 3, 2018 6:11 AM
**To:** Paul Staelin <pstaelin@birst.com>; Charles Phillips <Charles.Phillips@infor.com>
**Cc:** Ed Auriemma <edward.auriemma@infor.com>; Brad Peters <bpeters@birst.com>; Anne Benedict <Anne.Benedict@infor.com>; Erica Bellavia <Erica.Bellavia@infor.com>
**Subject:** RE: Birst rep retention - please approve

I get the retention bonus, but why would we do a recoverable draw for tenured reps?

INvPSG00033658



**Chris McDade | VP, Corporate FP&A | 508.280.1039 | christine.mcdade@ infor.com**

**From:** Paul Staelin
**Sent:** Monday, July 02, 2018 5:34 PM
**To:** Charles Phillips <Charles.Phillips@infor.com>
**Cc:** Ed Auriemma <edward.auriemma@infor.com>; Christine McDade <Christine.McDade@infor.com>; Brad Peters <bpeters@birst.com>; Anne Benedict <Anne.Benedict@infor.com>; Erica Bellavia <Erica.Bellavia@infor.com>
**Subject:** Birst rep retention - please approve

Charles,

Thank you for your support of the Birst retention program for Birst's most tenured sales reps. The specifics of the plan, as discussed with Brad, is below. We have budgeted $300K for this program and the expected cost is $275K. Can you please reply "approved" and we will work with Anne and Erica to put this program in place before Birst's SKO starts next Tuesday, 7/10? Thank you for your support!

Paul



**Paul Staelin** | Chief Operating Officer, Birst | SVP Go-to-Market, BI & Analytics, Infor | office: +1.415.766.4830

The retention program is targeted at Birst sales reps with over 20 months of tenure and is comprised of 2 parts:

1. $25K retention payment paid now, recoverable pro-rata from 5/1/18 – 12/31/18 (8 months) should the rep leave before 12/31/18
2. 50% recoverable draw for first 6 months of the year (totaling 25% of Annual Variable Amount, paid monthly for 1FQ18 and 2FQ18). Since this is recoverable, the actual expense for this line item is expected to be low.

The total expense of the retention payments is $275K. There is $300K in the budget for this program so the cost is covered. The specific reps included in the program are:

| |
|---|
| **Matti Karell** |
| **Brandon Bailey** |
| **Dirk Verweij** |
| **Gareth Hobson** |
| **Richard Brandon** |
| **Jerry Sullivan** |
| **Jim Broadley** |
| **Mathias Ritter** |
| **Jodi Malandaras** |
| **John Hand** |
| **Jason Borens** |

# EXHIBIT 12

| | |
|---|---|
| **From:** | Michael McQuaid </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=560F840E7F9B4517AD361B1DB23FC911-MICHAEL MCQ> |
| **To:** | Brad Peters; Paul Staelin |
| **Sent:** | 10/5/2017 8:29:45 AM |
| **Subject:** | RE: FYI :: Birst Platform Packages Review - Monday Sales Call |

We need to turn it into a use case discussion vs functionality.

Birst in CS is limited and only supports reporting within ERP. The content cannot be modified or extended and no other third party data can be added. The customer will most likely want to add additional data sources from other applications and will most likely want to modify and/or extend the content. In order to do this, they will need to purchase Birst Enterprise Edition.

Best regards,
Mike



**Mike McQuaid** | SVP North American Sales
office: 919 386 5476 | mobile: 919 757 3858| mike.mcquaid@infor.com | birst.com

**From:** Brad Peters
**Sent:** Thursday, October 5, 2017 10:03 AM
**To:** Michael McQuaid <mmcquaid@birst.com>; Paul Staelin <pstaelin@birst.com>
**Subject:** RE: FYI :: Birst Platform Packages Review - Monday Sales Call

John Duda was very explicit in how he positioned this. It's now come back to me a couple of times. It includes the internal allocation for Birst which should not be in the broader doc for the rest of Infor.

Anyway we can make this better I think. But the actual functionality is also directly listed in this, so I'm not sure what we can do to keep a rep from cherry picking. We need to make it very clear that it is not full Birst and significant functionality will not be there in the free version.

**From:** Michael McQuaid
**Sent:** Thursday, October 5, 2017 6:59 AM
**To:** Brad Peters <bpeters@birst.com>; Paul Staelin <pstaelin@birst.com>
**Subject:** RE: FYI :: Birst Platform Packages Review - Monday Sales Call

I think the internal message went out a few days after the doc was sent. Also, an argument could be made that Infor is internal as well. Not making an excuse for him, but highlighting that we need to "spoon feed the sales team with the right info written in 6th grade English" to avoid confusion.

Best regards,
Mike



**Mike McQuaid** | SVP North American Sales
office: 919 386 5476 | mobile: 919 757 3858| mike.mcquaid@infor.com | birst.com

**From:** Brad Peters
**Sent:** Thursday, October 5, 2017 9:51 AM
**To:** Michael McQuaid <mmcquaid@birst.com>; Paul Staelin <pstaelin@birst.com>
**Subject:** RE: FYI :: Birst Platform Packages Review - Monday Sales Call

**Exhibit
00046**

Yes. But also John Hand was not supposed to distribute this. It was explicitly for internal Birst use. The fact that he sent it along before it was made consumption ready is a problem.

**From:** Michael McQuaid
**Sent:** Thursday, October 5, 2017 6:47 AM
**To:** Brad Peters <bpeters@birst.com>; Paul Staelin <pstaelin@birst.com>
**Subject:** FW: FYI :: Birst Platform Packages Review - Monday Sales Call

Gents,

See below. Reps are now seeing "Birst included in CS" but are not familiar enough with the offering or Birst to know that it is limited functionality with no ability to edit. We need to be very very clear that B for CS offers limited reporting and that reps should add the Enterprise SKU for full BI.

Best regards,
Mike



**Mike McQuaid** | SVP North American Sales
office: 919 386 5476 | mobile: 919 757 3858| mike.mcquaid@infor.com | birst.com

**From:** Kirk McGlasson
**Sent:** Thursday, October 5, 2017 9:40 AM
**To:** Michael McQuaid <mmcquaid@birst.com>
**Subject:** FYI :: Birst Platform Packages Review - Monday Sales Call

Mike, FYI... See the 2nd email from Tony (below @ 7:48 AM).
The ERP reps will see that "Birst is part of the CS"...
We're going to have a lot of work to do to make sure the ERP reps (and ERP SCs) don't just simply say to customers that "Birst is part of the CS".

John has this topic covered... Just FYI. We need firm (and simple) messaging from the top explaining what Paul S. has been telling us. E.g. the delivered content requires Birst enterprise if you want to edit anything out of the box.



**Kirk McGlasson** | VP for North America Manufacturing, Retail, and Healthcare
mobile: 972.342.4926 | http://www.infor.com | www.birst.com

**From:** John Hand
**Sent:** Thursday, October 05, 2017 7:04 AM
**To:** Kirk McGlasson <kmcglasson@birst.com>
**Subject:** FW: Birst Platform Packages Review - Monday Sales Call

FYI... I started working with Tony last week on another deal. He told me about this deal a few days ago. He wants to sell some Pro seats at a minimum...

Thanks,



**John Hand** | Sr. Account Executive, Sales
mobile: (770) 625-6538 | jhand@birst.com | birst.com

**From:** Tony Listro
**Sent:** Thursday, **October 5, 2017 7:48 AM**
**To:** Christina Van Houten <Christina.VanHouten@infor.com>; Kamakshi Mallikarjun
<Kamakshi.Mallikarjun@infor.com>; John Gledhill <john.gledhill@infor.com>; Brian Dunks

<brian.dunks@infor.com>; Brad Peters <bpeters@birst.com>; Paul Staelin <pstaelin@birst.com>
**Cc:** Gary Drake <gary.drake@infor.com>; Ole Rasmussen <ole.rasmussen@infor.com>; Alistair Stone <alistair.stone@infor.com>; MaryJo Tincher <maryjo.tincher@infor.com>; John Hand <jhand@birst.com>
**Subject:** RE: Birst Platform Packages Review - Monday Sales Call

Hi folks – Short listed at Tencarva Machinery, a $500K+ ACV deal. We need to provide best & final pricing by tomorrow. Proposing CloudSuite Equipment Rental and Birst. Need pricing for Birst. Is Birst now included for CloudSuites per the slide below? Note, this is an end of Nov'17/early Dec'17 contract. Please advise. ////
Thx - Tony



## Packaging

| Description | Included by default in MT CloudSuites | Departmental and SMB Edition | Enterprise Edition |
|---|---|---|---|
| Infor Deployment Scenario | MT and new ST customers | On Prem, ST, MT | On Prem, ST, MT |
| Birst Deployment Scenario | MT | MT | On Prem, ST, MT |
| Dashboards | | | |
| Designer (ad-hoc product reports) | | | |
| Mobile | | | |
| Report Bursting (delivery) | | | |
| Guided Ad hoc (prompted ad hoc) | | | |
| Live Access | | | |
| Visualizer (discovery/visualization) | | | |
| Prisma (end user data preparation) | | | |
| Networked BI (model blending) | | | |
| ADE (advanced/enterprise modeling) | | | |
| Multi Tenant | | | |
| Always On (no downtime for loading) | | | |
| Open Client Interface (Excel/Others) | | | |
| In-memory Database | | | |
| Platform Fee | Included in core applications 100% allocation to Birst product line | $9,500/year (includes 3 users) | $35K-200K/year |
| User Fees | | $375/user/month | $750/user/year $5,000/admin user/year |

**Tony Listro** | Senior Account Executive
862-686-6496
tony.listro@infor.com | http://www.infor.com

**From:** Christina Van Houten
**Sent:** Wednesday, October 04, 2017 5:06 PM
**To:** Kamakshi Mallikarjun <Kamakshi.Mallikarjun@infor.com>; John Gledhill <john.gledhill@infor.com>; Brian Dunks <brian.dunks@infor.com>; Tony Listro <tony.listro@infor.com>; Brad Peters <bpeters@birst.com>; Paul Staelin <pstaelin@birst.com>
**Cc:** Gary Drake <gary.drake@infor.com>; Ole Rasmussen <ole.rasmussen@infor.com>; Alistair Stone <alistair.stone@infor.com>; MaryJo Tincher <maryjo.tincher@infor.com>
**Subject:** Re: Birst Platform Packages Review - Monday Sales Call

Looping in Paul and Brad that are leading the presentations that have been scheduled with the Sales/ BU leads and their teams.

**From:** Kamakshi Mallikarjun <Kamakshi.Mallikarjun@infor.com>
**Date:** Wednesday, October 4, 2017 at 1:00 PM
**To:** John Gledhill <john.gledhill@infor.com>, Brian Dunks <brian.dunks@infor.com>, Tony Listro <tony.listro@infor.com>
**Cc:** Gary Drake <gary.drake@infor.com>, Ole Rasmussen <ole.rasmussen@infor.com>, Alistair Stone <alistair.stone@infor.com>, Christina Van Houten <Christina.VanHouten@infor.com>, MaryJo Tincher <maryjo.tincher@infor.com>

**Subject:** RE: Birst Platform Packages Review - Monday Sales Call

Hi John

Christina is leading the Birst packaging with Brad and Paul. Christina said that instead of a Fuel Call, Christina is working with Ed Auriemma to have meetings with the Sales Business Units.

And what you have described below is the packaging – Base with Add Ons.


Best regards,
Kamakshi

**Kamakshi Mallikarjun** Sr. Product Director, Technology Adoption | Infor
office: +1610 524 2942 | mobile :+1484 437 7570
Kamakshi.Mallikarjun@infor.com|http://www.infor.com

**From:** John Gledhill
**Sent:** Wednesday, October 04, 2017 12:38 PM
**To:** Brian Dunks <brian.dunks@infor.com>; Tony Listro <tony.listro@infor.com>; Kamakshi Mallikarjun <Kamakshi.Mallikarjun@infor.com>
**Cc:** Gary Drake <gary.drake@infor.com>; Ole Rasmussen <ole.rasmussen@infor.com>; Alistair Stone <alistair.stone@infor.com>
**Subject:** RE: Birst Platform Packages Review - Monday Sales Call

The pricing around Birst is being driven by Kamakshi

My understand is that in new deals cloudsuites will include a base Birst and industry content which will be built over the coming months, for some of the Birst capabilities which I believe many M3 customers will need they will have to purchase Birst Professional or Enterprise.

I think there may be a Fuel call to explain this in the coming days, Kamakshi?

All the Best

**John**



**John Gledhill** (VP Product Management)
Mobile - +44 (0)7872 911947 [ john.gledhill@infor.com ][ www.infor.com ]

**From:** Brian Dunks
**Sent:** 04 October 2017 17:04
**To:** Tony Listro <tony.listro@infor.com>
**Cc:** Gary Drake <gary.drake@infor.com>; Ole Rasmussen <ole.rasmussen@infor.com>; John Gledhill <john.gledhill@infor.com>; Alistair Stone <alistair.stone@infor.com>
**Subject:** RE: Birst Platform Packages Review - Monday Sales Call

Hi, Ole normally works on the generic CloudSuite pricing but will need to work with the Birst folks to agree a % split of the CloudSuite revenue, I guess the Birst folks will want a much larger % split than we allocate to BI today

Ole... any comments?

Regards /Brian



**Brian Dunks** - Product Director
mobile: +44 7831 235 982
brian.dunks@infor.com | http://www.infor.com

Infor (United Kingdom) Limited | Registered Office: One Central Boulevard, Blythe Valley Park, Shirley, Solihull, England B90 8BG | Registered in England No. 2766416

**From:** Tony Listro
**Sent:** 04 October 2017 16:44
**To:** Brian Dunks <brian.dunks@infor.com>
**Cc:** Gary Drake <gary.drake@infor.com>; Ole Rasmussen <ole.rasmussen@infor.com>; John Gledhill <john.gledhill@infor.com>; Alistair Stone <alistair.stone@infor.com>
**Subject:** RE: Birst Platform Packages Review - Monday Sales Call

Hi Brian

Thanks. Do you know who manages the pricing aspect of this? So if I sell them CS now, just want to be able to tell them Birst would come included in Mar'18, which would be during their implementation.



**Tony Listro** | Senior Account Executive
862-686-6496
tony.listro@infor.com | http://www.infor.com

**From:** Brian Dunks
**Sent:** Wednesday, October 04, 2017 11:33 AM
**To:** Tony Listro <tony.listro@infor.com>
**Cc:** Gary Drake <gary.drake@infor.com>; Ole Rasmussen <ole.rasmussen@infor.com>; John Gledhill <john.gledhill@infor.com>; Alistair Stone <alistair.stone@infor.com>
**Subject:** RE: Birst Platform Packages Review - Monday Sales Call

Hi Tony, I think the current 'plan' is to target CloudSuite 10.2.2.1 in March 2018, I've not heard how and if Birst will affect the price of the CloudSuites.
Regards /Brian



**Brian Dunks** - Product Director
mobile: +44 7831 235 982
brian.dunks@infor.com | http://www.infor.com

Infor (United Kingdom) Limited | Registered Office: One Central Boulevard, Blythe Valley Park, Shirley, Solihull, England B90 8BG | Registered in England No. 2766416

**From:** Tony Listro
**Sent:** 04 October 2017 16:26
**To:** Ole Rasmussen <ole.rasmussen@infor.com>; Brian Dunks <brian.dunks@infor.com>; John Gledhill <john.gledhill@infor.com>; Alistair Stone <alistair.stone@infor.com>
**Cc:** Gary Drake <gary.drake@infor.com>
**Subject:** FW: Birst Platform Packages Review - Monday Sales Call
**Importance:** High

Hey guys –

Hope all is well.

Short listed at Tencarva Machinery, a $500K+ ACV deal. We positioned Birst there during the detailed demos last week. We are selling CloudSuite Equipment Rental (CSER). We have been asked to provide best & final pricing by end of this week.

See attached PPT showing Birst for CloudSuites (slide 3) included in the core CS at no additional charge. When will this be officially included to CSER at no additional charge? FYI, this would be an end of Nov'17/early Dec'17 contract.

Thanks
Tony

INvPSG00013459



**Tony Listro** | Senior Account Executive
862-686-6496
tony.listro@infor.com | http://www.infor.com

**From:** John Hand
**Sent:** Wednesday, October 04, 2017 11:08 AM
**To:** Tony Listro <tony.listro@infor.com>
**Subject:** FW: Birst Platform Packages Review - Monday Sales Call
**Importance:** High



**John Hand** | Sr. Account Executive, Sales
mobile: (770) 625-6538 | jhand@birst.com | birst.com

**From:** John Duda
**Sent:** Wednesday, September 27, 2017 8:37 AM
**To:** DL-TEAM-Michael McQuaid-Chart <DL-TEAM-michael.mcquaid-Chart@infor.com>; DL-TEAM-David
Gray-Chart <DL-TEAM-david.gray-Chart@infor.com>; DL-TEAM-John Duda-Chart <DL-TEAM-john.duda-
Chart@infor.com>
**Cc:** Brad Peters <bpeters@birst.com>; Paul Staelin <pstaelin@birst.com>; Pedro Arellano
<parellano@birst.com>
**Subject:** Birst Platform Packages Review - Monday Sales Call
**Importance:** High

All,

Attached.  Thanks Paul.

John



**John P Duda** | Vice President, Global Solution Consulting
mobile: 303 408-5089 | john.duda@infor.com | birst.com

CONFIDENTIAL

INvPSG00013460

# EXHIBIT 13

| | |
|---|---|
| **From:** | Paul Staelin </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS /CN=D6D2232F48174345B625B7B657662214-PAUL STAELI> |
| **To:** | Christine McDade |
| **Sent:** | 2/14/2019 11:04:37 PM |
| **Subject:** | Re: Birst CA Revenue |
| **Attachments:** | image012.jpg; image001.jpg; image002.png; image003.jpg; image004.png; image005.jpg; image013.png |

Birst gets 10% of the CloudSuite revenue for those CloudSuites that use Birst for CloudSuites. That was decreed by Charles almost 18 months ago...

On Feb 14, 2019, at 6:18 PM, Christine McDade <Christine.McDade@infor.com> wrote:

Have you had a chance to meet with Product Mgmt to work out splits going forward on the CS's in question? <image001.jpg> <image002.png>
**Chris McDade | VP, Corporate FP&A | 508.280.1039 | christine.mcdade@ infor.com**

**From:** Paul Staelin
**Sent:** Thursday, February 14, 2019 5:19 PM
**To:** Christine McDade <Christine.McDade@infor.com>
**Subject:** Re: Birst CA Revenue
Done. Thank you for the suggestion.

**From:** Christine McDade <Christine.McDade@infor.com>
**Date:** Thursday, February 14, 2019 at 1:57 PM
**To:** Paul Staelin <pstaelin@birst.com>
**Subject:** RE: Birst CA Revenue
yes
<image003.jpg><image004.png>
**Chris McDade | VP, Corporate FP&A | 508.280.1039 | christine.mcdade@ infor.com**

**From:** Paul Staelin
**Sent:** Thursday, February 14, 2019 4:57 PM
**To:** Christine McDade <Christine.McDade@infor.com>
**Subject:** Re: Birst CA Revenue
Yes. Same group + Wendy?

**From:** Christine McDade <Christine.McDade@infor.com>
**Date:** Thursday, February 14, 2019 at 1:49 PM
**To:** Paul Staelin <pstaelin@birst.com>
**Subject:** RE: Birst CA Revenue
Paul,
We need a bigger stick. Can you please invite Wendy to the call and see if we can unlodge this.
<image005.jpg><image013.png>
**Chris McDade | VP, Corporate FP&A | 508.280.1039 | christine.mcdade@ infor.com**

**From:** Paul Staelin
**Sent:** Thursday, February 14, 2019 4:47 PM
**To:** David Mazul <David.Mazul@infor.com>; Steve Horniak <Steve.Horniak@infor.com>; Dan Castrejon <Dan.Castrejon@infor.com>; Christine McDade <Christine.McDade@infor.com>; Lauren Alexander <Lauren.Alexander@infor.com>; Megan Widmann <mwidmann@birst.com>; Pradeep Solanki <PSOLANKI@birst.com>; Drew Bragga <Drew.Bragga@infor.com>
**Subject:** Re: Birst CA Revenue
Can and Chris,
Any insight into how we should proceed? Shall we convene another call to get everyone on the same page? Please let us know. Thank you for your help!
Paul

**From:** David Mazul <David.Mazul@infor.com>
**Date:** Friday, February 1, 2019 at 7:44 AM
**To:** Steve Horniak <Steve.Horniak@infor.com>, Paul Staelin <pstaelin@birst.com>, Dan Castrejon

> **Exhibit 00069**

<Dan.Castrejon@infor.com>, Christine McDade <Christine.McDade@infor.com>, Lauren Alexander <Lauren.Alexander@infor.com>, Megan Widmann <mwidmann@birst.com>, Pradeep Solanki <PSOLANKI@birst.com>, Drew Bragga <Drew.Bragga@infor.com>

**Subject:** RE: Birst CA Revenue

Hello Steve,
I agree with you. We need guidance from Christine/Dan.
Many Thanks,
David Mazul

**From:** Steve Horniak
**Sent:** Friday, February 1, 2019 9:35 AM
**To:** David Mazul <David.Mazul@infor.com>; Paul Staelin <pstaelin@birst.com>; Dan Castrejon <Dan.Castrejon@infor.com>; Christine McDade <Christine.McDade@infor.com>; Lauren Alexander <Lauren.Alexander@infor.com>; Megan Widmann <mwidmann@birst.com>; Pradeep Solanki <PSOLANKI@birst.com>; Drew Bragga <Drew.Bragga@infor.com>
**Subject:** RE: Birst CA Revenue

Thanks David,
Before FPA provides any reclass, I need to be 100% sure of the reconciliations, which you are still having issues over. It needs to be full reconciled and traceable.
Thanks
Steve

**From:** David Mazul
**Sent:** February 1, 2019 2:00 AM
**To:** Paul Staelin <pstaelin@birst.com>; Dan Castrejon <Dan.Castrejon@infor.com>; Christine McDade <Christine.McDade@infor.com>; Steve Horniak <Steve.Horniak@infor.com>; Lauren Alexander <Lauren.Alexander@infor.com>; Megan Widmann <mwidmann@birst.com>; Pradeep Solanki <PSOLANKI@birst.com>; Drew Bragga <Drew.Bragga@infor.com>
**Subject:** RE: Birst CA Revenue

Hello all,
After reviewing the file provided there are some concerns we have surrounding this request.

1. The ACV number in the attached file does not match the ACV number in CRM; trying to determine this so we have a clean starting point to tie back to
2. After identifying the Order in Softrax we are unable to break out the details to tie to columns "Per CPM Bookings"
3. The go forward SKU is not ready
    a. New deals would have to be manually added to this sheet to ensure we get the right amount month over month
    b. Once the SKU is available, most likely, there will be an exchange SKU order adjustment
4. When it comes to renewals of these contract, the IDB record will be off and will require manual intervention to capture correctly

To elaborate on point 2, I was unable to tie out any of these items to the numbers we are calculating the 10% on. I have attached the Softrax details of Denver Health on to a different tab; column D has the SKU and column H has the contract amount. Please review and let us know if you could provide guidance.

As of now, there is no easy way to what items are being affected based with the information provided. I do not see this being resolved in Q3. In addition, if there is a reclass needed, we would ask for the reclass to be provided by FP&A using the revenue template to ensure we are capturing the correct details. Please let us know if you have any questions.
Many Thanks,
David Mazul

**From:** Paul Staelin
**Sent:** Tuesday, January 29, 2019 4:15 PM
**To:** David Mazul <David.Mazul@infor.com>; Dan Castrejon <Dan.Castrejon@infor.com>; Christine McDade <Christine.McDade@infor.com>; Steve Horniak <Steve.Horniak@infor.com>; Lauren Alexander <Lauren.Alexander@infor.com>; Megan Widmann <mwidmann@birst.com>; Pradeep Solanki <PSOLANKI@birst.com>
**Subject:** RE: Birst CA Revenue

Thank you!

**From:** David Mazul
**Sent:** Tuesday, January 29, 2019 1:02 PM
**To:** Paul Staelin <pstaelin@birst.com>; Dan Castrejon <Dan.Castrejon@infor.com>; Christine McDade

INvPSG00009071

<Christine.McDade@infor.com>; Steve Horniak <Steve.Horniak@infor.com>; Lauren Alexander <Lauren.Alexander@infor.com>; Megan Widmann <mwidmann@birst.com>; Pradeep Solanki <PSOLANKI@birst.com>
**Subject:** RE: Birst CA Revenue
Hello Paul,
Have not gotten time to dive into the details on what I have pulled yet; been pulled into some SaaS items and Vivonet details.
Looking to get something out on this tomorrow.
Thanks,
David Mazul

**From:** Paul Staelin
**Sent:** Tuesday, January 29, 2019 4:00 PM
**To:** Dan Castrejon <Dan.Castrejon@infor.com>; Christine McDade <Christine.McDade@infor.com>; Steve Horniak <Steve.Horniak@infor.com>; Lauren Alexander <Lauren.Alexander@infor.com>; David Mazul <David.Mazul@infor.com>; Megan Widmann <mwidmann@birst.com>; Pradeep Solanki <PSOLANKI@birst.com>
**Subject:** RE: Birst CA Revenue
All –
Just following up on this – any update or progress? Things will get hectic shortly here with end-of-quarter and would love to make progress before that happens. Thank you for your time and assistance!
Paul

**From:** Paul Staelin
**Sent:** Friday, January 25, 2019 12:19 PM
**To:** Dan Castrejon <Dan.Castrejon@infor.com>; Christine McDade <Christine.McDade@infor.com>; Steve Horniak <Steve.Horniak@infor.com>; Lauren Alexander <Lauren.Alexander@infor.com>; David Mazul <David.Mazul@infor.com>; Megan Widmann <mwidmann@birst.com>; Pradeep Solanki <PSOLANKI@birst.com>
**Subject:** RE: Birst CA Revenue
All –
Just following up. Have we made any progress in moving the one test customer over to Birst for the Birst for CloudSuites 10% revenue allocation? We are moving more customers to Birst each week and would love figure this out so we can get the revenue right as we are already incurring the hosting expense. Thank you for your help!
Paul
-----Original Appointment-----
**From:** Dan Castrejon
**Sent:** Tuesday, January 8, 2019 10:41 AM
**To:** Dan Castrejon; Paul Staelin; Christine McDade; Steve Horniak; Lauren Alexander; David Mazul; Megan Widmann; Pradeep Solanki
**Subject:** Birst CA Revenue
**When:** Thursday, January 17, 2019 2:00 PM-2:30 PM (UTC-06:00) Central Time (US & Canada).
**Where:** Skype Meeting
Purpose: To continue the conversation about Cloudsuite products being upgraded/transitioned to Birst and to ensure that the financials for these customers and products will be properly reflected & reported within the our internal systems.
I've added Lauren (SaaS Revenue) & David (Accounting) to the invite.
..................................................................................................

# à Join Skype Meeting

This is an online meeting for Skype for Business, the professional meetings and communications app formerly known as Lync.

## Join by phone
Toll number: +1 (312) 754-8060 (Dial-in Number) English (United States)
Find a local number
Conference ID: 70374482
Help|Legal


<image012.jpg>

..................................................................................................

# EXHIBIT 14

| | |
|---|---|
| **From:** | Christina Van Houten </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=95B040E23DB64AE886E120FD967BF4D2-CHRISTINA V> |
| **To:** | Charles Phillips; Soma Somasundaram |
| **CC:** | Brad Peters; Paul Staelin |
| **Sent:** | 9/26/2017 4:20:36 AM |
| **Subject:** | FW: Overview of Birst Packaging for Cloudsuites and also the Birst Like for Like Upgrade Packages for Reporting and Infor BI/Analytics |
| **Attachments:** | Birst_Platform_Packages-2017-09-25 v2.pptx |

Charles and Soma,

Yesterday, Brad and Paul did a great session with the product leads below on where we've landed with Birst pricing and packaging. From here, we'll be doing training workshops with each BU lead and their team.

Christina

**From:** Paul Staelin <pstaelin@birst.com>
**Date:** Tuesday, September 26, 2017 at 2:15 AM
**To:** Kamakshi Mallikarjun <Kamakshi.Mallikarjun@infor.com>, Brad Peters <bpeters@birst.com>, Christina Van Houten <Christina.VanHouten@infor.com>, Anita Gregory <anita.gregory@infor.com>, Kitam Sari <ksari@birst.com>, Andrew Kinder <Andrew.Kinder@infor.com>, Christine Williams <Christine.Williams@infor.com>, John Gledhill <john.gledhill@infor.com>, Todd Stratton <Todd.Stratton@infor.com>, Trish McFarlane <Trish.McFarlane@infor.com>, Alistair Stone <alistair.stone@infor.com>, Adriana Maradiaga <Adriana.Maradiaga@infor.com>, John Carrico <John.Carrico@infor.com>, Howard Noreen <Howard.Noreen@infor.com>, Catherine Henn <Catherine.Henn@infor.com>, Debbie Baldwin <Debbie.Baldwin@infor.com>, Pramod Mathur <Pramod.Mathur@infor.com>, Parker Erickson <parker.erickson@infor.com>, Beth Wilgis <Beth.Wilgis@infor.com>, Adriaan Rijke <Adriaan.Rijke@infor.com>, Kristian Ujlaki <Kristian.Ujlaki@infor.com>, Kevin Kelly <Kevin.Kelly@infor.com>, Anthony Vitelli <anthony.vitelli@infor.com>, John Mulchrone <John.Mulchrone@infor.com>, Dale List <Dale.List@infor.com>, Henrik Johansson <henrik.johansson@infor.com>, Javier Buzzalino <Javier.Buzzalino@infor.com>, Brian Nigri <Brian.Nigri@infor.com>, Eric Ryerson <Eric.Ryerson@infor.com>, Massimo Capoccia <Massimo.Capoccia@infor.com>, Jacob Krebs <jkrebs@birst.com>, Junaid Saiyed <jsaiyed@birst.com>, MaryJo Tincher <maryjo.tincher@infor.com>, Ingemar Venckus <Ingemar.Venckus@infor.com>, Michelle Rydman <Michelle.Rydman@infor.com>, Andy Knudsen <Andy.Knudsen@infor.com>
**Cc:** Nancy Demko <Nancy.Demko@infor.com>, Barbara Flanagan <Barbara.Flanagan@infor.com>, Pierre Nolte <Pierre.Schmerbach@infor.com>
**Subject:** RE: Overview of Birst Packaging for Cloudsuites and also the Birst Like for Like Upgrade Packages for Reporting and Infor BI/Analytics

All –

Thank you for your time this morning. I hope you all found the call helpful. Now that we have the basic offerings for the Birst platform defined, let's focus on driving value for our customers and revenue for Infor by developing the best analytical applications and solutions in the marketplace and selling them to our customers. As we discussed, the business goal is to drive new and upsell revenue by enticing new and existing customers to purchase Birst Professional and Enterprise and the value-added solutions your teams will develop using those platforms over time. To help ensure that existing Infor BI customers move in this direction, the company is putting a 25% trade-in incentive in order to help entice customers who have purchased Infor BI in the past to make the move to Birst. We look forward to working with you and your teams in the coming months to develop the high-value analytical applications that reflect Infor's industry knowledge and best practices.

As promised, please find enclosed the slides from today's session. Thank you again for your time and attention.

Paul

-----Original Appointment-----

**Exhibit
00045**

**From:** Kamakshi Mallikarjun

**Sent:** Wednesday, September 20, 2017 8:39 AM

**To:** Kamakshi Mallikarjun; Brad Peters; Paul Staelin; Christina Van Houten; Anita Gregory; Kitam Sari; Andrew Kinder; Christine Williams; John Gledhill; Todd Stratton; Trish McFarlane; Alistair Stone; Adriana Maradiaga; John Carrico; Howard Noreen; Catherine Henn; Debbie Baldwin; Pramod Mathur; Parker Erickson; Beth Wilgis; Adriaan Rijke; Kristian Ujlaki; Kevin Kelly; Anthony Vitelli; John Mulchrone; Dale List; Henrik Johansson; Javier Buzzalino; Brian Nigri; Eric Ryerson; Massimo Capoccia; Jacob Krebs; Junaid Saiyed; MaryJo Tincher; Ingemar Venckus; Michelle Rydman; Andy Knudsen

**Cc:** Nancy Demko; Barbara Flanagan; Pierre Nolte

**Subject:** Overview of Birst Packaging for Cloudsuites and also the Birst Like for Like Upgrade Packages for Reporting and Infor BI/Analytics

**When:** Monday, September 25, 2017 12:00 PM-1:00 PM (UTC-05:00) Eastern Time (US & Canada).

**Where:** Call-in toll-free number (US/Canada): 1-855-244-8681; Access Code - Please see invite.

I apologize for the late time for Europe. Trying to find a time that works for CA and Europe.
-- Do not delete or change any of the following text. --

Join WebEx meeting
Meeting number (access code): 598 838 976
Meeting password: analytics

Join by phone
**1-650-479-3207** Call-in toll number (US/Canada)
**1-855-244-8681** Call-in toll-free number (US/Canada)
Global call-in numbers | Toll-free calling restrictions

Can't join the meeting?

If you are a host, go here to view host information.

IMPORTANT NOTICE: Please note that this WebEx service allows audio and other information sent during the session to be recorded, which may be discoverable in a legal matter. By joining this session, you automatically consent to such recordings. If you do not consent to being recorded, discuss your concerns with the host or do not join the session.



# Birst Platform Options

September 2017

Specialized by industry.
Engineered for speed.

Copyright © 2012. Infor. All Rights Reserved. www.infor.com

1

CONFIDENTIAL

INvPSG00014891

 **Birst Professional vs. Enterprise Editions**

| | Professional Edition | Enterprise Edition |
|---|---|---|
| Use Case | Simple to Moderate | Complex |
| Data Sources | Flat files / Popular Cloud Applications / Relational Databases | ERP / Big Data Applications / Transactional Systems / etc |
| Analytical Model | Simple data model 1 – 20 tables | Dimensional data model req'd 10 + tables |
| Deployment Size | 5 – 200 users | 50 users – ELA |
| Time to Value | weeks | months |
| Price Point | $9k - $50k+ | $100k - $2M+ |
| Customer Targets* | SMB firms/Smaller Departments | Larger organizations |

*Note:  Packaged integration to Infor solutions is not yet available, so all require paid Services engagement.  Each sales cycle should evaluate the most relevant feature/function set for the target customer's business situation.

Copyright © 2016 Infor. All Rights Reserved. www.infor.com

2

CONFIDENTIAL

# Packaging

| Feature | Birst for CloudSuites | Birst Professional | Birst Enterprise |
|---|---|---|---|
| Description | Included by default in MT CloudSuites | Departmental and SMB Edition | Enterprise Edition |
| Deployment Scenario | MT | On Prem, ST, MT | On Prem, ST, MT |
| Dashboards | ✓ | ✓ | ✓ |
| Designer (pixel-perfect reports) | ✓ | add on | ✓ |
| Mobile | ✓ | ✓ | ✓ |
| Report Bursting (delivery) | ✓ | add on | ✓ |
| Guided Ad hoc (prompted ad hoc) | ✓ | ✓ | ✓ |
| Live Access | ✓ | ✓ | ✓ |
| Visualizer (discovery/visualization) | | ✓ | ✓ |
| Pronto (end-user data preparation) | | ✓ | add on |
| Networked BI (model blending) | | add on | add on |
| ADR (advanced/enterprise modeling) | | | ✓ |
| Multi-lingual | ✓ | | ✓ |
| Always On (no downtime for loading) | | | add on |
| Open Client Interface (Excel/others) | | add on | add on |
| In-memory Database | | | add on |
| Platform Fee | Included in core application (10% allocation to Birst product line) | $9,500/year (includes 5 users) | $100,000/year |
| User Fees | | $35/user/month | $750/user/year $5,000/admin user/year |

Infor Confidential

3

INvPSG00014893



CONFIDENTIAL

INvPSG00014894

# Infor Product Lines + Birst Connect Integration

| Infor product line | On-Prem Timeline | Single Tenant Timeline | Multi-Tenant Timeline | Details |
|---|---|---|---|---|
| M3 | Today | Today | End of Year | On Prem/ST: BC 1.0<br>MT: Birst Connect 2.0 + Infor Data Lake |
| EAM | Today | N/A | Nov 10th | On Prem/ST: BC 1.0<br>MT: Birst Connect 2.0 |
| LN | Contact Product | Contact Product | End of Year | MT: Birst Connect 2.0 + Infor Data Lake |
| HCM | Oct 27th | Oct 27th | End of Year | On Prem/ST: Rest Connector +  ION API gateway support for Landmark 11<br>MT: Birst Connect 2.0 + Infor Data Lake |
| CSF | Oct 27th | Oct 27th | End of Year | On Prem/ST: Rest Connector +  ION API gateway support for Landmark 11<br>MT: Birst Connect 2.0 + Infor Data Lake |

 + 

CONFIDENTIAL

INvPSG00014895

# Infor OS + Birst Cloud Integration

| Infor | Birst | Timeline | Details |
|---|---|---|---|
| Portal | Embed Dashboards | Today | Works today |
| Homepages | Embed Visualizer Reports | Oct 27 | Responsive and Filter Passing |
| IFS | SSO/SAML | Oct 27 | Multiple Dashboards, Visualizer Reports embedded on the same page |
| In-Context BI | Net new development | Nov (Beta) Jan (GA) | Search reports and create reports in context |
| Drill back | Fit Gap Analysis | Nov (Beta) Jan (GA) | Drill from Birst to Target and vice-versa |
| OLAP Cubes | OLAP source | End of Year | Support for Infor BI OLAP cubes |

 +    Infor OS integration covering SSO, Ming.le Homepage widgets, Portal, In-Context BI for Applications, OLAP Cubes

Infor Confidential                                        Copyright ©2018 Infor. All Rights Reserved. www.infor.com     6

CONFIDENTIAL

INvPSG00014896

# Migration Path (from IBI, IR and LBI)

- Infor BI, Infor Reporting and Lawson BI all have migration paths to Birst which will replace those products
- For customers upgrading an ERP application which includes one of these products to a version which no longer supports these products:
  - Entitled to a limited like-for-like edition of Birst that is consistent with existing functionality, but is not intended to provide additional benefits
  - Only available during an upgrade
- For customers wishing to take advantage of Birst capabilities today:
  - Customers are entitled to a credit towards purchase of Birst of 25% of their existing maintenance; customers may then cancel their existing maintenance

CONFIDENTIAL

INvPSG00014897

| | Reporting Upgrade Migration Package | Analytics Upgrade Migration Package | Birst for Cloudsuites | Birst Pro | Birst Enterprise |
|---|---|---|---|---|---|
| Description | Migration path available when upgrading ERP from version that contained Infor Reporting or LBI | Migration path available when upgrading ERP from version that contained Infor BI | Included by default in MT CloudSuites | Departmental and SMB Edition | Enterprise Edition |
| Deployment Scenario | On Prem, ST | On Prem, ST | MT | On Prem, ST, MT | On Prem, ST, MT |
| Applicable Infor Products | Replacing Cognos/Infor Reporting in WFM, XM, EAM, SCE,SX.e  Replacing Crystal/LBI in FSM | M3 Analytics, HCM Analytics, Syteline Analytics, EAM Analytics, FSM, GHRTM  TBD - LN Analytics, Distribution Business Analytics that use BDS | | | |
| Dashboards | included | included | included | included | included |
| Designer | included | | included | add on | included |
| Report Bursting | included | | included | add on | included |
| Guided Adhoc | included | included | included | included | included |
| Visualizer | | included | | included | included |
| Pronto | | | | included | add on |
| Advanced Data Modeling (ADR) | | | | | included |
| Live Access (MLS) | Infor operational tables only | Infor analytical sources only including cubes, DWD | Infor analytical sources only including cubes | included | included |
| Mobile | | included | included | included | included |
| Multi-lingual | included | included | included | included | included |
| Networked BI | | | | add on | add on |
| Always On | | | | | add on |
| Open Client Interface (Excel and other tools) | | included | | add on | add on |
| In-memory database | | | | | add on |
| Pre-built content | Included, pixel-perfect reports  NOTE: these applications must be developed with Birst features included in this upgrade package | On premise add on: embedded content and dashboards  NOTE: these applications must be developed with Birst features included in this upgrade package (So MGA, HCM will use DWD, FSM/GHRTM/Syteline Live Access against Cubes) | Included, Guided Ad Hoc & embedded content for core ERP application Add on: value-added applications for more than core apps (could vary by cloudsuite)  NOTE: these applications may be developed with Birst Enterprise features, including networked BI without giving customer access to them | Cloudsuite content available and can be networked with customer-created content using Birst Professional | Cloudsuite content available and extendable using Birst Enterprise |
| Platform Fee | | | Allocated 10% of ACV | $9,500 per year (includes 5 users) | $100K per year |
| User Fees | | | | $35/month/user | |
| Packages | | | | | - $5000 per analyst per year - $750 per user per year Enterprise Plus Pkg: $150k per year - Networked BI (Packages) - Pronto - Always On - OCI |

CONFIDENTIAL



# Birst Customer Scenario Playbook

**2 key offers/ terms:**
1. Additionally, if a customer owns full Infor BI, they can continue to use that or get a credit toward Birst equal to 25% of their Infor BI support bill.
2. Cloud products with embedded BI as part of the solution will continue to receive functionality and content that is consistent with what they now run.

| 1 | 2 | 3 | 4 | 5 | |
|---|---|---|---|---|---|
| **Customers - On Premise** | | | | **Customer - Cloud** | |
| Owns Infor apps, but no BI | Owns Infor BI, but hasn't implemented | Owns Infor BI, in process of implementing | Owns Infor BI and been running for a while with Infor solutions | Runs CloudSuite | Runs application in the Cloud |
| Can solve immediate use cases with purchase of Birst today. | Customer has option to keep ownership of Infor BI and eventually deploy _OR_ swap out the license for a **credit toward Birst equal to 25%** of their Infor BI support bill. | Customer has option to keep ownership of Infor BI and eventually deploy _OR_ swap out the license for a **credit toward Birst equal to 25%** of their Infor BI support bill. | Recommend that customers running Infor BI on premise add Birst incrementally to existing deployment, phasing in Birst as while phasing out Infor BI over time.<br><br>Customer has option to keep ownership of Infor BI and eventually deploy _OR_ swap out the license for a **credit toward Birst equal to 25%** of their Infor BI support bill. | Customer gets prebuilt reports, dashboards, and analytical content in Birst as part of the core CloudSuite offering.<br><br>If customer wants to **analyze data** from additional sources, edit or create new analytical reports, build custom dashboards, etc, they need to **buy Birst Enterprise or Birst Professional.** | If the customer purchased a cloud application that includes Infor BI as part of the core packaging, the customer will get Birst prebuilt reports, dashboards, and analytical content **as Infor BI content is replaced by Birst content in the future.**<br><br>If customers want to **analyze** data from additional sources, edit or create new analytical reports, build custom dashboards etc, they need to buy **Birst Enterprise or Birst Professional**. |

CONFIDENTIAL

INvPSG00014899



CONFIDENTIAL



CONFIDENTIAL

INvPSG00014901

# EXHIBIT 15



# Birst Implementation; Birst for Cloudsuite vs Custom Birst Implementations

**Kevin Hodgkins**
Vice President of Consulting ICS Global BI Competency Center

INvPSG00097807

 # Full disclaimer

This presentation reflects the direction Infor may take with regard to the products or services described herein, all of which is subject to change without notice. This presentation is not a commitment to you in any way and you should not rely on any content herein in making any decision. Infor is not committing to develop or deliver any specified enhancement, upgrade, product, service or functionality, even if such is described herein. Many factors can affect Infor's product development plans and the nature, content and timing of future product releases, all of which remain in the sole discretion of Infor. This presentation, in whole or in part, may not be incorporated into any agreement. Infor expressly disclaims any liability with respect to this presentation.

Copyright © 2017, Infor. All Rights Reserved. www.infor.com        2

CONFIDENTIAL

INvPSG00097808



CONFIDENTIAL

# Birst:  Ancient History

- Business:  **Birst is the leader in Cloud BI**
- History of Birst:
  - Business started in 2005 to deliver cloud BI applications to large enterprises
  - Financial crisis in 2008 led to move from vertical to horizontal focus
  - Re-launched Birst in 2009 with general purpose cloud BI application
  - In 2013, the BI market began to support cloud
  - In 2014, achieved product maturity to provide a horizontal product to enterprises
  - In 2017, acquired by Infor to become its go to market BI platform

Copyright © 2017, Infor. All Rights Reserved. www.infor.com

4

CONFIDENTIAL

INvPSG00097810

# Gen I: Query and reporting, cubes



- Desktop/Analyst Focus
- Goals
  - Formatting/Presentation
  - Sandbox Analysis
- Technical users
- Repeatability and Scalability Challenged

INvPSG00097811

# Gen II: Governed enterprise data with centralized analytical production



ance

INvPSG00097812



CONFIDENTIAL

INvPSG00097813

 A couple quick questions

1. Part of your mission is to drive a data-driven organization?
2. Have some sort of common version of the truth?
3. Good idea to let business users answer their own questions?

Is it hard to do # 2 and #3 at same time to drive #1?

Copyright © 2017, Infor. All Rights Reserved. www.infor.com          8

# The trade off



CONFIDENTIAL

INvPSG00097815



CONFIDENTIAL

INvPSG00097816



INvPSG00097817

# Infor accelerates Birst's networked analytics



### Global

Global reach of 15,000 employees in 200 countries



### Design

Pulitzer-prize winning UX team to enhance ease-of-use



### Science

100+ PhD Data Scientists to



### Cloud

Cloud expertise behind 62 million subscribers



### R&D

1000+ additional developers of Infor

Copyright © 2017, Infor. All Rights Reserved. www.infor.com   12

CONFIDENTIAL

INvPSG00097818



CONFIDENTIAL

INvPSG00097819

# Birst for CS vs Professional vs. Enterprise

| | Birst for CloudSuite | Professional Plus Edition | Enterprise Edition |
|---|---|---|---|
| Use Case | Standard reporting | Extended Discovery Analytics | Networked Analytics |
| Data Sources | Only CloudSuite application data | Flat files / Popular Cloud Applications / Relational Databases | ERPs / EMRs / Big data apps / 3rd Party, etc. |
| Data Model | Only delivered data structures | Simple relational data model 1 – 20 tables | Dynamic dimensional data model w/ 10 + tables |
| User Count | All CS named users | 5 – 100 users* | 50 users – ELA |
| Time to Value | days / weeks | weeks | months |
| Price Point | Included with core app | $10k - $50k | $100k - $2M+ |
| Targets* | CS clients requiring basic reporting and analysis | LIO, CS HC clients' small-to-medium Departments | Entire organizations, or departments with large data |

- Professional deployments for more than 100 seats will require approval by Birst leadership
- Targets & user counts are common uses

Copyright ©2017, Infor. All Rights Reserved. www.infor.com    14

CONFIDENTIAL

INvPSG00097820



# Detailed Feature Comparison

| Feature | Birst Trial | Birst for Cloudsuites | Birst Professional | Birst Professional Plus | Birst Enterprise | Enterprise Plus |
|---|---|---|---|---|---|---|
| Product Description | Free Trial | Included in multi-tenant CloudSuites | Departmental & SMB Edition | Departmental & SMB Edition | Enterprise Edition | Enterprise Edition |
| Infor Deployment Scenario | | Multi-tenant & new single tenant customers | On prem, single & multi-tenant | On prem, single & multi-tenant | On-prem, single & multi-tenant | On-prem, single & multi-tenant |
| Birst Deployment Scenario | | Multi-tenant | Multi-tenant | Multi-tenant | On-prem, single & multi-tenant | On-prem, single & multi-tenant |
| Dashboards | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Live Access (query data in place) | ✓ | | ✓ | ✓ | ✓ | ✓ |
| Ad Hoc discovery & visualization (Visualizer) | ✓ | | ✓ | ✓ | ✓ | ✓ |
| End User data preparation (Prontio) | ✓ | | ✓ | ✓ | Add on | ✓ |
| Pixel-perfect reports (Designer) | | ✓ | | ✓ | ✓ | ✓ |
| Birst Mobile | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Admin report scheduling (Triggered & Time-based distribution) | | ✓ | | ✓ | ✓ | ✓ |
| Notifications (self service scheduling from dashboard) | | | ✓ | ✓ | ✓ | ✓ |
| Column Level Security | | | ✓ | ✓ | ✓ | ✓ |
| Drill Maps (for global drilling) | | | ✓ | ✓ | ✓ | ✓ |
| Global Variables (to support incremental data loads, etc.) | | | ✓ | ✓ | ✓ | ✓ |
| Product Feature Security (based on user group) | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Open Client Interface (Excel/others) | | | Add on per named users | Add on per named users | Add on per named users | Add on per named users |
| Networked BI (model blending) | | | | ✓ | Add on | ✓ |
| Access to Birst Web Services API | | | | ✓ | ✓ | ✓ |
| Single Sign On (SSO) support | | | | ✓ | ✓ | ✓ |
| Embedding Birst into another web-based application | | | | ✓ | ✓ | ✓ |
| Conformed Dimension Automation | | | | | ✓ | ✓ |
| Slowly Changing Dimension Support (Type 2) | | | | | ✓ | ✓ |
| Snapshots of source applications (to build history) | | | | | ✓ | ✓ |
| Auto-detection of source data change | | | | | ✓ | ✓ |
| Support for custom fiscal calendars | | | | | ✓ | ✓ |
| Auto-assignment of users to feature groups | | | | | ✓ | ✓ |
| Row Level security | | | | | ✓ | ✓ |
| Aggregate Awareness | | | | | ✓ | ✓ |
| Offline Mobile | | | | | ✓ | ✓ |
| OLAP cube data source support | | | | | ✓ | ✓ |
| Customized data processing sequence | | | | | ✓ | ✓ |
| In-memory Database for ADR storage | | | | | Add on | Add on |
| Always On (no downtime during data load) | | | | | Add on | ✓ |
| Language Support for application | English only | All currently available | English only | English only | All currently available | All currently available |

CONFIDENTIAL

# Types of integration

| Integration #1: Custom BI | Integration #2: Pre-built content |
|---|---|
| • Birst can integrate with **ALL** Infor applications **TODAY** | • Pre-built data model, KPIs, reports available for **SOME** Infor applications |
| • Out-of-the-box connectors extract data from Infor applications into Birst | • M3 (on-prem) |
| • Professional Services (or Partner) builds data model, BI analytic reports and dashboards in Birst | • FSM (MT) |
| | • Lawson (on-prem and ST) |
| | • GHR/HCM (MT) |
| • Average deployment time: 90-120 days | • Coming soon |
| | • M3 (ST and MT), LN (MT), CSD (MT and on-prem), CSI (MT and on-prem), SCE, XM, EAM, WFM |

Copyright © 2017, Infor. All Rights Reserved. www.infor.com     16

CONFIDENTIAL

INvPSG00097822



Infor Cloudsuites Pre-delivered
Analytics Content

CONFIDENTIAL

INvPSG00097823

# Analytics Solution Guide

| Birst for CloudSuite Implementation | Birst Professional Plus Custom Implementation | Birst Enterprise Custom Implementation |
|---|---|---|
| Access CloudSuite data in cloud or on-premise | Access any data in cloud or on-premise | Access any data in cloud or on-premise |
| Deploy in cloud | Deploy in cloud | Deploy in cloud or on-premise |
| Actionable industry specific content | Actionable industry specific content | Actionable industry specific content |
| View & create Interactive Dashboards | View & create Interactive Dashboards | View & create Interactive Dashboards |
| Create highly formatted, pixel perfect reports | Create highly formatted, pixel perfect reports | Create highly formatted, pixel perfect reports |
| Easily share information via scheduled reports or exports | Easily share information via scheduled reports or exports | Easily share information via scheduled reports or exports |
| Access key insights from anywhere with full mobile interactivity | Access key insights from anywhere with full mobile interactivity | Access key insights from anywhere with full mobile interactivity |
| | Modify pre-delivered reports and widgets | Modify pre-delivered reports and widgets |
| Manage Orchestration of data loads | Discover new insights faster with powerful data discovery | Discover new insights faster with powerful data discovery |
| Manage user, group and space security settings | Easily blend simple 3rd party data like spreadsheets | Easily blend simple 3rd party data like spreadsheets |
| | Eliminate data silos with full self-service end user data preparation | Eliminate data silos with full self-service end user data preparation |
| | Directly access 3rd party data in real-time with query in place | Directly access 3rd party data in real-time with query in place |
| | Networked shared data across tenants | Networked shared data across tenants |
| | Embed analytics into other core applications outside of Infor | Embed analytics into other core applications outside of Infor |
| | Replace costly 3rd party tools like Tableau, Qlik & Power BI | Replace costly 3rd party tools like Tableau, Qlik & Power BI |
| | | Extend and modify pre-delivered core Infor ERP data models |
| | | Easily blend complex 3rd party enterprise data into a single version of the truth |
| | | Accelerate time to value using patented automation technology to generate enterprise class data models |
| | | Ensure seamless access to business-critical analytics during data load processing with advanced high availability |
| | | Discover new trusted insights from third party applications with Open Client Interface |
| | | Provide enhanced localization support for richer analytics experiences across the globe |
| | | Replace costly legacy BI tools like Business Objects, Oracle, MicroStrategy & Cognos |
| "How much am I spending on supplies" "What is my labor cost by department" | "How is spend trending over time compared to Census or Cases" | "What service lines do I need to focus on to improve profit marine" |

CONFIDENTIAL

INvPSG00097824



INvPSG00097825

# EXHIBIT 16

| From: | Ashley Hart </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8C40094706344F30BE163375EB576ED1-ASHLEY HART> |
|---|---|
| To: | Brad Peters; Paul Staelin; Christine Hunter |
| CC: | Kim Livingston; Soma Somasundaram; Kevin Samuelson |
| Sent: | 9/3/2019 7:26:53 PM |
| Subject: | Re: Marketing Birst in CloudSuite vs. Standalone |

+ Kevin

Hi Brad and Paul,

As Christine indicated,  Soma and I had a discussion this morning in regards to marketing Birst as part of the CloudSuites, and not as a standalone in the marketing strategy.

We will move forward to start marketing the product as part of the CloudSuite, which is part of the pancake strategy.  If Soma changes strategy,  after your conversation,  we'll certainly change direction.

Thanks.

Ashley

Chief Marketing Officer
Infor.com

Sent via the Samsung Galaxy S9

**Exhibit 00049**

-------- Original message --------

From: Brad Peters <bpeters@birst.com>

Date: 9/3/19 9:29 PM (GMT-05:00)

To: Paul Staelin <pstaelin@birst.com>, Christine Hunter <Christine.Hunter@infor.com>

Cc: Ashley Hart <Ashley.Hart@infor.com>, Kim Livingston <kim.livingston@infor.com>, Soma Somasundaram <Soma.Somasundaram@infor.com>

Subject: Re: Marketing Birst in CloudSuite vs. Standalone

Christine,

We definitely need to follow up on this as I'm not sure I understand the intent, motivation or business goal here. The vast majority of our bookings and revenue come from standalone Birst - either Core or Cross sell. Cloud suites is a small part of our business and one where we are already embedded in the suite and hence there is no voluntary purchase decision to be made that could be influenced by marketing.

Soma, can we discuss this tomorrow morning?

CONFIDENTIAL

Thank you,

Brad

---

**From:** Paul Staelin <pstaelin@birst.com>
**Sent:** Tuesday, September 3, 2019 6:21:33 PM
**To:** Christine Hunter <Christine.Hunter@infor.com>
**Cc:** Ashley Hart <Ashley.Hart@infor.com>; Kim Livingston <kim.livingston@infor.com>; Soma Somasundaram <Soma.Somasundaram@infor.com>; Brad Peters <bpeters@birst.com>
**Subject:** Re: Marketing Birst in CloudSuite vs. Standalone

+ Brad

Christine,

Thank you for reaching out. I was surprised by our conversation as the discussed change would be a marked departure from our current strategy under which we strive to maintain Birst as a best-of-breed analytics platform rather than a captive analytics platform for Infor. I would greatly prefer we discuss this as a group rather than make such a significant change without the appropriate discussion. I have cc'd Brad on this reply and hope that we will all discuss this shortly. Thank you for you help!

Paul

Get

---

**From:** Christine Hunter <Christine.Hunter@infor.com>
**Sent:** Tuesday, September 3, 2019 5:26 PM
**To:** Paul Staelin
**Cc:** Ashley Hart; Kim Livingston; Soma Somasundaram
**Subject:** Marketing Birst in CloudSuite vs. Standalone

Hi Paul,

Glad we had a chance to connect over the phone today. As discussed, Ashley shared with me this morning that Soma has asked that we move to marketing Birst as part of the CloudSuites and not standalone, so we will be looking at the Birst marketing plans to identify areas where we need to adjust messaging.

Thanks,



**Christine Hunter** | Head of North America Field Marketing
mobile: 512 554 4404 |Christine.Hunter@infor.com | http://www.infor.com

YOUR        Employee Engagement
ESTYPE      Committee member

# EXHIBIT 17

| From: | David Gray </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS /CN=D1ADCBDDFE554CF7920DD0DFCB01F2E2-DAVID GRAY> |
|---|---|
| To: | Christine McDade; Paul Staelin |
| CC: | Brad Peters; Jesus Arbo |
| Sent: | 5/15/2019 2 53:46 AM |
| Subject: | Re: Birst FY20 Core Bookings targets |

Hi,

I'm aware the B4CS 10% allocation is still being debated re rep and SC comp. I'd understood though B4CS allocation was not a subject of debate re the BU's target.

In FY19 both BU and rep and SC numbers included the B4CS allocation. I strongly believe we should not change that for FY20. Our budget presentations and rep quota setting clearly called out maintaining that approach.

Rather than just make this a statement of my opinion I have set out below facts re BU and rep performance in FY18 and FY19, together with a few conclusions based on that data. The data points make bleak reading and they show, should there be a fear in this regard, that B4CS allocation at BU and rep and SC level will contribute towards a decent performance this year, versus be "free" revenue where the reps significantly over-perform en masse as a result. I do want us to finally hit a BU target, I do want some reps to start to hit their quota, and I do want to see average rep attainment rise to something half way decent. If those things happen, it will be due to improved teaming internally and growth in core revenue, plus some contribution from B4CS. Not solely B4CS allocation. We have an opportunity here to carry our recent momentum into FY20 and aspire to hit the BU target of $28.259m. Or we can mess with the B4CS allocation to fix an issue that doesn't exist and undermine that momentum and deliver lower revenues.

**FY18**
- $14.4m bookings in total V BU quota of $18m
- 24 direct sales reps
- Only 2 of the 24 reps made quota – 8.3%
  - Jason Borens booked $2.4m, of which $1.5m was Cap One, a legacy pre-acquisition sales cycle. Without it, he would have booked $900k.
  - Richard Branson booked $1.4m. But, in FY18, we allowed our reps to count bookings made in the 4 months from January to April 2017 to "count" towards FY18. Richard booked almost half of his FY18 numbers in that period, i.e. before the acquisition even took place.
- **Average rep attainment of $602k per head, or 43% of quota.**

**FY19**
- $22.3m bookings in total – **including B4CS** in Qs 3 & 4 V BU quota of $29m
  - $18.774m attributed to direct sales reps, the balance is IPN for $718k and House for $2.838m
- Huge step change in H2
  - H1 – Q1 of $2.7m + Q2 of $3m = $5.7m or 25% of full year
  - H2 – Q3 of $6.75m + Q4 of $9.8m = $16.55m or 75% of full year
- 31 direct sales reps
- Only 2 of the 31 reps made quota – 6.4%
  - Jerry Sullivan booked $2.5m. Jerry is a CORE OEM rep, and booked the big Aetna $1.6m deal
  - Dave Bundy booked $2.45m. **Our only CROSS rep to make quota.**
  - Only x3 other reps booked over $1m
- **Average rep attainment of $605k per head, or 43% of quota.**
- Attrition:
  - Sales: lost x8 reps (26%) and x1 manager (not counting Mike McQuaid)
  - Pre-Sales: I don't have the number of SCs, but John Duda quotes over 50%


**Exhibit 0099**

**Conclusions**
- Even when counting B4CS revenues towards rep bookings and comp the average rep attainment is steady at circa $600k per rep.
- That average rep attainment is in itself already a fundamental problem. **We have had an average attainment of 43%, with and without B4CS content, over the two years since the acquisition.** How long can reps operate on that basis?
- Too few of the reps are making quota. I'd argue only x1 cross rep in 2 years. A healthy sales team has a far greater number hitting quota.

- Attrition is already far too high for both reps and SCs. We need to reduce it, not allow it to increase.
- Birst Cross reps and SCs earn their revenue and comp on multi product deals
  - They engage in a continuous process of enablement of their Industry colleagues re Birst value prop: content and enterprise
  - Both Birst content and enterprise adds value and differentiation to the overall Infor value prop to the prospect – which the Birst reps and SCs articulate
  - They are only added to an opportunity by the Industry AE if they have added value to that sales cycle – both for enterprise and/or B4CS
  - **In FY19 there was $2.838m of "House" revenue to the Birst BU, 13% of total revenue. This illustrates that unless a Birst cross rep adds value, they are not added to the opportunity team**
- In H2 FY19 we finally hit that post acquisition inflection point and started to build strong momentum and associated revenues for the company.
  - We need to build on that progress, drive greater revenue and see higher average rep attainment and full year quota achievement
  - In the first 6 quarters after the acquisition our average quarterly bookings was $3.35m. In H2 FY19 that average was $8.275m
  - The H2 jump can be sustained in FY20, though seasonality will of course dictate quarterly bookings
  - **The H2 jump is not just down to B4CS revenue**, it is also the dividend of an uptick in core and increasingly strong collaboration with the Industry teams
- **The theme for the Birst BU for FY20 should be to double down and improve upon on the successful forumla of H2 FY19, "more of the same". Not alter a fundamental building block, B4CS comp for reps and SCs. It is not too expensive, it is "earned" in any case, and if we remove it we will see higher attrition, loss of productivity and much lower total revenues.**

Cheers
D



**David Gray** | Senior Vice President, Global Sales
mobile: +44 7917 372748 | david.gray@infor.com |
birst.com

**From:** Christine McDade <Christine.McDade@infor.com>
**Date:** Tuesday, May 14, 2019 at 23:29
**To:** David Gray <dgray@birst.com>, Paul Staelin <pstaelin@birst.com>
**Cc:** Brad Peters <bpeters@birst.com>, Jesus Arbo <Jesus.Arbo@infor.com>
**Subject:** RE: Birst FY20 Core Bookings targets
The target is going to be further adjusted for the CS allocation. With the 10% allocation up for debate, it would seem the SE target should be adjusted.

 

**Chris McDade | VP, Corporate FP&A | 508.280.1039 | christine.mcdade@ infor.com**

**From:** David Gray
**Sent:** Tuesday, May 14, 2019 4:38 PM
**To:** Paul Staelin <pstaelin@birst.com>
**Cc:** Brad Peters <bpeters@birst.com>; Christine McDade <Christine.McDade@infor.com>; Jesus Arbo <Jesus.Arbo@infor.com>
**Subject:** Re: Birst FY20 Core Bookings targets
Thanks Paul.
JR,
I assume I can just use the quarterly %s you have applied here per Q on the total BU targets? For example the Q1 % below is 18.65% of full year.
I understand from Brad and Paul that we will almost certainly not hire the x2 NN core reps in NA, so BU target will be $28.259m.
Cheers
D



**David Gray** | Senior Vice President, Global Sales
mobile: +44 7917 372748 | david.gray@infor.com |
birst.com

 INvPSG00013313

**From:** Paul Staelin <pstaelin@birst.com>
**Date:** Tuesday, May 14, 2019 at 20:27
**To:** David Gray <dgray@birst.com>
**Cc:** Brad Peters <bpeters@birst.com>, Christine McDade <Christine.McDade@infor.com>, Jesus Arbo <Jesus.Arbo@infor.com>
**Subject:** Birst FY20 Core Bookings targets

David,

All I have for FY20 in terms of Selling Effort targets is our current Core numbers, see below. Waiting for JR to provide the full Selling Effort BU targets for FY20 by quarter… I have cc'd him on this thread in the hope that he can provide them to all of us without waiting for me to see the email in my inbox… Thank you for your continued efforts to grow the Birst business!

Paul

FY20 Birst Core Bookings Targets by Quarter

|             | FY20      | Q1        | Q2        | Q3        | Q4        |
|-------------|-----------|-----------|-----------|-----------|-----------|
| Total ACV   | 3,625,000 | 598,125   | 797,500   | 942,500   | 1,286,875 |
| Traditional | 2,485,000 | 541,730   | 546,700   | 603,855   | 792,715   |
| Total       | 6,110,000 | 1,139,855 | 1,344,200 | 1,546,355 | 2,079,590 |

INvPSG00013314

# EXHIBIT 18

| From: | Paul Staelin <pstaelin@gmail.com> |
|---|---|
| To: | 'bradleypeters@gmail.com' |
| Sent: | 6/3/2019 10:53:45 PM |
| Subject: | Draft Earnout Email |

Brad,

Here is my draft email on the earnout. We should discuss if I should send this to Wendy or if you should send it to Pam instead. Let me know what you think.

Paul

Wendy,

Thank you for your help. As you know, Birst had a great FY19 and we exceeded our earn-out target of $21.0 million in BU bookings in FY19. Our records show that we had the following business unit bookings in FY19:

Total Business Unit Bookings in FY19: $26,529,705
Selling Effort Bookings, ACV + Perp: $22,330,028
- Birst Pro + Enterprise:
> 1FQ19: $2,743,582
> 2FQ19: $3,055,430
> 3FQ19: $5,624,923
> 4FQ19: $6,825,131
- Birst for CloudSuites:
> 1FQ19: $ -
> 2FQ19: $ -
> 3FQ19: $1,124,350
> 4FQ19: $2,956,612
Business Unit Bookings: $4,199,677
- Birst for CloudSuites provisioning
> 1FQ19: $ -
> 2FQ19: $ -
> 3FQ19: $ -
> 4FQ19: $4,199,677

The earn-out target was $21.0 million of business unit bookings, so that means Birst exceeded the target by $5,529,705. The three leaders remaining in the business with incentives tied to this business unit achievement and their associated payouts and payout rates are:

Brad Peters (20%): $1,105,941.00
David Gray (11%): $608,267.55
Paul Staelin (11%): $608,267.55

I have attached our sales bookings for the four quarters of FY19 as well as a list of the new Birst for CloudSuites customers provisioned in FY19 for your review.

We are very excited about our strong performance in FY19 and look forward to an even stronger FY20. I will follow up with you shortly for us to discuss how to best proceed. Thank you for your time and assistance!

Paul



**Exhibit**
**00075**

CONFIDENTIAL

INvPSG00152386

# EXHIBIT 19

| From: | Paul Staelin </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS /CN=D6D2232F48174345B625B7B657662214-PAUL STAELI> |
|---|---|
| To: | Brad Peters |
| CC: | Paul Staelin |
| Sent: | 5/23/2019 5:47:41 PM |
| Subject: | First Earnout Math for FY20 |
| Attachments: | Earnout Project as of 5.22.19_v2.xlsx; Q4'19 FINAL Rep Scorecard as of 5.9.19.xlsx |

Brad,

Here are the backup spreadsheets for the earnout math we discussed earlier. The basic numbers boil down to:

1. FY20 Sales Achievement (see "Manager Scorecard" tab of the "Q4'19 FINAL Rep Scorecard as of 5.9.19" file): $22.33mm
2. B4CS Enablement Credit, which can be measured 3 ways (see "Summary" tab of "Earnout Project as of 5.22.19_v2" file):
   a. Enabled, meaning LN, CSF, HCM, M3 plus other core apps with Birst content (as of 4/30/2019) that was sold post-acquisition 6/1/2017:

i. $5.52mm at 10% credit to Birst (see "Sum of Product ACV" in attached sheet)

   b. Enabled AND Provioned, meaning Kevin Hodgkins has provisioned the account AND the customer bought one of the core apps with Birst content (as of 4/30/2019) that was sold post-acquisition 6/1/2017:

i. $3.46mm at 10% credit to Birst *(see "Sum of Product ACV" column in attached sheet after filtering for "Provisioned?" column = Provisioned)

   c. Provisioned only, from Kevin's spreadsheet (see screenshot from his Birst space on the topic below):

i. $5.4mm

Based on the amounts above, it seems that we have exceeded the earnout target by somewhere between $27.85 - $21.0 = $6.85mm to $25.79 - $21.0 = $4.79mm. Good news!

Good luck with Charles tomorrow!

Paul



**Exhibit 00050**

INvPSG00015232

# EXHIBIT 20



KEKER
VAN NEST
& PETERS

Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
415 391 5400
keker.com

**R. James Slaughter**
(415) 391-5400
rslaughter@keker.com

May 15, 2020

**VIA EMAIL**

Mr. Bradley Peters c/o Avi Lipman
McNaul Ebel Nawrot & Helgren
600 University Street, Suite 2700
Seattle, WA 98101-3143
alipman@mcnaul.com

Re:   Fiscal Year 2019 Earnout Bonus

Dear Mr. Peters:

I write regarding the Earnout Bonus that you received from Infor (US), Inc. based on the growth of the Birst business during Infor's fiscal year 2019 ("FY 19"). Upon review, we have determined that you were not entitled to receive an Earnout Bonus for FY 19. Accordingly, please immediately return to Infor the FY 19 Earnout Bonus that you received in the amount of $494,204.10.

I am available to provide wiring instructions at your convenience. You may also send a check to my attention at the address listed above. If you fail to return by May 19, 2020 the $494,204.10 payment that you received, you will wrongfully and willfully be withholding Infor's property in violation of law. Infor is prepared and intends to pursue all appropriate legal remedies.

**I.   Background**

Infor acquired Birst in or around May 2017. You received an employment offer in connection with Infor's acquisition of Birst. Your Offer Letter—dated May 26, 2017—stated that you were eligible to receive an Earnout Bonus based on the growth of the Birst business during FY 19, subject to the terms and conditions of the Offer Letter. *See* **Exhibit A**. Your Offer Letter further stated that "[t]he FY19 Earnout Bonus," if any, "shall be an amount equal to 28% of the amount by which FY 19 Bookings exceeds $21 million." *See id.* at 2.

By letter dated December 2, 2019, Infor set forth its calculation of FY 19 Bookings. *See* **Exhibit B**. Infor enclosed with its communication a Microsoft Excel file that detailed all transactions that were included in its FY 19 Bookings calculation. Infor determined FY19 Bookings to be $22,757,872, resulting in an Earnout Bonus payment to you in the amount of

1383831

CONFIDENTIAL

May 15, 2020
Page 2

$494,204.10.  *See id.* at 2.  Infor subsequently transmitted $494,204.10 to you on December 31, 2019.[1]

## II.    Revised calculation of FY 19 Bookings

Upon review, Infor has determined that its December 2, 2019 calculation of FY 19 Bookings inadvertently included certain transactions that closed in fiscal year 2020 ("FY 20"), rather than FY 19.  Under Infor's revised analysis, FY 19 Bookings did not exceed the $21 million threshold required to trigger an FY 19 Earnout Bonus payment to you.  Given that you were not entitled to receive an Earnout Bonus for FY 19, you were overpaid in the amount of $494,204.10.  You have no right to retain that property because you were not actually entitled to receive an FY 19 Earnout Bonus payment under the terms of your Offer Letter.

Infor demands that you return your FY 19 Earnout Bonus Payment—$494,204.10— immediately to Infor.  Infor does not consent to your retention of its $494,204.10 payment.  If you fail to return the $494,204.10 payment that you received, you will wrongfully and willfully be withholding Infor's property in violation of law.

* * *

Infor is prepared and intends to pursue all appropriate legal remedies.  If Infor is forced to file suit, it will seek damages, pre- and post-judgment interest, and an order requiring you to pay for Infor's costs and fees, including its attorneys' fees.

If you have any questions or concerns, please kindly direct them to my attention via email to rslaughter@keker.com or contact me by telephone at +1 415-391-5400.

Sincerely,

KEKER, VAN NEST & PETERS LLP

R. James Slaughter

---

[1] This amount was subject to applicable withholdings.

CONFIDENTIAL

# Exhibit A

CONFIDENTIAL

INvPSG00045099



641 Avenue of the Americas
New York, NY 10011
800-260-2640
infor.com

May 26, 2017

Bradley Peters
118 Alta St
San Francisco, CA  94133

Re:  Employment offer in connection with the acquisition of Birst, Inc.

Dear Brad,

In connection with the anticipated acquisition of Birst, Inc. and its subsidiaries (collectively, "Birst") by Infor (US), Inc. (collectively with its affiliates and subsidiaries, "Infor") in a merger transaction pursuant to which Birst will become a wholly owned subsidiary of Infor (such transaction referred to herein as the "Acquisition"), this letter sets forth the terms of your employment with Infor  beginning on the calendar day immediately following the closing of the Acquisition.

Provided that you sign and deliver this letter as instructed below, subject to the consummation of the Acquistion and the other conditions set forth below, your employment under the terms of this letter will begin on the calendar day immediately after the Acquisition becomes effective (or such later date as you sign and deliver this letter to Infor).  You will initially remain employed by Birst, provided that Infor reserves its right to transfer your employment to another Infor entity.

<u>Position</u>:  The title of your position will be SVP, BI and Analytics, Birst.  In this position you will report to Charles Philips, CEO.  Your principal place of employment shall be located within 35 miles of San Francisco, CA.

<u>Compensation</u>:  Your annual base salary will be $350,000 subject to applicable withholdings, payable semi-monthly and in accordance with Infor's normal payroll procedures.  In addition to your base salary, during your employment with Birst or Infor, you will be eligible for a management bonus of up to $100,000 (on a full year basis) based on the achievement of agreed upon business objectives during the applicable fiscal year.  Such bonus will be payable after the end of Infor's fiscal year, promptly following completion of Infor's financial audit with respect to such fiscal year and in no event later than December 31 of the same calendar year (*e.g.*, the bonus payment for the 2018 fiscal year will be made no later than December 31, 2018).  Infor's 2018 fiscal Year ("FY18") ends April 30, 2018 and any amount payable for FY18 may be prorated to reflect the partial year resulting from the timing of the Acquisition.

<u>Ongoing Equity Awards</u>.  You will be eligible to receive periodic Infor equity grants following the Acquisition that are provided to similarly situated Infor executives.

<u>Retention Bonuses</u>:  You will be eligible to receive a one-time retention bonus in the amount of $2,901,958.50, subject to applicable withholdings (the "First Retention Bonus"), provided that you remain continuously employed by Infor through the date that is six (6) months after the closing of the Acquisition (the "First Retention Bonus Date").  You will no longer be eligible for the First Retention Bonus if you voluntarily resign your employment or if your employment is terminated by Infor for Cause (defined below) prior to the First Retention Bonus Date.  The First Retention Bonus will be paid to you in the event that your employment is terminated by Infor without Cause before the First Retention Bonus Date or in the event of your death before the First Retention Bonus Date.

You will be eligible to receive a second one-time retention bonus in the amount of $2,901,958.50, subject to applicable withholdings (the "Second Retention Bonus"), provided that you remain continuously employed by Infor through the date that is twelve (12) months after the closing of the Acquisition (the "Second Retention Bonus Date"). You will no longer be eligible for the Second Retention Bonus if you voluntarily resign your employment or if your employment is terminated by Infor for Cause prior to the Second Retention Bonus Date. The Second Retention Bonus will be paid to you in the event that your employment is terminated by Infor without Cause before the Second Retention Bonus Date or in the event of your death before the Second Retention Bonus Date.

You will be eligible to receive a third one-time retention bonus in the amount of $5,803,917.00, subject to applicable withholdings (the "Third Retention Bonus"), provided that you remain continuously employed by Infor through the date that is twenty four (24) months after the closing of the Acquisition (the "Third Retention Bonus Date"). You will no longer be eligible for the Third Retention Bonus if you voluntarily resign your employment or if your employment is terminated by Infor for Cause prior to the Third Retention Bonus Date. The Third Retention Bonus will be paid to you in the event that your employment is terminated by Infor without Cause before the Third Retention Bonus Date or in the event of your death before the Third Retention Bonus Date.

For purposes of this letter, "Cause" means (i) the conviction of, or a plea of plea of nolo contendere to any charge of a felony or any act of fraud or any act or omission involving dishonesty, or material disloyalty with respect to Infor, or any of its customers or suppliers or other material business relations, (ii) misconduct subjecting Infor to  public disgrace or disrepute, (iii) failure or refusal to perform duties as reasonably directed by Infor, following written notice of same and a meaningful opportunity to cure,  (iv) gross negligence or willful misconduct, (v) use of illegal drugs or abuse of other drugs or excessive consumption of alcohol interfering with the performance of your duties to Infor, or (vi) any material breach by you of any agreement between you and Infor, including without limitation, your breach of any provision of any nondisclosure, non-competition, trade secret protection or developments agreement.

In the event that the First Retention Bonus, Second Retention Bonus and/or the Third Retention Bonus becomes payable, it will be paid to you in the first regularly scheduled payroll following the date that the applicable bonus becomes payable.  In no event will the First Retention Bonus, Second Retention Bonus or the Third Retention Bonus be subject to proration or other partial payment.

Earnout Bonuses: You will be eligible to receive an earnout bonus based on the growth of the business acquired in the Acquisition during each of FY18 and FY19 (each an "Earnout Bonus" and together the "Earnout Bonuses"). The Earnout Bonuses (if any) will be payable after the end of the applicable fiscal year, promptly following completion of Infor's financial audit with respect to such fiscal year and in no event later than December 31 of the same calendar year (i.e., the Earnout Bonus for FY18 (if any) will be paid no later than December 31, 2018, and the Earnout Bonus for FY19 (if any) will be paid no later than December 31, 2019).

The FY18 Earnout Bonus shall be an amount equal to 35% of the amount by which FY18 Bookings exceeds $18 million.  The FY19 Earnout Bonus shall be an amount equal to 28% of the amount by which FY19 Bookings exceeds $21 million.

For purposes of calculating the Earnout Bonuses, the following capitalized terms shall have the meanings set forth below:

>  "*Annual Contract Value*" or "*ACV*" means the total amount of subscription fees applicable to  Birst Offerings payable under a contract, divided by the term of the

CONFIDENTIAL

INVPSG00045101

subscription in years (e.g. $300,000 total subscription fees for a 3 year subscription results in an ACV of $100,000)

*"Allowed Attrition"* means, for any fiscal year, an amount equal 20% of the Year End Subscription Revenue Run Rate for all customers subscribing to the Birst Offerings for the immediately preceding fiscal year.

*"Attrition"* means the ACV of all reductions to previously contracted subscription fees for Birst Offerings determined on a customer by customer for the applicable fiscal year.

*"Birst Offerings"* shall mean any and all products or services offered, licensed, provided, sold, distributed or otherwise exploited by Birst at the time of the Acquisition and any and all products or services already designed and developed by or for Birst at the time of the Acquisition, including all versions and releases of the foregoing, together with any related user documentation.

*"Booking"* means ACV from subscriptions to the Birst Offerings that are Contracted in the applicable fiscal year. The amount of any Booking shall include only that portion of the subscription fees payable under a contract that are attributable to the Birst Offerings. If Birst Offerings are sold bundled or in combination with other products or services offered by Infor, the subscription revenue for purposes hereof shall be deemed to be the list price of the Birst Offerings as if the Birst Offerings had been sold individually; provided however, that if Birst Offerings are sold bundled with other products or services offered by Infor where a discount was applied to such sale, the aggregate discount on such sale shall be applied pro rata to each product in such sale, including the applicable Birst Offerings, in accordance with each such product's list price. Bookings associated with existing customers shall include only the amount of incremental subscription fees (i.e. exclude any amounts representing renewal of prior subscriptions).

*"Contracted"* means that the written contract or order forms have been duly executed by all parties and subscription revenue recognition in accordance with GAAP and Infor's revenue recognition policies has commenced.

*"FY17"* means the fiscal year ending April 30, 2017

*"FY18*" means Infor's fiscal year ending April 30, 2018

"*FY19*" means Infor's fiscal year ending April 30, 2019

"*FY18 Bookings*" means the Bookings for FY18 <u>minus</u> any excess of Attrition over Allowed Attrition for FY18.

"*FY19 Bookings*" means the Bookings for FY19 <u>minus</u> any excess of Attrition over Allowed Attrition for FY18.

*"Year End Subscription Revenue Run-Rate"* means, for any fiscal year, the amount of net revenue (as defined by and determined in accordance with GAAP and Infor's revenue recognition policies) from the sale of the Birst Offerings attributed to the last full month of the fiscal year, multiplied by twelve (12).

By way of example and in no way guaranteeing the amount of any Earnout Bonus, in the event that:

Bookings = $25 million,

FY17 Year End Subscription Revenue Run Rate = $41M

CONFIDENTIAL

Allowed Attrition (20%) = $8.2M

Attrition = $12M

FY18 Bookings = $25M Bookings − ($12M Attrition − $8.2 Allowed Attrition)

$$= \$25M - \$3.8M$$

$$= \$21.2M$$

FY18 Bookings exceeds $18M by $3.2M

The FY18 Earnout Bonus amount would be $1,120,000 (i.e. $3.2 million excess x 0.35).

For the avoidance of doubt, in the event that you are no longer employed by Infor at the end of the relevant fiscal year, no Earnout Bonus shall be payable, in whole or in part, regardless of the circumstances under which employment was terminated.

Benefits:  You will continue to be eligible for all employment benefits as generally offered to employees of Birst who remain employed with Infor following the Acquisition.   Your participation in all such employee benefit plans is subject to the terms of such plans, as they may be modified from time-to-time including by transition to the benefits generally offered to employees of Infor.

At-Will Employment:  Your employment shall be considered at all times to be on an "at-will" basis.  This means either you or Infor may terminate your employment at any time, with or without notice, and for any or no reason.  In addition, nothing in this letter summarizing your prospective employment terms shall constitute or be construed as a guarantee of employment for any definite period of time or a contract of employment.  By signing this letter as instructed below, you acknowledge and agree that any prior employment agreement, severance arrangements or terms and conditions of employment between Birst and you (the "Birst Employment Agreement") shall terminate and be of no further force or effect immediately upon the consummation of the Acquisition and that neither Birst nor Infor shall owe any further obligation to you (including, without limitation, any severance or termination payment) under such Birst Employment Agreement.

Infor may modify its policies and practices, including the compensation and benefits it provides from time to time, as it deems necessary; provided that such modifications shall not alter or amend the Compensation, Earnout Bonuses or Retention Bonuses specified in this letter.  However, the at-will nature of your employment may be modified only by a written agreement signed by both you and Infor.

Nondisclosure, Noncompetition and Developments Agreement: It is also a condition of your prospective employment that, prior to the commencement of  employment with Infor, you must sign Infor's Nondisclosure, Noncompetition and Developments Agreement, which contains additional requirements for the protection of Infor's trade secret, confidential and proprietary information, protections pertaining to Infor's business relationships, as well as an assignment to Infor of the ideas, concepts and other intellectual property that you create during your employment.

Immigration:  For purposes of United States' immigration law, you will be required to provide to Infor documentary evidence of your identity and eligibility for employment in the United States.  Such documentation must be provided to us within three (3) business days of your start date.

CONFIDENTIAL

<u>No Employment-Related Claims</u>: You hereby confirm that you have no claims for unpaid wages or other employment-related remuneration against Birst other than for your regular salary for the current pay period as of the effective time of the Acquisition.  As a condition of accepting employment with Infor and by signing below, you confirm your agreement not to make any claim against Infor or any of its past, present or future affiliated companies for any employment-related matters arising from or in any way related to events that occurred prior to the date on which you countersign this letter, including without limitation, any claims for wages earned prior to commencing employment with Infor; provided that the foregoing agreement specifically excludes (i) any rights you may have in your capacity as a security holder of Birst in connection with the Acquisition; and (ii) any rights to indemnification or exculpation from Birst that you may have in your capacity as a former officer or director of Birst.  You also confirm your permission for Birst to provide, and for Infor to receive and maintain copies of your employment records, personnel file and any other materials and information related to your employment with Birst.

Your signature below will acknowledge your understanding and agreement to the terms and conditions set forth in this letter.  These terms supersede any other agreements (including, without limitation the Prior Agreement) or promises made to you by anyone affiliated with Infor, whether oral or written.  Infor reserves the right to withdraw these terms without further notice if they are not timely accepted by you or if any aspect (e.g. job references, education, proof of citizenship, etc.) of your qualifications cannot be verified and these terms shall only become valid upon Infor's final acceptance of this letter, signed by you.

Should you have any questions regarding this letter, please call me at 718-501-3320.

Welcome to Infor we look forward to having you as part of the team!

Sincerely,

Anne Benedict
SVP, Talent

CONFIDENTIAL                                                                                                                    INvPSG00045104

ACKNOWLEDGEMENT AND ACCEPTANCE:

The undersigned Bradley Peters acknowledges receipt of the foregoing letter setting forth the terms of Infor's offer of employment.  The undersigned accepts such offer subject to the terms of the letter and agrees to its terms, including, without limitation the termination of the Birst Employment Agreement.

Accepted: _____        _____

                Bradley Peters        May 30, 2017

                                                         Date

CONFIDENTIAL        INvPSG00045105

# Exhibit B

CONFIDENTIAL

INvPSG00045106



641 Avenue of the Americas
New York, NY 10011
800-260-2640
infor.com

December 2, 2019

VIA EMAIL: bradleypeters@gmail.com

Mr. Bradley Peters
8279 West Mercer Way
Mercer Island, WA 98040

Re:  Birst Earnout Bonus

Dear Brad:

Reference is made to your employment offer in connection with Infor's acquisition of Birst, Inc. dated May 26, 2017 (the "Offer Letter").  The Offer Letter provides for payment of an Earnout Bonus based on the growth of the Birst business during Infor's fiscal year ended April 30, 2019. This letter sets out Infor's calculation of FY19 Bookings in accordance with the Offer Letter. Capitalized terms used but not otherwise defined in this letter shall have the meanings given to such terms in the Offer Letter.

In accordance with the calculations set out the Offer Letter,  Infor has determined the FY19 Bookings to be $22,757,872.  Enclosed with the email distribution of this letter is an Excel file with the filename **_Birst FY19 Bookings.xlsx_** (the "Bookings File") which includes the details of all transactions included in Bookings for FY19.

FY19 Bookings was determined as follows:

1) Bookings for FY19 in the amount of $22,757,872 consisted of three sets of transactions Contracted in FY19 and resulting in revenue recognition in accordance with GAAP and Infor's revenue recognition policies:

   a) $2,541,307 ACV from sales of licenses to the Birst Virtual Appliance offerings delivered on-premises on a perpetual or term license basis. The detailed transactions included are listed in the _Appliance_ tab of the Bookings File;

   b) $6,011,192 ACV from subscriptions to the Birst Offerings sold on a stand-alone basis. The detailed transactions included are listed in the _Stand-Alone_ tab of the Bookings File; and

   c) $14,205,373 in adjusted ACV from subscriptions Birst Offerings in which the Birst Offerings were sold bundled or in combination with other products or services offered by Infor. The adjusted ACV amount included in Bookings was determined by applying the aggregate discount on such sale pro rata to each product in such sale, including the applicable Birst Offerings, in accordance with each such product's list price.  The detailed transactions included are listed in the _Multi-Product_ tab of the Bookings File.

2) Attrition of 19.8% was less than Allowed Attrition of 20% resulting in no adjustment to Bookings.

CONFIDENTIAL

December 2, 2019
Mr. Bradley Peters
Re:  Birst Earnout Bonus
Page 2

FY19 Bookings is therefore equal to Bookings for FY19 of $22,757,872 minus $0 excess Attrition.

FY19 Bookings of $22,757,872 exceeds the FY19 threshold amount of $21,000,000 by $1,757,872. Bonus-eligible FY19 Bookings of $1,757,872, when multiplied by the Earnout Bonus percentage for FY19 of 28% set forth in the Offer Letter, yields an FY19 Earnout Bonus of $492,204.10 payable to you subject to applicable withholdings.

Please kindly review the calculations set forth above and the contents of the Bookings File. If you dispute any component of the FY19 Bookings, please deliver a written response to my attention within ten business days of the delivery of this letter.   Should you have any questions or concerns, please kindly direct them to my attention via email to kevin.taylor@infor.com or contact me directly by phone at +1 267-422-4897.

Sincerely,

Kevin J. Taylor
Associate General Counsel

Enclosure:  Birst FY19 Bookings.xlsx

cc:     A. Benedict
        W. Blotner
        G. Giangiordano

CONFIDENTIAL

# EXHIBIT 21



KEKER
VAN NEST
& PETERS

Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
415 391 5400
keker.com

**R. James Slaughter**
(415) 391-5400
rslaughter@keker.com

May 15, 2020

**VIA EMAIL**

Mr. David Gray c/o Avi Lipman
McNaul Ebel Nawrot & Helgren
600 University Street, Suite 2700
Seattle, WA 98101-3143
alipman@mcnaul.com

Re:   Fiscal Year 2019 Earnout Bonus

Dear Mr. Gray:

I write regarding the Earnout Bonus that you received from Infor based on the growth of the Birst business during Infor's fiscal year 2019 ("FY 19"). Upon review, we have determined that you were not entitled to receive an Earnout Bonus for FY 19. Accordingly, please immediately return to Infor the FY 19 Earnout Bonus that you received in the amount of $193,365.90.

I am available to provide wiring instructions at your convenience. You may also send a check to my attention at the address listed above. If you fail to return by May 19, 2020 the $193,365.90 payment that you received, you will wrongfully and willfully be withholding Infor's property in violation of law. Infor is prepared and intends to pursue all appropriate legal remedies.

**I.   Background**

Infor acquired Birst in or around May 2017. You received an employment offer in connection with Infor's acquisition of Birst. Your Offer Letter—dated July 25, 2018—stated that you were eligible to receive an Earnout Bonus based on the growth of the Birst business during FY 19, subject to the terms and conditions of the Offer Letter. *See* **Exhibit A**. Your Offer Letter further stated that "[t]he FY19 Earnout Bonus," if any, "shall be an amount equal to 11% of the amount by which FY 19 Bookings exceeds $21 million." *See id.* at 2.

By letter dated December 2, 2019, Infor set forth its calculation of FY 19 Bookings. *See* **Exhibit B**. Infor enclosed with its communication a Microsoft Excel file that detailed all transactions that were included in its FY 19 Bookings calculation. Infor determined FY19

1383962

INvPSG00045109

May 15, 2020
Page 2

Bookings to be $22,757,872, resulting in an Earnout Bonus payment to you in the amount of $193,365.90. *See id.* at 2. Infor subsequently transmitted $193,365.90 to you on December 20, 2019.[1]

## II.    Revised calculation of FY 19 Bookings

Upon review, Infor has determined that its December 2, 2019 calculation of FY 19 Bookings inadvertently included certain transactions that closed in fiscal year 2020 ("FY 20"), rather than FY 19. Under Infor's revised analysis, FY 19 Bookings did not exceed the $21 million threshold required to trigger an FY 19 Earnout Bonus payment to you. Given that you were not entitled to receive an Earnout Bonus for FY 19, you were overpaid in the amount of $193,365.90. You have no right to retain that property because you were not actually entitled to receive an FY 19 Earnout Bonus payment under the terms of your Offer Letter.

Infor demands that you return your FY 19 Earnout Bonus Payment—$193,365.90—immediately to Infor. Infor does not consent to your retention of its $193,365.90 payment. If you fail to return the $193,365.90 payment that you received, you will wrongfully and willfully be withholding Infor's property in violation of law.

* * *

Infor is prepared and intends to pursue all appropriate legal remedies. If Infor is forced to file suit, it will seek damages, pre- and post-judgment interest, and an order requiring you to pay for Infor's costs and fees, including its attorneys' fees.

If you have any questions or concerns, please kindly direct them to my attention via email to rslaughter@keker.com or contact me by telephone at +1 415-391-5400.

Sincerely,

KEKER, VAN NEST & PETERS LLP

R. James Slaughter

---

[1] This amount was subject to applicable withholdings.

1383962

CONFIDENTIAL                                                                                               INvPSG00045110

# Exhibit A

CONFIDENTIAL



641 Avenue of the Americas
New York, NY 10011
800-260-2640
infor.com

July 25, 2018

David Gray
Wren House
Shacklestead Lane
Godalming, SURREY GU7 1RP
United Kingdom

Re:      Second Amended and Restated Earnout Bonus Eligibility

Dear David,

This letter amends and restates, in its entirety, that certain letter dated August 25, 2017 regarding Amended and Restated Earnout Bonus Eligibility in connection with Infor's acquisition of Birst previously acknowledged and agreed to by you (the "Prior A&R Earnout Letter"). Upon your acknowledgement of and agreement to the terms of this letter by return of a signed copy in accordance with the instructions below, the Prior A&R Earnout Letter will be of no further force or effect.

In connection with the acquisition of Birst, Inc. and its subsidiaries (collectively, "Birst") by Infor (US), Inc. (together with its subsidiaries (including Birst) and affiliates, "Infor") in a merger transaction pursuant to which Birst became a wholly owned subsidiary of Infor (US), Inc. (such transaction referred to herein as the "Acquisition") and subject to the terms and conditions of this letter, you are eligible to receive certain bonuses based on the growth of the business acquired in the Acquisition as described below.

In addition to your base salary and any variable compensation, bonus or sales commission payable to you in connection with your employment, you will be eligible to receive a bonus based on the growth of the business acquired in the Acquisition during each of Infor's fiscal years ending April 30, 2018 and April 30, 2019 (each an "Earnout Bonus" and together the "Earnout Bonuses"). The Earnout Bonuses (if any) will be payable after the end of the applicable fiscal year, promptly following completion of Infor's financial audit with respect to such fiscal year and in no event later than December 31 of the same calendar year (*i.e.*, the Earnout Bonus for FY18 (if any) will be paid no later than December 31, 2018, and the Earnout Bonus for FY19 (if any) will be paid no later than December 31, 2019).

The FY18 Earnout Bonus shall be an amount equal to 5% of the amount by which FY18 Bookings exceeds $18 million. For the avoidance of doubt and notwithstanding the date of this letter, the FY18 Earnout Bonus pursuant to this letter shall not duplicate any FY18 Earnout Bonus paid or payable under the Prior A&R Earnout Letter. The FY19 Earnout Bonus shall be an amount equal to 11% of the amount by which FY19 Bookings exceeds $21 million.

For purposes of calculating the Earnout Bonuses, the following capitalized terms shall have the meanings set forth below. For the avoidance of doubt, the definitions set forth below apply only to the calculation of Earnout Bonuses pursuant to this letter and shall have no effect on, nor shall they be affected by any contrary or conflicting terms or definitions in the Birst 2017 Sales Compensation Plan or any alternate or successor sales compensation plan in which you may participate.

> "***Annual Contract Value***" or "***ACV***" means the total amount of subscription fees applicable to Birst Offerings payable under a contract, divided by the term of the subscription in years (e.g. $300,000 total subscription fees for a 3 year subscription results in an ACV of $100,000)

INvPSG00045112

*"Allowed Attrition"* means, for any fiscal year, an amount equal 20% of the Year End Subscription Revenue Run Rate for all customers subscribing to the Birst Offerings for the immediately preceding fiscal year.

*"Attrition"* means the ACV of all reductions to previously contracted subscription fees for Birst Offerings determined on a customer by customer basis for the applicable fiscal year.

*"Birst Offerings"* shall mean any and all products or services offered, licensed, provided, sold, distributed or otherwise exploited by Birst at the time of the Acquisition and any and all products or services already designed and developed by or for Birst at the time of the Acquisition, including all versions and releases of the foregoing, together with any related user documentation.

*"Booking"* means ACV from subscriptions to the Birst Offerings that are Contracted in the applicable fiscal year.  The amount of any Booking shall include only that portion of the subscription fees payable under a contract that are attributable to the Birst Offerings. If Birst Offerings are sold bundled or in combination with other products or services offered by Infor, the subscription revenue for purposes hereof shall be deemed to be the list price of the Birst Offerings as if the Birst Offerings had been sold individually; provided however, that if Birst Offerings are sold bundled with other products or services offered by Infor where a discount was applied to such sale, the aggregate discount on such sale shall be applied pro rata to each product in such sale, including the applicable Birst Offerings, in accordance with each such product's list price.  Bookings associated with existing customers shall include only the amount of incremental subscription fees (i.e. exclude any amounts representing renewal of prior subscriptions).

*"Contracted"* means that the written contract or order forms have been duly executed by all parties and subscription revenue recognition in accordance with GAAP and Infor's revenue recognition policies has commenced.

*"FY17"* means the fiscal year ending April 30, 2017

*"FY18"* means Infor's fiscal year ending April 30, 2018

*"FY19"* means Infor's fiscal year ending April 30, 2019

*"FY18 Bookings"* means the Bookings for FY18 <u>minus</u> any excess of Attrition over Allowed Attrition for FY18.

*"FY19 Bookings"* means the Bookings for FY19 <u>minus</u> any excess of Attrition over Allowed Attrition for FY18.

*"Year End Subscription Revenue Run-Rate"* means, for any fiscal year, the amount of net revenue (as defined by and determined in accordance with GAAP and Infor's revenue recognition policies) from the sale of the Birst Offerings attributed to the last full month of the fiscal year, multiplied by twelve (12).

By way of example and in no way guaranteeing the amount of any Earnout Bonus, in the event that:

Bookings = $25 million,

FY17 Year End Subscription Revenue Run Rate = $41M

Allowed Attrition (20%) = $8.2M

Attrition = $12M

FY18 Bookings = $25M Bookings − ($12M Attrition − $8.2 Allowed Attrition)

= $25M - $3.8M

= $21.2M

FY18 Bookings exceeds $18M by $3.2M

The FY18 Earnout Bonus amount would be $160,000 (i.e. $3.2 million excess x 0.05).

For the avoidance of doubt, there is no guarantee that the performance of the business acquired in the Acquisition will result in any minimum Earnout Bonus. If the calculation of the Earnout Bonus as described in this letter does not yield a positive amount, no Earnout Bonus will be payable to you.

This letter shall not be construed as an agreement, either express or implied, to employ you for any stated term. At all times during your employment with Infor your employment shall remain subject to Infor's policy of employment and local employment laws. In the event that you are no longer employed by Infor at the end of the relevant fiscal year, no Earnout Bonus shall be payable, in whole or in part, regardless of the circumstances under which employment was terminated. Nothing in this letter shall be construed as an agreement, either express or implied, to pay you any compensation or grant you any benefit beyond the end of your employment with Infor.

By signing and returning this letter, you acknowledge and agree to all terms and conditions hereof. Any modification to this letter will not be effective unless in a writing that is signed by both you and a duly authorized representative of Infor.

Please scan and email signed letter to Louise.whitehouse@infor.com and mail signed letter to Infor, One Central Boulevard, Blyth Valley Business Park, Solihull, B90 8BG:

Yours Sincerely

Louise Whitehouse
Senior HR Manager UK, Ireland, MEA & Russia

---

I have read and understood the terms regarding the Earnout Bonus.

Signature: _____

Printed Name: ____DAVID GRAY_____

Date: _____02 / 08 / 18_____

Second Amended and Restated Birst Earnout Bonus – D Gray
25Jul2018

3

CONFIDENTIAL

# Exhibit B

CONFIDENTIAL



641 Avenue of the Americas
New York, NY 10011
800-260-2640
infor.com

December 2, 2019

VIA EMAIL: dave68_gray@hotmail.com

Mr. David Gray
Wren House
Shacklestead Lane
Goldaming, SURREY GU7 1RP
United Kingdom

Re:  Birst Earnout Bonus

Dear David:

Reference is made to that certain letter dated July 25, 2018 regarding Second Amended and Restated Earnout Bonus Eligibility in connection with Infor's acquisition of Birst, Inc. (the "Offer Letter").  The Offer Letter provides for payment of an Earnout Bonus based on the growth of the Birst business during Infor's fiscal year ended April 30, 2019. This letter sets out Infor's calculation of FY19 Bookings in accordance with the Offer Letter.  Capitalized terms used but not otherwise defined in this letter shall have the meanings given to such terms in the Offer Letter.

In accordance with the calculations set out the Offer Letter,  Infor has determined the FY19 Bookings to be $22,757,872.  Enclosed with the email distribution of this letter is an Excel file with the filename ***Birst FY19 Bookings.xlsx*** (the "Bookings File") which includes the details of all transactions included in Bookings for FY19.

FY19 Bookings was determined as follows:

1) Bookings for FY19 in the amount of $22,757,872 consisted of three sets of transactions Contracted in FY19 and resulting in revenue recognition in accordance with GAAP and Infor's revenue recognition policies:

   a) $2,541,307 ACV from sales of licenses to the Birst Virtual Appliance offerings delivered on-premises on a perpetual or term license basis.  The detailed transactions included are listed in the *Appliance* tab of the Bookings File;

   b) $6,011,192 ACV from subscriptions to the Birst Offerings sold on a stand-alone basis. The detailed transactions included are listed in the *Stand-Alone* tab of the Bookings File; and

   c) $14,205,373 in adjusted ACV from subscriptions Birst Offerings in which the Birst Offerings were sold bundled or in combination with other products or services offered by Infor. The adjusted ACV amount included in Bookings was determined by applying the aggregate discount on such sale pro rata to each product in such sale, including the applicable Birst Offerings, in accordance with each such product's list price.  The detailed transactions included are listed in the *Multi-Product* tab of the Bookings File.

INvPSG00045116

December 2, 2019
Mr. David Gray
Re:  Birst Earnout Bonus
Page 2

2)  Attrition of 19.8% was less than Allowed Attrition of 20% resulting in no adjustment to Bookings.

FY19 Bookings is therefore equal to Bookings for FY19 of $22,757,872 minus $0 excess Attrition.

FY19 Bookings of $22,757,872 exceeds the FY19 threshold amount of $21,000,000 by $1,757,872. Bonus-eligible FY19 Bookings of $1,757,872, when multiplied by the Earnout Bonus percentage for FY19 of 11% set forth in the Offer Letter, yields an FY19 Earnout Bonus of $193,365.90 payable to you subject to applicable withholdings.

   Please kindly review the calculations set forth above and the contents of the Bookings File. If you dispute any component of the FY19 Bookings, please deliver a written response to my attention within ten business days of the delivery of this letter.   Should you have any questions or concerns, please kindly direct them to my attention via email to kevin.taylor@infor.com or contact me directly by phone at +1 267-422-4897.

Sincerely,

Kevin J. Taylor
Associate General Counsel

Enclosure:  Birst FY19 Bookings.xlsx

cc:     A. Benedict
        W. Blotner
        G. Giangiordano

**EXHIBIT 22**



**KEKER**
**VAN NEST**
**& PETERS**

Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
415 391 5400
keker.com

**R. James Slaughter**
(415) 391-5400
rslaughter@keker.com

May 15, 2020

**VIA EMAIL**

Mr. Paul Staelin c/o Avi Lipman
McNaul Ebel Nawrot & Helgren
600 University Street, Suite 2700
Seattle, WA 98101-3143
alipman@mcnaul.com

Re:    Fiscal Year 2019 Earnout Bonus

Dear Mr. Staelin:

I write regarding the Earnout Bonus that you received from Infor (US), Inc. based on the growth of the Birst business during Infor's fiscal year 2019 ("FY 19"). Upon review, we have determined that you were not entitled to receive an Earnout Bonus for FY 19. Accordingly, please immediately return to Infor the FY 19 Earnout Bonus that you received in the amount of $140,629.74.

I am available to provide wiring instructions at your convenience. You may also send a check to my attention at the address listed above. If you fail to return by May 19, 2020 the $140,629.74 payment that you received, you will wrongfully and willfully be withholding Infor's property in violation of law. Infor is prepared and intends to pursue all appropriate legal remedies.

**I.     Background**

Infor acquired Birst in or around May 2017. You received an employment offer in connection with Infor's acquisition of Birst. Your Offer Letter—dated May 30, 2017—stated that you were eligible to receive an Earnout Bonus based on the growth of the Birst business during FY 19, subject to the terms and conditions of the Offer Letter. *See* **Exhibit A**. Your Offer Letter further stated that "[t]he FY19 Earnout Bonus," if any, "shall be an amount equal to 8% of the amount by which FY 19 Bookings exceeds $21 million." *See id.* at 2.

By letter dated December 2, 2019, Infor set forth its calculation of FY 19 Bookings. *See* **Exhibit B**. Infor enclosed with its communication a Microsoft Excel file that detailed all transactions that were included in its FY 19 Bookings calculation. Infor determined FY19

1383960

INvPSG00045118

May 15, 2020
Page 2

Bookings to be $22,757,872, resulting in an Earnout Bonus payment to you in the amount of $140,629.74. *See id.* at 2. Infor subsequently transmitted $140,629.74 to you on December 31, 2019.[1]

## II.   Revised calculation of FY 19 Bookings

Upon review, Infor has determined that its December 2, 2019 calculation of FY 19 Bookings inadvertently included certain transactions that closed in fiscal year 2020 ("FY 20"), rather than FY 19. Under Infor's revised analysis, FY 19 Bookings did not exceed the $21 million threshold required to trigger an FY 19 Earnout Bonus payment to you. Given that you were not entitled to receive an Earnout Bonus for FY 19, you were overpaid in the amount of $140,629.74. You have no right to retain that property because you were not actually entitled to receive an FY 19 Earnout Bonus payment under the terms of your Offer Letter.

Infor demands that you return your FY 19 Earnout Bonus Payment—$140,629.74— immediately to Infor. Infor does not consent to your retention of its $140,629.74 payment. If you fail to return the $140,629.74 payment that you received, you will wrongfully and willfully be withholding Infor's property in violation of law.

* * *

Infor is prepared and intends to pursue all appropriate legal remedies. If Infor is forced to file suit, it will seek damages, pre- and post-judgment interest, and an order requiring you to pay for Infor's costs and fees, including its attorneys' fees.

If you have any questions or concerns, please kindly direct them to my attention via email to rslaughter@keker.com or contact me by telephone at +1 415-391-5400.

Sincerely,

KEKER, VAN NEST & PETERS LLP

R. James Slaughter

---

[1] This amount was subject to applicable withholdings.

1383960

CONFIDENTIAL                                                                                                    INvPSG00045119

# Exhibit A

CONFIDENTIAL



641 Avenue of the Americas
New York, NY 10011
800-260-2640
infor.com

May 30, 2017

Paul Staelin
1 Lost Valley Ct
Orinda, CA 95463

                    Re: Employment offer in connection with the acquisition of Birst, Inc.

Dear Paul,

In connection with the anticipated acquisition of Birst, Inc. and its subsidiaries (collectively, "Birst") by Infor (US), Inc. (collectively with its affiliates and subsidiaries, "Infor") in a merger transaction pursuant to which Birst will become a wholly owned subsidiary of Infor (such transaction referred to herein as the "Acquisition"), this letter sets forth the terms of your employment with Infor beginning on the calendar day immediately following the closing of the Acquisition.

Provided that you sign and deliver this letter as instructed below, subject to the consummation of the Acquistion and the other conditions set forth below, your employment under the terms of this letter will begin on the calendar day immediately after the Acquisition becomes effective (or such later date as you sign and deliver this letter to Infor). You will initially remain employed by Birst, provided that Infor reserves its right to transfer your employment to another Infor entity.

<u>Position</u>: The title of your position will be SVP Customer Success, BI & Analytics, Birst. In this position you will report to Brad Peters, SVP BI and Analytics, Birst.

<u>Compensation</u>: Your annual base salary will be $250,000 subject to applicable withholdings, payable semi-monthly and in accordance with Infor's normal payroll procedures. In addition to your base salary you will be eligible for a management bonus of up to $70,000 (on a full year basis) based on the achievement of agreed upon business objectives during the applicable fiscal year. Such bonus will be payable after the end of Infor's fiscal year, promptly following completion of Infor's financial audit with respect to such fiscal year and in no event later than December 31 of the same calendar year (e.g., the bonus payment for the 2018 fiscal year will be made no later than December 31, 2018). Infor's 2018 fiscal Year ("FY18") ends April 30, 2018 and any amount payable for FY18 may be prorated to reflect the partial year resulting from the timing of the Acquisition.

<u>Ongoing Equity Awards</u>. You will be eligible to receive periodic Infor equity grants following the Acquisition that are provided to similarly situated Infor executives.

<u>Retention Bonuses</u>: You will be eligible to receive a one-time retention bonus in the amount of $1,153,625.50, subject to applicable withholdings (the "First Retention Bonus"), provided that you remain continuously employed by Infor through the date that is six (6) months after the closing of the Acquisition (the "First Retention Bonus Date"). You will no longer be eligible for the First Retention Bonus if you voluntarily resign your employment or if your employment is terminated by Infor for Cause (defined below) prior to the First Retention Bonus Date. The First Retention Bonus will be paid to you in the event that your employment is terminated by Infor without Cause before the First Retention Bonus Date or in the event of your death before the First Retention Bonus Date.

You will be eligible to receive a second one-time retention bonus in the amount of $1,153,625.50, subject to applicable withholdings (the "Second Retention Bonus"), provided

CONFIDENTIAL

that you remain continuously employed by Infor through the date that is twelve (12) months after the closing of the Acquisition (the "Second Retention Bonus Date"). You will no longer be eligible for the Second Retention Bonus if you voluntarily resign your employment or if your employment is terminated by Infor for Cause prior to the Second Retention Bonus Date. The Second Retention Bonus will be paid to you in the event that your employment is terminated by Infor without Cause before the Second Retention Bonus Date or in the event of your death before the Second Retention Bonus Date.

You will be eligible to receive a third one-time retention bonus in the amount of $2,307,250.00, subject to applicable withholdings (the "Third Retention Bonus"), provided that you remain continuously employed by Infor through the date that is twenty four (24) months after the closing of the Acquisition (the "Third Retention Bonus Date"). You will no longer be eligible for the Third Retention Bonus if you voluntarily resign your employment or if your employment is terminated by Infor for Cause prior to the Third Retention Bonus Date. The Third Retention Bonus will be paid to you in the event that your employment is terminated by Infor without Cause before the Third Retention Bonus Date or in the event of your death before the Third Retention Bonus Date.

For purposes of this letter, "Cause" means (i) the conviction of, or a plea of plea of nolo contendere to any charge of a felony or any act of fraud or any act or omission involving dishonesty, or material disloyalty with respect to Infor, or any of its customers or suppliers or other material business relations, (ii) misconduct subjecting Infor to public disgrace or disrepute, (iii) failure or refusal to perform duties as reasonably directed by Infor, following written notice of same and a meaningful opportunity to cure, (iv) gross negligence or willful misconduct, (v) use of illegal drugs or abuse of other drugs or excessive consumption of alcohol interfering with the performance of your duties to Infor, or (vi) any material breach by you of any agreement between you and Infor, including without limitation, your breach of any provision of any nondisclosure, non-competition, trade secret protection or developments agreement.

In the event that the First Retention Bonus, Second Retention Bonus and/or the Third Retention Bonus becomes payable, it will be paid to you in the first regularly scheduled payroll following the date that the applicable bonus becomes payable. In no event will the First Retention Bonus, Second Retention Bonus or the Third Retention Bonus be subject to proration or other partial payment.

<u>Earnout Bonuses:</u> You will be eligible to receive an earnout bonus based on the growth of the business acquired in the Acquisition during each of FY18 and FY19 (each an "Earnout Bonus" and together the "Earnout Bonuses"). The Earnout Bonuses (if any) will be payable after the end of the applicable fiscal year, promptly following completion of Infor's financial audit with respect to such fiscal year and in no event later than December 31 of the same calendar year (*i.e.*, the Earnout Bonus for FY18 (if any) will be paid no later than December 31, 2018, and the Earnout Bonus for FY19 (if any) will be paid no later than December 31, 2019).

The FY18 Earnout Bonus shall be an amount equal to 11% of the amount by which FY18 Bookings exceeds $18 million. The FY19 Earnout Bonus shall be an amount equal to 8% of the amount by which FY19 Bookings exceeds $21 million.

For purposes of calculating the Earnout Bonuses, the following capitalized terms shall have the meanings set forth below:

> "**Annual Contract Value**" or "**ACV**" means the total amount of subscription fees applicable to Birst Offerings payable under a contract, divided by the term of the subscription in years (e.g. $300,000 total subscription fees for a 3 year subscription results in an ACV of $100,000)

*"Allowed Attrition"* means, for any fiscal year, an amount equal 20% of the Year End Subscription Revenue Run Rate for all customers subscribing to the Birst Offerings for the immediately preceding fiscal year.

*"Attrition"* means the ACV of all reductions to previously contracted subscription fees for Birst Offerings determined on a customer by customer for the applicable fiscal year.

*"Birst Offerings"* shall mean any and all products or services offered, licensed, provided, sold, distributed or otherwise exploited by Birst at the time of the Acquisition and any and all products or services already designed and developed by or for Birst at the time of the Acquisition, including all versions and releases of the foregoing, together with any related user documentation.

*"Booking"* means ACV from subscriptions to the Birst Offerings that are Contracted in the applicable fiscal year. The amount of any Booking shall include only that portion of the subscription fees payable under a contract that are attributable to the Birst Offerings. If Birst Offerings are sold bundled or in combination with other products or services offered by Infor, the subscription revenue for purposes hereof shall be deemed to be the list price of the Birst Offerings as if the Birst Offerings had been sold individually; provided however, that if Birst Offerings are sold bundled with other products or services offered by Infor where a discount was applied to such sale, the aggregate discount on such sale shall be applied pro rata to each product in such sale, including the applicable Birst Offerings, in accordance with each such product's list price. Bookings associated with existing customers shall include only the amount of incremental subscription fees (i.e. exclude any amounts representing renewal of prior subscriptions).

*"Contracted"* means that the written contract or order forms have been duly executed by all parties and subscription revenue recognition in accordance with GAAP and Infor's revenue recognition policies has commenced.

*"FY17"* means the fiscal year ending April 30, 2017

*"FY18"* means Infor's fiscal year ending April 30, 2018

"*FY19*" means Infor's fiscal year ending April 30, 2019

"*FY18 Bookings*" means the Bookings for FY18 underline(minus) any excess of Attrition over Allowed Attrition for FY18.

"*FY19 Bookings*" means the Bookings for FY19 underline(minus) any excess of Attrition over Allowed Attrition for FY18.

*"Year End Subscription Revenue Run-Rate"* means, for any fiscal year, the amount of net revenue (as defined by and determined in accordance with GAAP and Infor's revenue recognition policies) from the sale of the Birst Offerings attributed to the last full month of the fiscal year, multiplied by twelve (12).

By way of example and in no way guaranteeing the amount of any Earnout Bonus, in the event that:

Bookings = $25 million,

FY17 Year End Subscription Revenue Run Rate = $41M

Allowed Attrition (20%) = $8.2M

CONFIDENTIAL

Attrition = $12M

FY18 Bookings = $25M Bookings − ($12M Attrition − $8.2 Allowed Attrition)

$$= \$25M - \$3.8M$$

$$= \$21.2M$$

FY18 Bookings exceeds by $18M by $3.2M

The FY18 Earnout Bonus amount would be $352,000 (i.e. $3.2 million excess x 0.11).

For the avoidance of doubt, in the event that you are no longer employed by Infor at the end of the relevant fiscal year, no Earnout Bonus shall be payable, in whole or in part, regardless of the circumstances under which employment was terminated.

Benefits:  You will continue to be eligible for all employment benefits as generally offered to employees of Birst who remain employed with Infor following the Acquisition.   Your participation in all such employee benefit plans is subject to the terms of such plans, as they may be modified from time-to-time including by transition to the benefits generally offered to employees of Infor.

At-Will Employment:  Your employment shall be considered at all times to be on an "at-will" basis.  This means either you or Infor may terminate your employment at any time, with or without notice, and for any or no reason.  In addition, nothing in this letter summarizing your prospective employment terms shall constitute or be construed as a guarantee of employment for any definite period of time or a contract of employment.  By signing this letter as instructed below, you acknowledge and agree that any prior employment agreement, severance arrangements or terms and conditions of employment between Birst and you (the "Birst Employment Agreement") shall terminate and be of no further force or effect immediately upon the consummation of the Acquisition and that neither Birst nor Infor shall owe any further obligation to you (including, without limitation, any severance or termination payment) under such Birst Employment Agreement.

Infor may modify its policies and practices, including the compensation and benefits it provides from time to time, as it deems necessary; provided that such modifications shall not alter or amend the Compensation, Earnout Bonuses or Retention Bonuses specified in this letter.  However, the at-will nature of your employment may be modified only by a written agreement signed by both you and Infor.

Nondisclosure, Noncompetition and Developments Agreement: It is also a condition of your prospective employment that, prior to the commencement of  employment with Infor, you must sign Infor's Nondisclosure, Noncompetition and Developments Agreement, which contains additional requirements for the protection of Infor's trade secret, confidential and proprietary information, protections pertaining to Infor's business relationships, as well as an assignment to Infor of the ideas, concepts and other intellectual property that you create during your employment.

Immigration:  For purposes of United States' immigration law, you will be required to provide to Infor documentary evidence of your identity and eligibility for employment in the United States.  Such documentation must be provided to us within three (3) business days of your start date.

No Employment-Related Claims: You hereby confirm that you have no claims for unpaid wages or other employment-related remuneration against Birst other than for your regular salary for the current pay period as of the effective time of the Acquisition.  As a condition of

CONFIDENTIAL

accepting employment with Infor and by signing below, you confirm your agreement not to make any claim against Infor or any of its past, present or future affiliated companies for any employment-related matters arising from or in any way related to events that occurred prior to the date on which you countersign this letter, including without limitation, any claims for wages earned prior to commencing employment with Infor; provided that the foregoing agreement specifically excludes (i) any rights you may have in your capacity as a security holder of Birst in connection with the Acquisition; and (ii) any rights to indemnification or exculpation from Birst that you may have in your capacity as a former officer or director of Birst. You also confirm your permission for Birst to provide, and for Infor to receive and maintain copies of your employment records, personnel file and any other materials and information related to your employment with Birst.

Your signature below will acknowledge your understanding and agreement to the terms and conditions set forth in this letter. These terms supersede any other agreements (including, without limitation the Prior Agreement) or promises made to you by anyone affiliated with Infor, whether oral or written. Infor reserves the right to withdraw these terms without further notice if they are not timely accepted by you or if any aspect (e.g. job references, education, proof of citizenship, etc.) of your qualifications cannot be verified and these terms shall only become valid upon Infor's final acceptance of this letter, signed by you.

Should you have any questions regarding this letter, please call me at 718-501-3320.

Welcome to Infor we look forward to having you as part of the team!

Sincerely,

Anne Benedict
SVP, Talent

CONFIDENTIAL

INvPSG00045125

ACKNOWLEDGEMENT AND ACCEPTANCE:

The undersigned Paul Staelin acknowledges receipt of the foregoing letter setting forth the terms of Infor's offer of employment. The undersigned accepts such offer subject to the terms of the letter and agrees to its terms, including, without limitation the termination of the Birst Employment Agreement.

Accepted: _____     May 30, 2017
          Paul Staelin                        _____
                                              Date

CONFIDENTIAL

INvPSG00045126

# Exhibit B

CONFIDENTIAL
INvPSG00045127



641 Avenue of the Americas
New York, NY 10011
800-260-2640
infor.com

December 2, 2019

VIA EMAIL: pstaelin@gmail.com

Mr. Paul Staelin
1 Lost Valley Ct.
Orinda, CA 94563

       Re:  Birst Earnout Bonus

Dear Paul:

     Reference is made to your employment offer in connection with Infor's acquisition of Birst, Inc. dated May 30, 2017  (the "Offer Letter").  The Offer Letter provides for payment of an Earnout Bonus based on the growth of the Birst business during Infor's fiscal year ended April 30, 2019. This letter sets out Infor's calculation of FY19 Bookings in accordance with the Offer Letter. Capitalized terms used but not otherwise defined in this letter shall have the meanings given to such terms in the Offer Letter.

     In accordance with the calculations set out the Offer Letter,  Infor has determined the FY19 Bookings to be $22,757,872.  Enclosed with the email distribution of this letter is an Excel file with the filename *Birst FY19 Bookings.xlsx* (the "Bookings File") which includes the details of all transactions included in Bookings for FY19.

     FY19 Bookings was determined as follows:

1) Bookings for FY19 in the amount of $22,757,872 consisted of three sets of transactions Contracted in FY19 and resulting in revenue recognition in accordance with GAAP and Infor's revenue recognition policies:

   a) $2,541,307 ACV from sales of licenses to the Birst Virtual Appliance offerings delivered on-premises on a perpetual or term license basis. The detailed transactions included are listed in the *Appliance* tab of the Bookings File;

   b) $6,011,192 ACV from subscriptions to the Birst Offerings sold on a stand-alone basis. The detailed transactions included are listed in the *Stand-Alone* tab of the Bookings File; and

   c) $14,205,373 in adjusted ACV from subscriptions Birst Offerings in which the Birst Offerings were sold bundled or in combination with other products or services offered by Infor. The adjusted ACV amount included in Bookings was determined by applying the aggregate discount on such sale pro rata to each product in such sale, including the applicable Birst Offerings, in accordance with each such product's list price. The detailed transactions included are listed in the *Multi-Product* tab of the Bookings File.

2) Attrition of 19.8% was less than Allowed Attrition of 20% resulting in no adjustment to Bookings.

CONFIDENTIAL

December 2, 2019
Mr. Paul Staelin
Re:  Birst Earnout Bonus
Page 2

FY19 Bookings is therefore equal to Bookings for FY19 of $22,757,872 minus $0 excess Attrition.

FY19 Bookings of $22,757,872 exceeds the FY19 threshold amount of $21,000,000 by $1,757,872. Bonus-eligible FY19 Bookings of $1,757,872, when multiplied by the Earnout Bonus percentage for FY19 of 8% set forth in the Offer Letter, yields an FY19 Earnout Bonus of $140,629.74 payable to you subject to applicable withholdings.

Please kindly review the calculations set forth above and the contents of the Bookings File. If you dispute any component of the FY19 Bookings, please deliver a written response to my attention within ten business days of the delivery of this letter.   Should you have any questions or concerns, please kindly direct them to my attention via email to kevin.taylor@infor.com or contact me directly by phone at +1 267-422-4897.

Sincerely,

Kevin J. Taylor
Associate General Counsel

Enclosure:  Birst FY19 Bookings.xlsx

cc:     A. Benedict
         W. Blotner
         G. Giangiordano

                                                                          INvPSG00045129

# EXHIBIT 23

EXECUTION VERSION
CONFIDENTIAL

AGREEMENT AND PLAN OF MERGER

AMONG

INFOR (US), INC.

BLITZ ACQUISITION CORP.,

BIRST, INC.,

AND

FORTIS ADVISORS LLC, AS THE REPRESENTATIVE,

DATED APRIL 25, 2017

**CONFIDENTIAL**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**PARENT**

**INFOR (US), INC.**

By: _____
Name: Gregory M. Giangiordano
Title: President

**MERGER SUB**

**BLITZ ACQUISITION CORP.**

By: _____
Name: Gregory M. Giangiordano
Title: President

**COMPANY**

**BIRST, INC.**

By:_____*James B. Larson*_____
Name: James B. Larson
Title: CEO

**REPRESENTATIVE**

**FORTIS ADVISORS LLC**

By:_____
Name: Ryan Simkin
Title: Managing Director

[SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER]